**<u>Sheet A</u>**

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **Brian D. Blankenship** | ) | |
|   Plaintiff, | ) | Case Number: 23-CV-0867 (Amended) |
|   v | ) | Judge Martha M. Pacold |
| | ) | Magistrate Judge Maria Valdez |
| **Outer Banks Capital, Inc.** | ) | |
| Attention: ANDREW GIRARD, Agent | ) | |
| 1464 W WEBSTER AVE | ) | |
| CHICAGO, IL 60614 | ) | |
| | ) | |
| **Westward360, Inc** d/b/a Westward360 GC, | ) | |
| Westward360 PC, Westward360 PROS | ) | |
| Attention: David Westveer, Agent | ) | |
| 1464 W WEBSTER AVE | ) | |
| CHICAGO, IL 60614 | ) | |
| | ) | |
| **Nathan J. Brown**, individually and personally | ) | |
| 711 North Ivy Lane | ) | |
| Glencoe, IL 60022 | ) | |
| | ) | |
| **Brent R. Straitiff**, individually and personally | ) | |
| 2116 Thornwood Avenue | ) | |
| Wilmette, IL 60091 | ) | |
| | ) | |
| **Ann Marie Reilly** also known as Ann Schenk, | ) | |
| individually and personally | ) | |
| 3750 West School Street, Apartment 1 | ) | |
| Chicago, IL 60618 | ) | |

  Defendants.

02/23/2023

## COMPLAINT (AMENDED)

Brian D. Blankenship **("Complainant" or "Plaintiff" or "Blankenship", or "Employee")** files this employment related action for violation of the Plaintiff's civil rights and other applicable rights by his former employer, Outer Banks Capital, Inc. **("Company" or "Employer" or "Respondent")** and Westward360, Inc. d/b/a Westward360 GC, Westward360 PC, Westward360 PROS and Nathan Brown, individually and personally; and Brent R Straitiff; individually and personally, and Ann Marie Reilly aka Ann Schenk, individually and personally (collectively **"Defendants")**,  This action seeks (1) permission to file late and (2) declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' sex discrimination, sexual harassment and retaliation negatively impacting Plaintiff.

## JURISDICTION

1. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §1391(b) and supplemental jurisdiction based on 28 U.S.C. §1367(a), 775 ILCS 5/1-101, et seq., 820 ILCS 115/1, et seq., 820 ILCS 115/1, et seq., 29 CFR Part 1984, and related state law tort claims.

2. Venue is appropriate insofar as Defendant operates and transacts business in this judicial district and the events giving rise to Plaintiff's. claims occurred within this District.

3. Plaintiff was employed by Defendant as an "employee" within the meaning of 42 U.S.C. § 2000e(f).

4. During the applicable limitations period, Defendant has had at least fifteen employees, has been an "employer" as defined by Title VII, and has been engaged in an industry affecting commerce within the meaning of Title VII, 42 U.S.C. § 2000e(b).

## NATURE OF PLAINTIFF'S CLAIMS

Plaintiff was formerly employed as Vice President, Business Development at Employer from July 14, 2021 to December 2, 2021.  At all times relevant to the allegations herein, Plaintiff

met the legitimate work performance expectations of Defendant. He brings this action to enforce the provisions of Title VII of the Civil Rights Act of 1964 **("Title VII")** 42 U.S.C.§ 2000e et seq., as amended, the Illinois Human Rights Act **("IHRA")**, 755 ILCS 5/2 et seq. and others. Beginning in August 2021, Plaintiff was discriminated against for his sex, gender, and sexual orientation and harassed. Defendant unlawfully terminated Plaintiff in retaliation of reporting discrimination, harassment, and retaliation he was exposed to by others in the Company. The Defendant was negligent in their duty to care.

The Defendant failed to take any prompt and appropriate action to address the reported complaints which led to a hostile working environment. Plaintiff experienced discrimination and harassment that led to various forms of retaliation that was continuous and persistent, had the effect of creating a hostile and intimidating work environment, and adversely affected the terms and conditions of Plaintiff's employment and interfered with his ability to do his job. These retaliatory actions include, but are not limited to:

1. Threats designed to shut Blankenship up and "stop rocking the boat" or expose his sexual orientation would be exposed if he failed to comply with a Board member demand.
2. Added responsibilities to the role that exceeded the full-time hours.
3. Derogatory comments along with ostracized and mocking conduct.
4. Increased scrutiny, unfair criticalness and held to different standards than peers.
5. Effectively reducing compensation with the deferral of new business responsibilities
6. Removed job responsibilities and re-assigned tasks designed to demote and reduce authority.
7. Assigned new job duties that were inconvenient, burdensome, and below the "pay grade level" he was hired.
8. Direct supervisor's attempt to alter and control Blankenship's work schedule while hundreds of other employees are given autonomy with their schedule.
9. Denial of group Company benefits when eligible.
10. Instructed to carry out commands that are illegal or that they reasonably believe to be discriminatory.
11. Creating a hostile work environment through derogatory comments, micromanaging, and other forms of harassment that became so severe and pervasive the hostile work environment caused tremendous stress, lack of motivation, and mental health decline.

Then, when Plaintiff identified fraudulent activity and questionable accounting functions, Defendant terminated Plaintiff three (3) hours after presenting the findings to his direct supervisor

---

(whistleblowing) on December 2, 2021. Plaintiff was a protected employee at the time of termination as a result of his reported discrimination and harassment as early as August 13, 2021.

Defendant's actions constituted sex discrimination, sexual harassment, and retaliation in violation of Title VII, IHRA, 42 USC Section 1981, Illinois Whistleblower Act, Section 1558 of the Patient Protection and Affordable Care Act **("ACA")** and Illinois common law. The Defendant exercised an adverse action by terminating Plaintiff's employment on December 2, 2021. Defendant's unlawful termination was the result of reporting discrimination, sexual harassment, sexual orientation harassment, unfair and inconsistent treatment, fraudulent accounts payable scheme, undisclosed and unlawful profit centers, identification of improper accounting functions, unethical and unlawful business solicitation requirements, and financial report manipulations that Plaintiff had the reasonable good faith belief were unethical and/or unlawful. The Defendant has provided multiple versions to multiple parties and agencies trying to explain the reason for Plaintiff's termination. Plaintiff seeks relief as set forth below

### **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

All conditions precedent to jurisdiction under § 706 of Title VII, 42 U.S.C. §2000e5, have occurred or been complied with except for the timely filing of this lawsuit for which Plaintiff is requesting the doctrine of equitable polling be granted. See Equitable Tolling Request for Late Filing. .

A charge of employment discrimination on basis of sex and retaliatory discharge was filed by the Plaintiff with the Equal Employment Opportunity Commission ("EEOC") (Attached hereto as **"Exhibit C-2"**).

Notification of the Right to Sue was received from EEOC on or about September 28, 2022. (Attached hereto as **"Exhibit I-1"**).

This Complaint has not been filed within the 90 days of receipt of EEOC's Dismissal and Notice of the Right to Sue. See Equitable Tolling Request for Late Filing...

**PARTIES**

Plaintiff is a 49-year-old white male who, at all times material to the allegations in this Complaint, resides in Northbrook, Illinois (Cook County) and had an office address of 1464 W Webster St Chicago, Illinois (Cook County).

Plaintiff was unfairly and unjustifiably dismissed by Defendant on December 2, 2021. The ever shifting and expanding reason(s) cited for termination, which were provided to multiple agencies including U.S. Department of Labor **("DOL")**, Occupational Safety and Health Administration **("OSHA")**, Equal Opportunity Employment Commission **("EEOC"),** Illinois Department of Human Rights **("IDHR"),** Illinois Department of Employment Security **("IDES"),** and Illinois Department of Labor **("IDOL"),** are inaccurate, unjustifiable, and indefensible. The Employer was aware of Plaintiff's protected activities and chose the material adverse action to terminate Plaintiff's employment. They have tried to justify their retaliatory motive and the termination decision using shifting pretextual reasons that will not withstand the harsh scrutiny of a trial, jury, or judge.

Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission on May 12, 2022 **("Exhibit C-3").** Thereafter, the EEOC sent Plaintiff a Notice of Right to Sue, dated September 28, 2022, based upon said charge **("Exhibit I-1")**. Plaintiff did not file a complaint in a timely manner with this Court within 90 days of his receiving the Notice of Right to Sue. See Equitable Tolling Request for Late Filing.

Outer Banks Capital, Inc, an Illinois corporation **("Defendant")**, is a small conglomerate that owns multiple businesses, including Westward360, Inc. **("Westward360").** Westward360 is a company owned by Defendant. The corporate office is located at 1464 W Webster St Chicago, Illinois (Cook County). Westward360, was created in 2019 when the principals of Westward Management, Inc. (doing business as Westward Property Management) **("Westward")** and TriView Property and Investments, LLC (doing business as TriView Property Management, LLC)

("TriView") Brent Straitiff and Nathan Brown, respectively, agreed to merge their companies in 2019. Both Westward Property Management and TriView Property Management are Chicago-based companies that were formed in 2005.and began operations in 2005 in Chicago. The new, merged company, branded, and marketed as Westward360, focuses largely on community association management ("Condominium Association Management Division" or "CAM Division") and, residential property management of multifamily buildings and single-family owned condominiums and single-family homes ("Investment Division")[2]. The company's maintenance teams were merged into a new entity ("Westward360 PROs" or "Westward PROs") that offers clients and investors the convenience of in-house daily, recurring, preventive, and emergency maintenance services. And finally, Westward Management, Inc. consolidated its brokerage team with TriView to create a brokerage group with 30 to 50 real estate brokers (range due to seasonality and market conditions) ("Westward360 Realty").

The Company is led by Brent Straitiff, Chief Executive Officer and Chairman of the Board of Directors ("Straitiff"). Plaintiff reported directly to Straitiff. The seven-member Board of Directors[1] ("Board") includes the following members, who also hold a dual role in managing the businesses of Westward360:

1. Chief Executive Officer — Brent Straitiff
2. Chief Operating Officer — Travis Taylor
3. Chief Financial Officer — David Westveer
4. Chief Investment Officer — Nathan Brown
5. Chief Technology Officer — Brawley Reichman
6. Chief Marketing Officer — Patrick Gill[1] *(left organization in 2022)*
7. Chief Sales Officer — Ian Duni

Westward360 has no employees but has employees of Outer Banks Capital, Inc., and multiple instances of employing 1099 independent contractors as employees. Westward360 PROs is staffed by employees of Outer Banks Capital, Inc. plus a few 1099 "independent contractors". Westward360 Realty has only 1099 "independent contractors" in every role except for a photographer who is an employee of Outer Banks Capital, Inc. There are several employees of

Outer Banks Capital, Inc. with a State of Illinois real estate broker's license held by Westward360, a Licensed Real Estate Broker Corporation, as their Managing Broker. This group of employees also function as 1099 "independent contractors" for Westward360 Realty and not included as a Realty employee below.

| Outer Banks Capital, Inc. and Westward360, Inc. Employee Profile | Board | Corporate | CAM | Investments | PROs | Realty | TOTAL |
|---|---|---|---|---|---|---|---|
| Exempt [1] | 6 | 6 | 36 | 20 | 5 | 1 | 74 |
| Non-Exempt [2] | 0 | 5 | 5 | 15 | 42 | 0 | 67 |
| 1099 "Employee" [3] | 0 | 0 | 2 | 3 | 3 | 30 | 38 |
| Offshore [4] | 0 | 12 | 35 | 10 | 3 | 2 | 62 |
| TOTAL | 6 | 23 | 78 | 48 | 53 | 33 | 241 |

1-W2 employees; 2-W2 employees; 3-1099 independent contractors used as employees, 4-employed by third-party in Philippines

*Data as of September 2021

Brent Straitiff, LLC is an Illinois limited liability corporation that is controlled by Brent Straitiff. This company and Brent Straitiff, individually and personally, are Defendants and bear personal liability for select actions in violation of one of more Illinois common laws.

Nathan Brown, Inc. is an Illinois corporation that is controlled by Nathan Brown. This company and Nathaniel Brown, individually and personally, are Defendants and bear personal liability for select actions in violation of one of more Illinois common laws.

Ann Marie Taylor, individually and personally, is a Defendant with personal liability for select actions in violation of one of more Illinois common laws.

---

1 – The size of the Board has changed. Patrick Gill left the organization in 2022 and Westward360 has acquired several small companies. The net impact is one less Board Member, but an unknown number may have been added. As Chief Marketing Officer, Gill was responsible for corporate branding, digital marketing, promotions, marketing of each division, and other general marketing needs. As part of Plaintiff's hire, and detailed in the job description, he assumed all marketing-related responsibilities from Gill and management of the marketing department and staff. This transition was completed in September 2021.

2- Westward360 today includes the following acquisitions and mergers of peer companies Owl Management, Peak Properties' Condominium Association Division, community association managed portfolio of Pabcor Management, Community Association Management division of Cortland Properties, Howes Property Management, building better community management (BBCM), Rooftop Association Management, and others.

3- The Company operates or has operated as other entities, including Westward360, Inc.; Westward360 PC, Westward360 GC[4], Westward360 Pros[4], Westward360 Realty, Elevation Exterminating, LLC, Westward Insurance Services, Inc., Westward Properties, Westward Lending, Westward Residential Brokerage Corp., AJAX Construction, and others unknown to Plaintiff.

The Company and Westward360 were actively using several business names that were not registered in the State of Illinois for an extended period (years). It appears they agreed with the assessment made by the Plaintiff because in late 2022 several companies were registered with the State, including Westward360 GC and Westward360 Pros, as assumed business names under the Westward360, Inc. entity

## **EQUITABLE TOLLING REQUEST FOR LATE FILING**

Plaintiff requests the doctrine of equitable tolling be applied to excuse the failure to comply with the 90-day filing period granted by the U.S. Equal Employment Opportunity Commission (**"EEOC"**) on September 28, 2022 involving Charge # 440-2022-01739. The Charge is for employment-related discrimination, harassment and retaliation against his previous employer Westward 360 D/B/A Outerbanks Capital. The correct legal entity of the Employer is Outer Banks Capital, Inc.

Plaintiff acknowledges the 90-day filing period has expired but requests the Court grant equitable tolling because Plaintiff (a) has acted with reasonable diligence in pursuing his right to file during the initial 90-day filing period and (b) the series of extraordinary circumstances that occurred that contributed to this untimely filing. Because 42 U.S.C. § 2000e-5(e)(1)'s charge deadline is not a jurisdictional prerequisite, a plaintiff who files a charge with the EEOC after the statutory deadline may still sue in federal court if equitable tolling applies. *See Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch.,* 167 F.3d 1170, 1173-74 (7th Cir. 1999). The 90-day "Right to Sue" period may be reopened based on extraordinary circumstances, upon the Court's approval, but is subject to equitable tolling.[1] Three circumstances justify equitable tolling in discrimination cases: *"when a plaintiff exercising due diligence cannot within the statutory period obtain the information necessary to realize that []he has a claim, when a plaintiff makes a good faith error such as timely filing in the wrong court, or when the defendant prevents a plaintiff from filing within the statutory period." Porter v. New Age Servs. Corp.*, 463 F. App'x 582, 584 (7th Cir. 2012). Plaintiff argues the first and second circumstances apply to this case.

Plaintiff requests equitable tolling for attorney abandonment, inability to file within the statutory time frame, and the diligence, summarized below, put forth to preserve the rights afforded to him.

---

A detailed timeline of activity **("Timeline of Plaintiff's Diligence")** conducted by Plaintiff then follows. The Plaintiff should be entitled to equitable tolling because he has been pursuing his rights diligently and multiple extraordinary circumstances prevented timely filing.

EEOC Charge of Discrimination/Right to Sue Period

1. 90-day period of limitation set forth in 42 U.S.C. § 2000e-5(f)(1) begins to run on the date that the EEOC Determination and Notice of Rights letter **("Exhibit I-1"; "Determination Letter")** is actually received either by the claimant or by the attorney representing him in the Title VII action[2]. The Plaintiff received a Determination Letter on October 7, 2022, nine (9) days after the EEOC issued the Determination Letter.

   a. The EEOC issued the Determination Letter on September 28, 2022

   b. Plaintiff received a reminder email from the EEOC on October 6, 2022

   c. Plaintiff did not receive the Determination Letter until October 7, 2022.

   d. The EEOC access log provides proof that Plaintiff did not attempt to access the public portal between September 28, 2022 and October 7, 2022 **("Exhibit D-5").**

   e. Based on the date of the Determination Letter, this complaint is filed 44 days after the end of the statutory period.

|  | **Scenario A** |
| --- | --- |
| Determination Letter Dated | September 28, 2022 |
| Determination Letter "Received" | September 28, 2022 |
| 90-day Right to Sue Period Begins | September 28, 2022[3] |
| 90-day Right to Sue Period Ends | December 27, 2022 |
| Late Filing Date | February 10, 2023 |
| **Days Filed Late** | **44 Days** |

   f. See Agency Filings – EEOC, IDOL, IDHR - Equal Employment Opportunity Commission section for further detail about the EEOC Charge.

Extraordinary Events Prevented Timely Filing

Relief is requested and equitable tolling be granted for the following extraordinary events that occurred during the Right to Sue period causing Plaintiff's inability to file the lawsuit timely.

---

Blankenship vs. Outer Banks Capital, Inc.   23-CV-0867   Page 8

1. **Attorney Abandonment**.  Plaintiff was diligent about obtaining legal representation upon receipt of the Determination Letter. See Timeline of Plaintiff's Diligence for details about daily efforts.  However, the selected attorney negotiated with Plaintiff in bad faith and abandoned him at the last minute. Plaintiff ultimately lost 64 days as the attorney, Attorney D, went silent the day the final contract was to be provided.   Their office went unresponsive preventing Plaintiff from presenting his case effectively and timely.

   a.  As the Timeline of Plaintiff's Diligence indicates, Plaintiff initially interviewed four (4) attorneys between October 9, 2022 and October 30, 2022.  Two additional attorneys were contacted in January 2023.

   b.  Plaintiff selected Attorney D for representation on November 10, 2022

   c.  Between November 10, 2022 and December 5, 2022, Plaintiff provides Attorney D confidential case information while at the same time negotiating the terms of the fee structure and agreement.

   d.  All terms were agreed upon by both parties on December 6, 2022.  The penultimate version of the agreement is provided at **Exhibit JJ-1**.  Attorney D was to provide a final agreement for execution on December 8, 2022.

   e.  Attorney D did not provide the final agreement as expected on December 8, 2022.  All phone calls and emails went unanswered on December 8, 2022 and December 9, 2022. The parties spent significant resources finalizing an agreement including emails, video conferences, phone calls, and an on-site meeting.

   f.  On December 13, 2022, Plaintiff sends Attorney D a letter since contact attempts were unanswered.  The letter pleads with the attorney to maintain representation and the last minute withdrawal was unprofessional given the effort both sides put forth since October 30, 2022.

2. **Resources Exhausted**. Plaintiff exhausts options to gain representation after Attorney D departure and after the Right to Sue period ends.

    a. Plaintiff contacted Attorney A. Attorney A was unable to assist given case complexities and the limited time to file. Attorney A had limited availability between December 19, 2022 - December 26, 2022 due to Hanukkah.

    b. Plaintiff subscribes to on-demand online attorney services on two different applications on December 28, 2022 (avvo.com and justanswers.com) to get opinions given the situation.

    c. Plaintiff contacted two additional attorneys January 5 and 6, 2023

        i. Plaintiff contacts Attorney E via email to determine representation options. They responded the next day with no interest because of the late filing.

        ii. Plaintiff contacts Attorney F by phone and discusses the case. The attorney was reluctant to provide service but said he would consider an hourly rate arrangement, but the estimated cost was prohibitive for Plaintiff.

3. **Plaintiff Illness.** Plaintiff was unavailable for ten (10) days during the Right to Sue period due to medical issues that required multiple hospitalizations that were beyond his control as detailed on the Timeline of Plaintiff's Diligence.

    a. October 3, 2022 [One (1) Day]

        i. See **Exhibit M-4** for documentation.

    b. October 4, 2022 [One (1) Day]

        i. See **Exhibit M-5** for documentation.

    c. October 24, 2022 to October 27, 2022 [Four (4) Days]

        i. See **Exhibit M-6** for documentation.

    d. December 15, 2022 to December 17, 2022 [Three (3) Days]

        i. See **Exhibit M-3** for documentation.

e.  December 22, 2022 [One (1) Day]

   i.  See **Exhibit M-7** for documentation.

4.  **Mitigation Interview**.  Plaintiff has been diligent to mitigate damages by actively pursuing employment opportunities.  Plaintiff lost three (3) days when a job interview was required in an effort to mitigate damages.

a.  Plaintiff began pursuing an executive level position in his skilled area, property management and operations of self-storage assets, in March 2022.

b.  The company and position, Managing Director, are based in Denver, Colorado

c.  Plaintiff initially visited Denver, Colorado in May 2022.

d.  The Company ended discussions in July 2022 due to market concerns.

e.  The Company contacted Plaintiff in January 2023 to re-engage in employment discussions.

f.  Plaintiff traveled to Denver, Colorado January 15, 2023 to January 17, 2023 for a 2nd visit and market tour exploring housing options.

   i.  See **Exhibit M-2** for American Airlines receipt for documentation.

g.  As of the date of this filing, no job offer has been received.

5.  **Pro Se Support.**  Plaintiff ultimately decided to file Pro Se since he was unable to obtain replacement representation.  Those efforts began on December 18, 2022 and Plaintiff realized he needed assistance and direction.  After searching for resources on the district court webpage, Plaintiff contacted William J. Hibbler Memorial Pro Se Assistance for assistance on December 20, 2022.  The next day Hibbler notified Plaintiff there were no appointments remaining for December 2022 or January 2023 but later that day Hibbler contacted Plaintiff offering an appointment for January 27, 2023.  Plaintiff accepted and then confirmed the appointment on December 27, 2022 with Hibbler acknowledging on

January 3, 20232 **("Exhibit MM").** On January 27, 2023, Plaintiff has 45-minute session with a Hibbler attorney and presented the facts about the case.

   a. The attorney suggested filing the late complaint pro se, as soon as possible, and ask the Court for relief given the diligence put forth to file timely and the unique circumstances that prevented a timely filing.

   b. Plaintiff immediately began to construct a timeline showing the Court the diligence involved and, at the attorney's suggestion, revised the Complaint to contain less detail and condense.

The Timeline of Plaintiff's Diligence details the diligent effort of the Plaintiff leading up to the date of the filing; he remained diligent once the extraordinary circumstances had abated.

At no fault of his own, Plaintiff had to restart the process to pursue his rights on December 18, 2022 and leveraged court-offered support services while exhausting other options. Plaintiff is presenting this lawsuit on February 10, 2023, or ±45 days after he restarted the process to file pro se. In addition, Plaintiff worked diligently to preserve his rights beginning October 7, 2022 as noted in the Timeline of Plaintiff's Diligence. Even with diligent effort, extraordinary circumstances prevented timely filing.

For the reasons cited above and the Plaintiff's diligent effort to preserve his rights since the first day of the Right to Sue period, Plaintiff respectfully asks the Court to apply the doctrine of equitable tolling and grant tolling for the days beyond the expiration of the Right to Sue period (Scenario A) and allow this complaint to be accepted.

---

1 *See Jones v. Madison Service Corp.*, 744 F.2d 1314 (7th Cir.1984)
2 "The 90-day period of limitation set forth in 42 U.S.C. § 2000e-5(f)(1) begins to run on the date that the EEOC right-to-sue notice is actually received either by the claimant or by the attorney representing him in the Title VII action." *See Jones v. Madison Service Corp.*, 744 F.2d 1309, 1312 (7th Cir.1984); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 532 n. 11 (7th Cir.1993).

Timeline of Plaintiff's Diligence

| September 28, 2022 | EEOC issues Determination Letter; email notice sent to Plaintiff's email |
| September 28, 2022 | 90-day EEOC filing period begins-Scenario A |
| September 28, 2022 | 30-day IDHR Notification period begins Scenario A |
| October 3, 2022 | Plaintiff has multiple medical-related appointments |
| October 4, 2022 | Plaintiff has an outpatient procedure performed at Northshore Glenbrook Hospital |
| October 6, 2022 | EEOC sends Reminder email about important document on portal |
| October 7, 2022 | Plaintiff receives/downloads the EEOC Determination Letter via email |
| October 9, 2022 | Research Right to Sue options via Google and EEOC website |
| October 9, 2022 | Research attorneys; contact Attorney A for consultation |
| October 12, 2022 | Research FOIA request and Section 83 requests; attorney research on Legal Match |
| October 13, 2022 | File FOIA request with the EEOC; Case evaluation with Attorney A |
| October 16, 2022 | Plaintiff sends Attorney A various documents related to the case |
| October 17, 2022 | Introduction call with Attorney B |
| October 18, 2022 | Plaintiff receives FOIA acknowledgement from EEOC and to expects the requested information by November 9, 2022 |
| October 19, 2022 | Plaintiff researches Attorney A's cases on Pacer; Attorney A indicated willingness to represent Plaintiff; Phone call to discuss terms with Attorney A |
| October 20, 2022 | Contact Attorney B; phone calls/emails not answered. Plaintiff no longer pursues. |
| October 22, 2022 | Research additional attorneys via HG.com and Avvo.com |
| October 24, 2022 | Plaintiff has surgical procedure at Evanston Northshore Hospital. There were surgical complications which resulted in multiple blood transfusions and an extended hospital stay. Plaintiff was released October 27, 2022. |
| October 27, 2022 | EEOC Case file received from FOIA request; Plaintiff released from hospital |
| October 28, 2022 | Contact Attorney C; Introduction phone call with Attorney C. Plaintiff not interested. |
| October 30, 2022 | Contact Attorney D and complete online Intake Form |
| October 31, 2022 | 30-day IDHR Notification period ends Scenario A |
| November 1, 2022 | Case Evaluation with Attorney D scheduled |
| November 2, 2022 | Plaintiff sends Attorney D various documents related to the case |
| November 3, 2022 | Attorney D case evaluation video call; Plaintiff researches Attorney D cases on Pacer |

| November 4, 2022 | Plaintiff sends IDHR the required notification requesting further investigation of the EEOC charge; Letter sent USPS certified mail and postmarked November 4, 2022. |
| --- | --- |
| November 7, 2022 | Attorney D provides notice willing to represent. |
| November 10, 2022 | Plaintiff selects Attorney D to move forward; notifies Attorney A of selection. |
| November 22, 2022 | Plaintiff contacts EEOC investigator seeking confirmation with the "received" date and the calculation of the 90-day filing period as Plaintiff used October 6, 2022 as the received date for all filing period time limits. In speaking with the Investigator, she acknowledged the language of the official EEOC Determination Letter, "*Receipt generally occurs on the date that you (or your representative) view this document*", meant if the document is viewed on October 6, 2022 then the 90-day filing period begins at that time. She did state she was not providing legal advice. However, given the language of the Determination Letter and the Investigator's acknowledgement of Plaintiff's interpretation of the time limits, Plaintiff believed the receipt date of October 6, 2022 was vetted and correct. |
| November 22, 2022 | Plaintiff suggests settlement to Employer and proposed an Offer to avoid a lawsuit. |
| November 23, 2022 | Attorney D phone call to discuss contract terms; Attorney D indicates provided materials were nearly sufficient but requested two minor details and a summary of damages. |
| November 29, 2022 | Plaintiff provides Attorney D summary of damages and confirms no further documents or details were necessary to draft the complaint. Plaintiff states his agreement with the suggested "File First" approach against Defendant versus engaging in any conversation before filing. Attorney D provides timeline that had an expected filing date of December 22, 2022 but no later than December 27, 2022. |
| November 30, 2022 | Follow-up phone call with Attorney D regarding red-line of proposed agreement incorporating/revising based on prior discussions. Contingency fee, hourly hybrid fee and event timeline were finalized. |
| December 1, 2022 | Employer did not respond to Plaintiff's willingness to discuss settlement. Proposed Offer expired. [Plaintiff had the Offer expire before executing the representation agreement with Attorney D. The proposed agreement with Attorney D included a fee provisions in the event (a) the Employer agreed to settle before the complaint's filing date and (b) Attorney D obtained settlement after the Complaint was filed but before the Employer's initial response to the Complaint.] |
| December 6, 2022 | Phone call with paralegal of Attorney D to review contract; all comments were resolved except two that only required review by Attorney D. |
| December 8, 2022 | Attorney D did not provide updated "final" contract per our prior agreement. |
| December 9, 2022 | Agreement signing date and retainer invoiced. However, no final agreement was delivered. No response from Attorney D, paralegal or intake coordinator via phone/email. |
| December 12, 2022 | No response from Attorney D, paralegal or intake coordinator via phone/email. |

| | December 13, 2022 | Plaintiff sends Attorney D a letter since contact attempts were unanswered. The letter pleads with the attorney to maintain representation and the last minute avoidance was unprofessional given the effort both sides put forth. |
|---|---|---|
| | December 14, 2022 | Plaintiff contacts Attorney A and explains the situation; Attorney A was unable to assist given case complexities and the limited time to file. Attorney A had limited availability between December 19, 2022 - December 26, 2022 due to Hanukkah. |
| | December 15, 2022 | Plaintiff had medical procedure at Northshore Evanston Hospital. The procedure was performed by Dr. Michael Ujiki and Dr. Craig Zimmerman. Plaintiff released from the hospital on December 17, 2022. |
| | December 17, 2022 | Plaintiff recovered at home; Pain medicines, including OxyContin, were used through December 22, 2022. |
| | December 19, 2022 | Plaintiff begins research about filing a pro se complaint; begin to draft pro se complaint. |
| | December 20, 2022 | Plaintiff required resources so he used the 7th District Court website for support. Notices resource and contacts William J. Hibbler Memorial Pro Se Assistance for assistance. Plaintiff research online legal assistance and pro se filing. |
| | December 21, 2022 | Hibbler notified Plaintiff there are no appointments remaining for December 2022 or January 2023. |
| | | Contacted Court to register for CM/ECF Online Training and Assessment. |
| | | Hibbler notified Plaintiff later in the afternoon an appointment was available January 27, 2023. Plaintiff confirmed the appointment on December 27, 2022 upon expiration of filing (Scenario A). |
| | December 22, 2022 | Complications from the surgery resulted in Plaintiff going to the Northshore Glenbrook Emergency Room; released at 2:00 AM CST December 23, 2022. |
| | December 23, 2022 | Limited activity. Prepared and posted a "job" for paralegal support to prepare complaint at upcounsel.com |
| | December 24, 2022 | Plaintiff spent 10 to 12 hours daily on December 24 and 26 researching pro se filing in federal court, downloaded pro se documents from the Court's website, how and where to file a complaint, and began to create outline for a pro so complaint. |
| | December 25, 2022 | Plaintiff remains in Northbrook for Christmas in his attempt to file a timely complaint instead of traveling to parent's home in Central Indiana. Plaintiff joined family events via Facebook Messenger |
| | December 26, 2022 | See December 24, 2022 note. An email was sent to the Clerk asking what time a complaint was due in order to be accepted the same day. The Court was closed for the Christmas holiday. |
| | December 27, 2022 | 90-day EEOC filing period ends (Scenario A). |
| | December 27, 2022 | Plaintiff needed assistance to overcome all the federal and local rules of a complaint. Multiple attempts to get information from online source unsuccessful. The clerk's office responded to the previous day's email at 3:14 PM CST. Plaintiff determined he was not able to complete the complaint in time for it to be received |

| | | |
|---|---|---|
| | | on December 27, 2022; Plaintiff confirms appointment with William J. Hibbler Memorial Pro Se Assistance for January 27, 2023. |
| | December 28, 2022 | Plaintiff subscribes to on-demand online attorney services on two different applications (avvo.com and justanswers.com) to get opinions given the situation. |
| | | Plaintiff connects with two attorneys licensed to practice in Illinois. |
| | December 29, 2022 | Research on various websites; review employment discrimination and equity tolling case summaries of the Seventh District Court on Pacer seeking an approach to overcome a late filing. This continued periodically daily through January 6, 2023. |
| | January 3, 2023 | Hibbler confirms appointment for January 27, 2022 |
| | January 5, 2023 | Plaintiff contacts one attorney, Attorney E, via email to determine representation options. They responded the next day with no interest because of the late filing. |
| | January 6, 2023 | Plaintiff contacts one attorney, Attorney F, by phone and discusses the case. The attorney was reluctant to provide service but said he would consider an hourly rate arrangement, but the estimated cost was prohibitive for Plaintiff. Plaintiff continues with drafting the Pro Se Complaint. |
| | January 15, 2023 | Plaintiff travels to Denver, Colorado for 2nd in-person interview for an executive level position in the self-storage industry. Plaintiff has been pursuing the opportunity since April 2022. Also, toured various neighborhoods with a realtor to identify the area to potentially relocate. |
| | January 17, 2023 | Plaintiff returns to Chicago from Denver, Colorado early evening. |
| | January 18, 2023 | Plaintiff drafts a detailed Complaint (100+ pages) and the supporting exhibits (over 1,000 pages). |
| | January 27, 2023 | Plaintiff has 45-minute session with a Hibbler attorney and presents the facts about the status. The attorney suggested filing the late complaint pro se, as soon as possible, and ask the Court for relief given the diligence put forth to file timely and the unique circumstances that prevented timely filing. Plaintiff immediately began to construct a timeline showing the Court the diligence involved and, at the attorney's suggestion, revised Complaint to contain less detail. |
| | February 8, 2023 | The Complaint is completed. |
| | February 10, 2023 | The Complaint is filed. |

## **COMPLAINT OF EMPLOYMENT DISCRIMINATION**

### **COUNT I**
### Title VII
Sexual Discrimination and Harassment

### **COUNT II**
### Illinois Human Rights Act
Sexual Discrimination and Harassment

**COUNT III**

Title VII & Illinois Human Rights Act

Retaliation


**COUNT IV**

Title VII & Illinois Human Rights Act

Sexual Harassment, Harassment and Hostile Work Environment


**COUNT V**

42 USC Section 1981

Hostile Work Environment


**COUNT VI**

Title VII

Failure to Investigate


**COUNT VII**

Section 1558 of the Patient Protection and Affordable Care Act ("ACA")

Retliation


**COUNT VIII**

Illinois Whistleblower Act 740 ILCS 174/10,15,20,20.1,20.2

Wrongful Termination, Retaliation, and Harassment


**COUNT IX**

Illinois Wage and Payment Collection Act ("IWPCA"), 820 ILCS 115/1, et seq.

Violations related to Illinois Department of Labor

Wage Claim (#22-0000336) filed February 22, 2022


**COUNT X**

Illinois Common Law-Failure To Investigate


**COUNT XI**

Illinois Comon Law-Retaliatory Discharge


**COUNT XII**

Illinois Common Law-Negligent Retention


**COUNT XIII**

Illinois Common Law-Negligent Supervision


**COUNT XIV**

Illinois Common Law-Intentional Infliction of Emotional Distress ("IIED")


**COUNT XVI**

Illinois Common Law-Fraudulent Inducement


**COUNT XVII**

Illinois Common Law-Defamation

---

## <u>STATEMENT OF FACTS</u>

*The reference to the January 20, 2022 Response and/or Response refers to Exhibit C.*

1. Blankenship originally applied for a Vice President, Rental Management position with Westward360, Inc. on April 10, 2021. He had a phone interview with the hiring manager, Nathan Brown, Chief Investment Officer, on April 29, 2021. Brown contacted me by email on May 7, 2021, informing me I lacked the experience in the industry he was looking for and he was pursuing other candidates.

2. On May 14, 2021, Brown calls Blankenship. The first question I asked Brown was what type of experience he felt I was lacking? To which he responded lack of experience was not the reason for his non-interest. He said the opposite -my experience was unique, relatable and superior to other external candidates. The reason he chose to not pursue me was because, in his opinion, [it would be difficult for him and I to work together] (emphasis added). He continued by stating he was impressed with "the whole package" (an apparent reference to my resume, background, education, experience, and professionalism). The purpose of the call was to let me know his business partner, Brent Straitiff, expressed an interest in meeting me.

3. Straitiff and I connected via email on May 14, 2021 and had an initial phone call on May 17, 2021. Between May 17, 2021 and June 27, 2021 I met with Straitiff twice in-person, sat for an in-person group interview with Straitiff, Brown, Reischman, and Cruz in Chicago, participated in three (3) video conferences with Straitiff and the Board, joined multiple video conferences, made numerous phone calls and sent emails.

4. Straitiff and Blankenship jointly developed a job description for a new role in the Company – Vice President, Business Development. The job description was agreed to and finalized (**"Exhibit G"**) on June 19, 2021. The position involved the following responsibilities and the estimated time allocations, provided by Straitiff

---

| Responsibility | FINAL June 19, 2021 | | | INITIAL May 30, 2021 | |
|---|---|---|---|---|---|
| | %/week* | Hours/ Week | | %/week* | Hours/ Week |
| Business development | 40% | 20 | | 60% | 30 |
| *Marketing | 30% | 15 | | 20% | 10 |
| *Onboarding and | 20% | 10 | | 20% | 10 |
| *Reputation Management | 10% | 5 | | 0% | 0 |
| | | 50 | | | 50 |

*- non-business development responsibilities*

5. The initial offer letter, provided on June 21, 2021, was not accepted. Blankenship countered on June 23, 2021 and compensation terms were agreed later that day. Blankenship accepted the role on June 28, 2021 based on the representations made by Straitiff **("Exhibit G")** Blankenship was the key hire in Straitiff's plan to re-organize the Company leadership team.

- Blankenship hired as Vice President, Business Development (new business, marketing, transitions)
- Staszczak promotion from Director of Community Association Management to Executive Vice President, Property Management
- Reilly promoted to Vice President, Rental Management to manage the Investment Division
- Daniel O'Conner promoted to Director of Community Association Management
- Remove Duni from business development tasks for CAM
- Remove Brown from business development tasks for Investments.
- Remove Brown from daily operations of the Investment Division
- Reassign Brown as the permanent Managing Broker for Westward360 Realty
- Straitiff intends for Brown to grow a fund, owned by several Board Members, with new acquisitions.
- Remove Gill from marketing and shift responsibility to new Vice President position.
- Consolidate onboarding/offboarding teams in CAM and Investments into one department – Transitions.

Reilly and O'Conner would report to Staszczak. Staszczak and Blankenship would report to Straitiff.

6. Blankenship was the first "outside hire" for the Company. He was also the first member of the senior leadership group that came from outside the industry. His salary and compensation package were the Employer's highest.

7. Plaintiff begins employment on July 14, 2021.

8. Plaintiff reports concerns regarding Nathan Brown to Straitiff on July 31, 2021 **("Exhibit X-5")**. Straitiff acknowledges letter and resolves by forcing a 1:1 meeting between Brown and Plaintiff.

9. Greg Halpern contacted Blankenship by phone on Saturday, July 31, 2021, at 8:42am. He reached out to seek advice about his relationship with Reilly and Brown. He felt like they were telling employees, including Blankenship, inaccurate observations about him to push him out. Apparently, he mentioned to Reilly that he had not received a performance review or a salary review since he came over from the Owl Management acquisition. Reilly had a reactionary response telling Greg he was not worth what he was already getting paid and that she could bring in one of her own people for much less. After the 32-minute phone conversation I suggested a meeting between Halpern and Reilly which was scheduled for August 2, 2021.

10. The Marketing Department and staff are transitioned from Board member to Plaintiff on August 1, 2021.

11. Blankenship coordinates a meeting with Reilly and Halpern on August 2, 2021. The meeting did not go as intended. Halpern was very confrontational and Reilly had resigned to an impasse. Further, Reilly was upset with Halpern because he did not discuss his concerns with her directly and went to Blankenship. Reilly was upset with Blankenship because she expected him to contact her so she was included in the initial conversation with Halpern so she could "defend" herself. Blankenship was surprised at Reilly's unprofessional approach and unwillingness to listen to an issue; she made the entire meeting about her. The meeting ended with no actionable items. Halpern was upset post-meeting and expressed to Blankenship that Reilly's reaction during the meeting was his experience with any interaction with her.

12. On August 12, 2021, Halpern met with Blankenship in the office and he remained concerned about Reilly's treatment and felt nothing changed since the August 2, 2021 meeting (Event #2). I suggested he try to connect with her in a neutral setting, suggest phones be muted, and engage in a discussion about his concerns. I offered to coordinate and define the meeting and/or join as an independent party. Further, I suggested a venue such as a coffee shop mid-morning or mid-afternoon. Blankenship sent Reilly an email that evening informing her about the conversion with Halpern and the suggestion he provided to Halpern. [Reilly had an approved PTO day on August 12, 2021. She sent an email to various parties that was forwarded to Blankenship by Brown on August 5, 2021. The email stated, *"I want to take some days this month before my kids go back to school. Wanted…you know you will be out these days…Friday august 6 Thursday august 12 Monday august 16 Thursday august 19 Friday august 20."*]

13. The following day, August 13, 2021, Reilly contacted Blankenship on his mobile phone at 7:15 AM CST, after returning from a PTO day the day prior, just as he was leaving his home to commute to the office for a 7:45 AM CST meeting. She acknowledged receipt of the email detailing Event #3. Reilly was livid and literally screamed at Blankenship because of the summary email I sent. Reilly falsely accused Blankenship of behaving in a sexist manner and gender discrimination. She accused him of treating her differently because of her gender. He was getting harassed by getting improperly accused of gender discrimination. Then she attacked my integrity, commitment, and communication skills. Accused of being sexist and discriminating against her because she is a woman, she told me that I was handling situations differently than I would be if she were a man. She blamed Blankenship for her current compensation level. She alluded my salary is higher than her simply because I am a man and she makes less than me because she is a woman with a lifetime of industry experience and employed by the Company for a few years.

[Blankenship had never had a compensation discussion with Reilly and never disclosed his compensation to her.] The harassment and attacks continued and she ranted that I didn't have her back when defending her to another employee. She brought my sexual orientation into the discussion by making gender-based insults, yelling derogatory words *"fag"* and *"faggot"*, and taunting Plaintiff. She used the words 'your kind" and "family" which implied gay men and the LGBTQ+ community, respectively. Reilly told me *"Your kind"* can be so dramatic and since we were *"family",* she expected me to defend her more than I would anyone else. She threatened disclosure of my sexual orientation to others if I *"don't have her back"* or if I allow any employee who reports to her to speak to me without her present. Blankenship ended the call after approximately 4 minutes.

14. In the days that followed, Reilly used sexual or gender-related comments and conduct to bully Plaintiff. She would often brag about her sexual prowess and feminist goals in her new role to harass Plaintiff.

15. Plaintiff informs Cruz of the Reilly Incident on August 19, 2021. Cruz said she has seen and experienced Reilly's unprofessional style and attacks on people she does not like. Apparently, several of her direct employees, other Investment employees, and PROs managers informed Cruz about Reilly. Cruz suggested I follow the chain of command in reporting the Reilly issue to Straitiff.

16. Plaintiff reports the Reilly Incident to Straitiff on August 24, 2021. Brown was also present for the conversation, but he did not participate or comment. I reviewed the initial and subsequent events. I had to disclose my sexual orientation and requested both Straitiff and Brown keep it confidential. Straitiff only responded that he knew my relationship with Reilly was strained but he expected me to continually improve my relationship with her. No investigation or follow-up occurred.

17. During the initial 45 days of Plaintiff's employment, Plaintiff identifies immediate opportunities to create value for the organization. Straitiff realigns Plaintiff's focus multiple times to focus on these opportunities and to support other department heads as a "consultant". Opportunities are presented to Straitiff and the Board; Plaintiff receives approval to implement recommendations. **Exhibit X-11** summarizes the major shifts Straitiff enacted during the Plaintiff's term of employment.

18. Plaintiff is exposed to hostile working environment given Reilly's harassment and sexual threats against Plaintiff that began on August 13, 2021. Brown begins to create more problems for Plaintiff after August 24, 2021 once he became aware of the Reilly Incident and Plaintiff's sexual orientation. Brown's conduct was an attempt to leverage his power to control, intimidate or embarrass the Plaintiff. See **Exhibit OO.**

19. Complaints were repeatedly documented or provided verbally to Straitiff and/or Cruz but went unanswered which only allowed the severity to increase by authorizing and fostering a hostile work environment. Brown and Reilly were allowed to increase the harassment and retaliation after the reported harassment or retaliation went unaddressed. See **Exhibit OO.** The only response Straitiff would provide is to say that he needed to remove Brown from Investments because (1) he was not willing to adapt the department to align with the rest of the Company with procedures, technology, compliance, financial reporting, (2) Brown's people management skills were questionable and often problematic, and (3) he was aware of the difficulty of working with Brown.

20. Plaintiff followed the guidelines and procedures outlined in the Westward360 Associate Handbook for reporting the harassment to his direct supervisor, Straitiff, and Cruz, as required by company policy.

21. Straitiff informs Plaintiff on September 2, 2021 that his new business responsibilities will be delayed until January 2022 so he can focus on the value creation projects that were approved by the Board **("Exhibit M-1")**.

22. Related to above, Plaintiff requested Straitiff prioritize Plaintiff's project list to ensure focus was on the right initiatives. On September 13, 2021, Straitiff provides Plaintiff with six projects **("Priority Projects"; "Exhibit N")** to complete by December 31, 2021 and reassigned about 10 of his projects to other employees in the Company.

   a. Five of the six Priority Projects assigned to Plaintiff were previously assigned to a Board member or a member of the senior leadership group as a 1Q2021 or 2Q2021 "Rock". They were not completed.

   b. The Employer states Plaintiff was terminated for his inability to complete the Priority Projects and provided multiple versions of the status of each Priority Project, in their opinion, but their updates are inaccurate. Furthermore, the update they provide could not have been known at the time they decided to terminate employment on December 2, 2021. The Employer terminated Plaintiff before these projects were due.

23. Plaintiff conducts an employee survey in early September 2021. Results were shared with the Board on September 21, 2021 and with the senior leadership group on September 23, 2021. The version shared with the senior leadership group was edited to remove several very bad comments by employees about Reilly and Brown specifically.

24. Mid-September 2021, Plaintiff creates new "Transitions" Department and staffing plan with the goal to fully implement no later than October 15, 2021.

25. Brown used sexual orientation as a threat if Plaintiff was not more appreciative of how Brown got him the job. During a phone call that began at 3:07 pm, Brown changed the subject and wanted to make sure that I knew he *'stuck his neck out'* for three recent changes

in the organization. He was referencing 1.) Ashley's promotion to Managing Broker for the Realty Division, 2.) Reilly's promotion to Vice President, and 3.) Blankenship's hiring. He said, *"I got you hired. I am letting you work here even though I wouldn't hire you."* Brown was attempting to get Plaintiff to comply to his demands. He got me hired and I would be gone at a snap of his finger if he so decided and I needed to remember that anytime I think about raising a concern or problem with him, Reilly or the Investment Division. He continued by stating "Ann is loyal to me" and he hoped I would become more appreciative and supportive given the circumstances and everything he has done for me. He then laughed saying, "my decision to hire you has exceeded expectations". Or at least that's how I feel at the moment." This sexual harassment event occurred on September 20, 2021.

26. Plaintiff launches new Reputation Management Program for the Company on September 28, 2021.

27. On October 1, 2021, Blankenship disclosed the employee comments from the employee survey that were about Reilly to Reilly. This disclosure was discussed and approved by Straitiff, Brown, and Staszczak. Plaintiff had a conversation with Reilly and felt it was a meaningful discussion.

28. Brown again harassed Plaintiff by threatening to expose his sexual orientation on October 3, 2021. He threatened to spread sexual rumors to penalize or otherwise punish Plaintiff for reporting issues that were discovered as it made him look bad and caused more work for him.

29. Plaintiff became eligible to participate in Company provided health insurance and related benefits on October 1, 2021.

30. Plaintiff was falsely accused by Reilly on October 4, 2021 of treating her differently than he would if she was a man and complains to Straitiff about my handling of disclosing the

employee comments to her on October 1, 2021. Straitiff and Plaintiff discuss but Plaintiff completely disagreed with how the situation was being handled. Straitiff's position now was I should have never given the comments to Reilly; my decision was flawed from the beginning. He then criticized me for "ruining her weekend" because I gave her the comments at 4:30 PM on a Friday. Further telling me I didn't do enough to protect her feelings and emotions.

31. On October 5, 2021, Plaintiff was given benefit documents but could not be enrolled as of his eligibility date. Human resources eventually told him to enroll during the upcoming open enrollment period that became effective February 1, 2022.

32. Plaintiff reminds Straitiff about the Reilly Incident during a conversation on October 13, 2021. Plaintiff states, *"you have a VP who gets to run around the company and accuse me of treating her different because she's a women and her sexuality. She falsely accused me"*. No action is taken.

33. On October 14, 2021, Plaintiff sends a letter to Straitiff and the Board about harassment and unfair standards **("Exhibit X-1")**. An emergency board meeting was called but there was never any action taken. Plaintiff was told to meet with Brown 1:1 to sort out their differences. Straitiff contacted Plaintiff the next morning and refused to discuss the issues presented. He turned the conversation into all the things I did wrong by sending that type of letter. A follow-up letter was sent on October 21, 2021 after no action was taken **("Exhibit X-6")**.

34. On October 15, 2021, Plaintiff was ordered to terminate two long-term employees at Straitiff's demand and despite Plaintiff's recommendation to approach the situation differently. His recommendation was based on guidance from the attorney. Straitiff wanted the terminations to occur to save $100k in annual payroll.

35. The working environment continued to become more hostile when Straitiff and Brown changed Plaintiff's job duties on October 15, 2021, in retaliation for the letter sent to the Board. He was assigned administrative tasks and given restrictions to how he communicated and required Brown to approve all outbound emails. Straitiff now had Plaintiff reporting to Brown 95% of the time. This was not the plan given Brown's unwillingness to work with Plaintiff since May 14, 2021.

36. On October 17, 2021, Brown instructed Plaintiff to use a series of statements to solicit new business that would not disclose internal processes that were designed to generate additional revenue from each client. Plaintiff was told to mislead clients into thinking the company only made money from its management fee when multiple profit centers existed to generate additional revenue. Brown tells Plaintiff, "*Overall, it's my strong opinion when explaining things you DO NOT give the client more information than they need.*" Several of these profit centers were illegal or non-compliant with regulations. See **Exhibit X-12**.

37. Plaintiff makes the first of three requests to meet with Straitiff to discuss elimination of his responsibilities with Brown on October 29, 2021.

38. Cruz returned from maternity leave and Plaintiff met with her on November 3, 2021 to discuss the events that occurred during her two-month absence. Follow-up documents were sent that day and November 10, 2021.

39. Reilly favored working with females and was vocal about her desire to bring female equality to the Company. The Company allowed her to terminate or demote male employees to replace them with a new female employee or promote a female employee. Reilly intentionally misreported and/or fabricated false information about Plaintiff and then reported the false information to Plaintiff's direct supervisor, Straitiff. Straitiff would verbally reprimand Plaintiff based on the accusations made by Reilly without a discussion.

This allowed Reilly's behavior and her harassment tactics to go unchecked and became progressively more severe.

40. On October 29, 2021, Straitiff contacts Plaintiff stating he needs to find a way forward with Brown, Reilly and myself. He says, *"Um, and I'm going to call me and Nathan as well. And I just I,lI, what what's happening right now is it's just not good for the business."* And then some word salad, *"And then, um, I got to figure out how I'm going to, I think I need to do a meeting with, um, you, the, uh, Nathan and, and, and, uh, and I might it all in, cause I got here, you know, I value a lot of people, like probably sure they level how to view as well. 'So I think I'll do that, but I gotta get spotted. I gotta put like some, I gotta figure this out or, you know,"*

41. Conditions worsened and Straitiff coordinated a "Clear the Air" meeting on November 4, 2021. This was a meeting to flush out the issues between Plaintiff, Reilly, and Brown. Straitiff arranged for a moderator to oversee given his conflict with Brown. Straitiff changed the topic of this meeting at the last minute, removed human resources from participating, and failed to address any of the issues between the parties.

42. Plaintiff sends Straitiff letter discussing his disappointment with the Clear Air meeting **("Exhibit KK-1")** on November 7, 2021.

43. Plaintiff and Straitiff met on November 8, 2021 to discuss Plaintiff's disappointment in the November 4, 2021 Clear the Air meeting. Straitiff admitted he let his personal relationship with Brown impact his objectivity and he changed the topic at the last minute because he felt I would attack Brown and he didn't want to upset Brown. Straitiff commented that he was loyal to Brown, he has been a friend for decades, and Brown was sensitive to constructive feedback. Plaintiff sends Straitiff an email on November 10, 2021 summarizing the meeting and expressing his disappointment in how he has handled all these issues **("Exhibit KK-6")**.

44. On November 10, 2021, Cruz inquires the status of the Clear the Air meeting from Plaintiff. Plaintiff provides **Exhibit KK-1** and **Exhibit KK-6** to which she replied, *"That doesn't sound like the formal complaint was resolved in the best manner."*

45. Plaintiff is contacted by human resources on November 10, 2021 for information related to the Reilly Incident. Reilly made sexual harassing comments about Straitiff to other employees and Straitiff ordered a full investigation. Straitiff asked Cruz to contact Plaintiff because according to Cruz, *"he remembered an event that occurred with Reilly related to sexual comments and her being sexist."* Plaintiff provided Cruz with emails and his personal notes from the event **("Exhibit UU")**. Only when Straitiff experienced a similar event by Reilly was the Company interested in what happened with Plaintiff. Straitiff ignored Plaintiff's disclosure in August and October and conducted no investigation. Straitiff recommended immediate termination to the Board given the severity of the issue but the Board did not approve his recommendation. Straitiff used the August 13, 2021 incident as evidence for the discrimination and harassment he experienced from Reilly.

46. Later that evening on November 10, 2021, in an email to Plaintiff, Straitiff said, *"The goal is this makes a better working relationship for everyone. I think it will, please trust me on this. We are moving in the right direction now with everyone. If you want to talk further about this tomorrow. Let me know."* He had a follow-up email stating, *"Please continue to work on the relationships with Brown and Reilly. I'm here for guidance and to lean on."*

47. The following day, November 11, 2021, Straitiff tells Plaintiff to "trust him" that relationships have been reset and there should be no problems going forward. He acknowledged Reilly went unchecked for too long, but he now had the situation under control. He told Plaintiff to improve his working relationship with Reilly and Brown.

48. Approximately on November 15, 2021, Cruz and Plaintiff have a conversation about the significant renewal increase for medical benefits for the upcoming open enrollment period.

49. According to documents provided by the Employer, Straitiff obtained Board approval to terminate Plaintiff on November 17, 2021. The reason was "poor performance" and his inability to complete the Priority Projects, which had a deadline of December 31, 2021. Plaintiff had protected status given his prior complaints of discrimination and harassment even though the Company failed to investigate or address.

    a. Plaintiff is of the belief he was also targeted for termination given his sexual orientation and his compensation. The Plaintiff was the highest paid employee of the Company, who was not a Board Member. Between October 2021 and February 2022, Straitiff eliminated eight (8) positions and every position eliminated, except one (1), had an employee earning in the Top 10% of the Company. Sexual orientation had to be a target given four (4) of those terminated identified as gay, lesbian or bi-sexual.

        i. Straitiff took termination actions on (1) Jude Tungul, Director of Business Intelligence **("Tungul")** in August 2021 and February 2022, (2) Gregory Halpern, Director of Investment Rentals **("Halpern")**, in October 2021, (3) Reilly in November 2021, and (4) Blankenship in December 2021. All four employees identify as gay or lesbian; the group was employed 4.4 years on average and total payroll costs exceeding $350,000 in base salaries.

            1. In fact, he has tried to terminate Tungul and Reilly on more than one occasion.

            2. Given the ages of those eight (8) terminated, it does not appear the Company complied with various "testing" to comply with labor laws considering four (4) of the employees were over the age of 40.

        ii. Straitiff took no termination action(s) on any employee during the term of Blankenship's employment except for the eight (8) referenced employees.

50. Plaintiff attended and participated in the annual Company Meeting on November 18, 2021 and November 19, 2021.

51. On November 23, 2021, Plaintiff identified a fraudulent invoice scheme in the Investment Division, which is led by Brown. The intent of the scheme is to capture unearned profit for Westward360.  It appears there is a structured, routine, and fraudulent process that marks up certain third-party vendors and Westward360 re-invoices the vendor invoice, using a shell company (Westward360 PC) or via Westward360 PROs, by marking up the new invoice up to 35% at the expense of the client **("Exhibit X-13")**.  A comprehensive and documented process manipulates data so the vendor receives a check for the original invoice amount and Westward360 receives a check for the marked up portion.  The process disguises the profit taking mechanics so the transactions are not visible on reports that are typically shared with clients and owners. This profit-taking scheme is not disclosed to any client or owner.

52. Plaintiff provides a project status update via the weekly Level 10 meeting on November 23, 2021 **("Exhibit L-1")**.  The Priority Project Schedule was updated for Straitiff at the same time **("Exhibit J")**.  Straitiff was on vacation for this meeting and did not participate.

53. On December 1, 2021, Plaintiff informs Straitiff and Brown of his medical condition due to an unexpected absence on November 30, 2021 **("Exhibit F" and "Exhibit F-1")**.

54. After preparing a written summary of the identified fraudulent invoice scheme **("Exhibit X-13")**, Plaintiff requests to meet with Straitiff on December 2, 2021 **("Exhibit D")**.  He intended to disclose his findings to make sure the fraud got reported.

55. During the December 2, 2021 meeting, Straitiff defended the practice and provided incorrect purposes for its existence. He was aware of the practice and became very defensive when questioned. The meeting ended at 9:30am. Straitiff was visibly upset and reactionary. Plaintiff followed up with two documents later that morning about the issue

and disclosed the anti-retaliation policy to protect his position **("Exhibit D" and "Exhibit EE").**

56. Straitiff attempted to contact Plaintiff 15 minutes after their meeting ended and became more aggressive in his contact attempts throughout the morning.

57. Straitiff and Cruz had no communication about the issues reported by Plaintiff as Cruz received her information directly from Plaintiff. Straitiff chose to not update Cruz before or after her maternity leave on any reported issue. The only instance of Straitiff communicating with human resources occurred around 12:00pm on December 2, 2021. Straitiff sent Cruz an email informing her he was going to terminate Plaintiff and he wanted her to be present **("Exhibit EE")**.

58. Straitiff aware Plaintiff had complaints about harassment and retaliation, informed about the Company's anti-retaliation policy, and reported fraudulent activity a few hours earlier, terminated Plaintiff's employment at 12:19pm on December 2, 2021 **("Exhibit A-1")**. Despite asking Cruz to be present, Straitiff instead sends Plaintiff a text message. No reason for termination was provided (Termination Reason 1).

59. On December 3, 2021, Plaintiff submits an inquiry to the EEOC for discrimination and retaliation.

60. December 7, 2021, Plaintiff is informed by Cruz that his employment was terminated for "work performance" and no other information would be provided.(Termination Reason 2)

61. On December 7, 2021, Plaintiff submits a complaint to DOL/OSHA **("Exhibit A")**

62. On January 20, 2022, the Employer responds to the OSHA Complaint filed by Plaintiff on December 7, 2021 by stating employment was terminated for "poor performance" related to incomplete Priority Projects and the Plaintiff's failure with his new business tasks (Termination Reason 3) **("Exhibit C").**

a. The Company claims Blankenship failed with his new business responsibility. The following three (3) statements acknowledge the Employer knew Blankenship would not be focused on business development. These truthful comments by Straitiff contradict the "failures" Westveer states as the basis for the "poor performance" termination.

    i. On May 30, 2021, Blankenship asks Straitiff, "e.) Can you give me an idea of time allocation? How much time is spent on new business development? Marketing? Transitions?" His response, *"after cleanup and organization, I anticipate the following; New Business Development - 60% Marketing 20% Transitions 20% - there will be a lot of upfront time needed for marketing and transition at the beginning."*

    ii. Then on September 2, 2021, Straitiff informed Blankenship his business development tasks would start in January 2022.

        1. Straitiff states on September 2, 2021, *"Definitely want you involved in opportunities as you get fully up to speed. I believe this will give you some time to get the foundational items over the line before year-end. Make sense? Do you have any questions?"*

    iii. Straitiff on December 2, 2021, at 9:23 am, *"you [Blankenship] were paid the Guaranteed Commission even though you've had no business development responsibility."*

        1. Straitiff is referencing the Guaranteed Commission of $20,000 payable to Blankenship for the initial six (6) months of employment. The intent of the Guaranteed Commission was to supplement his Base Salary while he onboarded and gained knowledge of the industry. It was also designed to ensure Blankenship received

bonus/commission as represented by Straitiff during his first year of employment.

63. On February 22, 2022 Blankensahip files a Wage Claim with the Illinois Department of Labor for unpaid guaranteed commission, bonus, and benefits. The Wage Claim is subsequentially updated on March 31, 2022. **("Exhibit H" and "Exhibit H-1").**

64. On May 19, 2022, Employer provides the EEOC a position statement stating termination was due to "work performance". (Termination Reason 4)

65. On June 10, 2022, the Employer provides the EEOC with an additional document containing five pages of reasons why Plaintiff was terminated. The reasons they claim were not available on December 2, 2021; their inaccurate facts were collected post-termination. (Termination Reason 5)

    a. The Employer provided information to the EEOC, DOL and OSHA regarding Plaintiff's termination is false, inaccurate, or was unavailable. First, the Employer states Plaintiff was terminated for poor performance related to six (6) Priority Projects that were assigned to Plaintiff on September 13, 2021 with a due date of December 31, 2021. Plaintiff was terminated 29 days before the Priority Projects were due; this premature action prevented Plaintiff from using 27% of the time allocated to complete the Priority Projects

    b. Plaintiff disagrees with the Priority Project statuses represented by the Employer. The Employer provides details that were considered to support their termination of Plaintiff. The details they provide were not available at the time of termination on December 2, 2021; the Employer provided this detail months post-termination, and the details were not available to the Employer at the time of termination. The information to support their reason(s) in the Response would have been limited to the most recent November 23, 2021 Level 10 Report **("Exhibit L-1")** or the project

list maintained for Straitiff which was updated **("Exhibit J").** [Exhibit J is an update from a previous date as Plaintiff maintained the Project List as a shared file with Straitiff and lost access to the file. This list was provided exclusively to Straitiff. Straitiff or the Company should be able to provide a copy of the latest updated Project List.]

> The Level 10 Meeting. The weekly Level 10 meeting began August 31, 2021 for Blankenship and was scheduled weekly at 11:00 am thereafter. These meetings were described as critical and senior leadership was required to attend. During my tenure, I had seven (7) Level 10 meetings; Straitiff was present for three (3), or 43%, of these critical meetings. It's important to note that Straitiff did not participate in Blankenship's Level 10 meetings between October 26, 2021 and November 23, 2021. The last Level 10 meeting that Straitiff, who again is Blankenship's direct supervisor, participated in was the October 19, 2021 meeting.

c. Straitiff did not attend the most recent Level 10 meeting as he was on vacation; he returned to the office on November 29, 2021. Plaintiff worked from home on November 29, 2021 and December 1, 2021; he had a PTO day on November 30, 2021. [This schedule was disclosed to Straitiff in advance and was acknowledged.] The last time Plaintiff and Straitiff had a 1:1 update meeting was by phone on November 17, 2021 and they both attended the company meeting November 18, 2021 and November 19, 2021. Records indicate a total of 31 emails containing 11 unique topics, nothing significant, were exchanged between Straitiff and Plaintiff between November 18, 2021 and December 1, 2021 there were no material phone call until the December 2, 2021 Disclosure Meeting. Straitiff attempted to obtain a project status update at the end of the December 2, 2021 Disclosure Meeting from Plaintiff but he refused to provide. No employee or Board member had knowledge of those projects or their status on December 2, 2021, beyond what was represented in the last Level 10 Report.

---

Blankenship vs. Outer Banks Capital, Inc.     23-CV-0867     Page 35

d. Plaintiff was on the path to complete the Priority Projects by the deadline but all other members of the senior leadership group were not able to complete their assigned 3Q2021 "Rocks" (or quarterly company goals). These employees were allowed to roll over their incomplete goal(s) into 4Q2021.

e. Therefore, the "evidence" the Employer claims to support their reason to terminate was obtained post-termination. And the claims they represent are either totally false or grossly inaccurate.

66. Claim was automatically filed with Illinois Department of Human Resources on July 14, 2022

67. On July 20, 2022, the Employer provides OSHA with a copy of the document they provided to the EEOC on June 10, 2022. (Termination Reason 6)

68. The EEOC issues the Determination Letter and Notice of the Right to Sue dated September 28, 2022 **("Exhibit I-1")**. Plaintiff receives the documents on October 7, 2022.

69. Plaintiff notifies IDHR to investigate the case under the Illinois Human Rights Act on November 4, 2022.

70. On November 30, 2022, OSHA dismisses Complaint for yet another reason provided by the Employer. *"Evidence gathered during the investigation indicates that Respondent elected to terminate Complainant's employment for legitimate, non-discriminatory reasons, specifically as an executive who had demonstrated excessive conflict with other senior leaders, and who had suddenly demanded to no longer work with a member of the senior leadership team he was required to work with in order to fulfil the duties of his position."* ("Termination Reason 7).

a. The Employer claims Plaintiff was unwilling to work with Brown when the reality was Brwon refused to work with Plaintiff. Brown made this clear to Plaintiff on May 14, 2021 during the interview process.

71. On December 8, 2022, IDHR requests additional information **("Exhibit T-1").**

72. Plaintiff files an appeal with OSHA related to the complaint on December 28, 2022

73. On January 10, 2023, IDHR dismisses the claim for lack of jurisdiction due to an untimely filing. The required notice was provided within 30 days of receiving the EEOC Determination Letter.

Additional Critical Facts

74. Defendant's shifting justification for the termination decision proves the proffered reasons were pretext for covering up a retaliatory termination. The Defendant has failed to clearly articulate and maintain accurate reasons for termination. They have been unable to provide documentation to defend their decision.

75. Plaintiff was terminated when peer employees received no disciplinary action for missed deadlines or any condition alleged by the Employer.

76. The Employer held Plaintiff to a standard that far exceeded the standards applied to Straitiff's other direct report, Board Members, or any employee in the Company.

77. According to the Company's Response to OSHA, it disclosed the medical information of Blankenship to a group of 15 senior-level employees after termination. The Company acknowledges and confirms this fact with their statement, *"they had no knowledge of the Complainants medical history until after the Complainant was terminated."* The Defendant knowingly and purposely shared confidential medical information.

78. During the term of his employment, Plaintiff identified several profit centers that were improperly implemented and/or not compliant **("Exhibit X-12").**

79. Information Defendant provided to OSHA, EEOC, IDOL and DOL states that the Board had ongoing discussions during Plaintiff's employment about work product and results. Westveer states in the Response, *"it quickly became apparent that he (Plaintiff) was incapable of delivering on the job description that was set forth between the two parties"*.

No discussions ever took place. Further, Plaintiff received no complaints, disciplinary actions, or documented performance concerns while he was employed. The only exception was a conversation between Plaintiff and Straitiff on October 15, 2021 when Straitiff criticized Plaintiff for sending the October 14, 2021 letter to him and the Board (**"Exhibit X-1"**)

80. Plaintiff received accolades from others at all levels from within the Company. On October 13, 2021, Cruz made several remarks about Plaintiff and he responded to her comments (see **"Exhibit KK-5"**). These are a few comments made by Board members, which indicate I was more than capable in my position.

> *"Thanks again, Brian! It's really exciting to see these foundational elements being developed. They are going to provide so much long-term value to our sales and marketing practice. As usual, you put a lot of thought into what you laid out. I'm glad you're overseeing what you are, especially considering the recent turnover. And great to see some of the improvements taking hold in Customer Service. Good stuff!!"* **Patrick Gill**, Chief Marketing Officer
> *Hey Brian, I'm really buying into this "guarantee" concept. Excited to see what you come up with. thanks,* **Brent Straitiff** Chief Executive Officer
> *Thank you, Brian! I really think you're getting us out of the small business mindset and taking us to the next level. Some growing pains on my end because change is scary but I'm so happy to have you guide us. It feels like we are on the verge of a new company. Thanks again for pushing us, we needed it.* **Jenny Cruz**, Director of Human Resources
> *Well done, Brian. Thanks for all your hard work. Appreciate it.* **David Westveer**, Chief Financial Officer (and author of the Response).
> *Brian, Thanks for this. Absolutely agree with you. Exciting and I appreciate your thoughtfulness. You have a TON on your plate right now. As much as I would love you working on Westarity, we need your full attention on the core business. Over the next 30 days, we will gather as a Westarity committee and divide and conquer to get all of this up and running. I will make sure that you are a part of this process. Thanks again. Have a great week.* **David Westveer**, Chief Financial Officer (and author of the Response).

Westveer also comments in the Response, *"[he] was unable to complete the tasks layed out in his job description".* This is disputed. Straitiff constantly changed Plaintiff's priorities during the term of his employment and a summary of those changes is provided at **Exhibit X-11**. A deficient employee with work or poor performance concerns would

---

not receive accolades from his immediate supervisor such as the following comments made 30-days prior to the termination (note the accolades continued after November 17, 2021 and the day before termination):

- ✓ November 1 – *"Good stuff Brian, thank you!"*
- ✓ November 5 – *"Good stuff. Thank you!"*
- ✓ November 10 – *"Looks great, thank you Brian"*
- ✓ November 10 – Straitiff asks Blankenship to *"trust him"* for improved relationships
- ✓ November 12 – *"Great work. This is very cool!"*
- ✓ November 29 – *"Great work Brian. Looks good to me."*
- ✓ December 1 – *"perfect, thank you."*
- ✓ December 1 – *"This is great. Good stuff Brian."*

81. Blankenship accepted the role of Vice President, Business Development based on fraudulent inducement by Straitiff. The Employer intentionally misrepresented facts that were used to convince Blankenship to accept a job offer. For example, there was an intentional financial misrepresentation that was one of the primary reasons Blankenship accepted the position to work at a Company. Furthermore, Straitiff indicated he was committed to the position and acknowledged it was going to be disruptive in the beginning. Straitiff was not committed to the position, willing to confront problems or deal with the disruptions that were taking place to move the Company forward. Blankenship suffered actual economic damages because of this inducement, which continues today, and would not have accepted the Employer's offer if representations were true, facts were accurate and financial assumptions were not artificially inflated.

82. The Defendant was negligent in their duty to supervise by their failure to monitor or reasonably control the actions of employees. The Company has policies in place for harassment, confidentiality, retaliation, and whistleblowers that provide protection, but the Company didn't follow their own policies on any of those items.

83. Defendant's failure to investigate complaints and address known issues allowed other employees to cause harm to Plaintiff. The Company is required to do everything that they

can to prevent, discourage, and promptly address workplace harassment and intimidation, bullying, and retaliation, but the Company took no action despite their knowledge making matters even worse.

    a. On October 18, 2021, Blankenship had a discussion via Google Chat with Leslie Arguer, a Property Manager. During the discussion she disclosed to him that she carries a concealed firearm at all times. He got really concerned when she stated, *"I'm not familiar with the area and [or] the quickest exit routes. I carry but would rather not have to use a weapon on a tenant."* Blankenship immediately sent Straitiff an email about the subject. The email expressed concern about an employee carrying a concealed weapon without others knowing the environment they were in. The Company had no policy in place to provide direction and the Company was in violation of the City of Chicago gun rules that require a business to display a logo at every entrance. Straitiff and Blankenship had a meeting later that afternoon and Straitiff expressed his frustration with my email regarding the gun. He said he didn't want to deal with it but now he needs to because I raised the issue. At the end of the discussion, he asked me if it should be addressed today, and Blankenship told him that was not a decision he has to make. The issue had not been addressed as of December 2. 2021.

84. The Defendant negligently retains employees who are proven to violate company policy. This practice is unfair and, in the case of Plaintiff, highlights the retaliatory nature of his termination.

    a. For example, Plaintiff identified a multi-year theft conducted by a long-term Senior Property Manager. The investigation proved the theft and human resources and the Board approved the termination. Blankenship was told to back off in late August 2021 to allow Staszczak to handle. The employee remains employed today.

---

Blankenship vs. Outer Banks Capital, Inc.           23-CV-0867           Page 40

b. Another example is Brown. The Defendant has known about Brown's treatment, harassment, and improper behavior for years. Despite employee complaints, client feedback, EEOC or similar claims, feedback from employee surveys, exit interviews from those reporting to Brown, and lawsuits from previous employees, the Defendant ignored all that knowledge and failed to determine the problem(s). If the Defendant diligently investigated these details, corrections could have been implemented to protect employees and prevent future reoccurrences.

85. The work environment became stressful, hostile, and uncomfortable. Plaintiff's psychiatrist grew more concerned about his well-being and mental health. Plaintiff experienced emotional distress, anxiety, fear, and insecurities that were treated, and continue to be treated, by his psychiatrist. Plaintiff has experienced a marked improvement in blood pressure, pulse, and general health once he was no longer part of the toxic environment. Blankenship's family noticed a change in Plaintiff's demeanor and began to ask if this job was worth its cost to him personally.

86. Defendant has made multiple inaccurate statements and given false information to multiple parties and government agencies that were designed to position the Employer in the best possible position. During employment, Defendant knowing allowed employees to state inaccurate and unprofessional statements about the Plaintiff. These defamatory comments have impacted Plaintiff's reputation and well-being.

## **AGENCY FILINGS – EEOC, IDOL, IDHR**

Plaintiff previously filed complaints or claims with government agencies related to his employment, compensation, and violation of his rights. A summary of those filings is below.

Equal Employment Opportunity Commission

Blankenship filed an inquiry with the Equal Employment Opportunity Commission **("EEOC")** on December 3, 2021 and an investigator, Kimberly Engram, reviewed the initially

provided information on February 22, 2022. The EEOC Charge relates to sex discrimination and harassment, hostile work environment, and retaliation by making inaccurate and disparaging statements as the pretext to terminating Blankenship's employment. The Defendant terminated Plaintiff's employment after reporting fraud and other accounting-related improprieties despite EEO protection.

During the initial intake of March 29, 2021, Engram was not very cooperative or willing to listen. She complained about the length of the supplemental materials provided and said she had not and was not going to review them. As I was explaining the situation to her, she made comments such as, *"personal statements are not the EEOC's problem"*, and *"the discrimination you describe is not severe enough and does not rise top the EEOC level",* and "*if you did not include the word harassment or discrimination in your complaints then they can't be considered by the EEOC,* and *"harassment doesn't float"*. Then she tells me she has investigated Westward360 in the past and knows if an employee complains, they are gone. To my surprise she knew the principals by first name when she said, *"Brent, David And Patrick don't like complaints."* I proceeded to ask her if she was the right investigator for the case given she appeared to know several principals on a first name basis. Engram became offended and told me my case sounded like it would have a better chance of success with the DOL complaint. She suggested I reconsider my intention based on our discussion and if I still wanted to move forward then contact her to have a charge issued.

The Employer responded to the Charge with one paragraph containing three (3) sentences on May 19, 2022 and was received by Complainant on June 6, 2022 **("Exhibit C-4")**. And their response was undated, did not mention the name of the Complainant, and failed to respond to the charges. A document has been discovered from a Freedom of Information Act **("FOIA") r**equest made by Complainant labeled 'EEOC Response from Employer Date: 6-10-2022' **("Exhibit P-**

**2”**).  This critical document was not provided to Complainant and it contains false statements and incorrect facts.  The contents of this letter were never discussed with the Complainant.

On April 11, 2022, Blankenship contacted Engram and informed her he would like to proceed with a formal charge based on discrimination, harassment and retaliation.  She was incensed that I wanted to proceed and told me I was wasting her time and there was no chance the EEOC would proceed with a lawsuit.  There was a contentious discussion about what to include on the charge document and the conversation eventually ended with her saying she knew what to do and she would handle it.  She said to check the portal later that evening for the charge document; the document was received around 5:30 PM.  Blankenship issued changes via the portal on April 22, 2022.  Engram did not respond to the portal inquiry, phone calls or email so Blankenship submitted another change via the portal on April 26, 2022 in an attempt to get Engram's attention.  Blankenship called Engram on May 4, 2022 and she answered the phone.  Again, she was quite bothered in tone to hear from me and said she had not reviewed the two prior change requests made in the portal.  The discussion became contentious again when she refused to make the requested changes to the charge.  Blankenship told Engram that he was concerned she lacked objectivity and had her mind made up already.  This statement was made based on her earlier disclosure of knowing principals of the Employer by first name and the fact she knew they did not like complaints about them.  He then proceeded to ask Engram the name of her supervisor.  After being persistent with his request, Engram finally conceded and provided the name of Sharonda Harris but made it clear calling her would do no good as she is aware of the case.  Ms. Engram refused to accept the prior versions Blankenship revised and, upon him telling her, to draft what language she will accept since it appears that's the only way the charge will get issued.  No changes were made to the Charge because she refused to consider the changes requested by Complainant; on May 5, 2022 the initial Charge of Discrimination (Charge # 440-2022-01739) **(“Charge”;**

**"Exhibit C-3")** was provided to Plaintiff. Blankenship approved the Charge on May 12, 2022 thinking the facts would be considered during an investigation.

There was no communication, with one exception, from Engram again. She incorrectly stated in an email the Charge was related to sexual orientation discrimination. As the timeline below represents, Blankenship sent emails, made phone calls, emailed Harris and went as far as emailing Julianne Bowman, the Director of the EEOC Chicago office to get a response. Four months later, Blankenship is contacted by Alison Fisher on September 22, 2022 who introduced herself as the new investigator assigned to the case. Fisher realized during our call that the file did not contain several documents I was referencing (all of which were previously provided to Engram). Blankenship told Fisher he would resend the documents by September 27, 2022 because he was unavailable to get access to his files until then; the files were sent to Fisher on September 27, 2022. Blankenship assumed the information was being evaluated until October 7, 2022 when he noticed a reminder email from the EEOC portal from October 6, 2022 stating important information was available on the portal. He was surprised to see the Determination Letter dated September 28, 2022 **("Exhibit I-1")**. Blankenship took immediate action to preserve his rights and move forward with filing a lawsuit within the Right to Sue period.

The documents from the FOIA request revealed Fisher recommended the case to be dismissed on September 26, 2022 (See EEOC Access Log Detail at **"Exhibit D-5")** which eventually resulted in the formal Determination letter on September 28, 2022 **(Exhibit I-1")**. This decision was made before additional documents were sent to Fisher on September 27, 2022 and Blankenship was denied the opportunity to discuss the case with Fisher having all of the information. The case was handled and processed by the EEOC with multiple errors and without a proper investigation. On these facts alone the Court should allow the case to be reopened and investigated properly.

Timeline of EEOC Material Events (CP=Complainant or Plaintiff)

| December 3, 2021 | .Initial inquiry submitted |
|---|---|
| March 9, 2022 | .Submitted Supplemental Information |
| March 29 | .Initial EEOC call with Engram. Told me too much information was provided and she was not going to review it. She ended the conversation by telling me she was not going to pursue it because there was not a case but told me to contact her if I still wanted to pursue it after I thought about our conversation. |
| April 11 | .Spoke to Engram. She was bothered by my decision to pursue a Charge given the direction she provided during our initial call. She posted the initial Charge document at 5:30pm. |
| April 22 | .Changes to Charge submitted<br>.Provided EEOCSummary04222022 document. |
| April 26 | .Changes to Charge submitted. |
| May 4 | .No communication so I called Engram and spoke with her. She had not reviewed 4/22 or 4/26 Charge comments. She was frustrated and defensive; refused to make recommended changes. I asked for her supervisor's name as I felt she was not being through and given her prior comments about Westward360. She proceeded to tell me that Ms. Harris, her supervisor, is aware of the case and supports her position but I could call anyway. |
| May 5 | .Engram sends revised Charge document. |
| May 12 | .Charge finalized. Accepted May 5, 2022 version as is to get the charge filed |
| May 19 | .Employer Position Statement Provided to EEOC |
| May 27 | .CP Requested Position Statement<br>.CP Sent: DOL Claim, Final Fraud report, Wage Claim<br>.Email Engram Updated EEOCSummary04222022, dated May 19, 2022 document. |
| June 2 | .CP left message for Engram. |
| June 6 | .Engram replies to June 2, 2022 email informing me the claim was predicated on sexual orientation discrimination. That was an inaccurate statement.<br>.EEOC requested additional information from Respondent.<br>.CP sent Engram copies of emails that have unanswered questions. I needed answers to respond further.<br>.Engram sent CP a copy of the Respondent's Position Statement requested May 27, 2022 |
| June 10 | .Respondent provided Additional Information document to the EEOC ('EEOC Response from Employer Date: 6-10-2022'). Complainant never received this document. |
| July 7 | .After a month of no communication from Engram, CP followed up by email seeking to clarify the discrimination and determine any other information she needed. |
| July 14 | .CP followed up by email to Engram due to no response. The email contained specific questions.<br>.CP also included cc: Sharonda Harris on the email requesting follow-up. |

| July 18 | .CP followed up by email to Engram and Harris due to no response. |
| July 22 | .CP followed up by email to Engram and Harris due to no response. |
| | .Engram sends one line email telling me the case is sexual orientation and to upload documents related to that to the portal. |
| | .CP sent Engram more information |
| July 28 | .CP followed up by email to Engram due to no response |
| August 19 | .CP followed up by email to Engram and Harris due to no response |
| September 9 | .CP followed up by email to Engram due to no response, and included Harris and Julianne Bowman as cc: |
| September 20 | .Case removed from Engram. |
| September 22 | .Case reassigned to Alison Fisher |
| | .CP spoke to Fisher. She did not have copies of the documents I previously uploaded. She said she had no files from me. She asked me to send a statement and document. I explained to her sexual orientation was only one component of the claim. I reviewed the initial sex discrimination incident and how it was never investigated until the same employee accused the CEO of what she did to me. Multiple harassment and sexual orientation discrimination events occurred prior to that. I told her I would send the documents by September 27 due to my schedule. |
| September 26 | .EEOC Log shows case was preliminarily closed by Fisher. |
| September 27 | .CP sent requested files to Fisher |
| September 28 | .EEOC Decision issued. |
| | .EEOC sent notice of important information on portal to CP. |
| October 6 | .EEOC sent Reminder email to CP about important information. |
| October 7 | .CP downloads EEOC Determination Letter |
| October 12 | .FOIA Request for documents |
| October 25 | .FOIA documents received. |

Illinois Department of Human Rights

A complaint was filed automatically by the EEOC on December 3, 2021. Based on the September 28, 2022 EEOC decision and issuance of the Right to Sue letter, I provided notice to the Illinois Department of Human Rights on November 4, 2022, requesting further action on the complaint (Control #230714.011) **("Exhibit T-1")**. The timing of the request was based on receipt of the EEOC Determination Letter on October 7, 2022 and not the date it was issued, which was September 28, 2022. On January 10, 2023, IDHR dismissed the request for lack of jurisdiction because the request was not filed in time. IDHR calculated the 30-day period using September 28, 2022 date the EEOC dismissed the Charge. Complainant intends to pursue any legal remedies available.

Illinois Department of Labor – Wage Claim

Per the agreed upon Year One Commission Plan **("Exhibit G)**, Blankenship was to be paid for all new business for CAM and Investments regardless of who closed the deal beginning July 14, 2021. Blankenship is due to the guaranteed commission and bonus for all new business growth for the period of his employment. Blankenship has reconciled the outstanding commission owed to the best of his abilities using the information he has available. The Employer owes Blankenship $12,345.86 in principal for commissions detailed below*.

|  | Principal | Principal & Penalty* |
|---|---|---|
| Guaranteed Commission: | $289.86 | $347.83 |
| New Business 3Q21 Bonus | $6,463.00 | $8,401.90 |
| New Business 4Q21 Bonus | $2,863.00 | $3,292.45 |
| New Business Denver 2021 | $2,730.00 | $3,412.50 |
| **TOTAL** | **$12,345.86** | **$15,454.68** |

*-as of March 31, 2022*

A Wage Claim (#22-0000336) was filed with the Illinois Department of Labor **("IDOL")** on February 22, 2022 **("Exhibit H-1").** On March 24, 2022, Blankenship amended the Wage Claim to include unpaid commission **("Exhibit H")** for new business in Denver, Colorado**.** The Employer provided their Answer to the Wage Claim on March 28, 2022 but based their response on the initial Wage Claim despite receiving the Amended Wage Claim on March 24, 2022. Blankenship replied to Employer's Answer on March 31, 2022; the Rebuttal included a settlement offer for this Wage Claim **("Exhibit GG").** The Employer did not respond to the offer and the offer is no longer valid.

The case status remains active with IDOL and is awaiting assignment to an administrative law judge for a hearing. As of December 31, 2022, the amount owed to Blankenship totals $21,010.32; interest and penalty will continue to accrue until balance is resolved.

Illinois Department of Labor - Employee Classification Act Complaints

The Company heavily relies on 1099 independent contractors to perform certain company functions, including brokerage, runners, accounting, and others; the entity that engages with the independent contractor is unknown. An Employee Classification Act Complaint Form (Case #21-ECA-000036) was filed on December 7, 2021, with the Illinois Department of Labor **("IDOL")** because the Company has independent contractors performing "employee" work **("Exhibit C-2").**

On April 12, 2022, Blankenship notified Cruz of a problem with the 2021 W-2 and 2021 1099-NEC. The Company shifted a portion of compensation to a 1099-NEC which reduces the Company's payroll tax liability but increases the recipient's tax liability. The IRS has a clear policy against paying a W-2 employee as a 1099 independent contractor for compensation earned while performing tasks paid as a W-2 employee. Blankenship requested this be corrected but the Company never responded. As stated during email exchanges **("Exhibit H-2"),** Plaintiff is seeking compensation for the additional tax liability shifted to him plus interest and penalties, as charged by the IRS. The IRS was notified and a complaint filed (Claim Number: 2021-011379) regarding employee misclassification. Blankenship, through his CPA, submitted IRS Form 8919 and SS-8 which paid Employee's share of 2021 payroll and related taxes and to contest the handling of the "worker status". An additional Employee Classification Complaint was submitted to IDOL for this specific issue on October 8, 2022 and assigned case number 22-ECA-000031.

## **WITNESSES**

The following current and previous employees of Outer Banks Capital, Inc. or independent contractors of Westward360, Inc. and professional contacts may have knowledge about the events described within. These are not character witnesses.

- Eric Staszczak
- Ann Marie Reilly
- Shana Johnson-Terminated January 2022
- Jenny Cruz
- Jude Tungul- Terminated February 2022

---

Blankenship vs. Outer Banks Capital, Inc.          23-CV-0867          Page 48

- Brent Straitiff
- Nathan Brown
- Patrick Gill–departed February 2022
- Romar Hidalgo – Philippines
- Zaela Consorcia Sevilla - Philippines
- Paul Pekofske–resigned September 2021
- Gregory Halpern–terminated October 2021
- Lazaro Estrada-resigned October 2021
- Aerial Furlan-resigned August 2021

Professional Contacts
Bulbul Bahuguna, M.D.
Psychiatrist
332 Skokie Valley Road
Suite 225A
Highland Park, IL  60035
(773) 907-2831

Dr. Gregory Wallman, D.O.
Primary Care Physician
Covenant Medical Group
2501 Compass Rd
Glenview, IL 60026
(847) 901-5200

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff requests judgement against Defendant and seeks appropriate remedies, pecuniary and non-pecuniary, including but not limited to compensation from December 3, 2021 to present; front pay until Plaintiff gains equivalent compensation, salary differential, other damages, and other costs that exceeds $600,000.00* including:

1. Back pay, commission, bonus and benefits;

2. Interest on back pay, commission, bonus and benefits;

3. Front pay, bonus and benefits;

4. Penalties and damages available to Plaintiff;

5. Compensation differential;

6. Compensatory damages for emotional pain and suffering;

7. Pre-judgment and post-judgment interest;

8. Injunctive relief;

9. Liquidated damages;

10. Punitive damages;

11. Plaintiff's time commitment to pursue this claim (if Back Pay in unpaid);

12. Reasonable attorney's fees and costs, if counsel is retained in future;

13. And, for any other relief this Honorable Court may deem just and equitable.

*-excludes 6, 7, 8, 9, 10, 11, 12, and 13

## DEMAND FOR JURY

Plaintiff demands trial by jury on all issues for which a jury trial is allowed.

Dated: February 10, 2023 (Original filed)
Dated: February 20, 2023 (Updated filing)
Dated: February 23, 2023 (Amended filing)

Respectfully submitted,

Brian D. Blankenship
Pro Se Plaintiff

Amended Complaint | 23-CV-0867 | February 23, 2023

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibits
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

# Blankenship vs. Outer Banks Capital, Inc.
## Exhibit Table of Contents
## February 10, 2023

| Exhibit | Page | Content |
|---|---|---|
| A | 53 | Department of Labor Complaint filed December 7, 2021 |
| A-1 | 67 | Text message from Straitiff terminating Plaintiff's employment |
| AA | 152 | Follow-up letter to Straitiff after 1:1 meeting discussing the Clear the Air meeting |
| C-2 | 69 | Charge of Discrimination from the EEOC, May 12, 2022 |
| C-3 | 71 | Defendant's Position Statement to the EEOC, around May 19, 2022 |
| C-4 | 73 | Plaintiff letter sent to Straitiff detailing the fraudulent accounting scheme |
| D | 76 | Supporting documents for the fraudulent accounting scheme |
| D-5 | 85 | EEOC Access Log |
| EE | 87 | Email with Straitiff, Blankenship and Cruz, December 2, 2021 |
| F | 90 | Plaintiff's medical disclosure to Straitiff |
| F-1 | 92 | Plaintiff's medical disclosure to Brown (call transcript) |
| G | 95 | Complete and executed employment offer package with job description and bonus plan |
| GG | 106 | Wage Claim reply to Defendant's response to DOL, March 31, 2022 |
| H | 114 | Amended Wage Claim, March 24, 2022 |
| H-1 | 119 | Wage Claim, originally filed |
| H-2 | 125 | Employee misclassification email to Cruz, April 12, 2022 |
| I-1 | 127 | Determination and Notice of Rights letter from the EEOC, September 28, 2022 |
| J | 134 | Project Tracking List example, September 7, 2021 |
| JJ-1 | 138 | Plaintiff's representation agreement with Attorney D |
| KK-1 | 146 | Letter to Straitiff after November 4, 2021 meeting |
| KK-5 | 150 | Email from Cruz about work performance |
| L-1 | 155 | Level 10 Weekly Agenda, November 23, 2021 |
| M-1 | 168 | Email with Straitiff about removing new business responsibilities |
| M-2 | 171 | Receipt for American Airlines ticket |
| M-3 | 175 | Documentation for hospital visit |
| M-4 | 181 | Documentation for hospital procedure |
| M-5 | 184 | Documentation for hospital procedure |
| M-6 | 187 | Documentation for hospital visit |
| M-7 | 190 | Documentation for hospital visit |
| MM | 193 | Confirmation email for January 27, 2023 appointment with Hibbler |
| N | 196 | Straitiff's email realigning Plaintiff's projects, September 13, 2021 |
| OO | 198 | List of reported concerns, complaints and problems to Straitiff in writing or verbally |
| P-2 | 200 | Defendant's June 10, 2022 follow-up response to the EEOC |
| T-1 | 205 | IDHR filing notification, December 8, 2022 |
| UU | 208 | Notes provided to Cruz regarding the November 10, 2021 incident |
| X-1 | 210 | October 14, 2021 letter Plaintiff sent to Straitiff |
| X-5 | 230 | July 31, 2021 letter sent to Straitiff regarding Nathan Brown |
| X-6 | 233 | October 21, 2021 follow-up letter sent to Straitiff and the Board |
| X-11 | 236 | Summary of Position Changes During Term |
| X-12 | 239 | Undisclosed Profit Centers |
| X-13 | 245 | Fraudulent Invoice Scheme |

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit A
# February 10, 2023

**U. S. DEPARTMENT OF LABOR**
**OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION**

**Complaint Filed on December 7, 2021**

I, Brian D. Blankenship ("Employee" or "Blankenship") reside at 2803 Brindle Ct., Northbrook, IL 60062. My telephone number is (224) 804-7692. I was hired on July 14, 2021, as Vice President, Business Development for Outer Banks Capital, Inc. d/b/a Westward360, Inc. ("Company") after a lengthy recruiting process that began on April 15, 2021. I am the first executive/senior-level employee the Company hired. A tremendous amount of due diligence on the Company was completed by me to ensure I decided knowing everything I could about the Company. The Company modified job descriptions to accommodate my skill set and we mutually agreed on the final version ("Exhibit A"). I was considering a job offer as COO for a company based in San Francisco at the same time I was considering the Company. After making several sacrifices, I chose the Company as my employer. The Company terminated my employment on December 2, 2021, without notice and without reason. The termination occurred after the following four events, which are discussed in more detail below,: (1) disclosing a medical condition to Straitiff, Chief Executive Officier ("Straitiff"), and Nathan Brown, Chief Investment Officer ("Brown"), on December 1, 2021, (2) in reprisal for my reporting and confronting Straitiff on December 2, 2021, with what I believed to be fraudulent management of company funds, (3) multiple written and verbal complaints regarding harassment and a hostile work environment, between July 31, 2021 and continuing through my termination date, that were ignored by Straitiff and Jenny Cruz, Director of Human Resources ("Cruz"), and (4) my December 2, 2021 refusal to mislead and lie to an investor, tenant, client or prospective client in an effort to retain and grow the Company's business.

On December 7, 2021, five (5) days after termination, I was informed by Cruz that work performance was the reason for my immediate termination. My contribution to the Company in less than 150 days was significant ("Exhibit B"). I was unaware Straitiff, or the Company, had any concern with my work performance. The decision to terminate my employment was made solely by Straitiff without input from human resources or the seven-member Board of Directors ("BOD") and in violation of multiple federal, state, and local laws. I'm of the belief Straitiff became frustrated and exposed after our meeting on December 2, 2021, that he overreacted by "flexing his muscle" and made the independent decision to terminate my employment. This is typical behavior of Straitiff when he wants to terminate a member of Company leadership. During the past 100 days, this behavior was seen on August 23, 2021, when Straitiff planned to terminate Jude Tungel, Director of Business Intelligence and a long-term employee of the Company, and then again on November 10, 2021, with Ann Marie Reilly, Vice President Rental Management, who has been with the Company for over two years and promoted into her current role July 2021. The BOD was involved with Tungel and Reilly terminations who over-ruled Straitiff's recommendation to terminate.

The Company changed my responsibilities several times while I was employed. I was hired to manage the following departments: new business, marketing, and transitions as outlined in the job description ("Exhibit A"). Immediately after my onboarding the Company had me get involved in operations to solve problems. This continued for about six (6) weeks. On September 2, 2021, Straitiff informed me I would not be assuming any new business responsibilities in CAM or Investments until January 2022, at the earliest. This decision was made to allow me to focus on several company-wide, significant projects, including a Reorganization and Realignment Plan, development and launch of a company-wide CRM, HR Department Improvements, call center upgrades and monitoring, and a Client Retention Plan. But then on September 13, 2021, Straitiff reviewed my Project Plan and gave me six priorities to complete by the end of 2021. This after being told to focus on operational initiatives just ten (10) days prior but now all those projects were pulled from me. Straitiff assigned additional tasks on October 13, 2021; creating and distributing Holiday Cards for clients, tenants, investors, and employees. I also was tasked with developing the employee gift from the employer. On October 15, 2021, another change occurred with responsibilities in Investments, working directly with Brown, after the Company laid off two employees in the Investment division. I was told to figure out what they do every day and re-distribute those tasks. Then I was to absorb any unassigned task. These new responsibilities required me to handle all inbound leads, email, and calls for new business within the Investment division working for Brown.

Amended Complaint | 23-CV-0867 | February 23, 2023

Employer corporate office address:
Outer Banks Capital, Inc. d/b/a Westward360, Inc.
1464 W. Webster Ave.
Chicago, IL 60614
Phone: (773) 572-0880
Web: www.westward360.com

My Year One salary was ▇▇▇▇ annually with a ▇▇▇▇ commission guarantee and a bonus potential of ▇▇▇▇ ("Exhibit C"). Total Year One compensation: ▇▇▇▇ Total Year Two compensation is ▇▇▇▇ Additional expenses for benefit costs, PTO, 401k contribution, and reimbursements are included in the Summary of Compensation Requested ("Exhibit OO"). Salary negotiations were a challenge during the recruiting process. I was seeking a salary of ▇▇▇▇▇▇ given my past earnings and responsibilities. The Company initially offered ▇▇▇▇ but I was able to get closer to my expectations through a combination of salary, guaranteed bonus and a bonus Plan. My supervisor's name was Brent R. Straitiff who was also the CEO and Chairman of the Board of Directors of the Respondent company.

*{Continued on Next Page}*

Filed 1/3/2022

## 1. Discrimination & Retaliation

I disclosed a medical condition to Straitiff via an email ("Exhibit D") and Brown during a phone conversation ("Exhibit E") on December 1, 2021.  I also shared this medical issue with Cruz on July 17, 2021, during my first week of employment, and she was aware during almost all of my tenure at the Company.  With this knowledge, the Company took a retaliatory action by terminating my employment the next day without notice and without cause. I can only assume Straitiff took this action to prevent me from joining the group health insurance plan to better control health insurance costs as the Company's health insurance premiums had a significant increase for 2022.  I became eligible for group health insurance on October 1, 2021, but enrollment was not offered until Open Enrollment, which the Company was in upon termination.  Upon enrollment, the group health insurance policy becomes effective February 1, 2022, which meant I would be 100% out-of-pocket for insurance costs even though I should've been permitted to join the group policy five (5) months earlier.

This is an example of Straitiff mismanagement, termination intentions, retaliatory actions, and overall failure to lead the executive members of the Company.

*{Continued on Next Page}*

Blankenship vs. Outer Banks Capital, Inc.

## 2. Money Laundering Activity and/or Misappropriation of Company Funds

On November 23. 2021, I noticed the same payee, Westward360 PC, on several GL expense lines within Repairs & Maintenance and Contracted Services (I don't recall the sections category) on a location's GL. The GL was reviewed to respond to a client's question about expenses. Next, I performed a search using the term "Westward360 PC" on the Company's network, which is Google Drive, because this was the first time, I saw this company name. The results Google Drive provided were based on the access level I was authorized by the Chief Technology Officer. After reviewing a few of the results, I quickly realized something was happening given the documentation of a process defined as "Centralized Dispatch". The documents made it clear that Brown was orchestrating a process that included creating false invoices payable to potential "shell" companies, inflating costs, and manipulating GL entries to generate profits. Further, there was evidence of Westward360 creating fraudulent invoices under multiple names, including Westward360 PC, Westward360 GC, and Westward360 PROS. According to the Office of the Illinois Secretary of State website's Corporation/LLC search, Westward360 GC and Westward360 PROS are not registered entities while Westward360 PC is an assumed name entity under Westward360, Inc. At that time, I didn't investigate any further because I wanted to confirm my initial findings with a colleague.

On November 24 I spoke with Eric Staszczak, Executive Vice President – Property Management, and Jude Tungel, Director of Business Intelligence, who are two of the Company's longest-term employees and have a deep understanding through their involvement in the Company. They both told me they recently became aware of the process I described to them and didn't know how to address it given Brown's control of the process. There was a collective agreement these findings were bothersome and, if accurate, mean Brown was stealing from clients for personal profit by creating fraudulent invoices and income statements and disguising the profit in one or more related companies. Again, if accurate, client income statements would be fraudulent, client funds misappropriated, inaccurate net operating income and cash flow reported to the IRS, and profits made by Westward360 from this scheme may not be reported as income

Not fully understanding what or how the Westward360 PC company functioned, I investigated my initial findings further over the Thanksgiving holiday. Specifically I discovered that the Company was marking up vendor invoices, creating false invoices payable to an assumed name shell company, Westward360 PC, withdrawing money from client and investor accounts using the inflated and false invoice, and profiting from the delta between the vendor amount billed and the amount charged by Westward360 PC. Additionally, false invoices were created from Westward360 PROS, the Company's in use maintenance division, for services not performed, maintenance retainers not implemented, and as the replacment for the actual vendor on certain services.

---

**Initial Findings**
To me, it seemed highly likely that the Company was effectuating a fraudulent laundering scheme by organizing the shell company to pay vendors and then charging our clients at a higher rate through the shell company. These are high-level observations to give perspective of how big this fraudulent activity may be:

- The Company created an offshore "department" to perform the tasks associated with the fraud
  - The department had three (3) offshore employees and the fourth employee hired in December 2021.
- The Investment Division created PowerPoint documents ("Exhibit F" and Exhibit F2") detailing the steps necessary to perform the fraud as well as step-by-step instructions ("Exhibit G") to ensure the fraud is disguised from clients and investors. Note: additional documentation regarding this topic is available upon request.)
- Invoices get marked up approximately 15% to 35%.

- The fraud scheme could be expansive given the size of the portfolio and the number of invoices processed monthly.
  - The Investment Division processed 504 invoices in October 2021 payable to the three entities (Westward360 PC, Westward360 GC, and Westward360 PROS) totaling $207,250. Specifically:
    - 398 invoices totaling $161,940 were billed by Westward360 PROS for the Investment Portfolio. An unknown number of invoices were completed by preferred vendors but re-billed under Westward360 PROS.
    - Two (2) invoices totaling $6,163 were billed by Westward GC for services provided by a preferred vendor. The amount of the mark-up is unknown but estimated to be 15% to 20% more than the amount billed by the preferred vendor.
    - 104 invoices totaling $39,145 were billed by Westward360 PC; all work was performed by preferred vendors but re-billed by Westward360 PC with a 25% mark-up.
- My research found 1,000's of invoices, beginning in February 2021, that were improperly marked up and processed through this fraudulent scheme.
  - For example, the three Westward entities used in the scheme were responsible for 47% of total invoices and 49% of total expense for the entire division in October 2021.
- And according to my research, it appeared that the Company had transferred funds equal to the inflated invoice charge from the client's account into the Westward360 PC shell company account.
- I have provided an example to demonstrate an invoice going through this process. ("Exhibit H").

To show the intention to perform these fraudulent activities, as an example as of November 24, 2021, Westward360 did not have an invoice from a preferred vendor, Mike's Sewer and Drain, for a plumbing repair completed on March 22, 2021. But Westward360 PC created a false invoice for the vendor in HCP and created another false invoice, but this invoice was made payable to Westward360 PC and for an inflated amount. The property account had funds withdrew on March 25, 2021, for the invoice payable to Westward360 PC at the inflated amount. It appears the vendor has yet to be paid the original amount because the original invoice has not been received. So not only did Westward360 bill a client for a service that was never invoiced and apply an increase on the false invoice, but they have also retained the amount collected from the property and not paid the vendor.

Westward360's fraudulent intention is further evidenced by 95 original invoices dating back to February 2021 from preferred vendors, including ASAP Appliances, Cold vs Heat HVAC, Cortina HVAC, Mikes Sewer and Drain, Nilsson Industries, Splash Plumbing, and Ward Plumbing that have not been received. Westward360 PC has already billed clients an inflated amount using false invoices to the property; Westward360 PC has collected $19,673 on original vendor invoices totaling $15,96 with the original invoice missing. Westward360 PC inflated original invoice amounts 23.3% on this batch of 95 invoices and they have retained these funds since the vendor has not produced an invoice.

On December 1, 2021, I sent an email to Eric Staszczak and Jude Tungul ("Exhibit I and J") letting them know the result of my investigation confirms our discussion from the prior week. The next step was to inform my immediate supervisor, Straitiff, of my findings so I scheduled a meeting with him at the office for 1pm December 2, 2021. I did not feel it was appropriate to just send him the prepared summary ("Exhibit K"), so I chose to deliver the findings "in person". After further thought, I was concerned about Straitiff reaction if he was aware of this fraudulent process in Investments, so I decided to work from home on December 2, 2021, and changed the 1pm meeting to a video conference. Straitiff and I had some back and forth regarding my choice to work from home, but I felt it was the right approach given the unknown variables. I believe Straitiff was already aware of the topic because of his demeanor and attitude. It's likely Staszczak or Tungul told Straitiff my findings after I shared with them in confidence. The video conference was moved to 9am.

As the 9am meeting started, I was quickly cut off by Straitiff and he told me he is aware of what I started to describe. He called it a new "service" the Company provides to vendors who otherwise could not do work with the Company because these vendors lack the sophistication and infrastructure to meet the Company's invoicing requirements. The clients have not been notified of this new service that involves Westward360 profiting from

Amended Complaint | 23-CV-0867 | February 23, 2023

inflating the amount due using a fraudulent invoice.  After a heated discussion, the meeting ended at 9:30am. Between 9:45am and 11:25am, Straitiff attempted to contact me no less than ten times.  Around 10am I sent him an email containing my prepared summary about the discovery, which included a statement reserving my federal, state, and local rights offering protection, including retaliatory termination. ("Exhibit K"). At 12:05pm my access to the company network and email were disconnected.  Then at 12:17pm I sent Straitiff a follow-up email ("Exhibit L").  At 12:19pm my employment was wrongfully terminated, via text message ("Exhibit M"), which was two minutes after sending Straitiff the email again reserving my federal, state, and local rights offering protection, including retaliatory termination. My termination occurred three (3) hours after I presented the discovery,  as  directed by company policy ("Exhibit N"), to Straitiff.

These are more examples of Straitiff mismanagement, participating in illegal actions, and overall failure to lead the executive members of the Company.

*{Continued on Next Page}*



### 3. Unprofessional Conduct, Harassment & Hostile Work Environment

Shortly after I began my employment, I began experiencing conflict with Brown. The conflicts would occur when he would micromanage me to an unprofessional and unnecessary degree, purposedly undermine my efforts to improve processes, treat me as his personal administrative assistant, spread inaccurate facts and lies about me to his senior staff, and placed limitations on my daily tasks preventing me from performing my job. Multiple complaints (verbal and written) were expressed to Straitiff, Cruz and the BOD between July 31, 2021 and December 3, 2021.

Straitiff has known about the harassment claim since initially reported by me on July 31, 2021 ("Exhibit O"). Despite being made aware of harassment and a hostile work environment, Straitiff failed to include the human resource department, investigate the multiple claims made, and took no action to protect the well-being of others in an escalating hostile environment. In fact, Straitiff only interest was to protect Brown's ego and prevent his defense mechanisms from activating. Straitiff chose to protect the person harassing and causing there to be a hostile work environment while ignoring my treatment, the impact on me, or its effect on the Company. Straitiff expressed to me many times "Nathan is a good friend", "He's my partner", or "We've known each other for 20 years" as the reason he refused to address the concerns.

On October 14, 2021, I sent a letter ("Exhibit P") to Straitiff expressing my frustration with the situation and the Company's unwillingness to implement change. I expected to discuss my letter with Straitiff but, instead, the letter was sent to the BOD, including Brown and scheduled an emergency board meeting that same afternoon. Supplemental information ("Exhibit Q") was provided to Straitiff for distribution to the Board for additional context. To date, Straitiff addressed the letter by mandating a :1 meeting between Brown and myself. It's apparent Straitiff, Cruz, nor the BOD took any action against Brown given the aggressive acts he took after reviewing the letter and our 1:1 meeting. I sent Straitiff and the BOD a follow-up letter on October 21, 2021 ("Exhibit R").

Straitiff contacted me by phone after the Board meeting; the 45-minute conversation did not address a single item from the October 14 letter ("Exhibit P"). Instead the time was spent by him telling me 15 things I did wrong by submitting the letter. Below are examples of the comments:

- I was accused of not being a very good political person. He could help me.
- My opinion is valued but I need to mature from a leadership perspective
- I need to go into meetings with Brown with an open mind and don't jump to conclusions
- He told me that I will look back on this letter and the choices I made today and realize it was not the best way o handle
- The Board is n going to look at me differently for sending the letter
- I must learn how to work with Brown and remember that he is also an owner

    I was accu ed o getting frustrated and/or "set in my ways" when things don't happen as I like. Two examples we e given: 1.) an employee who has been stealing from the Company for five (5+) years w s not immediately terminated, as I suggested, and remains employed 120 days after discovery and 2 ) I expect Brown to change to a new and different way of operating too quickly. Yes, both of these events have been frustrating.

The Company changed my job description on October 15, 2021, that increased my responsibilities with Brown. In fact, my new responsibilities required me to handle all inbound leads, email, and calls for new business within the Investment division. A few days later, I was told Brown was no longer going to handle leads, and I was now responsible for pre-qualifying leads and then deliver only pre-qualified leads to Brown. This was an intentional move to push me to resign. It was a very uncomfortable environment and caused tremendous stress and negatively impacted my mental health On October 23, 2021, I sent Straitiff a letter ("Exhibit S") setting some expectations and requesting clarity on a few issues.

None of my reports of harassment prevented Brown from taking the following actions against me beginning October 17 and continuing through October 29. The restrictions, below, prevented me from being responsive to prospective clients/leads and responding to client or tenant emails. He made these moves independently to exhibit his authority, his desire to control everything and everyone, and in retaliation for my October 14, 2021 letter:

- October 17 - my email communication to a client or owner must be approved by Brown
- October 25 - any phone call with a tenant, investor/owner, and prospective clients must be chaperoned by Brown
- October 29 - Brown removed my responsibility with management agreements and selected Zalea to oversee them in Investments. (I guess he didn't like the fact that I questioned some of the terms or general questions about the deal. So his solution is to offshore it and I quote "because she will do whatever I ask and provide it with no questions asked").

After a few weeks in this new environment, the situation and the hostile environment got worse. I complained to Straitiff several times and sent him a draft letter on October 23, 2021, I intended to send to Brown ("Exhibit T"). Straitiff had several comments to my draft. Most of Straitiff's comments ("Exhibit U") softened the tone of the letter so it would not upset Brown or cause him to get defensive. Then Straitiff called me on October 29, 2021. He told me he didn't know how to handle this situation between Brown and I. Straitiff admitted to me that he was not able to be objective because Brown was his good friend and partner and had been for over 20 years. He also told me if it doesn't get worked out, it will turn into a bad situation because he believed the company could not continue to operate with Brown and myself at a head. According to Straitiff, he took a step to attempt to "Clear the Air" between myself and Brown and he scheduled a meeting on November 4, 2021. Straitiff informed me that he planned to include Brawley Reishman, the Chief Technology Officer in the conversation as a neutral party. Thus, my understanding was that Reischman's presence at that meeting was to be an observer and a mediator. Straitiff scheduled the "Clear the Air" meeting for November 4 2021.

After multiple complaints of Brown to Straitiff without any action I informed Cruz on November 3, 2021, who had no idea I had any Complaints about Brown. Straitiff failed to inform human resources about the complaints to date as Cruz claimed she knew nothing about the situation until I provided her documents on November 3, 2021, previously sent to Straitiff regarding Brown. I felt it was important for Cruz to know the issues and I hoped she would insert herself into the November 4, 2021 "Clear the Air" meeting. Her initial response (not verbatim; see emails for specific response) was the events I described sounded like Brown. She said that it was my turn to get "tagged" as Brown's target and this typically happens to "most of us" yearly. Cruz also disclosed to me that there was an employee that filed a charge against Brown a few years back. According to her, Brown was guilty, and the Company had to settle with the previous employee.

Prior to the November 4, 2021 meeting and without my knowledge until it was already shared, Straitiff forwarded my EFPA-certified PI Behavioral Assessment result ("Exhibit V") to multiple members of the executive staff to "help them understand what made me tick" and how I worked. No information was shared about any other executive staff member, except my information. This information is personal, and I was quite embarrassed and vulnerable when Straitiff took it upon himself to share my personal information. I shared my Predictive Index results with Straitiff, in confidence, during my recruitment phase as a tool to help him evaluate my strengths and capabilities in May 2021.

Straitiff opened the November 4, 2021, Friday meeting with a PowerPoint on conflict management ("Exhibit W"). For 45 minutes, Straitiff highlighted issues that Reilly or I had in the past month and emphasized that Reilly and I would just have to work together better. The conflicts and issues between Brown and I did not get addressed or discussed. Straitiff excluded Brown from the discussion and any attempt to bring up an issue during this meeting, which was a meeting to help solve problems, was ignored. Straitiff allowed Brown to sit in this meeting that was to be about him but spent zero minutes discussing the main topic of the intended "Clear the Air" meeting. The meeting was pointless and accomplished nothing; Straitiff didn't deliver on the only attempt he's made to resolve the issues since becoming aware of the harassment on July 31, 2021. I was well prepared for the meeting with an outline and prepared questions ("Exhibit X") but became livid and felt betrayed when the meeting ended having hoped it would be a true attempt at resolving the conflict between myself and Brown. Cruz did not join the

Amended Complaint | 23-CV-0867 | February 23, 2023

meeting and when I asked Straitiff at the start of the meeting if Cruz should participate, he said No because Brawley was present. A follow-up email was sent to Straitiff the same evening expressing my disappointment of his avoidance of addressing the issue ("Exhibit Y"). This letter caused a meeting between Straitiff and I on November 7, 2021.

In the November 7, 2021, meeting, Straitiff told me he decided to exclude Brown from the "Clear the Air" meeting because it was too risky, so he chose 'not to deal with it". He further explained his rationale - "I don't want to hurt Nathan's ego," "If we get him at the wrong time, he's going to clam up," "he won't cooperate if he feels attacked or threatened," and "it will make things worse." His alternate plan was for Brown and me to meet 1:1 and "work things out". Straitiff again reminded me that these issues are unhealthy for the Company and things must change. I expressed to Straitiff that he needs to address Brown's behavior because nothing will improve with how he's handled the situation to date. Near the end of the meeting Straitiff admitted he made a mistake in changing the context of the "Clear the Air" meeting at the last minute and he has not dealt with any of this objectively because of his friendship and partnership with Brown. A few days later, November 10, 2021, Cruz asked how things were between Brown and I, so I shared the most recent correspondence to Straitiff with her ( Exhibit Z"). She said, "it looks like Brent didn't deal with the formal complaint." I agreed but that was the end  f the discussion. Straitiff, Cruz nor the Board addressed the complaints or worked to improve the toxic and h   ile work envi onment.

On November 17, 2021, Straitiff complained during a phone call that I was not b ing productive enough. I followed up the phone call with an email rebutting his statement and obse vation ("Exh bi  AA"). My response was also shared with Cruz. Cruz responded back with a few comments about my letter  o Straitiff ("Exhibit BB"). Also, on November 29, 2021, I responded to an email sent from Straitiff  egarding   is expectations of me ("Exhibit CC"). He was upset I did not return a person's phone call immediately; he ba  cally expects me to stop whatever I am working on to be more responsive to him. As my response states  that is a se fish and unprofessional requirement to place on a senior-level employee of the Company.

A summary letter outlining my investigation was sent to Straitif  on December 2, 2021, after our meeting that morning ("Exhibit DD"). Straitiff responded a few hours later by terminating my employment via text message ("Exhibit N"). I was wrongfully terminated o  December 2, 2021, without notice and without reason. On December 3, 2021, I sent a letter ("Exhibit E  ") o Strai iff, Cruz, and the BOD discussing my termination. I returned Company equipment, including corporate credit card and key FOB, on December 4, 2021. Cruz provided the reason for my termination, upon my request, on December 7, 2021 ("Exhibit FF"). She claims I was terminated "due to work performance". On Dece    er 8, 2021, Cruz reminded me I had a company Chromebook in my possession. The next day Cruz informed me  $600.00 deduction will be made on my final paycheck if it was not returned immediately. I informed Cruz on December 13, 2021, that I did not authorize the deduction and told her that action would cause immed ate  eactions. Since she conditioned my final paycheck, I told her the Chromebook would be returned upon  eceipt of my final compensation December 16, 2021. An attorney representing the Company sent me a letter ( Exhibit GG") on December 15, 2021, demanding the return of the Chromebook and any Compa y docum nts stored on a flash drive. I responded to the attorney on December 16, 2021 ("Exhibit HH")  nform ng her  received my final compensation, and the Chromebook was delivered to the UPS store earlier that  morning. In this same letter, I informed Outer Banks Capital, Inc. and Westward360, Inc. that, under  W istleblower protections, I was in possession of Company documents, but they would not be returned because they are needed to pursue several claims against the Company. The Company was given a Litigation Hold Notice on to preserve all records from December 1, 2020 to December 31, 2021.

In unrelated events that highlight Straitiff's inability to protect the Company and the staff, Straitiff and Cruz were notified on October 18, 2021, about a conversation I had with a Property Manager ("Exhibit II"). In my conversation, the employee disclosed to me that she was a concealed gun carrier. The gun is located on her person when she is in the Webster office and during property visits. The Company does not have a policy regarding guns and the Webster office does not contain the mandatory signage or secure storage when a concealed weapon may be present. Straitiff didn't respond to my email until October 20, 2021, at the end of a long, unrelated meeting. He was disappointed that I raised another issue that he needed to address. He then asked me if the email I sent was from me personally or professionally. I told him my personal feeling about guns was irrelevant. As of the date of this letter, this gun situation has not been addressed. There is another event that highlights Straitiff's inability to protect his client, Straitiff was informed August 8, 2021, that a long-term employee

was stealing. I provided the evidence showing the theft and Straitiff, Cruz, and Staszczak agreed the employee had been stealing from the Company for some time. I recommended an immediate termination but that was overruled by Staszczak. Today, nearly five months later, the employee remains employed and, to the best of my knowledge, was never counseled about the theft. The Company claims to have terminated me for work performance, yet the same Company will allow a proven thief manage properties.

These are examples of Straitiff mismanagement, protection of an employee accused of harassment, and overall failure to lead the executive members of the Company.

*{Continued on Next Page}*



### 4. Consumer Fraud and Deceptive Business Practices &
### Personally Identifiable Information Exposed

Westward360 has intentional processes and strategies that are intended to deceive tenants, clients, investors, and employees.  A major fraud is discussed above – 2. Money Laundering Activity and/or Misappropriation of Company Funds.  The following programs are maintained and operated by Westward360 but are deceptive and possibly illegal, but Westward360 collects many undisclosed fees ("Exhibit JJ") over and above the management fee. I estimate the Company has collected $495,936 in undisclosed fees and charges as of November 30, 2021.  When an owner hires Westward360 to manage a condominium unit, the owner agrees to allow collection of rent and other fees as necessary. The Company violates these terms by collecting and not disclosing fees they are generating profits from the investor or client's asset, including these examples:

Building Liability Coverage (Tenant Insurance) – this is an insurance program that is force placed on every new tenant and gradually forced onto current tenants. For new tenants the insurance must be accepted at the time the lease is signed. The monthly premium is $12.00.  To demonstrate t e growth - after the first few months there were only 76 insurance policies but in June 2021 there were 275 insurance policies. At the end of September 2021 there were 835 insurance policies generati g over $ 0,000 per month in premiums. Approximately 46% of the Investment rental portfolio had coverag  as of  ptember 30, 2021. Brown's goal is to increase the penetration level to 90% by December 31,  021  At 90% penetration, nearly 1,700 tenants will have this insurance force placed onto their accounts and generate over $20,000 per month.  A tenant is forces to select this insurance even if  hey hav  their own renter's insurance policy.  The program is administered by Rosenthal Bros., Inc. ( Rosenthal"  with a reinsurer based in the Cayman Islands.  It appears the relationship with Rosentha  is wi  h a single purpose entity ("SPE"), Everest Investments V LLC, and not with Westward360, Inc. or Outer Banks  apital, Inc.  The Company retains all premiums and commission from this program and does not a   ve a revenue share with the owner or investor.  This program is not disclosed in the management agreement; the Company is generating profits from an asset they have no financial interest in and do th s without a disclosure to the owner or investor. Based on my experience with tenant insuranc  programs, I was very concerned about this program and how it was being sold.  I attempted to  ring my concerns to Brown as early as October 5, 2021, but they were discounted or ignored.  On Decem er 1, 2021, I sent Brown an email ("Exhibit KK") asking for documentation related to this program because I had a concern with how the company sold the service and how it was compensated.

Eviction Protection Plan – th   is a se f-insured program that charges the investor or owner an annual fee for the Company assuming th  risk of a tenant placed by Westward360 into a rental apartment who becomes delinquent a d gets evicted.  If the owner or investor elected this program, then Westward360 will pay for the f rst $2 000   f expenses related to the eviction process.  The annual premium varies widely and is not con istently applied but in general it ranges from $150 per unit annually to $75 per unit annually for larger mu ti-family buildings. Westward360, Inc. has collected nearly $60,000 from this program through November 30, 2021.  The Company treats the premiums collected as 'cash' for accounting purposes and does not maintain a reserve for current or future claims.  Another important distinction is  he Company retains 100% of the premiums collected.

Kickbacks – the company claims it is transparent and passes all savings to the property or owner.  This is inaccurate based on the two claims noted above.  However, the Company has an internal entity called 360 Services.  This entity collects "kickbacks" from certain vendors detailed below.  For example, Vendor #1 (Lakeshore Recycling) is forced onto every new asset at the time of takeover canceling and ignoring any contract obligations or termination fees from a current contract.  They require the owner or investor to absorb any fees, without disclosing this to them. All financial business is coordinated with Wintrust, and it seems they have an interest in diverting all financial business to Wintrust given #3. One service is missing from this list and that is Rosen earnings split.  Rosen kickbacks an unknown percentage of the total insurance business generated by the Company monthly.  The Company requires all insurance to be funneled through Rosen including, but limited to commercial general liability, auto insurance, health insurance, errors & omission, and professional liability.  None of this is disclosed to an investor or owner.

Amended Complaint | 23-CV-0867 | February 23, 2023

| 1605 - 360 Services | | Earnings Split |
|---|---|---|
| 1 | Lakeshore Recycling | 7% of invoice |
| 2 | ITC | $4 per telephone line |
| 3 | Wintrust | Treasury less 75 basis points |
| 4 | Breea | $100 each invoice |
| 5 | McDonnell Energy | 25% of McDonnell commission |
| 6 | Servpro of Central Schaumburg | 10% of Invoice |
| 7 | NetVendor | $40 per vendor per year |
| 8 | Our Moving Concierge | Various per contract |
| 9 | Helios Visions | 10% of Invoice |
| 10 | A-Reliable Window Cleaning | 10% of Invoice |
| 11 | Personal Touch Carpet Cleaning | 10% of Invoice |
| 12 | Cortesi Law | 30% of tax appeal invoic |

Straitiff and Brown, both licensed real estate brokers in Illinois, coordinated and partic pa ed in unfair and deceptive business practices in violation of the Illinois Real Estate License Act of 2000.

The Company expected me to provide misleading, deceptive, or fraudulen statem nts to current and prospective clients. On October 17, 2021, Brown responded, "Overall, it's my strong opinion when explaining things you DO NOT give the client more information than they need." I refused to lie an mislead clients; Brown instructed me to not talk to any client, tenant, or prospective client. I sent Brown an email on O tober 19, 2021, expressing I did not subscribe to his opinion of explaining things (Exhibit LL).

There are no policies for handling, storing, protecting, and accessing personally identifiable information (PII) of employees and rental tenants and applicants within the Compan . Sensitive personal data, such as background checks, social security numbers, driver's licens numbers, health insurance records, and more is accessible to employees who have no right to that informati n or too much personal data is accessible for a person (a supervisor should not have access to HIPPA protected data about their staff). Because the Company lacks controls to protect personal data, employees can access and download this data on multiple devices, such as a laptop, tablet, phone, or home PC, which expos s the Company data further. Exhibit MM is a copy of my background check with my PII exposed pulled from the C mpany network. The Company allows most of its staff to work from home or remotely so the amount of p rsona information that is accessed improperly is significant. Finally, in the Investment Division, tenant applicat on data, which includes social security numbers, driver license numbers, birth dates, and credit card informat on is c llected but not protected which is a violation of the Personal Information Protection Act (PIPA) (815 ILCS 53 /1 et seq.) under the Consumer Fraud and Deceptive Business Practices Act. The application informatio can e accessed by most of the Company employees.

These are exampl of Straitiff mismanagement, inability to protect Company data and overall failure to lead the executive members of the Company.

*{Continued on Next Page}*

I believe my termination is directly related to my disclosing my suspicions that the Company was laundering and/or mishandling company funds in addition to the other three events co-occurring described above. The Company has an obligation to act fairly and in good faith in dealing with employee issues. They have caused intentional stress and constantly increased the hostile work environment by taking certain actions. All of this caused a decline in my mental health and negatively impacted my general health. In fact, I used several company-provided sick days in November 2021 to avoid Brown and the hostile work environment.

The primary request is for the Company to eliminate all fraudulent and improper practices until there is full disclosure to investors and clients. The investor or client can decide to accept the disclosure or terminate their agreement if they do not agree with the disclosure. Every client, investor and tenant have the right to know.

Personally, I request that OSHA to expunge my record of this incident and note that I am willing to consider reemployment, but it is highly unlikely given the circumstances. In terms of compensation, I'd like OSHA to collect the back pay to which I am entitled, forward pay to maintain my income until a job near my historical annual compensation is obtained, compensatory damages for out-of-pocket expenses caused by the wrongful termination and emotional distress damages, punitive damages to penalize the Company for these intentional actions and wrongful termination, and all reasonable attorney fees. Exhibit OO contains a detailed Summary of Compensation Requested. The estimate assumes (a) Back Pay is paid through February 28, 2022, which is the estimated date of settlement with the Company/employer and (b) Front Pay beginning March 1, 2022 through December 31, 2022 based on time took to secure position from most recent job searches. Compensatory n punitive damages are valid for this claim given the Company (a) committed retaliation against me which was intentionally extreme in its nature and such that by any reasonable standard, with the conscious knowledge that it was a violation of the law and (b) engaged in harsh, vindictive, reprehensible, and malicious conduc

Statement prepared by Brian D. Blankenship on December 27, 2021

**I approve/agree with this statement.**

Brian D. Blankenship
2803 Brindle Court
Northbrook, IL 60062
(224) 804-7692
bdblankenship@gmail.com

Exhibits A to OO attached

*{End of Document Before Exhibits}*

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit A-1
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023



# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit C-2
# February 10, 2023

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC  FEPA | 440-2022-01739 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| Brian D. Blankenship | (224) 804-7692 | 1973 |

Street Address

2803 Brindle Ct

NORTHBROOK, IL 60062

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| WESTWARD 360 D/B/A OUTERBANKS CAPITAL | 101 - 200 Employees | (773) 572-0800 |

Street Address

1464 W Webster Ave

CHICAGO, IL 60614

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address                                      City, State and ZIP Code

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |
| Retaliation, Sex | 12/02/2021          12/02/2021 |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by the Respondent in or around July 2021. My position was Vice President of Business Development. During my employment I was subjected to harassment, which included, but was not limited to, comments about my sexual orientation. I complained and was accused of performance deficiencies. On or about December 2, 2021, I was discharged.I believe that I have been discriminated against because of my sex (sexual orientation) and retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.  Digitally Signed By: Brian D. Blankenship  05/12/2022  Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT  SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Blankenship vs. Outer Banks Capital, Inc.                                                                 Page 70

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit C-3
# February 10, 2023



Position Statement of Employer, Westward360 Inc, an Outer Banks Capital Company

Charge number:  440-2022-01739

The charge provided by the claimant does not provide any details pertaining to why it was based on retaliation and/or sexual orientation.  The claimant was terminated due to work performance.
To my knowledge there were not any conversations pertaining to the claimant's sexual orientation nor would that have been factored at all into his poor work performance.

Jenny Cruz
Director of Human Resources
773-572-0908
jennyc@westward360.com

**1464 W Webster Ave - Chicago, IL 60614 / 773.572.0880**

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit C-4
# February 10, 2023

December 1, 2021

Brent -

I did not completely disclose complete details when you asked me how things are with Nathan earlier this week. I have not spoken to Nathan since November 23, 2021, and he hasn't responded to any email since November 24, 2021, except for one email at 9am November 29, 2021.  I know you want me to focus my energies on new business but I can't ignore a recent discovery because I'm not willing to sacrifice my morals and ethics by participating in an environment of fear, fraud and misrepresentations.

You should know, as most staff won't tell you otherwise, people are aware of and talk about Nathan's activity.  Your staff is afraid to say anything about Nathan because of the repercussions. His dishonesty and alteration of the facts are widely known internally.  It's very clear no one, including yourself, wants to confront Nathan to deal with known and unknown issues.  I don't share that opinion. Case in point – there are two members of staff that are aware of the activity I will detail below but don't want to confront Nathan or the situation.  The reasons are concerns about how they will be treated post-disclosure or nothing will happen or change because nothing ever does with Nathan. One employee has known about this for more than two months while the other claims two weeks.

In addition to the scheme discussed within, I have presented documented issues with Nathan's questionable management practices and his improper treatment of employees on three occasions since July 31, 2021.  The company has generally chosen to ignore the issues while at the same time increasing my responsibilities in the Investment Division which has only increased my interaction with Nathan. On November 17, during a discussion with you, you became very frustrated and said you want to talk about growing the business and not Nathan Brown.  My response was I wasn't sure how the situation could be expected to improve when the company has failed in its limited attempts and avoidance of the issues to temper the situation. It's been challenging to work with Nathan every day with those conditions; you have stated discussing these issues with him will only upset him, cause him to close off any further dialogue, potentially increase his inappropriate actions and upset his ego.  No consideration has been given to the effect this environment has on others and me professionally or how the environment is unhealthy and affects one's mental health. You have indicated it's the company's objective to remove Nathan Brown from the Investment Division due to unknown issues soon. Given the necessity of Nathan's involvement to keep the alleged scheme in place, I would argue he is unable to be removed if you or the Board are aware of this scheme.

**The Scheme**
The discovery of the False and Inflated Invoice Scheme was by complete accident but required a substantial effort to piece together the mechanics of the scheme.  Nathan Brown is directing a department to create inflated and fraudulent invoices to overcharge clients and increase profits.  Nathan knowingly accepts an invoice from a 3rd party "Preferred Vendor" and has created processes to overcharge clients for the vendor provided service. One of two fictitious vendors that were formed to support this scheme creates a replacement invoice inflating the original invoice by 15% to 30%.  To date the overcharge or markup, involve hundreds of invoices that total more than $111,000 beginning in April 2021. In an elaborate scheme, Nathan directs the Project Coordinator to submit a replacement invoice, which utilizes Zendesk, HPC, Strongroom, and multiple spreadsheets.  The scheme uses (a) 17 vendors, who must be aware their invoices are being inflated, (b) a process that includes onshore and offshore staff, (c) the Investment department staff, and Tara Lindborg, (d) Westward PROs for invoicing yet the service was performed by a 3rd party vendor, (e) two subcompanies created to disguise the invoice fraud, and (f) a non-existent GC/subcontractor relationship with the preferred vendors designed to deceive the client. Further, the scheme includes changing file names and purposely excluding invoice descriptions. On Owner's Statements, the report has been re-formatted to exclude comments, split comments, and pass throughs to deceive the client from what is taking place. Further, most of the false invoices include a section that says, "Service Provided by" and purposely state Westward360 PC despite the service being performed by a preferred vendor who had no general contractor/sub-contractor relationship with

Westward360 PC. I've included one example invoice and how it becomes a fraudulent invoice. See comments on each sheet in the green box.

Is this scheme a Company approved program? Is the Board of Directors aware of the program and its impact?

**Transparency**

I have personally been provided information by Nathan Brown and you stating Westward360 is a transparent Company and we are honest with the client. I am expected to promote the company's transparency to new clients without disclosing any fee we will charge them once they become a client. And I am lying to prospective clients when I tell them we don't markup our services or any third-party service except for those disclosed in the agreement. I've pushed to disclose these fees upfront and recommended changes to the management agreement to introduce the fees we charge our clients. My requests have been denied multiple times by Nathan Brown. Nathan Brown's fraudulent scheme and deceptive practices will impact my creditability with existing and future clients which will ultimately impact my reputation. The Company cannot expect any employee to work for Partner knowing his actions will negatively impact those around the Partner. The alleged scheme violates several laws, state statutes, Realtor regulations, professional designation requirements, and probably more. Most importantly, we appear to take advantage of our clients and ignore the fiduciary responsibility we are expected to provide.

**Protection**

My intentions are (1) getting myself removed from the Nathan Brown environment, (2) an obligation to report to my direct supervisor a scheme discovered by accident but identified from many years in the property management industry, that is allegedly fraudulent and illegal and (3) to make sure the Company acts on its Transparency core value. Effective immediately, I request that I be removed from working with Nathan Brown and to not be required to assist Investments in any way. I'd be willing to take on other responsibilities and even Investment tasks but only if Nathan Brown is removed from the day-to-day operations. Because I don't know who has knowledge of the scheme, I am forced to protect myself since I am exposing potentially illegal and fraudulent financial activities. *I reserve my rights and protection provided by Illinois Whistleblower Act, (740 Ill. Comp. Stat. §175 et seq), the Illinois False Claims Act (previously the Illinois Whistleblower Reward and Protection Act), state and federal Occupational Safety and Health Acts, Illinois Wage Payment & Collection Act, Securities and Exchange Commission ("SEC"), Commodity Futures Trading Commission ("CFTC"), Internal Revenue Service (IRS) and all other local, state, and federal protections which offer workplace retaliation protection from Nathan Brown, Outer Banks Capital, Inc. and Westward360, Inc.*

After you review the example, I can explain further or answer any questions. I'm aware of the risk in providing this information and I have a 90% confidence factor on the statements and claims made. If I am inaccurate, my request to be removed from the Nathan Brown environment remains. But if the scheme as described is approved by the Company, then there needs to be a discussion about my involvement and unwillingness to participate. I do not intend to ignore my morals and professional ethics by participating in illegal activities for the benefit of Nathan Brown or Westward360, Inc.

Respectfully –

**Attachment:** Walk-through of an invoice from JH Carpeting for $1,580.00 that is replaced by an invoice created by Westward360 PC under JH Carpeting's name to how the scheme charges the Client $1,800.00. The documents show how JH Carpeting collects $1,580 and how multiple bank accounts are used to disguise the scheme. Keep in mind this is only one example; there are hundreds of invoices that have been re-created. The mark-up portion of these invoices total over $111,000 (April 2021 to October 2021).

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit D
# February 10, 2023

| | $222,522.59 | | | $267,749.75 | | 0.831084212 |
|---|---|---|---|---|---|---|
| | | | | HCP | | |

| Date | ZenDesk # | Sub | Building Address Serviced | Sub Cost | Sub PW Bill # | Owner billed amount | Owner Invoice /HCP# | NOTES |
|---|---|---|---|---|---|---|---|---|
| 10/26/2021 | 572366 | Cold vs Heat HVAC | 1252 W Elmdale AVe #1 | $280.00 | 109150 | $350.00 | 384345-1 | |
| 10/26/2021 | 571874 | Cold vs Heat HVAC | 5607 W Irving Park Rd | $380.00 | 109151 | $455.00 | 384885 | |
| 8/14/2021 | 478427 | JH Carpeting | 5312 Foster Ave | $1,580.00 | 109152 | $1,800.00 | 384895 | |
| 7/15/2021 | 449047 | Personal Touch Carpet | 2034 Arthur / 6506 Seeley | $450.00 | 109154 | $600.00 | 379285-4 | |
| 9/27/2021 | 439195 | JH Carpeting | 6034 Hermitage / 6051 Ridge | $6,790.00 | 109155 | $9,600.00 | 374106 - 1 | |

Blankenship Vs. Outer Banks Capital, Inc.

*Ann*



# JH Carpeting

**TEL: (773) 562-2451**

**INVOICE / QUOTATION**

**No. 0090**

**INSTALLATION CHECK LIST**

**DATE:** 8-14-21

| | |
|---|---|
| **CUSTOMER'S NAME:** Westward 360 | **CASH** ☐  **CHECK** ☐ |
| **ADDRESS:** 5312 W Foster  Chicago, IL | **CHECK NUMBER:** |
| | **EST. INSTALLATION DATE:** |
| | **SALES CONTRACT:** |
| **PHONE:** | **PHONE:** |

## SPECIFIC INSTRUCTIONS AND SITE CONDITIONS

Stairs and landings runners

Binding

Carpet, padding and labor

| | | | |
|---|---|---|---|
| **PADDING** | **YES** ☐ **NO** ☐ | **FLOOR COVERING** | |
| **FURNITURE MOVE** | **YES** ☐ **NO** ☐ | ☐ TILE  ☐ CARPETING  ☐ WOOD | |
| **CARPET TAKE UP** | **YES** ☐ **NO** ☐ | ☐ OTHER _____ | |
| **SPECIAL EQUIPMENT / MATERIALS** | **YES** ☐ **NO** ☐ | **SUPPLIED BY:** _____ | |
| **TOTAL DUE UPON COMPLETION** | **YES** ☐ **NO** ☐ | **INSTALLED BY:** _____ | |

| | |
|---|---|
| **COST FOR MATERIAL** | 1580 00 |
| **COST FOR CARPET TAKE UP** | |
| **COST FOR FURNITURE MOVE** | |
| **COST FOR INSTALLATION** | |
| **DEPOSIT** | |
| **TOTAL DUE UPON COMPLETION** | 1580 00 |

**THE AUTHORIZED SIGNATURE BELOW SHOW ACCEPTANCE OF ALL THE CHARGES LISTED ABOVE FOR MATERIALS AND LABOR. THIS SIGNATURE ALSO CONFIRMS ACCEPTANCE OF THE FLOOR COVERING LISTED ABOVE**

**AUTHORIZED SIGNATURE** _____ **DATE:** _____

**QUOTATION GOOD FOR THIRTY (30) DAYS**

Blankenship vs. Outer Banks Capital, Inc.

Amended Complaint | 23-CV-0867 | February 23, 2023



Bill #109152  PAID

| Vendor | JH Carpeting | | Ref No. | 90 |

Bill Date 11/04/2021

Due Date 11/04/2021

Terms NET 30

Description HCP: 384895

Last Modified By tlindbor - 11/12/2021 10:12 AM

Attached to **ATTACH WORK ORDER**

## ⊖ Bill Splits

| Portfolio/Building | Unit | Account | Comments | Amount |
|---|---|---|---|---|
| WESTWARD360P | | SUBCONTRACTO - Sub Contract... | 5312 W Foster CA carpet | $1,580.00 |
| Total | | | | $1,580.00 |

## ⊖ Payments

| Date | Paid From | Payment Method | Amount (This Bill) | Amount | Action |
|---|---|---|---|---|---|
| 11/12/2021 | 1100 - Westward360 PC | Check To Be Printed | $1,580.00 | $8,370.00 | View Del |

## ⊖ Attachments

| File Name | Published To Owner Portal | Action |
|---|---|---|
| JH - HCP #384895.pdf | No | Publish Del |

Blankenship vs. Outer Banks Capital, Inc.                    Page 79

VIEW INVOICE    DONE    CLONE    EDIT    ATTACH FILE(S)    PRINT

# JH Carpeting

# INVOICE



4343 Wenonah Ave.

Stickney, IL 60402

Phone (773) 562-2451

**DATE:** 11/04/2021

**INVOICE #:** 109152

**FOR:** HCP: 384895

**Bill To:**

Westward360 PC

| LOCATION | DESCRIPTION | AMOUNT |
|---|---|---|
| WESTWARD360P | SUBCONTRACTO - Sub Contract... 5312 W Foster CA carpet | $1,580.00 |
| | **TOTAL** | $1,580.00 |

Make all checks payable to  **JH Carpeting**

If you have any questions concerning this invoice, please contact  **JH Carpeting , (773) 562-2451**

**THANK YOU FOR YOUR BUSINESS!**

Blankenship vs. Outer Banks Capital, Inc.

Page 80



| ⑤ Bill Payment | | | | | ⑦ Help |

| | Vendor | JH Carpeting | | Check No. | To Be Printed |
|---|---|---|---|---|---|
| | Payment Date | 11/12/2021 | | Amount | $8,370.00 |
| | Payment Method | Check | | Bank Account | 1100 - Westward360 PC |
| | Memo | | | | |
| | Last Modified By | tlindbor - 11/12/2021 10:12 AM | | | |

⊖ Bills Paid

| Bill # | Ref # | Bill Date | Due Date | Amount | Paid | Action |
|---|---|---|---|---|---|---|
| 109155 | 98 | 11/04/2021 | 11/04/2021 | $6,790.00 | $6,790.00 | View |
| 109152 | 90 | 11/04/2021 | 11/04/2021 | $1,580.00 | $1,580.00 | View |

Blankenship vs. Outer Banks Capital, Inc.

EDIT    PRINT CHECK    DONE

# Westward360 PC



**INVOICE**

| | |
|---|---|
| 1464 West Webster Avenue | **DATE:** 11/16/2021 |
| Chicago, IL 60614 | **INVOICE #:** 110475 |
| Phone (773) 572-0877 | **FOR:** Imported Bill |

**Bill To:**

Kleeg, LLC

| LOCATION | DESCRIPTION | AMOUNT |
|---|---|---|
| KLEEG / 5312WFOSTER | NEWCARPET - New Carpet Common Area Carpet Installation - 11.04.21 | $1,800.00 |
| | **TOTAL** | $1,800.00 |

Make all checks payable to  **Westward360 PC**

If you have any questions concerning this invoice, please contact  **Westward360 PC , (773) 572-0877**

**THANK YOU FOR YOUR BUSINESS!**



Blankenship vs. Outer Banks Capital, Inc.                                                    Page 83

<< Back to Report                                                    ? Help

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 85 of 254 PageID #:580
Amended Complaint | 23-CV-0867 | February 23, 2023

**Bill Payment**

| | | | |
|---|---|---|---|
| **Vendor** | Westward360 PC | **Check No.** | 119070 |
| **Payment Date** | 11/16/2021 | **Amount** | $1,800.00 |
| **Payment Method** | Check | **Bank Account** | 1049 - W360 - Escrow Trust |
| **Memo** | | | |
| **Last Modified By** | tlindbor - 11/30/2021 11:52 AM | | |

⊖ **Bills Paid**

| Bill # | Ref # | Bill Date | Due Date | Amount | Paid | Action |
|---|---|---|---|---|---|---|
| 110475 | 384895 | 11/16/2021 | 11/16/2021 | $1,800.00 | $1,800.00 | View |

Blankenship vs. Outer Banks Capital, Inc.                          Page 84

**EDIT**    **PRINT CHECK**    **VOID TRANSACTION**    **DONE**

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit D-5
# February 10, 2023

PORTAL ACCESS LOG
SOURCE:

**DATA FROM 9/28/2022 to 10/7/2022 Only**

**Respondent**  WESTWARD 360 D/B/A OUTERBANKS CAPITAL
**Charging Party**  BRIAN D BLANKENSHIP

| | |
|---|---|
| 9/28/2022 09:04:32 CST | Emailed Brian D. Blankenship at bdblankenship@gmail.com that a new document is available to |
| 9/28/2022 09:04:32 CST | download. |
| 9/28/2022 09:04:32 CST | Arcapp User |
| 9/28/2022 09:04:32 CST | Closure Notice/NRTS (2022-9-28 Blankenship.pdf) released |
| 9/28/2022 09:04:32 CST | Zena Beach |
| 9/28/2022 09:04:33 CST | Emailed WESTWARD 360 D/B/A OUTERBANKS CAPITAL at jennyc@westward360.com that a new |
| 9/28/2022 09:04:33 CST | document is available to download. |
| 9/28/2022 09:04:33 CST | Arcapp User |
| 9/28/2022 09:04:33 CST | Emailed David Westveer at david@westward360.com that a new document is available to download. |
| 9/28/2022 09:04:33 CST | Arcapp User |
| 9/28/2022 09:05:02 CST | Case status changed from Investigation to Charge Closed. |
| 9/28/2022 09:05:02 CST | Zena Beach |
| 9/28/2022 09:05:02 CST | Case moved to CLOSED stage. |
| 9/28/2022 09:05:02 CST | Zena Beach |
| 9/28/2022 09:05:02 CST | Charge has been closed with reason No Cause Finding. |
| 9/28/2022 09:05:02 CST | Zena Beach |
| 9/28/2022 09:05:02 CST | Closure Supervisor review approved. |
| 9/28/2022 09:05:02 CST | Zena Beach |
| 9/28/2022 09:06:24 CST | Respondent logged in |
| 9/28/2022 09:06:24 CST | Respondentportal User |
| 9/28/2022 09:06:29 CST | EEOC has completed the investigation of this charge. Please review the Notice of Right to Sue for details. |
| 9/28/2022 09:06:29 CST | Respondentportal User |
| 9/28/2022 09:06:29 CST | Respondent logged in |
| 9/28/2022 09:06:29 CST | Respondentportal User |
| 9/28/2022 09:07:00 CST | Downloaded Document. Type: Closure Notice/NRTS, FileName:2022-9-28 Blankenship.pdf |
| 9/28/2022 09:07:00 CST | Respondentportal User |
| 9/28/2022 09:24:54 CST | Respondent logged in |
| 9/28/2022 09:24:54 CST | Respondentportal User |
| 9/28/2022 09:24:59 CST | EEOC has completed the investigation of this charge. Please review the Notice of Right to Sue for details. |
| 9/28/2022 09:24:59 CST | Respondentportal User |
| 10/6/2022 22:02:25 CST | Reminder email sent to Brian D. Blankenship at bdblankenship@gmail.com that Closure Notice/NRTS |
| 10/6/2022 22:02:25 CST | document is available to download. |
| 10/6/2022 22:02:25 CST | Arcapp User |
| 10/7/2022 09:52:26 CST | The Charging Party has Downloaded Document. Type: Closure Notice/NRTS, FileName:2022-9-28 |
| 10/7/2022 09:52:26 CST | Blankenship.pdf |
| 10/7/2022 09:52:26 CST | Publicportal User |

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit EE
# February 10, 2023

Case: 1:23-cv-00867 Document #: 6 Filed: 03/24/23 Page 89 of 254 PageID #:584
Westward 360 Mail - Follow-Up
Amended Complaint | 23-CV-0867 | February 23, 2023



Jenny Cruz <jennyc@westward360.com>

## Fwd: Follow-Up

1 message

**Brent Straitiff** <brents@westward360.com>                    Thu, Dec 2, 2021 at 12:02 PM
To: "Cruz, Jenny" <jennyc@westward360.com>

See below. I'd like to have a call with you and Brian asap. We're going to let him go.

**Brent** Straitiff
*Chief Executive Officer*

Association Management  | Rental Management
Buy & Sell  | Rent  | Property Maintenance

1464 W Webster Ave
Chicago, IL 60614

773.572.0880  | westward360.com

        Forwarded me    age
From  **Brian Blankenship**   brianb@westward360 com
Date  Thu, Dec 2, 2021 at 11 56 AM
Subject  Follow Up
To  Brent Straitiff   brent  @westward360 com

December 2, 2021

Brent –

I suggest our communication be in writing until such time a path forward has been identified.  You've already accused me of recruiting other senior leaders to my "camp" when I did exactly what you've told me to do engage others and talk it through. Whether you are referring to one or both people I discussed the situation, they both were as concerned as me.  Be happy to share those conversation notes with you, at the appropriate time.  And there is already a difference of opinion on several issues you raised during our discussion.  Written communication will alleviate that problem going forward

Three items:

1. This is my formal request to be removed from working with Nathan Brown and to not be required to assist Investments in any way.  I am willing to take on other responsibilities and even Investment tasks but only if Nathan Brown is removed from the day-to-day operations.
2. You claim that the invoice program we discussed benefits our clients   The vendors who participate in this "program" are "one-man" shows and they lack the infrastructure to schedule visits, produce invoices, or maintain adequate insurance as you stated.  Those are not accurate statements.  There are approximately 11 preferred vendors, possibly more, and only three do not have a website but they have been in business for an average of 21 years   The remaining vendors have websites that promote their services.  These vendors have experience ranging from 12 to 66 years.  I find it hard to believe these

Blankenship vs. Outer Banks Capital, Inc.                                        Page 88

Case: 1:23-cv-00867 Document #: 6 Filed: 03/24/23 Page 90 of 254 PageID #:585

"preferred vendors" depend on Westward360 given the decades they serviced Chicago without Westward360.

3. Given the severity and sensitivity with the claims and statements I've made to date, I am providing the following statement. I reserve my rights and protection provided by the Illinois Whistleblower Act, (740 Ill. Comp. Stat. §175 et seq), the Illinois False Claims Act (previously the Illinois Whistleblower Reward and Protection Act), state and federal Occupational Safety and Health Acts ("OSHA"), Illinois Wage Payment & Collection Act, Securities and Exchange Commission ("SEC"), Commodity Futures Trading Commission ("CFTC"), Internal Revenue Service ("IRS"), Illinois Securities Law of 1953, Financial Industry Regulatory Authority ("FINRA"), Illinois Department of Insurance, Illinois Consumer Fraud Act, Consumer Fraud and Deceptive Business Practices Act and all other local, state, and federal protections which offer workplace retaliation protection from Brent Straitiff, Nathan Brown, Outer Banks Capital, Inc. and Westward360, Inc.

Thank you
Brian Blankenship

**Brian** D. Blankenship
*Vice President, Business Development*



Association Management | Rental Management
Buy & Sell | Rent | Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct: 773.676.0840 | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com | Email: brianb@westward360.com


Powered by
cloudHQ

Blankenship vs. Outer Banks Capital, Inc.                                                    Page 89

https://mail.google.com/mail/u/0/?k=bd0ef9a555&view=pt&search=all&permthid=thread-f%3A1718058422136807195%7Cmsg-f%3A1718058422136...        2/2

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit F
# February 10, 2023

12/1//2021

Brent - in the spirit of full disclosure I provide you with the following...I'd ask that you keep this confidential and not share with anyone, except for Jenny Cruz, because it's personal.



The problem I had yesterday, which caused me to miss work, was caused by my stress level and my coping mechanisms. I resort to drinking Diet Coke when I am stressed and I consume enormous amounts. I had to stop drinking Diet Coke, and all other carbonated beverages, before surgery. These beverages create havoc on the body's gastrenological system. I began drinking Diet Coke last month and have been consuming six to nine 12-ounce cans daily. The discomfort and pain I experienced Monday evening into Tuesday was related to my consumption of Diet Coke's carbonation. I know it sounds weird but it's all true.

That's the whole story and I felt like you should know this information since it has impacted my work performance. I'll be connected today around 12:30 PM and will catch up with emails.

Thank you,
Brian Blankenship

Amended Complaint | 23-CV-0867 | February 23, 2023

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit F-1
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

This transcript exported on Dec 27, 2021 from December 1, 2021 15:53:55 recorded call.

Speaker 1:     This Nathan.

Speaker 2:     Hey, Brian.

Speaker 1:     Hello, sir. How you feeling?

Speaker 2:     Um, I'm okay. I'm okay. Just some stomach problems.

Speaker 1:     Uh that's thanks. That's uh, those aren't fun. No, I'm uh,

Speaker 2:     No, no, no, no, they're not.

Speaker 1:     [00:00:30] ████████████████████████████████████████

Speaker 2:     Right? Yeah. I, I, um, uh, ████████████████████████████

               ████████████████████████████████████████████████

               ██████████████████████████████████████████ Been

               uncomfortable.

Speaker 1:     Yeah. Oh my good. I'm sorry to hear that, that, uh,

Speaker 2:     █████████████████████████████████████████. So

               that's the good thing.

Speaker 1:     Yeah. Oh, holy smokes. Um, yeah, so you've just gotta create like a very restrictive diet I
               would imagine, or, yeah, cause I mean, oh yeah. Acid in the stomach, right. That's like
               that. That's what doing,

Speaker 2:     Yeah. So what hap what, so yeah, I eat, um, uh, well I still, I mean, I, I forever will end up
               just, uh, taking or drinking [00:02:00] a couple protein shakes a day. Um, uh, yeah.
               ████████████████████████████████████████████████
               ████████████████████████████████████████████████
               ████████████████████████████████████████████████
               ████████████████████████████████████████████████

Speaker 1:     In. Yeah. Oh my

Speaker 2:     Gosh. So yeah, so it's critical, you know, for me to eat, um, healthy, because I gotta keep
               food, uh, █████████████████████ and he, cause that's where the body's getting
               us nutrients from. Um, right, right. So that's, so that's been, and then of course with STR
               ████████████████████████████████████████████████

Nathan12012021_call_15-53-55_OUT_ (Completed 12/20/21)                    Page 1 of 16

Amended Complaint | 23-CV-0867 | February 23, 2023

This transcript exported on Dec 27, 2021 from December 1, 2021 15:53:55 recorded call.



**Speaker 1:** Gosh, yeah,

**Speaker 2:** Yeah. And I don't just do one day. I don't just do one day, day <laugh>

**Speaker 1:** Yes. [00:03:30] Oh yeah. I mean, and it worse habits. That's what I keep saying. Right. Like I, I drink a, probably a pot and a half a coffee a day and that's probably like, uh, but, uh, yeah. Yeah. The headaches after you stop are, uh, are the real deals for sure. Turns out the turns about caffeine is, uh, is the thing

**Speaker 2:**

**Speaker 1:** Oh my goodness. Wow. Yeah. Well, yeah. And impressive. I mean, it, it, from the, our side of things like this zero things noticed, right. So like, I, I know how hard that is to balance. [00:05:00] So, uh, crazy.

Nathan12012021_call_15-53-55_OUT_ (Completed 12/20/21)     Page 2 of 16

Transcript by Rev.com
Blankenship vs. Outer Banks Capital, Inc.                                Page 94

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit G
# February 10, 2023



June 28, 2021

Brian  D.  Blankenship
Northbrook, IL 60062
bdblankenship@gmail.com; bdblankenship@outlook.com

Re: Offer of Employment

Dear Brian,

We are pleased to extend you an offer of full-time employment with Westward360. Westward360 can provide an outstanding opportunity for you to continue the development of your professional career, and we look forward to you joining our team.

Your exempt position at Westward360 will be as Vice President of Business Development and report directly to Brent Straitff, CEO of Westward360. Your detailed job description is the attachment labeled as Exhibit A. Your annual Base Salary will be ▮▮▮▮▮▮ that is paid on bi-monthly installments of ▮▮▮▮▮ gross.

The commission structure represented under the attachment labeled as Exhibit B ("Commission Plan") will be paid on the first pay period of the following month the commission was earned. Please note the model and numbers outlined on Exhibit B will adjust based on performance but commission potential shall not be less than ▮▮▮▮▮ annually.

For the first six months of employment, there will be a non-recoverable guaranteed commission of ▮▮▮▮ that is paid in monthly installments of ▮▮▮▮▮ beginning the first full month of employment. If this amount is surpassed with the commission structure detailed on Exhibit B, in any of the first six months of employment, you will receive the greater of the two amounts.  Upon expiration of the guaranteed commission, monthly commission will be paid in accordance to the Commission Plan outlined in Exhibit B.

Westward360 also offers:
- ❏ Group health, vision and dental insurance
    - Employer contributes a set amount towards the cost of the lowest cost Aetna medical plan, for the employee (if the employee chooses a different plan, the employer contribution monetary amount will be transferred to the plan of the employee's choice). The employee is eligible for these benefits first of the month after 60 days of employment or the open enrollment period that begins 01-15-2022 and plan updates go live 02-01-2022. The 2021-2022 benefits package is attached for your review.
- ❏ Vacation/sick time/Holidays and additional benefits.
    - One week (40 hours) sick time/ two week's (80 hours) vacation/ nine (9) holidays (vacation time is accrued on a monthly basis). Vacation amounts go by years with the company. The first two years of employment, you will be granted two weeks vacation, or 6.67 hours per month, the accrual balance is updated on the 15th of each month. For years three and four, the vacation increases to three weeks vacation (10.00 hours per month) and starting your fifth year of employment, the vacation increases to four  weeks vacation (13.34 hours per month) which would be the max allowed.  An employee can go up to 80 hours negative but if the employee terminates employment any negative vacation hours will be deducted from the final paycheck.
- ❏ Long and short term disability coverage provided at no cost to the employee.



- ❏ Continuing education coverage pertaining to your position up to ▮▮▮▮▮▮▮ar. *Detailed information pertaining to continuing education costs will be found in the employee handbook.
- ❏ Life insurance provided by the Company at no cost with an option to sign up for additional life insurance. ▮▮▮▮▮▮nded by the employer.
- ❏ Option to sign up for 401(k) plan- employer match up to ▮▮▮▮ Eligibility is must be with the company for 60 days, full time, and a W2 employee.
- ❏ Monthly cell phone stipend of ▮▮▮▮ non-taxed. You will also have a separate work number which can be linked to your cellphone under the application called Dialpad.
- ❏ Mileage reimbursement of .56 per mile. The first drive of the day, from home to work and the last drive of the day from work to home, are not permitted for reimbursement requests. Mileage reimbursement requests should be provided no less than quarterly. Approved reimbursements will be paid within 30 days of receipt.
- ❏ Westward360 shall reimburse employee for all necessary business-related expenditures incurred within the employee's scope of employment and directly related to services performed for the employer. Employee must submit all necessary reimbursement requests, with appropriate supporting documentation, within 30 days after incurring the expense.

**On your first day, scheduled for <mark>Wednesday, July 14th, 2021,</mark>** you will be asked to verify your identity and authorization for employment in the United States, in compliance with federal law. Typically, this is accomplished by presenting your U.S. passport or valid driver's license, along with your U.S. Social Security card. Please bring the appropriate documentation with you on your first day of employment.

I, Brian D. Blankenship, hereby authorize Westward360 to investigate my background for purposes of evaluating whether I am qualified for the position for which I have been offered. I understand that Westward360 will utilize an outside firm or firms to assist in checking such information, and I specifically authorize such an investigation by information services and outside entities of the company's choice. I also understand that I may withhold my permission and that in such a case, no investigation will be done, and my application for employment/onboarding will not be processed further.

<mark>To process a background check, please provide the following information:</mark>

Legal name: Brian D. Blankenship     Driver's license or state
ID number: ▮▮▮▮▮▮▮▮▮     Date of birth: ▮▮▮▮▮▮▮▮

SSN: ▮▮▮▮▮▮▮

Please confirm your acceptance of this offer by signing below and faxing or scanning the signed copy (see email for instructions). This offer is void if we do not receive your reply by 5 p.m. CST on Wednesday, June 23rd, 2021. Should you have any questions, please do not hesitate to contact me at (773) 572-0902. Welcome to the team!

Sincerely,

Brent Straitff
Chief Executive Officer

DocuSign Envelope ID: 19A398DB-10AB-4A4E-08F6-366840851B6C



I confirm my acceptance of employment with Westward360 subject to the terms and conditions set forth above.

DocuSigned by:

_Blankenship_

F0C0F04A2BB24E9...

Candidate's Signature

06/28/2021 | 4:23:50 PM CDT

Date

Blankenship vs. Outer Banks Capital, Inc.

Amended Complaint | 23-CV-0867 | February 23, 2023



# Vice President of Business Development
# Westward360, LLC

## Job Description (June 2021)

We are seeking an executive who is motivated, creative and aggressively growth-focused to lead our company's sales and marketing efforts.

This role will be focused on: Enhancing Reputation, Promoting Industry Leadership, Growing Revenues, and Department Management.

Monitoring the company's reputation and developing strategies to enhance it will be an important aspect of the job. The VP, working with their team, will prepare and execute planning that accomplishes goals set by the executive team, in concert with the CEO and board of directors.

Building relationships – both within the company and with clients, prospective clients and the community at large – will create an environment where referrals are common. Ensuring internal and external audiences understand what we do and how they benefit is the key to success in this role.

The VP will develop and execute plans that clearly outline goals, track and measure performance and ultimately lead to both client retention and revenue growth from both new and existing customers. Each service offering will require its own growth plan. Service offerings include but are not limited to 1.) Community Association Management (CAM), 2.) Investments (Property Rental Management), and 3.) PROs.

The Sales & Marketing Department and the staff responsible for onboarding and offboarding clients, referred to "Transitions" hereafter, shall be the responsibility of the VP.

The VP will develop a plan for a team and reporting structure that will be presented to and approved by the board of directors.

This position is based in our Chicago office (1464 West Webster Ave. Chicago, IL 60614), but VP can work remotely three (3) days per week at his discretion subject to the needs of the business and responsibility. Standard office hours apply but may, at times, require work on evenings and weekends.

## Responsibilities
- Grow new business through aggressive prospecting, reputation management, and online referrals
- Manage lead generation and nurturing using process and technologies
- Uncover cross-selling opportunities within our current client base
- Maintain and enhance current successful programs and initiatives
- Conduct internal and external sales demos promoting our range of services
- Prospect through industry conferences and trade association engagement
- Collaborate with other sales colleagues to lead outreach and direct sales opportunities
- Develop brand and sales materials to be used internally and externally
- Oversee and manage all digital marketing efforts, including website management and optimization
- Leverage existing technologies and systems (Zendesk, Propertyware, Buildium) for maximum efficiencies and customer experience
- Develop online strategies that educate, entice, generate leads to add new revenue
- Meet or exceed mutually agreed upon company goals
  - Initial 12-month goals are defined on Exhibit B
- Document your activities using our internal sales tracking systems

Blankenship vs. Outer Banks Capital, Inc.        Page 99

DocuSign Envelope ID: 19A398DB-10AB-4A4F-98F6-366840851B6C



- Develop metrics and reporting to track performance and progress
- Build a highly productive, customer friendly, and growth focused team

### Leadership
- Assist CEO and CFO with meeting the company budget
- Promote and manage initiatives of the Board of Directors
    - Promote and encourage behavior that is customer centric
    - Crosstrain divisions on best practices from each division
- Promote communication between departments
- Assist CEO/CFO in developing new revenue streams

### Qualifications
- Bachelor's degree
- Real estate or other similar industry sales experience, with a proven record of success
- Creative approach to problem-solving
- Must have a hunter mentality and an entrepreneurial drive
    - Ability to prospect, cold call, and develop new business relationships over the phone, video conference and in person
- Self-motivated individual who can also work effectively on a team as well as individually
- Direct exposure to the property management marketplace is desirable
- High comfort level with technology platforms and software
- Excellent listening, communication, negotiation, presentation and relationship-building skills
- Alignment with Westward 360's core values and mission

DocuSign Envelope ID: 19A398DB-10AB-4A4F-98E6-366940851B6C

| Sales by Quarter | Q1 | Q2 | Q3 | Q4 | Total | | 06/27/2021 |
|---|---|---|---|---|---|---|---|
| CAM Buildings | 20 | 14 | 14 | 20 | 68 | | |
| Investment Units | 119 | 119 | 119 | 119 | 476 | | |
| | | | | | | | |
| CAM Commission | ███████████████████████████████ | | | | | | |
| Investment Commission | | | | | | | |
| Total Commission | $16,463 | $12,863 | $12,863 | $16,463 | $58,650 | | |
| Guaranteed Commission***** | ███████████████████████ | | | | | | |

| Years | | | | | Additional Markets | Total Commission |
|---|---|---|---|---|---|---|
| 2 | ███████████████████████████████████████████████ | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |

Assumptions

* 5% growth year over year in Chicago Market

** Enter one new market per year over next 5 years

***Perform at 33% of Chicago market new business metrics

███████████████████████████████

*****Guaranteed commission will be paid in the amount noted. If actual commission exceeds the guaranteed amount for the month/quarter, the higher commission amount will be paid. Guaranteed commission is applicable for the first six (6) months of employment.

DocuSign Envelope ID: 19A398DB-10AB-4A4F-98F6-366840851B6C

Amended Complaint | 23-CV-0867 | February 23, 2023

| CAM Buildings | Monthly Mgmt Fee | Investment Units | Unit Commision |
|---|---|---|---|
| Building 1 | ███ | 7 | ███ |
| Building 2 | | 7 | |
| Building 3 | | 7 | |
| Building 4 | | 7 | |
| Building 5 | | 7 | |
| Building 6 | | 7 | |
| Building 7 | | 7 | |
| Building 8 | | 7 | |
| Building 9 | | 7 | |
| Building 10 | | 7 | |
| Building 11 | | 7 | |
| Building 12 | | 7 | |
| Building 13 | | 7 | |
| Building 14 | | 7 | |
| Building 15 | | 7 | |
| Building 16 | | 7 | |
| Building 17 | | 7 | |
| Building 18 | | | |
| Building 19 | | | |
| Building 20 | | | |
| | | | |
| Quarterly Total | | 119 | |
| Commission (50%) | | | |

**Commission is equal to 50% of one month's management fee for CAM Buildings.**

**Investment Rental commission is 50% of a flat per unit commission of █████**

**Commissions are paid regardless of the originator or source of new business.**

DocuSign Envelope ID: 19A398DB-10AB-4A4F-98F6-366840851B6C

| Building | Monthly Mgmt Fee | | Investment Units | Unit Commision |
|---|---|---|---|---|
| Building 1 | ████ | | 7 | ████ |
| Building 2 | | | 7 | |
| Building 3 | | | 7 | |
| Building 4 | | | 7 | |
| Building 5 | | | 7 | |
| Building 6 | | | 7 | |
| Building 7 | | | 7 | |
| Building 8 | | | 7 | |
| Building 9 | | | 7 | |
| Building 10 | | | 7 | |
| Building 11 | | | 7 | |
| Building 12 | | | 7 | |
| Building 13 | | | 7 | |
| Building 14 | | | 7 | |
| | | | 7 | |
| | | | 7 | |
| | | | 7 | |
| | | | | |
| | | | | |
| Quarterly Total | | | 119 | |
| Commission (50%) | | | | |

**Commission is equal to 50% of one month's management fee for CAM Buildings.**
**Investment Rental commission is 50% of a flat per unit commission of** ████
**Commissions are paid regardless of the originator or source of new business.**

| Building | Monthly Mgmt Fee | | Investment Units | Unit Commision |
|---|---|---|---|---|
| Building 1 | | | 7 | |
| Building 2 | | | 7 | |
| Building 3 | | | 7 | |
| Building 4 | | | 7 | |
| Building 5 | | | 7 | |
| Building 6 | | | 7 | |
| Building 7 | | | 7 | |
| Building 8 | | | 7 | |
| Building 9 | | | 7 | |
| Building 10 | | | 7 | |
| Building 11 | | | 7 | |
| Building 12 | | | 7 | |
| Building 13 | | | 7 | |
| Building 14 | | | 7 | |
| | | | 7 | |
| | | | 7 | |
| | | | 7 | |
| | | | | |
| | | | | |
| Quarterly Total | | | 119 | |
| Commission (50%) | | | | |

**Commission is equal to 50% of one month's management fee for CAM Buildings.**

**Investment Rental commission is 50% of a flat per unit commission of** ▮▮▮▮

**Commissions are paid regardless of the originator or source of new business.**

DocuSign Envelope ID: 19A398DB-10AB-4A4F-98F6-366840851B6C

Amended Complaint | 23-CV-0867 | February 23, 2023

| Building | Monthly Mgmt Fee | | Investment Units | Unit Commision |
|---|---|---|---|---|
| Building 1 | ███ | | 7 | ███ |
| Building 2 | | | 7 | |
| Building 3 | | | 7 | |
| Building 4 | | | 7 | |
| Building 5 | | | 7 | |
| Building 6 | | | 7 | |
| Building 7 | | | 7 | |
| Building 8 | | | 7 | |
| Building 9 | | | 7 | |
| Building 10 | | | 7 | |
| Building 11 | | | 7 | |
| Building 12 | | | 7 | |
| Building 13 | | | 7 | |
| Building 14 | | | 7 | |
| Building 15 | | | 7 | |
| Building 16 | | | 7 | |
| Building 17 | | | 7 | |
| Building 18 | | | | |
| Building 19 | | | | |
| Building 20 | | | | |
| | | | | |
| Quarterly Total | | | 119 | ███ |
| Commission (50%) | | | | ███ |

| |
|---|
| Commission is equal to 50% of one month's management fee for CAM Buildings. |
| Investment Rental commission is 50% of a flat per unit commission of ███ |
| Commissions are paid regardless of the originator or source of new business. |

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit GG
# February 10, 2023

March 31, 2022

Claudia Del Toro, Wage Claim Specialist
**Illinois Department of Labor**                     *Via email: Claudia.DelToro@Illinois.gov*
Michael A. Bilandic Building
160 N. LaSalle St. | FL-#13- Ste C-1300
Chicago, IL 60601

Re:     **Initial Response to Employer Answer to Notice of Wage Claim**
        **IDOL Claim:        22-0000336**
        **Claimant:          Brian D. Blankenship**
        **Respondent:        Outer Banks Capital, Inc.**
        **Date Filed:        March 16, 2022**

Ms. Del Toro –

This letter is a reply from Brian D. Blankenship ("Claimant" or "Blankenship" or "Employee) to the March 28, 2020, Employer Answer to the Notice of Wage Claim ("Initial Response").  The Initial Response was provided by Outer Banks Capital, Inc ("Respondent" or "Company" or "Employer"), The Respondent based the Initial Response on the Formal Notice To Employer of Wage Claim dated March 16, 2022 ("Initial Claim").  However, Claimant amended the Initial Claim on March 24, 2022 ("Amended Claim"), and Respondent received a copy of the Amended Claim on March 24, 2022.  The Respondent has 20 calendar days from the date of the Initial Claim date (March 16, 2022) to respond to the Initial Claim and Amended Claim ("Amended Response").

The Amended Claim totals███████████.  A copy of the Amended Claim is attached ("Exhibit A").

The Respondent may have additional details in response to the amended claim total.  Claimant response is included within.  The response is based on the Amended Claim but he reserves the right to respond to any new detail the Respondent may add.  The Amended Response from the Respondent is due April 5, 2022.

If any of the above is incorrect, please notify both parties as soon as possible.

Respectfully,

Brian Blankenship
bdblankenship@gmail.com
(224) 804-7692

cc:     Jenny Cruz *(sent via email jennyc@westward360.com)*
        Director of Human Resources
        **Outer Banks Capital, Inc.**
        1464 W Webster Ave
        Chicago, IL  60614

### Response for #1
I apologize if I presented the legal name of the employer incorrectly. I based my response on information previously provided to me. I will note that the Employer misrepresented the name of the Employer in this Response. The actual employer is Outer Banks Capital, Inc.

### Response for #2
I agree with the Employer's Answer.

### Response for #3
I agree with the Employer's Answer. The Employer is Outer Banks Capital, Inc.

### Response for #4
The Wage Claim has nothing to do with the disclosure of a medical condition. I request the Employer to refrain from exposing my personal information and my disclosed medical information. This is at least the fourth (4th) time during the past three (3) weeks I made this request to the Employer. Even as a terminated employee, the Employer is required to protect an employee's personal information and should not mention or disclose any medical or health information.

The Employer mentions my position as "New Business" or "New Sales" when the title was Vice President, Business Development. Obtaining new business was only a portion of this role, approximately 60% according to Brent as we developed the job description for the position. My responsibilities included the marketing and the onboarding/offboarding departments. This role would also leverage my strengths in other areas, such as call center management, and provide support and feedback. Brent called this "consulting" support. A job description for this role was created collaboratively with Brent and Brian during the recruiting process. The Job Description is included in the Executed Offer Letter Package ("Exhibit B"). Upon hire, I identified several value-add opportunities that "developed", or improved, current processes. The Employer had me focused on these tasks from the day they were identified. On September 2, 2021, Brent informed me that my new business responsibilities wouldn't happen until January 2022 as he wanted focus on the value-add opportunities I identified and was developing plans to improve. This is one example of how my job function changed; Brent made material changes to my responsibilities three (3) times during my employment ("Exhibit C")

> #### Commission
> I appreciate the fact that Cruz gave me credit for creating a "complete fabrication", but this is a well-documented topic and no fabrication is needed. Straitiff is the integrity-challenged, professional liar anyway, not me. With that said yet widely known, I am questioning the commission owed over and above the guaranteed commission amount.
>
> A significant amount of effort went into creating the commission plan. The new business number included on the quarterly schedules contain a number chosen by Straitiff and that number was derived from historical averages of new business plus a 5% growth factor, according to the initial plan he presented to me. The final commission plan even states, *"Assumptions: * 5% growth year over year in Chicago Market."* I attempted to break down new business by source but Straitiff didn't like the schedule ("Exhibit D") and told me to use his numbers. Even more telling is the numbers were used in the 2022 Revenue Budget ("Exhibit E"), per Straitiff's direction. He didn't want to "re-create the wheel" when targets were already defined in the commission plan. Notice the monthly or quarterly new business amount on the 2022 Revenue Budget; they match the new business count on the commission plan. The most compelling action to validate this is when the new business budget estimates were given to Eric, Daniel, and Ann. Straitiff wanted them to

"own" the numbers so I met with each of them to show the model I created and to be sure they supported the numbers. And, yes, I was to be paid, according to the commission plan, for all new business generated in both Divisions regardless how it was sourced or who sourced the deal.

Days before we finalized the Offer of Employment, Straitiff re-traded commissions on me. The initial commission was equal to one month management fee for all new business in CAM and Investments. Straitiff reduced this to 50% of one month's management fee. He told me that he had to reduce the structure because other people earn commission and he can't give me a one-month fee as commission because he wouldn't make any money due to commissions owed to others. I agreed to the change for three reasons (1) commission was to be paid for all new business in both divisions, (2) I proposed a bonus plan for managing the marketing and transitions departments to make up some of the lost commission; Straitiff initially supported it, and (3) the commission plan also included PROs commission for cross selling maintenance retainers, scheduled services, and emergency responses. Looking back and knowing what I know today, I should've walked away when he re-traded me with the commission plan for new business. He no longer supported a department bonus because no one currently receives that type of bonus and he eliminated the PROs commission altogether except he agreed to revisit the PROs commission after six (6) months.

The Employer provided guaranteed commissions of ▮▮▮▮▮ for the initial six months of employment. The footnote on the Commission Plan provides clear, agreed intentions – *"*****Guaranteed commission will be paid in the amount noted. If actual commission exceeds the guaranteed amount for the month/quarter, the higher commission amount will be paid."* Even the Offer Letter ("Exhibit B") addressed the topic, *"The commission structure represented under the attachment labeled as Exhibit B ("Commission Plan") will be paid on the first pay period of the following month the commission was earned. Please note the model and numbers outlined on Exhibit B will adjust based on performance but commission potential shall not be less than* ▮▮▮▮ *annually. For the first six months of employment, there will be a non-recoverable guaranteed commission of* ▮▮▮▮ *that is paid in monthly installments of* ▮▮▮▮ *beginning the first full month of employment. If this amount is surpassed with the commission structure detailed on Exhibit B, in any of the first six months of employment, you will receive the greater of the two amounts. Upon expiration of the guaranteed commission, monthly commission will be paid in accordance to the Commission Plan outlined in Exhibit B."* The intent is clear, Claimant had a guaranteed commission amount but if actual new business from all sources exceeded the guaranteed commission, then additional commission would be paid. Regarding the guaranteed commission, the Respondent owes Blankenship for two days commission (December 1 and December 2). The amount owed is ▮▮▮▮ before penalty.

The documents establish actual new business activity is reconciled with the guaranteed commission for the quarter, and the highest amount, using the Commission Plan, is paid to Claimant. According to the documents in my possession, new business for 3Q2021 (less activity July 1, 2021 and July 13, 2021) generated commissions exceeding the guaranteed amount by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ exceeded the guaranteed commission for the period July 14, 2021 to December 2, 2021 by ▮▮▮▮▮▮▮▮ Additionally, the Respondent owes Blankenship commission for the recent expansion into Colorado. The commission is due since the management agreements are new business for the Company and the commission plan pays out for all new business regardless of its source. Using limited information about the nine (9) new locations, one month's

Amended Complaint | 23-CV-0867 | February 23, 2023

management fee is estimated at ▮▮▮▮▮▮▮▮▮▮ that amount paid as a commission to Blankenship, or ▮▮▮▮▮

Below is a summary of commission owed (base amount) and the amount due which includes a 5% penalty for each month the commission owed is unpaid. **Total unpaid commissions due to Claimant** ▮▮▮▮▮▮▮

**Commission Owed Summary with Penalties (Commissions Only)**

| Item | Base Amount[1] | Amount Due[2] |
|---|---|---|
| Guaranteed Commission | ▮▮▮▮▮ | ▮▮▮▮▮ |
| Additional 3Q21[3] | | |
| Additional 4Q21 | | |
| Colorado Expansion[4] | | |
| **TOTAL** | ▮▮▮▮▮ | ▮▮▮▮▮ |

[1] – Base Amount represents the amount of the initial claim.

[2] – Amount due includes a 5% late fee on the base amount monthly. Amount Due includes a penalty through March 31, 2022. Additional amounts will be due after that date.

[3] – Excludes activity from July 1, 2021 to July 13, 2021; employment began July 14, 2021

[4] – Amount needs reconciled to management agreements. Respondent to provide proof the reconciled total is accurate.

**Insurance & COBRA**

Westward360 continues to say I was given enrollment information on October 5, 2021, for benefits. I am not disputing that fact. But I do question why enrollment options happened on October 5, 2021, when my eligibility date was October 1, 2021. I should have been provided information in late August/September to enroll as of October 1, 2021. The other issue was the effective date of coverage. If the HRIS system allows you to view historical user information, you will see two attempts in the benefit management section (I think that's the modules name). I was not able to enroll online with an effective date of October 1, 2021. I don't deny having a conversation with Claudia as you generally describe but things changed on my end and I needed to enroll. Towards the end of October, I was told to enroll in one of the four medical plans during the Company's open enrollment period which began December 2021. The enrolled policy would take effect February 1, 2022; I do not know why I had to wait until February 2022 when I became eligible October 1, 2021. Was I able to obtain coverage November 1, 2021 or December 1, 2021? To make this situation even worse, I can't obtain COBRA coverage after I was wrongfully terminated on December 2, 2021, because I was unable to enroll upon eligibility or the months preceding. The amended claim includes the following:

    a. Blankenship is seeking reimbursement of the monthly premium he paid directly to the provider for the months he was eligible but unable to enroll - October 2021, November 2021, and December 2021. ██████████████

    b. Blankenship is also seeking advance payment for 18 months of COBRA coverage from the Employer. The Employer's mistake(s) prevented Employee from obtaining benefits, specifically health insurance, when eligible and while employed. Employee will use these funds to offset his existing health insurance for up to 18 months beginning January 2022. Current health coverage is ████████████ and it appears the Company program has the employee paying ███████ for single coverage on the least expensive plan. Net cost to the Employer is ███████████████ for the COBRA eligibility period (January 1, 2022 to June 30, 2023).

        i. If Employee obtains new employment with benefits before June 30, 2023, then Employee will return the monthly COBRA premium of ████████ for any month covered by the new employer through June 30, 2023.

To summarize this portion of the Amended Wage Claim:

**Reimbursement Owed Summary (Insurance Only)**

| Item | Amount Due | |
|---|---|---|
| Insurance Premium Reimbursement | ████ | Three (3) months coverage |
| COBRA coverage with payment of premium | ████ | 18-month coverage period |
| **Total Insurance Due to Claimant** | ████ | |

*Note: A penalty has been excluded on the above two items and will remain excluded from the Claim if resolved by April 30, 2022. Penalties will be included on the above items beginning May 1, 2022.*

**<u>Response #5</u>**

I did not list David Westveer as my direct supervisor on the Wage Claim. I don't know why he is listed as the responsible individual. I disclosed Brent Straitiff as my direct supervisor/person in charge on the filed Wage Claim. I agree with the first two sentences of the Employer's Response. I do not agree with the last sentence of the Response; see Response #4 for more information.

Amended Complaint | 23-CV-0867 | February 23, 2023

**Amended Claim**

The Amended Claim totals ██████ and is comprised of dollars owed to Claimant, as of March 31, 2022. The total includes the base amount owed plus penalties equal to 5% per month on the balance.



| Amount Due Summary with Penalties, as of March 31, 2022 | | |
|---|---|---|
| **Item** | **Base Amount** | **Amount Due** |
| Guaranteed Commission | | |
| Additional 3Q21 | | |
| Additional 4Q21 | | |
| Colorado Expansion | | |
| Insurance Reimbursement | | |
| COBRA Reimbursement | | |
| **TOTAL** | | |

Penalties will continue to be accessed monthly and the claim amount will be adjusted to include the penalty charge each month. For example:

The amount due to Claimant will be ██████ as of March 31, 2022.
The amount due to Claimant will be ██████ as of April 30, 2022.
The amount due to Claimant will be ██████, as of May 31, 2022.
As of May 2022, the Amount Due totals ██████ which includes penalties totaling ██████ This reflects the expiration of waiving the penalty on Insurance and COBRA Reimbursement amounts due. The penalty is clawed back to the Initial Claim date.

**Hearing at a Future Date**

I understand Ms. Toro moved this claim forward to the Hearings Department for scheduling. The hearing for this claim will be months, possibly years. From firsthand experience, it took 32 months for a claim I was familiar with to get a hearing with the Administrative Law Judge ("ALJ"). As of April 2022, the IDOL court is conducting hearings from claims filed late 2019 and the first half of 2020. This has a significant impact on the claim amount if the ALJ provides Claimant a verdict in his favor. The ██ penalty will continue to be accessed monthly until the date of the hearing.

The table below represents the Amount Due to Claimant, upon a verdict in his favor, 24 months after the Initial Claim date.



| Amount Due With IDOL Hearing 24 Months Out | |
|---|---|
| **Item** | **Amount Due** |
| Guaranteed Commission | |
| Additional 3Q21 | |
| Additional 4Q21 | |
| Colorado Expansion | |
| Insurance Reimbursement | |
| COBRA Reimbursement | |
| **TOTAL** | |

**Settlement Offer**

To avoid the future Wage Claim Hearing and prevent the Amount Due from escalating, **Claimant proposes to settle the IDOL Wage Claim #22-0000336, using Amount Due totals as of April 2022, in one payment totaling** ▮▮▮▮ **("Settlement Amount").** The proposed Settlement Amount excludes the COBRA reimbursement o▮ ▮▮▮▮ to provide an incentive to resolve this month. I am confident in my position as it stands today. I am willing and have the patience for the Claim to be heard by a ALJ in 24, 32, or 36 months.

This is the only settlement offer that I intend to make on the Claim; the Offer is valid until April 30, 2022. All terms, conditions, and documents must be prepared, completed, and executed by both parties and payment made to Claimant no later than April 30, 2022. If the Employer accepts the Settlement Offer, they should provide the draft Settlement Agreement as soon as possible given the April 30, 2022 date.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit H
# February 10, 2023

**ILLINOIS DEPARTMENT OF LABOR**
FAIR LABOR STANDARDS DIVISION
160 NORTH LASALLE STREET, SUITE C-1300
CHICAGO, ILLINOIS 60601

## CLAIMANT'S AMENDED AMOUNT DUE

**March 24, 2022**

**CLAIM #22-0000336**

**EMPLOYER:** Outer Banks Capital, Inc., dba Westward360, Inc.

**I, Brian D. Blankenship, have amended my claim amount (see below) Please refer to the Amended Wage Claim document attached to this form.**

**Dates for which you were not paid?** 7/14/2021 to 12/2/2021

| | (Dates) |
|---|---|
| **UNPAID WAGES** | NA |
| **UNAUTHORIZED DEDUCTIONS** | NA |
| **BONUS** | |
| **OTHER** | |
| **VACATION** | |
| **TOTAL AMOUNT DUE** | |

_____
Claimant's Signature

03/24/2021
Date

**Illinois Department of Labor Wage Claim**
**Amended Wage Claim**

| | |
|---|---|
| **Employer:** | **Outer Banks Capital, Inc.** |
| **Employee:** | **Brian D. Blankenship | bdblankenship@gmail.com | (224) 804-7692** |
| **Wage Claim:** | **#22-0000336** |
| **Date:** | **Initial 2/4/2022; Updated 3/24/2022** |

## Additional Wage Notes and Amended Claim Amount to the Illinois Department of Labor

The Initial Wage Claim filed on February 4, 2022, totaled ▮▮▮▮▮▮ However, this was inaccurate and incomplete. **The amended Wage Claim has six (6) segments and totals** ▮▮▮▮▮▮ as detailed in #5. *This amount has penalties calculated through March 31, 2022. Additional penalties will become due starting April 1, 2022, in the amount of 5% per month of the amount owed per segment.* See the following summary for each segment's claim amount owed and the penalty calculation.

1. Guaranteed commission was part of the overall Commission Plan ("Exhibit A") was ▮▮▮▮ for the initial six (6) months beginning the first full month after start date, or August 2021.
   a. The Employer paid ▮▮▮▮▮ of the guaranteed commission total.
   b. Commission remains due for December 1 and December 2.
   c. With 23 working days in the month of December, the Employer owes Wages of ▮▮▮▮▮▮ ▮▮▮▮
   d. The penalty for not paying Final Compensation timely is 5% of the amount due per month. If the Employer pays by 3/31/2022, the penalty will be $62.47.
   e. **The Guaranteed Commission segment owes, with penalty,** ▮▮▮▮▮▮ March 31, 2022.

2. The compensation (commission) was not conditioned on "job performance" and additional commission would be paid if actual gains exceeded the Guaranteed Commission for the month. The Commission Plan ("Exhibit A") had a quarterly new business target but paid the same commission whether the target was achieved or not. Commission applies to all new business in CAM and Investments from July 14, 2021 to December 2, 2021.
   a. The commission is paid for each new association in the CAM division and each new rental unit in the Investment division regardless of who sourced the new business.
      i. <u>CAM Commission.</u> The commission amount for new CAM/associations was equal to ▮▮▮ of the stabilized monthly management fee per CAM/association gained.
         1. If an Association was added to the program and there were ▮▮▮▮ /owners in the Association, then the monthly management fee would be ▮▮▮▮▮ , or ▮▮▮▮▮▮▮▮▮▮▮▮▮
      ii. <u>INVESTMENT Commission.</u> New rental units gained in the Investment division paid ▮▮▮ ▮▮▮▮▮ commission per unit.
         1. If a new rental building had eight (8) rental units, the commission is paid per rental unit. ▮▮▮▮▮▮▮▮▮▮▮▮
   b. The Company owes Blankenship for the differential between the actual commission and the guaranteed commission for July 14, 2021 to December 2, 2021, which totals ▮▮▮▮▮ for both divisions.
      i. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   c. The penalty for not including the 3Q21 and 4Q21 reconciled amounts noted above in Final Compensation is 5% of the amount due per month. ▮▮▮▮▮▮▮▮▮ .
   d. **Therefore, Final Compensation for Commissions segment (3Q and 4Q Commission), with penalty, is** ▮▮▮▮▮ This amount is due immediately. If payment occurs after March 31, 2022, additional penalty will be applied.

Amended Complaint | 23-CV-0867 | February 23, 2023

3. Commission is also owed for the nine new Associations gained October 1, 2021. The nine new HOA's are detailed below; ███████ is past due along with a penalty o ███████ **Total Denver Commissions segment totals, with** ███████



I became eligible for insurance and benefits on October 1, 2021, but I wasn't provided any details until October 5, 2021, as you note at your Exhibit E. I was then told to elect benefits during the open enrollment period that began, I believe, November 1, 2021, with a February 1, 2022, start date via PayChex. The benefit portal on PayChex contained registration documents for the group policy beginning on February 1, 2022. This error caused me to go out of pocket for three months ███████ and if I was able to enroll properly, I would be eligible for COBRA upon termination. The Company failed to extend benefit coverage until after the eligibility date, provided one option to obtain coverage on February 1, 2022, and these errors prevented the COBRA option post-termination.

    a. Complainant seeks payment for three (3) months of his health insurance premiums from Blue Cross Blue Shield Precision HMO ███████ . (October 2021 to December 2021 and defined as "Period One"). **The amount due for Insurance Period One segment is** ███████ **with no additional penalty.**

    b. Complainant is also seeking payment from the Employer as compensation for their errors with enrollment which prevented me from obtaining COBRA coverage. COBRA is typically available for ██ months after termination or, specifically, January 1, 2022 to June 30, 2023 (called "Period Two"). For purposes of the Wage Claim, it is assumed the monthly COBRA rate for single coverage, using the average of plans offered, ███████ . **COBRA Period Two segment is** ███████ **with no penalty.**

Amended Complaint | 23-CV-0867 | February 23, 2023

5. **In total, the Wage Claim is amended to** ████████████████████ is for penalties.  Total Due by Segment, with penalty, is below:

| Total, All | Segments |
|------------|----------|
| ████ | Guaranteed Commission |
| ████ | 3Q Commission |
| ████ | 4Q Commission |
| ████ | Denver Commissions |
| ████ | Insurance Period One |
| ████ | COBRA Period Two |
| ████ | **TOTAL, all Segments** |

Blankenship vs. Outer Banks Capital, Inc.

Page 118

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit H-1
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023



# Wage Claim 22-0000336

**Illinois Department of Labor**

160 N LaSalle ST STE C1300
Chicago, IL 60601-3114

Phone: (312) 793-2800 • http://labor.illinois.gov

## Claimant

**First Name**

Brian

**Middle Name**

D

**Last Name**

Blankenship

**Postal Address**

2803 BRINDLE CT
NORTHBROOK, IL 60062-3379

**Primary Phone**

(224) 804-7692

**Secondary Phone**

**Primary Email**

bdblankenship@gmail.com

## Employer

**Business Name**

Outer Banks Capital, Inc. dba Westward360, Inc.

**To the best of your knowledge, is your Employer based in Illinois?**

Yes

**Is the Employer still in business?**

Yes

**Industry**

Real Estate

**Business Owner(s)**

Chief Executive Officer,Brent Straitiff;  Chief Operating Officer Travis Taylor; Chief Financial Officer David Westveer; Chief Investment Officer Nathan Brown; Chief Technology Officer Brawley Reishman; Chief Marketing Officer Patrick Gill;  Chief Sales Officer  Ian Duni

**Postal Address**

1464 W WEBSTER AVE
CHICAGO, IL 60614-3050

**Primary Phone**

(773) 572-0800

**Name of person in charge at your company / work site**

Brent Straitiff

**Job title / position of person in charge**

Chief Executive Officer

**Email address of person in charge**

brents@westward360.com

## General Information

**Starting date of employment with the Employer**

7/14/2021

1

Amended Complaint | 23-CV-0867 | February 23, 2023

**Are you still employed by the Employer?**

No

**Last day worked**

12/2/2021

**Your Job Title**

Vice President, Business Development

**Do/did you perform any part of your job outside of Illinois?**

No

**Rate of Pay**

$██████████

**How often are/were you supposed to be paid?**

Twice per month

**Do you have a written employment contract or agreement with your Employer?**

No

**Is your work subject to a union agreement or collective bargaining agreement?**

No

**If IDOL processes your claim, will you need an interpreter or translator to assist your communication with IDOL staff?**

No

**Language needed**


**Is or was the employment for which you are seeking compensation with State Government?**

No

**Is or was the employment for which you are seeking compensation with the Federal Government?**

No

### Unpaid Wages

### Unauthorized Deductions

| **Are you seeking compensation for unpaid wages (that is, all money earned in connection with the employment, BUT NOT INCLUDING bonuses, commissions, vacation time, minimum wage, overtime or other amounts)? If you have a claim for minimum wage or overtime wages, you will also be asked to complete the next section.** | **Are you seeking compensation for unauthorized deductions?** |
|---|---|
| No | No |
| **Approximate total number of hours you worked during this time period** | **Total amount you are claiming was deducted from your compensation without authorization** |
| | |

2

Blankenship vs. Outer Banks Capital, Inc.

| | |
|---|---|
| **Total amount of unpaid wages you claim you are owed or amount you believe you were underpaid** | **Period for which unauthorized deductions were made from** |
| **Date for which you were not paid from** | **Period for which unauthorized deductions were made to** |
| **Date for which you were not paid to** | **Comments** |
| **Approximate total amount you were actually paid (i.e., amount of money you actually received) during this time period** | |

### Vacation Pay

**Are you seeking compensation for vacation pay?**

No

**How much do you believe you are owed for vacation time accrued at the time of your separation?**

**Period for which vacation was earned from**

**Period for which vacation was earned to**

**Did your employer have a written policy explaining how vacation time was to be earned and/or paid out?**

No

**Comments**

### Bonus Pay

**Are you seeking compensation for bonus pay?**

No

**How much do you believe you are owed for any bonus(es) you had earned at the time of your separation?**

**Period for which bonus was earned from**

**Period for which bonus was earned to**

**Did your employer provide you with a written policy, agreement, or other document that explained how bonuses were earned and/or paid out?**

No

**Comments**

### Commission Pay

**Are you seeking compensation for commission pay?**

Yes

**How much do you believe you are owed for any commission(s) you had earned at the time of your separation?**

███████

████████████████████████

7/14/2021

### Other Compensation

**Are you seeking compensation for other types of compensation?**

Yes

**Other than wages, unauthorized deductions, vacation pay, bonus pay, and commission pay, what other amount do you believe you are owed?**

██████

██████████ ████ compensation was earned from

10/1/2021

3

Amended Complaint | 23-CV-0867 | February 23, 2023

| | |
|---|---|
| **Period for which commission was earned to** | **Period for which other compensation was earned to** |
| 12/2/2021 | 12/2/2021 |
| **Did your employer provide you with a written policy, agreement, or other document that explained how commissions were earned and/or paid out?** | **Please use the space below to explain why you believe you are owed this amount. (Maximum 300 characters)** |
| Yes | The Company failed to provide insurance enrollment information when Employee became eligible for insurance. Eligibility was October 1, 2021. |
| **Comments** | **Comments** |
| See attachment labeled Wage Claim-Blankenship_Commission.pdf | The Employer owes Employee for the Employee's cost of insurance beginning October 1, 2021. The monthly cost of the BCBS Blue Precision HMO policy was ▮▮▮▮▮ months is owed totaling ▮▮▮▮▮ |

## TOTAL AMOUNT CLAIMED: ▮▮▮▮▮▮

**In lieu of a written signature, typing your name in the box below and clicking "Submit Claim and Certify", certifies the information you provided is accurate and truthful to the best of your knowledge.**

X I agree to the above statement

Brian D Blankenship

**Did someone assist you in filling out this form, or fill it out on your behalf?**

No

**Please provide the contact information of the individual who assisted you or filled out the form on your behalf.**

**First Name**

**Last Name**

**Postal Address**

,

**Phone**

**Email**

**Relationship to you**

**May the IDOL contact the person who assisted you in connection with your claim?**

No

4

Blankenship vs. Outer Banks Capital, Inc.

Page 123

## Files uploaded with claim:

| File Name | Type of Document |
| --- | --- |
| Wage Claim-Blankenship_Commission.pdf | Commission Policy |
| Westward360OfferLetter_06282021_Executed.pdf | Other |

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit H-2
# February 10, 2023

 **Gmail**

Brian Blankenship <bdblankenship@gmail.com>

## Re: 2021 1099-NEC

1 me age

---

**Brian D. Blankenship** <bdblankenship@gmail.com>        Tue, Apr 12, 2022 at 8:57 AM
To: Jenny Cruz <jennyc@westward360.com>
Cc Brent Straitiff brent @we tward360 com

---

Simply because you have documentation does not make it accurate. The Company needs to know what's appropriate and compliant when providing choices. You should've known a W-2 employee cannot receive part of their compensation as a 1099 "employee". My CPA informed me on Friday about the concern as he was working on my taxes. This is not a mall i ue becau e I'm ure I wa not the only per on receiving wage on a W 2 and 1099 NEC My CPA did not make estimated self-employment tax payments on the 1099 income which means, for me, late fees and penalties - interest and penalties for federal is ████████████████████ because my employer let me choose when there was no choice. Given the various 1099-compensated people in the Company, I was expecting someone to know right from wrong

You gave the same reason - "I have the documentation" - with my personal information given to the Department of Labor. The instructions say black out or remove all PII data before transmitting to the DOL. Simply because I said send to me via email doe n't override the direction provided by the DOL But even after the initial event with my PII and DOL, you did it again weeks later.

I filed a Employee Misclassification Complaint with IDOL on December 13, 2021 for this exact event. The case for your reference i 2022 CA RP12 3478 with the Illinoi Department of Labor Employee Cla ification Divi ion The ca e wa assigned a labor conciliator 10 to 12 days ago. I'll share with him my experience as one example.

Good luck.
Brian

---

 Powered by
cloudHQ

On Fri, Apr 8, 2022 at 12:17 PM Jenny Cruz <jennyc@westward360.com> wrote:

> Brian,
> I have documentation from you stating to be paid in this manner.

> On Fri, Apr 8, 2022 at 11:52 AM Brian D. Blankenship <bdblankenship@gmail.com> wrote:
>> Jenny-
>>
>> Using the 1099-NEC tax form for commission payments is wrong. 1099-NEC forms report payments made to independent contractors, freelancers, sole proprietors, and self-employed individuals. I am none of those. The Employer is shifting payroll and state tax liability onto the employee. By issuing a 1099-NEC, the Company saves ████████████████████████ compensation. The commission relates to my job as an employee; therefore, it should be handled as an employee and reported on the W2. I assume the Employer will disagree these are wages earned as an employee for some reason, but let the IRS decide.
>>
>> Unless the Employer intends to correct this error, my CPA will include Form 8919 and SS-8 which will pay my share of payroll and related taxes and contest the handling of the "worker status". I assume the IRS will then follow up with the Employer to collect the Employer portion of the tax due.
>>
>> Thank you
>> Brian Blankenship
>>
>>  Powered by

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit I-1
# February 10, 2023



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

**To:**   Brian D. Blankenship
2803 Brindle Ct
NORTHBROOK, IL 60062

Charge No: 440-2022-01739

EEOC Representative and email:          Alison Fisher
Investigator
Alison.Fisher@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2022-01739.

On behalf of the Commission,

Digitally Signed By: Julianne Bowman
9/28/2022
Julianne Bowman
District Director

**Cc:** Westward360 d/b/a Outerbanks

Please retain this notice for your records.

Amended Complaint | 23-CV-0867 | February 23, 2023

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 440-2022-01739 to the District Director at Julianne Bowman, 230 S Dearborn Street

Chicago, IL 60604.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

Amended Complaint | 23-CV-0867 | February 23, 2023



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On:

**To:** Brian D. Blankenship
2803 Brindle Ct
NORTHBROOK, IL 60062
Charge No: 440-2022-01739

EEOC Representative and email:    Alison Fisher
Investigator
Alison.Fisher@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2022-01739.

On behalf of the Commission,

<span style="color:red">UNDATED FILE COPY</span>

Digitally Signed By:Julianne Bowman

Julianne Bowman
District Director

**Cc:** Westward360 d/b/a Outerbanks

Please retain this notice for your records.

Blankenship vs. Outer Banks Capital, Inc.                                                     Page 131

Amended Complaint | 23-CV-0867 | February 23, 2023

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 440-2022-01739 to the District Director at Julianne Bowman, 230 S Dearborn Street

Chicago, IL 60604.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit J
# February 10, 2023

**CURRENT PROJECTS, INITIATIVES, AND RESPONSIBILITY SUMMARY**
**Brian D. Blankenship**
**August 18, 2021**
**Updated:**        9/7/21

### 1 CONSOLIDATION & REALIGNMENT.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☐ | Consolidating on and off boarding between divisions (processes) |
| | | ☑ | Analyze current staff (marketing, transitions, new business support) |
| | | ☐ | Redefine roles, and create a Realignment Plan |
| | 9/6/2021 | ☑ | Provide the BOD with Realignment Status Update |
| | | ☐ | Streamline checklists and select tool to track and report progress. |
| | | ☐ | Implement approved Realignment Plan. |
| | | ☑ | Review and suggest improvements to current severance process and documentation. |
| | | ☐ | Adopt "bench" PM concept |
| | | ☑ | Audit front desk tasks to determine what is happening. Adjust as approved by Board. |
| | | ☑ | Review separations with HR attorney; update docs |

### 2 LEAD MANAGEMENT & SALES STRATEGY.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☑ | Analyze current lead management process and recommend CRM. |
| | | ☑ | Develop proactive sales approach strategy for new business including financial targets. |
| | | ☐ | CRM (Pipeline) deployment. |
| | | ☐ | content creation for workflows, . |
| | | ☐ | Customization to both CAM and Investment for improved lead management and tracking |
| | | ☑ | Engage consultant to support CRM development and implementation. |
| | | ☑ | Meet with Brawley to review Pipedrive, his involvement, and advice |
| | | ☐ | |

### 3 BRANDED MATERIALS & FULFILLMENT.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☑ | Obtain inventory of current materials and use |
| | | ☐ | standardize marketing materials |
| | | ☑ | determine need for printed/branded materials and create from scratch |
| | | ☐ | consolidate vendors for ordering (remove Print Runner and FastSigns and migrate to online ordering with AlphaGraphics) |
| | | ☐ | create single online source for consistent ordering by CAM, Investments, PROs, Outer Banks, and Realty |
| | | ☑ | Source graphic artist |
| | | ☑ | Source content writer |
| | | ☑ | Source web developer for the Parthenon and Wordpress website structure |

### 4 WEBSITE & DIGITAL MARKETING.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☐ | Complete website development from March 2021 |
| | | ☐ | Investigate errors identified from audit, |
| | | ☑ | Create a website development update focused on 10 improvements for October 2021 |
| | | ☐ | deploy critical fixes from audit, |
| | | ☐ | address website within a website problem, |
| | | ☐ | create content for new pages and service offering landing pages, |
| | | ☐ | incorporate referral strategy with website as the source of all referrals |
| | | ☐ | create page for Westarity non-profit |
| Pros another meeting to deten | | ☑ | Decide if Aruria will develop the Update or engage a new developer for update. |
| | | ☐ | Improve monitoring of website |
| | | ☐ | (a) utilize Moz to audit the website for errors, |
| | | ☐ | (b) incorporate Moz Local into the strategy to manage business listings across the web, |
| | | ☐ | (c) perform form test to ensure they function and flow per workflows (quarterly). |
| | | ☐ | Business listing improvements |
| | | ☐ | Create a "Board Room" on the website that populates with Board content. Concept is to educate a Board Member to get the traffic. |
| | | ☐ | help.westward360.com needs sorted out and completed. |
| | | ☐ | |

### 5 REFERRAL STRATEGY.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☑ | Develop a referral strategy for realtors, referral partners, employees, and rental tenants, |
| | | ☐ | Determine referral fee paid out per referral type, |
| | | ☑ | Investigate best practices to implement across the organization |
| | | ☐ | ~~Source "off-the-shelf" referral tracking software to incorporate into website with planned Update project~~ |
| | | ☐ | Work with accounting to process referral payments |

**Workforce Realignment Plan**                                      8/17/2021
**Target Dates & Timeline**

| Task | Target Date* | Step | Option | Responsible |
|---|---|---|---|---|
| 1 | 8/10/2021 | Workforce Realignment & People Movement Plan Complete; Sent to Brent | | Brian |
| 2 | 8/18/2021 | Review Plan, salary updates and lay-offs with the Board; adjust as necessary | | Brian |
| 3 | 8/19/2021 | Begin Recruiting for open positions. | | Claudia |
| 4 | WE 8/23/2021 | *Review "SmartContact" concept* (kiosk application, smart lockers and communication) | Optional | Brian |
| 5 | 8/23/2021 | Onboarding/Offboarding Consolidation & Transition Plan continues | | Brenda/Greg |
| 6 | 8/27/2021 | New Severance Agreement Complete, COBRA compliance reviewed and adjusted | | Jenny/Attorney |
| 7 | By 8/31/2021 | Incorporate Zaela to the On/Off Team | | Jude |
| 8 | By 8/31/2021 | Off load financial only clients from Brenda to Joanne & Bridge, who will handle forward | | Jackie/Romar |
| 9 | 8/31/2021 | Re-define sales process and build into CRM | | Ian/Brian |
| 10 | By 8/31/2021 | Reset financial only client management expectation (too much time is currently spent) | | Eric |
| 11 | By 8/31/2021 | Reassign new business lead follow-up from Brenda to Brian | | Brian |
| 12 | 9/1/2021 | Promote Brenda to Transitions Manager | | Jude/Brian |
| 13 | 9/1/2021 | Promote Alexandra Wiseman to Client Services Manager (new title) | | Eric |
| 14 | 9/1/2021 | Promote James to full-time Office Manager w/ additional tasks and onboarding support | | Jenny |
| 15 | 9/1/2021 | Extend job offer for Marketing Coordinator | | Brian |
| 16 | 9/3/2021 | Examination of every task performed with On/Off, eliminate tasks not provided for | | Transitions |
| 17 | 9/3/2021 | Define transition tasks for Zendesk template working with Boris* | | Transitions |
| 18 | 9/10/2021 | Brian to absorb new business tasks handled by Sunny | | Brian |
| 19 | 9/10/2021 | Brian to absorb new business tasks handled by Greg | | Brian |
| 20 | As Needed | Leverage department heads for property visits related to new business | | Eric/Ann |
| 21 | 9/10/2021 | Announce new office requirement for all staff (whether its one or two days) | Optional | Brent |
| 22 | 9/10/2021 | Company-wide, mandatory conference call conducted by Brent (develop talking points) | Optional | Brent |
| 23 | 9/10/2021 | Conduct Lay-offs. Plan for Friday at 9am | | Varies |
| 24 | 9/13/2021 | Announce Client Retention Program & Employee Amnesty | Optional | TBD |
| 24a | 9/13/2021 | Conference Call with PM, CAM, Investments to review Client Retention Program | Optional | TBD |
| 24b | 9/13/2021 | Conference Call with offshore staff to review Client Retention Program | Optional | TBD |
| 24c | 9/13/2021 | Add Contracts Retained Countdown on main floor and kitchen area (manual/easel) | Optional | James |
| 25 | Week of 9/15/2021 | Distribute company branded Appreciation gift (46" Golf Umbrella or Water Bottle) | Optional | James |
| 26 | By 9/15/2021 | Adopt "Bench" staffing; create training program | Optional | Eric/Brian |
| 27 | 9/30/2021 | Initial CRM Pipedrive application to be released | | Brian |
| 28 | By 9/30/2021 | Phase Jude out of onboarding/offboarding process | | Brian |
| 29 | By 9/30/2021 | IT develops new Zendesk protocol for onboarding/offboarding | | Brawley/Boris |
| 30 | 9/30/2021 | Reputation Management Strategy developed, rolled out of monitoring tools thereafter | | Brian |
| 31 | 10/1/2021 | Soft launch new task list and tracking in Zendesk to select events* | | Brawley/Boris |
| 32 | 10/31/2021 | Website Update Launched | | Developer/Brian |
| 33 | 11/1/2021 | Referral Program Announced; Referral Program active on website | | Developer/Brian |
| 34 | 11/1/2021 | New task list and tracking in Zendesk in use* | | Brawley/Boris |
| 35 | By 11/15/2021 | Re-entry of onboarding/offboarding checklists for pending deals complete | | Transitions |
| 36 | 11/15/2021 | Final CRM Pipedrive application released | | Brian |

*: subject to change

Amended Complaint | 23-CV-0867 | February 23, 2023

## 6 REPUTATION MANAGEMENT.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☐ | Investigate and triage (immediate actions) our reputation issues that exist online and from call center calls. |
| | | ☑ | Identified one source creating reputation problems at the call center and revisions are underway. |
| | | ☑ | Suggested structured call listening requirements by CSR managers. |
| | | ☐ | Another source contributing to reputation issues has been identified but is a cultural fix. |
| | | ☑ | Recommended immediate Client Retention Strategy to try and get in front of terminations before they occur. |
| | | ☐ | Remind all staff to ask for a review when something good happens; we want this to become routine so incentives should not be part of this. |
| | | ☑ | Incorporate software to monitor the web, primary review sites, and social media sites. (Three products are under review and there is one solution that meets our requirements. Product is Reviewtrackers and it's a start-up with an eight-year history that is based in Chicago; very inexpensive). |
| | | ☐ | Define our competitors with CAM, Investments, Rentals and PROs and monitor competitive set. |
| | | ☐ | Claim Westward 360 on social media, review sites, and local listings. |
| | | ☐ | Develop Reputation Management Strategy and implement monitoring tools. |
| | | ☐ | Create request review process focused on asking for positive reviews. |

## 7 NEW BUSINESS.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☐ | Gain new business tactics by getting involved in potential new transactions with Ian, Michelle, Greg and Nathan. |
| | | ☐ | Analyze the option of adding Virtual Visits via Yelp for new business opportunities. |
| | | ☑ | Determine current cost per lead (CPL) and cost per rental (CPR) for Investments and CAM (include commission paid out). |
| | | ☑ | Prepared a Retention Program draft for consideration in hope of slowing down terminations. |
| | | ☐ | Assume lead management tasks |
| | | ☐ | Develop the sales strategy across business lines |
| | | ☐ | Create Press Release plan to promote our growth and solicit for new business |
| | | ☐ | Discuss - Cell tower and billboard opportunities for any managed location or owned investments |
| | | ☑ | Present Client Retention Program (draft) to the Board |

## 8 MARKETING.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | 8/5/2021 | ☑ | Review and adjust Marketing Manager job description. |
| | 8/29/2021 | ☑ | Recruit and conduct interviews. Hire position by 9/1/2021. |
| | | ☐ | Work through outstanding marketing projects from Ari's departure. 10 projects outstanding; Five of these projects are included within a larger project |
| | | ☐ | 1    Email campaigns for Realty (Paul) - Propertybase |
| | | ☑ | 2    Company brochure (included in #3 above) |
| | | ☐ | 3    Webster Front Window Projeect |
| | | ☐ | 4    CAM Surveys (Board) |
| | | ☐ | 5    Rental Surveys (survey renters) |
| | | ☐ | 6    Newsletter (initial) HOLD; determine best time to deliver |
| | | ☑ | 7    Brand Standard PDF (included in #3 above) |
| | | ☐ | 8    PROs page on website. PROs want to add pricing books. MEET WITH TODD |
| | 8/6/2021 | ☑ | 9    Need a graphic artist |
| | | ☑ | 9    Re-iew Strategy (included in #8 abo-e) |
| | | ☐ | 11    Coordinate headshots for leadership. Does Patrick want them on the website? |
| | | ☐ | 12    SEO Audit needs performed on new website |
| | | ☐ | 13    PROs quarterly special offer email distribution |
| | | ☐ | Patrick has requested creative briefs for each remaining project. |
| | 8/27/2021 | ☑ | Review the Happiness Employee Survey and then pass responsibility to HR going forward |
| | | ☐ | Meet with Michelle to fo low-up our August meeting and what her marketing ideas and needs |
| | | ☐ | Research options to have our own W360 app. What would it offer and accomplish? |

## 9 TENANT INSURANCE.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☐ | The investment division requires Building Liability Coverage from each tenant. |
| | | ☐ | Is this coverage legal given we have no exposure from tenant damages. The owner has the liabil ty but the owner already has liability coverage from his CGL policy. |
| | | ☐ | How does Westward360 become damaged and make a claim under the Building Liability Coverage? If the claim is larger than the policy limit, how can Westward360 pursue those funds when they were not damaged? |
| | | ☐ | Building off the current penetration level, I see opportunity to grow participation to 70% to 75% penetration. To accomplish this we need a insurance product that is beneficial to the tenant. |
| | | ☐ | One idea is to replace the Building Liability Coverage policy with either a renter's insurance policy or a "protection" plan. The renter's insurance approach has a higher value than the protection plan. |
| | | ☐ | A renter's program (at 90% occupancy and 75% penetration and a $20.00 premium, generates $28,350 per month in total premiums. The protection plan has 100% penetration with a lower monthly cost of $15.00, or $28,350/month |
| | | ☐ | Another option would be to create a Captive Insurance Company and self-insure some of the exposure. Hire a insurance service agency to manage the claims and keep the captive in compliance. |
| | | ☐ | Using renters insurance in my example, total premiums collected for Year 1 are $340,200. With a captive, admin costs, reinsurance costs, and claim liability paid, you could expect to see 75% to 80% of the premium as profit which would be $255,150 Year One. |

## 10 LEGAL & COMPLIANCE.

| Due Date | Actual Date | Done | |
|---|---|---|---|
| | | ☐ | Email. Our outbound emails for marketing purposes do not contain the proper legal disclosure or originator contact information. We are required to include Unsubscribe in all outbound emails but we lack this feature. |
| | | ☐ | Trademark. The company is using various trademark symbols - © ™ ℠ - incorrectly. Determine if we have applied for any trademark by name or phrase. |
| | | ☐ | Rental Agreement. Our agreements may not properly name the various parties. In my experience, a rental agreement is entered into under the legal name of the property owner with the property manager listed as the managing agent. The agreement is signed as the legal owner with the signature as the agent of owner. |
| | | ☐ | PCI-Call Center. The call center may not be PCI Compliant. PCI Compliance standards went into effect in January 2015 and the current protocol is from May 2019 (version PCI DSS 3.2.1). The primary issue is handling credit cards over the phone. The customer provides their credit card information over the phone and these calls are recorded; we record the credit card data on a server somewhere. To be compliant we must use a software that stops recording the call when the credit card is disclosed or implement a pay by phone service. |
| | | ☐ | PCI-Files. Assuming the company has a record retention policy, PCI Compliance requires certain changes to information stored. If we have any document that contains a credit card number or other personally identifiable data, that information must be removed before it sits in storage. |

Amended Complaint | 23-CV-0867 | February 23, 2023

☐ PCI-Other. There are other requirements that should be reviewed to determine the necessary impact on the company to become PCI Compliant.

☐ Web-There are five different "websites" within our website via links or URLs. Some of these sites do not have the proper legal disclosures. Also, review these websites to possibly cancel so they stop competing with our main website.

☐ Web-www.westward360.com is not consistent with displaying Terms of Use, Privacy Policy or Disclosure.

☐ Web-An area that is new and has risk is the ADA status of the website. There is a standard ADA requirement to website must adhere to be ADA compliant. We are required to include a disclosure on each page and provide our Accessibility Policy online. This requirement is a hot button, well it's been that way for a few years. There are lawyers who identify non-compliant websites and sue the company for not having a ADA compliant website. I know this first hand because it happened to me while running Prime Group Holdings, LLC in New York. We eventually settled for $20,000 plus a commitment to have our website ADA compliant within six months.

☐ Late Fees. I'm concerned we may apply late fees inconsistently across the rental properties. I believe the Condo Act provides for a late fee structure. Late fees are typically applied consistently across the tenant base and the late fee structure replaces the late fee terms of the lease. There is typically a 30-day notice required to change late fees; however, I have not seen a provision in the lease agreement giving us the right to change fees with proper notice.

☐ Building Liability Coverage, - See concerns under Tenant Insurance section

☐ Review & comment to Nathan about Investment Management Agreement

☐ Vendor Insurance - the requirements differ per division but there should be a minimum established for coverage, including workers comp. We have the risk if an owner te ls us to perform a task with no vendor insurance. Anyone who uses a ladder, gets on a roof need insurance.

☑ HR & Related. Present summary memo to Dave and Brent\

## 11 CALL CENTER

| Due Date | Actual Date | Done | |
|----------|-------------|------|---|
| | | ☐ | Discuss adopting "skill-based" routing of calls at the call center. |
| | | ☑ | Address issue of CSR's putting callers on hold for extended periods of time |
| | | ☐ | Set-up Dialpad Analytics to measure negative sediment with the goal of identifying trends per location or by person |
| | | ☑ | Suggestion to Jude revamp the phone tree to have fewer options. |
| | | ☑ | Suggestion to Jude have supervisors listen to x calls per week to identify problems and trends. |
| | | ☐ | Suggestion to Jude For CSR, develop a Call Review Sheet and have the CSR grade their own calls. Then have a supervisor review and turn the conversation to a coaching exercise or a great job response. |
| | | | How to get after hours support armed with the details to solve problems? |

## 12 WESTARITY

| Due Date | Actual Date | Done | |
|----------|-------------|------|---|
| | | ☐ | Develop page on website discussing the non profit |
| | | ☐ | Content for the page will need sourced (videos, photos, narrative) |

## 13 ADMINISTRATIVE

| Due Date | Actual Date | Done | |
|----------|-------------|------|---|
| | | ☑ | Establish Level 10 Meeting. Determine participants |
| | | ☐ | Sort thru help.westward360.com issues (Consumer vs. Sales POV) |
| | | ☐ | Why don't we have PM/APM available on weekends or later each evening? |
| | | ☐ | Triview still exists in Google, LinkedIn and Yelp - determine why and terminate |
| | | ☐ | Talk with Brent about a short-term time tracking project to see where the company time is allocated. |
| | | ☐ | Zero day turns are causing tenant issues (units get partial or no turnover services). Review with Nathan |
| | | ☐ | LinkedIn has Westward Management page in addition to Westward360. Consolidate? |
| | | ☐ | Review Brian's responsibilities post-changes. Review Summary Memo. |

## 14 TRANSITIONS DEPARTMENT

| Due Date | Actual Date | Done | |
|----------|-------------|------|---|
| | | ☑ | Develop task management process in Zendesk (Brawley) |
| | | ☐ | Consolidate onboarding task list into the same format and use expectation |
| | | ☐ | Consolidate offboarding task list into the same format and use expectation |
| | | ☐ | Incorporate stepped tasks into the new process (currently used by CAM) |

Blankenship vs. Outer Banks Capital, Inc.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit JJ-1
# February 10, 2023



## CONTINGENCY OR FEE PETITION REPRESENTATION AGREEMENT

This Representation Agreement **("Agreement")** is made between ████████████ doing business as ████████████████████████ and Brian D. Blankenship ("Client") effective as of the date of the Client's signature below. This Representation Agreement is made because the Client wishes to retain the ████████████ as their attorneys in the following matter: Cause of Action related to Client's employment with Outer Banks Capital, Inc. **("Employer"**) and all employment-related events with Client's termination, including Equal Employment Opportunity Commission **("EEOC")** claim (Charge # 440-2022-01739), Illinois Department of Human Rights **("IDHR")** claim (Control #230714.011), Illinois Department of Labor **("IDOL")** Employee Classification Act Complaint (Case #21-ECA-000036) **,** and the IDOL Wage Claim (Case #22-0000336) **(**the **"Matter")**.

Separate from the Matter is the Client's pending Whistleblower Case (Case #5-2330-22-037) filed with the US Department of Labor **("DOL")** and Occupational Safety and Health Administration **("OSHA")** on December 7, 2021**(**the **"Additional Matter")**. The Firm agrees it shall provide legal consultation service, to Client and based on Client's need, related to the Additional Matter on an hourly basis and reimbursement of certain expenses as defined on the ==Fee Schedule **("Exhibit A")**.== Upon resolution of the Additional Matter and subject to Client's use of legal consultation service, the Client will have no obligation to provide the Firm any additional fee beyond those outlined on the Fee Schedule.

████████████ is retained on the following terms and conditions:

### 1.    **Commencement of Representation.**

The Parties understand and agree that representation will not begin until this Agreement is signed. No retainer is requested.

The Firm has been engaged to represent the Client for the purpose of the Matter and represents all attorneys representing Client are licensed and in good standings in the State of Illinois. The Firm warrants they are not, to the best of its knowledge, involved in any situation that might create, or appear to create, a conflict of interest. The Client represents they are not aware of any other legal matter, except those that are outstanding with the Employer or Westward360, Inc. **("Company").** If such matters arise later, Client agrees that this Agreement does not apply to any related legal matter. Such matter could be handled under a separate representation agreement if the Parties so desired.

Amended Complaint | 23-CV-0867 | February 23, 2023

Client is retaining ███████████ not any particular attorney, and attorney services to be provided to Client will not necessarily be performed by one attorney.

2.      **Firm-Client Cooperation.**

Client retains ███████████ to represent Client in the Client's claims related to the Matter.  The Firm will provide the legal services reasonably required to represent Client as called for under this Agreement, respond timely to other parties on Client's behalf, take reasonable steps to keep Client informed of progress and developments, including copies of all communication received and sent related to the Matter, respond promptly to Client's inquiries and communications, and, ultimately, recover a favorable judgement or settlement for the Client.  The Firm will take appropriate and timely actions to comply with any deadline issued by any statue, court or agency related to the Matter.  The Client received the Right to Sue from the EEOC on September 27, 2022, and the Firm will take the appropriate action to preserve that right within 90 days of Client receiving the Right to Sue.  The Firm will devote their full professional abilities to the Matter.

The Client agrees to fully cooperate with the Firm and agrees to appear, if requested, for all meetings and hearings including but not limited to all depositions and court appearances, and to generally cooperate fully with the Firm in all matters related to the preparation and presentation of the Matter.  This includes providing the Firm with requested information in a timely manner. The Client will be truthful, candid, and cooperative with ███████████ and will keep Firm reasonably informed of developments and of Client's address, telephone number, email address, and whereabouts.

3.      **Firms' Fees.**

In consideration of the legal services to be rendered by ███████████ Client agrees to pay the Firm compensation one of the following fees: A. Early Settlement Fee, B. Contingency Fee or C. Fee Petition Award Fee.  For the purpose of calculating compensation to the firm. Gross Recovery Amount is defined as the dollar amount awarded to the Client by the court, trial or negotiated settlement.  Net Recovery Amount is the Gross Recovery Amount less reasonable and necessary expenses and reimbursements made by Client related to the Matter.

A. **Early Settlement Fee.**  As of the effective date of the Agreement, the Firm acknowledges it has received the information necessary, either by documentation or from discussion, to file the appropriate complaint(s) and Client will continue to provide further information reasonably requested.

If a settlement occurs between the date a complaint(s) is filed and the earlier of (A1) Defendant's Answer to Complaint, (A2) Dispositive Motion (Motion to Dismiss, Motion for Summary Judgement, etc.) by Defendant, or (A3) 60 days after complaint is filed, then Client will pay the Early Settlement Fee to the Firm.  The fee is equal to the actual hours billed to the Client through the date of the settlement, at the rates per the Fee Schedule, up to a maximum of ███████

B. **Contingency Fee.**  Without early settlement as defined in 3(A), then a

Contingency Fee will apply and calculated as follows:

B1. ▮▮▮▮▮ of the Net Recovery Amount, whether by judgment or settlement;

B2. ▮▮▮▮▮ of the Net Recovery Amount, whether by judgment or settlement, and when any judgment has been appealed, either on behalf of the Client or by any adverse party, or if any proceeding after judgment has to be brought to collect the judgment or any portion thereof; or

B3. ▮▮▮▮▮ of the Net Recovery Amount, whether by judgment or settlement, and the Matter is the subject of a retrial as ordered by a trial or appellate court.

C. **Fee Petition Award Fee.** The Fee Petition Award Fee is the amount submitted to the Court for legal services provided to the Client for the Matter (the **"Fee Petition"**). The Fee Petition is submitted to the court after the Client becomes the prevailing party. The Firm will bill at a rate of $400.00 per hour for this purpose only and billed in incremental amounts of tenths of an hour (10ths of an hour or six [6] minute increments), or as adjusted by the Court.

If the Court accepts the Fee Petition, or approves an amount more or less than submitted, the Firm will accept the court-ordered Fee Petition Award, which is the financial responsibility of the Employer, as total compensation for the Matter excluding expense and reimbursements to be paid by the Client. The amount ordered by the Court becomes the Fee Petition Award Fee for purposes of the Firm's Fee.

In the case of a settlement, if any attorney fees are recovered from the Employer as part of the settlement, the amount recovered or allocated to these fees shall be credited to the Client and distributed without any additional fee paid by Client. [Logic is the Firm will earn 100% of their fee per Section 3 paid by the Client and if the Employer reimburses that should go to Client since the Firm has already been paid a Fee.]

The Client agrees that the Firm may deduct either the Early Settlement Fee, Contingency Fee or Fee Petition Award Fee, as defined in this section, from the Gross Recovery Amount along with all reasonable and necessary expenses and reimbursements related to the Matter as detailed in Section 6. The Firm shall disperse all funds owed to the Client within 10 days upon receipt of the Gross Recovery Amount. If the Gross Recovery Amount is not received from the Employer within xx days after judgment or settlement, then the Firm will xxxxxx.

In the event of no recovery by settlement or judgment, the Client shall have no legal obligation to the Firm for Early Settlement Fee, Contingency Fee, Fee Petition Award Fee or any fee but Client will remain responsible for all reasonable and necessary expenses and reimbursements related to the Matter as detailed in Section 6.

4. **Billing.**

Every month, by the 10th day, the Client will receive a statement for the legal services provided, including the expenses and reimbursements related to the Matter, during the previous month. The statement consists of a list of entries showing the date, the timekeeper, a brief description of the tasks performed for that entry, and a figure consisting of the hourly rate multiplied by the amount of time for that entry. This Client will have 20 days upon receipt of the statement to review and comment after which the Client accepts the amounts for legal services provided and expenses. Hours will be billed at the Firm's standard rates per the Fee Schedule for purposes of this Agreement. The hourly rate will be "risk-adjusted" for the purpose of the Fee Petition motion defined in 3(c).

5. **Firms' Lien.**

The Client agrees to give to ▓▓▓▓▓▓▓ a lien on the claims or causes of action on a sum equal to and not to exceed the Firm's fee as described in Section 3 plus expenses and reimbursements. It is further agreed that ▓▓▓▓▓▓▓ shall have all general, possessory, or retaining liens, and all special or charging liens known to the common law or available under law but limited to the Firm's fee, as described in Section 3, plus expenses and reimbursements.

6. **Costs or Expenses Incurred.**

The Firm will advance all reasonable and necessary expenses and reimbursements, and any costs approved by the Client, related to the Matter via the Firm's trust account. These costs include but are not limited to subpoena and service process fees, depositions, photocopying, postage, filing fees of the court, witness fees, court reporter and videographer fees, travel expenses and any other expenses reasonably necessary for the professional handling of the Matter. The Client agrees to pay all costs of investigation, preparation, and trial of the case. These costs are also any cost advanced by the Firm to a third-party provider for the purpose of advancing representation in the Matter. These include, but are not limited to, travel costs, court costs, subpoena costs, photocopies, depositions, court reporter costs, medical reports, witness statements, witness costs, and consultant, or expert costs.

7. **No Representations or Promises.**

The Client agrees that ▓▓▓▓▓▓▓ has not made any promises, representations, or guarantees regarding the outcome of Client's claim. The Parties further agree that this is the entire agreement of the Parties with regards to Firm's representation of Client in the Matter and that there are no other written or oral agreements between Client and Firm relating to the Matter.

The Client authorizes ▓▓▓▓▓▓▓ to fully investigate the facts and law relative to the Matter. The Parties shall have the right to terminate this Agreement, which would end the Firm's representation of Client, pursuant to the terms in Section 10 (Termination).

8. **Settlement**.

The ▓▓▓▓▓▓▓ agrees to make no compromise or settlement in this Matter without the approval of the Client as to the specific settlement or compromise. The Firm agrees to notify the Client whenever an offer of settlement or compromise is received, whether it was made verbally or in writing, by the Firm including informing the Client of the amount of that offer. The Firm will advise and make a recommendation as to the acceptability of any settlement or

compromise received.

Likewise, the Client agrees to make no compromise or settlement in this Matter without the approval of ▇▇▇▇▇▇▇ The Client agrees to notify the Firm whenever an offer of settlement or compromise is received by the Client and to inform the Firm of the amount and terms of any such offer.

The Client has the ultimate right to decide whether or not an offer of settlement is satisfactory.

9. **Associate Counsel.**

The Client authorizes and agrees that any other attorney, investigator, paralegal, secretary, or other person in the firm may, at the professional discretion of Firm, perform necessary services under the direction of ▇▇▇▇▇▇▇ If, at the professional discretion of the Firm, associated counsel from another firm is necessary, the Firm will notify Client.

10. **Termination.**

Either side may terminate this Agreement by providing the other side with written notice of termination. The Firm may withdraw from representation of Client (a) with Client's consent, or (b) upon court approval, or (c) if no court action has been filed. If the Agreement is terminated by the Firm before settlement or judgment, Client shall owe no fee to the Firm, but Client shall remain responsible for expenses and reimbursements. In the event the Agreement is terminated by Client before settlement or judgement, Client agrees to pay the Firm the billed hours using the standard hourly rates defined on the Fee Schedule, per the monthly statements, plus expenses and reimbursements. The monthly statements reflect the hours reasonably spent by the Firm on the Client's matter. In the event of such termination by either side, the Firm shall be entitled to be reimbursed for all costs and expenses that the Firm incurred and for any fees incurred by the Client. The Client understands that depending upon when the Agreement is terminated, the Firm may need to seek judicial permission to withdraw as the Client's representative.

Upon conclusion of the Matter, either by judgement, settlement, or termination pursuant to this section, or any combination thereof, the Firm's representation of the Client will terminate. At termination, the Firm shall provide Client with (a) a written statement stating the outcome of the Matter showing a complete reconciliation of the Firms' fees, expenses and reimbursements and (b) any tax-related document, such as a 1099-NEC, or documentation notifying the appropriate party of Client's information for tax purposes.

11. **File Retention and Destruction.**

After Client's Matter is closed, or in the event the Agreement is terminated, ▇▇▇▇▇▇ ▇▇▇ will provide the Client a copy of their file in digital format at no cost to the former Client, upon request, and within 15 business days.

The Parties understand that ▇▇▇▇▇▇▇ will only store client file materials in a digital or electronic format. Any non-public or confidential information provided by the Client related to the Matter will be always kept confidential. After the Client's documents are digitized, the Firm may destroy the paper documents in the client file.

Amended Complaint | 23-CV-0867 | February 23, 2023

12. **Insurance.**

The Firm, at their expense, acknowledges they carry customary insurance, including errors and omissions (malpractice), applicable to the services provided to Client. All insurance coverage shall be maintained for the duration of representing Client. Client can request that the Firm provide evidence of coverage via a certificate of insurance.

13. **Disputes.**

Do we need to outline how this would work or is there standard protocol that would apply in the event there is a dispute? The Firm will have lien rights on the amount of the fee but if I have a material dispute that is not able to be resolved, what are the mechanics for a Client dispute?

14. **Acknowledgment by Electronic Signature.**

The Client acknowledges that they have read and understand all the terms and conditions of this Agreement before signing it. The Client acknowledges that by original or electronic signature on this Agreement, the Client accepts this Agreement as stated above.

Client: _____     Date: _____
        Brian D. Blankenship

Firm: _____       Date: _____

**Exhibit A**
**Fee Schedule**

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit KK-1
# February 10, 2023

November 7, 2021

Brent –

I cannot express how disappointed I am with the communications meeting held on November 4, 2021, at the office. I have been clear and detailed since raising issues and concerns about Nathan Brown beginning July 31, 2021. The subject of the meeting was a communication conflict between Ann Marie Riley and me. While there are occasional communication breakdowns between Ann and I, the real problem, and the point of the meeting, is Nathan Brown. The meeting did nothing to address the conflict or egregious actions by Nathan Brown.

You have selectively picked this conflict between Ann and me to "clear the air" and stop any conflict spillover to other areas of the business. The communication plan put on the table for Ann and I is another level and task that is unnecessary. Nathan wasn't even held to the new communication policy that you require for Ann and me. The Company has so many communication conflicts, often created by Nathan's actions, that cause issues with departments, management, owners, clients, tenants, and employees. Respectfully you have many bigger issues that spill over that have a negative impact on the business right now. I hate saying this but…if you took the energy and time you spent on this issue but tried to solve a real conflict in the organization, like Nathan Brown, our employees would appreciate the problem solving.

I was given tasks in September involving the Investment group because "Investments needs some help" and the Company wanted insight into the functions and problems of the department since they operate independently from the rest of the company. A tremendous amount of time was spent learning about Realty's systems and how there were improvements needed in the rental process. Every suggestion was turned down, and I was steered to a path that Nathan wanted. None of the goals happened because Nathan was permitted to box me out of every approach I took to figure things out.

All past attempts to improve the situation with Nathan have failed and the entire situation has only escalated since we met on October 14 and had a follow up phone call the next day. During our October 15, 2021 call, the conversation was very critical of me, my actions and my employment in general. In fact, there were 13 points of criticism, some of it constructive, that you highlighted. You mentioned two company failures and there were **zero** mentions addressing any concern about Nathan raised in my letter. Then on October 20, we had a meeting to discuss the status of my 2021 tasks and a draft letter I wanted to send to Nathan. This meeting was basically a "counseling" meeting as it was followed up with documented notes. Your recommended changes to the letter changed the tone of my draft; your changes protected Nathan so he would not become defensive or upset. The changes made the letter submissive and was never sent to Nathan. I'm not interested in rehashing all the topics here, but I will respond to a few of the more bothersome critiques.

1. **You want to be told the truth.** I can only assume this comment was made because you feel I've provided a non-true statement. I do not lie. I've been accused of withholding facts at times, but never lying. I stand by EVERY comment made in all my communication about this subject. If there is something you don't believe, tell me what it is and I will validate the concern.
2. **Statement, "The Board is not going to look at me differently."** I don't quite know what to say except to question why it was even said. If raising issues supported with facts causes me to be looked at differently, then the Board needs some professional maturity. I don't think that's the case, though; it's fear that prevents the Board from taking any action. As I've told you before, it's not easy presenting problems to the Board; disclosing this information knowing its potential to negatively impact me should be appreciated.
3. **Politics**. It was suggested I become more aware of company politics and learn how to co-exist with them. Sorry but that's not for me. As you and the Board know, I am not afraid to address a problem or situation head on and ignore any politics or other noise. I will get to the root cause and go from there. I have never been a political guy and it has served me just fine in my professional career to date. I don't see that changing any time soon.

The October 14, 2021 letter contained **63** different statements about Nathan's actions. Sixty-three! 63! **NOT ONE ISSUE WAS DISCUSSED IN THE MEETING.** Instead, I'm told to meet with him 1:1 to "work things out" after

the meeting. HELLO! The meeting was about conflict with Nathan! It's clear to me now that Nathan Brown is invincible, and the communication meeting of November 4 only increased his invisibility.

In less than 10 business days, Nathan restricted my communication with clients, tenants, and prospective clients and removed my responsibilities with management agreements, a task you specifically told me to manage. On October 17, Nathan required that I obtain his approval before responding to any client, tenant, or prospective client email communication but he really preferred that he respond instead of me. I sent multiple responses and emails for his approval that remain unanswered to this day. On October 27, he took another restrictive action by requiring his presence on any phone call. I am to add him to any scheduled call and if he decides to attend then he will lead the call. Then on October 29, Nathan calls me, but he doesn't call to discuss any of the responses I'm waiting on him to approve. He called to tell me that he decided it would be best if Zalea took over administration of management agreements. I couldn't believe it. Nathan feels Zalea can be more responsive and will just "plug the numbers he tells her to put in and get it done". He didn't like me having that control because he's unable to do as he wants with me as he does others. He was extremely cocky and arrogant during this call.

Whatever conversations have been had with Nathan since October 14 didn't change anything as evidenced by his increased aggressiveness to remove my presence from Investments. His actions towards me are now deemed acceptable because he was not held accountable. It's mind boggling that no action has been taken by you or the Board despite being made aware of many issues. At this point, you and the Board appear to accept his improper activities and the toxic environment he creates because you've known about issues with him before I started to work for the company. Despite being aware, you've done nothing about them and, in fact, protect him.

I had high hopes with the meeting you called for between Nathan, Ann and myself. I was hoping your involvement could solve a real conflict. A recent conversation we had you reference that "Nathan is my partner and friend" and "we go back 20 years." Maybe you're too close to Nathan and your relationship to be objective. Then, as recently as the afternoon before the meeting, we had two discussions about the meeting, and I expressed to you several concerns regarding Nathan. You interrupted me on both occasions and said bring it to the meeting so it can be worked out. Nathan was present for the meeting but **zero** minutes were spent talking about his actions, relationship with others or poor communication. This was very surprising. Instead I've been singled out and penalized with an odd and unnecessary communication protocol that will be complied with by silence and avoidance. Out of 175 employees in the Company, I'm the only one in the company, besides Ann, that is deemed a poor communicator and the only one that is subject to an individualized communication protocol. Please take five (5) minutes and read Zendesk tickets from our clients; that's where the focus should be if you are seeking poor communicators.

Nathan knew he was wrong and knew he would not be held accountable. How do I know this? Because towards the end of our 1:1 discussion on November 4 he whispered "I'm sorry for making you go through all that. I'm just having a hard time letting go so I make barriers and get angry." I did not accept his apology and probably won't for one main reason. He was permitted to make my days uncomfortable, unproductive, and embarrassing for months. No one stepped in despite being informed multiple times verbally and in writing.

<u>I am being held to a higher standard than you expect from a principal of the company.</u> I feel like a pawn and quite honestly, I haven't felt this let down in a very long time. I've made my issues known, and many of the issues I raise have been acknowledged by you and/or, frankly, other members of the Board. There has been no action to change Nathan's behavior or flexibility because the Board took no action.

***

My position with Westward360, Inc. has changed several times since I started. I've remained flexible and accommodating to date. For reasons I do not know nor was I made aware in advance, Jude has assumed the prominent role in onboarding and offboarding. It would've taken months for me to function at the high level he functions in the role today. Following your previous direction, I had several conversations with Jude leading up to the change about minimizing his involvement so he could focus on PH and other tasks the Board wanted. I look like a fool for (a) having those conversations given the complete opposite happened and (b) promoting

Brenda to Transitions Manager. If I'm expected to have any responsibility with onboarding and offboarding then I need my responsibilities defined.

This is how I understand my role to be with Investments:

- Respond and follow-up on all incoming leads
- Qualify the leads contacted
- For all qualified leads, have a conference call to discuss further (these meetings have run one hour to 1 hour 15 minutes).
- Respond to client, tenant and prospective client phone calls and email.
- For qualified leads <5 units, send any requested document from call and notify Zalea to have a management contract created.
- If the lead is for units >5, then I forward the lead to Nathan to handle going forward
- For qualified leads, meet the owner at the property, as requested
- Prepare proposals
- Answer any questions about the management agreement and work to have the client sign.
- Maintain incoming and outgoing locations on various Google Sheet files
- Communicate frequently with Investments to ensure they are aware of incoming and outgoing locations.
- Communicate with the Transition Team for planning new and outgoing locations.
- Ensure the property is properly on-boarded or off-boarded
- Maintain accurate inventory of management agreements
- Pipedrive responsibility as it relates to reporting needs and usage for other projects
- Managing the staff which includes one onshore and three offshore employees

The tasks described above are close to full-time as it encompasses tasks from Greg and Kathy's position and newly created tasks. Overall, the administrative tasks are more than I was expecting, and I will have significant interaction with Nathan Brown. As it stands now with the above tasks, my involvement in new business will be very limited which has a major impact on my compensation. All of which creates a less exciting position for me at Westward360.

*** 

As I said in my October 14 letter – "It is going to be a real challenge for me to work with Nathan Brown" and "I cannot operate in the environment he creates". **Therefore, I am making a formal request and statement – I will not work with, for, receive direction, or support Nathan Brown.** The environment around him is toxic and has a negative impact on one's job satisfaction, reputation, and mental health. Despite my conscious effort, multiple conversations, 1:1's, and advice from others, a co-working relationship with Nathan Brown is not possible. The Company has not addressed any of the valid issues I've raised since July 31, 2021. The Board's inaction and with Nathan's most recent actions validated, he will continue to act improperly and unprofessionally while harnessing more independence and more control. I am uninterested in being his target like I have been since early September, so **please remove all my responsibility related to Nathan Brown and the Investment Group.**

I'm prepared to explore any arrangement or option as long as (a) my role is defined, (b) my contribution helps the company forward, (c) creates value, (d) allows me to gain knowledge about the industry, and e.) addresses the commission portion of my compensation. I don't want to be terminated because of this request or statements made. However, if my request cannot be accommodated, then I may offer my resignation.

Respectfully,

Brian Blankenship

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit KK-5
# February 10, 2023

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 152 of 254 PageID #:647
Amended Complaint | 23-CV-0867 | February 23, 2023

Thanks for your comment about 'being on fire'. I appreciate you taking notice. There is a ton of opportunity to push for change, improvement and enhancements in the Company. Change is not liked or appreciated by some...It can be very challenging to maneuver around here - there are so many different obstacles and opinions that get in your way. I smiled when you told me that because you and I had some bumpy weeks when I got involved with a few HR-related issues. Today, I think we are way beyond those moments and my efforts are recognized as improving the company and not taken as a personal attack. Not everyone appreciates my involvement and I have work to do in order to change those feelings...

Thanks again for your comment! I hope you get some sleep soon...

Brian

**Brian** D. Blankenship
*Vice President, Business Development*



Association Management | Rental Management
Buy & Sell | Rent | Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct: 773.676.0840 | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com | Email: brianb@westward360.com

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit AA
# February 10, 2023

11/9/2021

Brent –

Thank you for your time on Monday.  As you know, I called the meeting to discuss Friday's conflict meeting with Ann, Nathan, and yourself.  That meeting failed to address any of the concerns raised regarding Nathan Brown.  From our conversation, this was purposeful as you determined my concerns about Nathan needed to be handled differently.  While I came around to your approach when we met, I have a different opinion of the situation now that I've had some time to think about our conversation. I'm not quite sure how you can expect the situation to improve because right now the issues are avoided, yet I'm expected to work with Nathan every day without letting the issues get in the way.  This approach will not succeed, and no one should be required to work in an environment like that.  I am being held to a higher standard than a principal of the company.

**Background**

The chain of events that have occurred represents retaliation by Nathan Brown in response to making the company aware of his behavior. These experiences have negatively impacted my drive, my excitement, and my focus as an employee of Westward360.

On October 11, 2021, I prepared an email to Nathan and Ann that put some framework into combining Investments with CAM onboarding and offboarding.  I shared my draft email with you because I knew it was not going to be received well.  You asked me to make several revisions to "soften" the tone so it would not put Nathan on the defensive because you didn't want him to write off the email before he finished reading it.  The softened email was sent later that afternoon and it caused Nathan to immediately react.  That reaction then caused me to cancel my attendance at a speaking engagement with Nathan. The days that followed led me sending the October 14 letter to you.  I had enough.  To my surprise, Nathan was given a copy of my October 14 letter by you as you decided to include the Board.  The letter detailed several problems and at varying levels in Investments and with Nathan.  In fact, the letter contains 63 different concerns and issues about Investments, Nathan, and his handling of certain events.

On October 15, 2021, you and I had a call that I thought was going to be about the letter but you took a different approach.  The letter was undiscussed but, instead, you had 13 different points of criticism about me, my actions, and my employment in general.  Some of the points were constructive but I wasn't expecting that type of conversation one day after I provided the letter regarding Nathan.  You requested a meeting with me on October 20, 2021, to discuss the status of my six (6) priorities.  This meeting felt like its purpose was to document your concerns; the meeting was followed up with a written summary later that afternoon.  During this meeting I provided you with a note I wanted to send to Nathan so there would be no confusion or misunderstandings.  The letter was mildly aggressive, if not less, in its tone.  You made material changes to the letter which caused the letter to be very submissive in tone.  Most of my statements questioning him on what he said to me were removed.  You recommended this tone so Nathan's defense mechanisms wouldn't kick in.  You were very sensitive to how he would receive the letter.  I did not send the letter because I was Uncomfortable with the submissive tone and the elimination of real questions that needed explained.  The same thing happened to an October 28 letter I intended to send Nathan to follow up a phone conversation he and I had earlier that afternoon.  You made the same changes as you did with the October 20 letter.  At this point it appeared to me that you were trying to protect Nathan's ego and pride.

Nathan made a series of moves against me beginning days after he was permitted to read the October 14 letter.  In retaliation, it took him just over 10 business days to restrict my communication with clients, tenants, and prospective clients and remove my responsibilities with management agreements, a task you specifically told me to manage.  On October 17, Nathan required I obtain his approval before responding to any client, tenant, or prospective client email communication but he really preferred that he respond instead of me.  I sent multiple responses and emails for his approval that remain unanswered to this day. On October 27, he took another restrictive action by requiring his presence on any phone call.  I am to add him to any scheduled call and if he decides to attend then he will lead the call. I even shared with you

a transcript from a call with Nathan on October 27 to prove my points. Then on October 29, Nathan calls me, but he doesn't call to discuss any of the responses I'm waiting on him to approve. He called to tell me he decided it would be best if Zalea took over administration of management agreements. I couldn't believe it. Nathan feels Zalea can be more responsive and will just "plug the numbers he tells her to put in and get it done". He didn't like me having that control because he's unable to do as he wants with me as he does others. He was extremely cocky and arrogant during this call. I struggled to get anything completed after that conversation because of the restrictions he placed on me. A few days later you scheduled a "clear the air" meeting with Ann, Nathan, and me for November 4. On November 3 you ask to share a behavioral test I shared with you during my hiring process. This request baffles me today, and I regret authorizing you to send it to Nathan, Ann, and Eric. That one step has now cost me all credibility because by taking that step you basically say I am the problem and here is a behavioral study to prove it. It was stupid of me to agree to your request, but it was equally unprofessional for you to even ask.

Then in the November 4 meeting you focused on conflict between Ann and me. While not a completely irrelevant topic, the bigger focus should've been Nathan Brown. None of the conflicts I've been expressing since July 31, 2021, about Nathan Brown were discussed during this "clear the air" meeting. I had high hopes with the meeting you called for and was hoping your involvement could solve a real conflict. But as noted above, you did not include Nathan issues in the "clear the air" meeting for reasons that I now know were to protect him and prevent him from becoming defensive just like my letters were modified. A recent conversation we had you referenced that "Nathan is my partner and friend" and "we go back 20 years." Maybe you're too close to Nathan and your relationship to be objective.

The L10 meeting on November 9 is a perfect example of how he conveniently lies to speak to his audience. For example, he stated he was open to exploring options so we could use Buildium for the rental listings. That is so far from the truth. I discussed the options available using Buildium apps to handle rental leasing but in doing so we would have to change some procedures to "stay within the box." This was initially discussed on October 1, but he said there is no option. I re-approached the topic on October 22, and he said he would find a solution. A lot happened between those two dates, including a phone call from Nathan telling me to "stay in my lane." Then because of the audience during the Level 10 meeting, when confronted about the topic, he is now receptive to any option. And to hear that he is constantly complaining about the transition process changeover…I wouldn't expect anything less from him. Just like he's gone behind my back to offload several department tasks onto the onboarding and offboarding team is insulting.

**Request**

As I said in my October 14 letter – "It is going to be a real challenge for me to work with Nathan Brown" and "I cannot operate in the environment he creates". I subscribe to a certain level of professional morals and ethics and they are not compatible with Nathan at several levels. Despite my conscious effort, multiple conversations, 1:1's, and heeding advice from others, a co-working relationship with Nathan Brown is not possible. Respectfully, your approach to address the issues while providing some protection to Nathan is not going to resolve any issue. With Nathan's most recent actions validated, he will continue to act improperly and unprofessionally while harnessing more independence and more control.

I am uninterested in being his target like I have been since early September, so I respectfully request all my responsibilities related to Nathan Brown and the Investment Group be reassigned, effective immediately. I am making this a formal request with the following statement – I will not work with, for, receive direction, or support Nathan Brown. The toxic environment has a negative impact on one's job satisfaction, reputation, and mental health.

I'm prepared to explore other arrangements or option if (a) my role is defined (b) my contribution helps the company forward (c) creates value (d) allow me to gain knowledge about the industry and e.) addresses the commission portion of my compensation. If my request cannot or will not be approved, please let me know as soon as possible as I will need to evaluate my options.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit L-1
# February 10, 2023

**Level 10 Meeting**
**New Business, Marketing, Transitions & Other**
**Weekly Agenda**
**Date:  11/23/2021**



**Segue (5 minutes)**

Round robin – Go around the room and tell your Best and Best.  Best good news from both personal and professional week.

**Scorecard (5 minutes)**

- [9/28/2021 BB did not get a chance to create a scorecard]  **10/12 Will create and begin scorecard for 4Q21.**
  - **10/19: Scorecard overlap with CAM KPI's**
- Tracking Review details on Leadership Level 10
- Would like to provide # of offboards, #of onboards with one month's fee for the current month for both CAM and Investments.
  Add Future Outgoing and Future Incoming with one month's fee to show whats coming
- Add data point relative to marketing; PROs email per quarter; new business "touches"
- Add website performance – total unique visitors, depth of site, time spent on site, and abandon rate.  Capture conversion rate for each Request Proposal and Contact Us form

**Quarterly Rock Review (5 minutes)**

4Q2021 ROCKS - Nothing new; complete 3Q21 Incomplete ROCKS

**Rocks from Leadership Level 10**

| | |
|---|---|
| Consolidate Admin Services across CAM and Invest | BB/JT |
| ~~Develop a Customer Reviews/Experience Manager Strategy~~ | BB |
| Develop and Deploy New Proactive Sales Strategy | BB |

11/9/21 No update. 11/2/21-Quarterly Rocks were presented last Tuesday.  Rock 1 and 2 are complete; Rock 3 will continue into 4Q21.  No additional Rocks were assigned for 4Q21.

Brief Update to the above Rocks:

**#1 –** 10/4/21-no further update beyond the update sent last week.

The Plan has been split and I am only focusing on Transitions changes.  These should occur during the week of October 18.  Separate update will be provided later today (9/28/2021). 10/12/2021 Zaela has been fully transitioned to the onboarding team.  Staff adjustments will occur on 10/15/21. Concerned with unassigned tasks outside of new business and onboarding. Discuss the communication message. 10/19/21-Greg and Kathy released. Working to get our arms around the Investment processes.  I am working with Brawley to create a "company calendar" that will be shared with all.  The calendar will include onboarding and offboarding dates for all CAM and INVEST locations.

- Onboarding/Offboarding - go to Brenda
- New business - go to Brian
- Greg projects - related to onboarding/offboarding/new business - go to Brian
- Unique items - review with Brian (ex: "Greg would do this")
- All other items - go to Nathan/Ann

1

Amended Complaint | 23-CV-0867 | February 23, 2023

~~#2 – Three primary review sites are monitored – Google My Business, Yelp, and BBB. With the launch of our new software product, we will add Facebook, Four Square. The call center still deals with a lot of customer service calls. Working with Jude, several structural changes happened, supervisors will listen to actual calls and grade the CSR instantly, and the phone tree is being reworked to make it more efficient but also provide the customer a callback if they don't want to wait on hold.~~ Our next big move with leverage AI and listen for conversations that are positive, negative, or compliant. This data is assigned to a location and a person handling the call. This process should allow us to extract good and bad calls and allow us to analyze every call every day. Then with the call center call sediment tracking coupled with online reviews and listen beacons observing forum sites, such as Reddit, we will have built a trifecta of tools to better manage our reputation.

#2 (9/17/21) We need to improve our review scores at Indeed.com and Glassdoor.com. If you find yourself handling something particularly well for an employee, ask them to give a review in Indeed or Glassdoor. (9/28/21) The new software, Review Tracker, has a feature where a property manager can upload one or 100 accounts to solicit for positive customer reviews. We have tested the "Ask for a review" feature in Woodstock. Michelle picked 10 HO's and we asked for a review. 80% opened our email request and we had two (2) submit a review within a few hours. A 20% success rate is huge. Sydney is going to work with Eric to identify 10 HO's at 10 Associations for a larger test.

10/4/21-Sydney has not met with Eric to discuss; schedule conflicts. There's been a rush of negative reviews during the past week, primarily on Yelp. They have all been commented on or requested for removal. Quarterly data compared to prior year quarter:

(3Q21 vs. 3Q20)
47 vs. 56 Reviews Submitted
3.31 vs 3.00 Average Score
71% vs. 24% Response Rate
3.4 vs 65.4 Days Response Time

10/12/2021 the expanded test has not started yet. See included Review Summary. 10/19/2021-T30 is falling off at 1.67 average of 12 reviews. Travis asked about who is giving us a review. 3Q21: 67.4% INVESTMENT, 29.% CAM, 3.4% OTHER. YTD: 71.9% INVEST, 22.1% CAM, and 6.0 OTHER. 11/9/2021 We are moving forward with a test at 10 Chicago-area Associations and one Association in Woodstock. The Woodstock experiment will drive traffic to a pre-qualification page before allowing a review on Google. If the reviewer answers the questions in a positive manner, then we serve up Google Review. If not, the reviewer gets a thank you page. This all happens behind the scenes and the logic is based on weighted responses. It's pretty cool! **11/23 Pre-qual survey is being designed and we will be using NPS (Net Promoter Score) to determine if the user will give us a positive review. It's one question and two short text questions. This approach will be used any time we are reaching out and asking for a review.**

MTD Review results below.

2.67 MTD;
1.67 Prior Month
2.63 YTD

Review volume is down 7% compared to last year; 166 reviews completed MTD. 47% of the reviews gave us a one star rating. On the flip side 43% of reviewers gave a 5 star review. It's a love or hate experience.

2

#3 – Our first step has been to consolidate CRM systems between Investments and CAM. We have chosen a product called PipeDrive. On August 3, 2021 we engaged a 3rd party certified partner to develop the integrations and workflows. August 10 we had 2-hour call with them and they expect to show us Version 1 with our custom set-up on September 15, 2021 with the goal of a fully functioning Pipedrive by September 30, 2021. Explain PipeDrive. 9/7/21 Request was made to Add New Lead. Define qualified leads. Brent would like the draft Pipedrive to be presented to the Board on 9/15/20212. 9/28/2021 – development continues. There have been two meetings during the past two weeks. I am working through a series of items needed to move the process to the next step. Within the next two weeks I expect the beta version of PipeDrive will be complete with project completion estimate October 31, 2021. Ian was going to clean up and clear out current PipeDrive data. 10/4 Progress continues. Key developer was on vacation last week and out sick yesterday. Next step should be a final meeting to review content provided. Met with Brawley to review several technical issues; we have solutions to solve the issues. At this point, we are looking at mid to late October for the beta Pipeline.

10/11/2021-Pipedrive Update: My last big hurdle relates to the marketing automation, which will control outbound email that happens automatically. Pipedrive was scheduled to release a product called Campaigns on September 1. Campaigns would allow us to keep email management within the application and eliminate the development to a third party application such as Mailchimp. Pipedrive has delayed the launch of Campaigns until 1Q2022; the consultant has been trying to get our account included in the Beta but has been unsuccessful to date. On Friday I told our consultant to develop an integration with Mailchimp so we can launch with a fully functional system. Once Campaigns is released we will need to perform some minor development to unhook from MailChimp. Based on the current status, the revised delivery estimate provided on September 20, 2021 still holds true - v1.0 delivered +/- November 15, 2021.

Email. The way Pipedrive is set up there will be an integration with gmail. You will use Pipedrive to communicate with the lead and behind the scene these emails will originate from your westward360.com email. Then every 10 minutes a sync happens behind the scenes and scans your inbox for any Pipedrive-related message. It scans looking for matched email addresses, phone numbers and any response to an email generated via Pipedrive. If it finds a message then the system brings that message into Pipedrive and flags the message in your inbox so you know it's been picked up by Pipedrive. This approach allows the company to have a complete view into the lead as emails no longer exist in one person's inbox.

I've taken a similar approach with outbound phone calls. When making a call you will start in Pipedrive by initiating the call. Pipedrive will then call your cell or office number (you select) and when you answer the system will then call the lead. If there is no answer or voicemail, Pipedrive will automatically add a note and then prompt you for the next action. If the call connects then Pipedrive will launch a notepad for notes taken during the call. When the call ends, it will ask for the next action to be performed. All phone calls will be recorded and attached to the lead record.

There is a solution to tag inbound lead calls to an existing lead but it requires an integration with Dialpad. This was not in my original scope and the integration can be developed post-launch.

Management Agreements will shift from Propertyware to Pipedrive. Agreements are part of the sales process and in using PW, we are required to set up the location and add tenants in order to use the Docusign function. PW set-up should not occur until we have a signed agreement.

10/19/21-changing our lead flow should start soon (discuss with Brawley). We've settled on various terminology and identifiers for use in Pipedrive. I feel there is >75% chance to have v1.0 ready by 11/1; user training the same week. DocuSign may be the following week. Will need to coordinate lead crossover. 11/9/21 Updated Sales Funnel created. Pipedrive is really close to completion. Brawley and Boris have been working with the API to post our leads. All online forms have been consolidated to where

3

there are only 2 forms compared to approximately 8 different forms.  The forms are 75% deployed on our website with the balance getting crossed over overnight on 11/10/2021.  One of the last pieces is to get the call center to use these new forms so everything is consistent in terms of forms and data required to create the contact and deal in Pipedrive. **11/23 Forms are in place.  APM is integrated but not tested yet. Call center form is being designed so they can submit new business leads into Pipedrive.  Pipedrive historical data has been cleaned 90%.  The last 10% will require Ian to review individual leads that are still active. I am behind in getting the final pieces to the Pipedrive consultant which I intend to resolve over the long holiday weekend.**

### People News

1.  Marketing Coordinator – Sydney   9/28/21 Sydney completed the training program except for meeting with Eric.  This has been scheduled for this week.

2.  9/28/2021 Realignment Plan Update, Timing Changes 10/12/2021 See #1 above. Also will announce Brenda's promotion early next week. Any other changes or promotions, such as Ashley and Tammy, so we can have one company message instead of messages by department. 10/19/2021-When to announce Brenda promotion?  11/9/2021 I am drafting an internal "press release" to announce Brenda's promotion and the re-organization of the group.  This is designed to recognize the new team. **11/23 Press release complete; needs to be distributed internally. Brenda is very nervous about the announcement.  This is why it has not been distributed.**

### To-Do List

- ~~9/7/2021 Research SendSquare to determine if we can target METRA riders (Danny idea).~~
  10/19/2021 Priorities:
    - #3 - Onboarding and Offboarding task management conversion to Zendesk
    - #4 - Development of Pipedrive and the various integrations
    - #7 - Reputation Management Strategy & Software Implementation
    - #10 - Reconfiguration of propertybase.com
    - #11 - Referral Program
    - #14 - New market business development (Prospecting)

Note: 11/9/21 New business tasks in Investments have been very time consuming since October 18. I do not foresee that changing any time soon which, potentially, will impact my ability to complete the above tasks in their entirety.  **11/23/21 Tasks in Investment still cause time constraints.**

#3 October 18, 2021 will be the first day of the combined Investment and CAM Transitions team.  On October 11, 2021 a few suggested parameters were presented to Investments.  The suggestions are designed to gain some control over the transition process for Investment assets.  Discuss further as needed. 10/19/21-revisit after 30 to 45 days after we get through current properties.  10/19/2021-we hit our target/goal date for Greg/Kathy changes.  Is front desk still happening?  Onboarding/offboarding is to get eight to 10 hours/week with James (this is an increase of about 3 hours/week from his current job description. **11/9/2021 Gave Jenny my notes regarding the front desk changes and she will handle going forward.  I'm not sure how far Eric got with it so I suggested she connect with Eric.**

**#4 Discussed above.**

**#7 Discussed above.**

**#10-**10/4/2021 Continuing research of options and gaining knowledge of current processes.  The reconfiguration of propertybase.com will be impacted by the decision to implement a new property management software for Investments.  At this point, I've suggested the key users of these systems have a meeting to discuss what's important to them and the priority of that item.  This will set the stage for multiple upcoming conversions - Propertyware to Buildium.  RealtyMX to Buildium or Propertybase.com.  After we determine what we need in a new system, a Conversion Plan needs to be prepared to ensure all parties understand each conversions impact, downtime, client/tenant impact, critical dates, etc. 10/12/2021 we need to find a way to live within the system's capabilities which means we may need to change the way we

4

currently conduct business. Moving RealtyMX to Buildium is a major conversion and unrelated to the Propertyware conversion. RealtyMX can be replaced by Buildium. This change, and others, will require changes to current business practices. The revised practices will be limited to system capabilities. Platform decisions are needed so we know what systems we are working with. A series of recommendations, timeline, and Propertyware conversion questions were presented on October 3. 11/9/2021 Haven't focused on this task since the last update due to additional responsibility on the Investment side.

#11-10/12/2021 Referral program scope drafted. Next step is to confirm the referral program types and then develop a new page on the website promoting referrals. The new page will contain a form for the referrer to register the referee. The registration is required for any referral payment. **11/9/2021 Haven't focused on this task since the last update due to additional responsibility on the Investment side. 11/23/2021 Identified a potential solution of several known issues and it involves a third party app called Front Desk. The consultant I've been working with is putting together a proposal to support its installation and help in the proper set-up of Propertybase.**

#14- 10/12/2021. We have collected multiple lists of associations throughout Chicago. A 2019 association list of Draper & Kramer and Lieberman clients has been updated to reflect current President and Secretary. I am in discussion with an omni media company that may support the program we develop to maintain "touches" with the prospective audience. 10/19/21-the provided lists have been updated with current Board details. Meeting with Patrick and Brent on 10/14/2021. Will include HOA's in seven additional towns/villages, approximately 500 targeted audience leads. Approach/plan in discovery. Goal is to have our first message be something holiday related. 11/9/2021 In process of preparing a holiday card to the targeted contacts on our lists. The card serves as an introduction to Westward360. This will be followed up by an interactive marketing message - several options being considered. The Plan I've assembled in six months and includes five direct contacts. My goal is to get our new '360 Guarantee' perfected by the end of November so it can be promoted. I am also thinking of different approaches to make the transition seamless. One concept is to create a theme around the "Switch Squad". I expect this program to cost approximately $20k, or about $25 per contact over a 6 month period. **11/23 Cards are in production. The cards will be produced, address added to the envelope and sealed. The cards will be shipped to us for postage and local mailing.**

~~10/12/21 We have secured a billboard in Lincoln Park that will be used to promote our Property Management services to passerbys. The billboard will be in place for three (3) months~~**. 10/19 Billboard has been installed**



Melissa- #1512 is done. Have a great Weekend!

5

Amended Complaint | 23-CV-0867 | February 23, 2023

**IDS (Identify, Discuss, Solve)**

**1 Job titles discussion**
**2 PW example with incorrect billing. Bundle/BLC not charged**
**3 Late fee differences**
**4 Payment options (from a marketing POV)**
**5 Holiday cards**
**6 Holiday employee gifts**
**7 Proposed changes to proposal for Investments re: fees**
**8 APM lead costs**
**9 Conceptual idea: Post-mortem of transitions at 30 and 90 days**
**10 Incorporating PROs in the new business sales process. Opportunity to get commitments for recurring/preventive maintenance at the same time the management agreement is signed. There is definite interest from clients.**
**11 New business - target market areas. The recent termination of a deal after we started management shouldn't happen.** ~~Note: I added this property to my agenda on 10/19.~~

- ~~6/12 Lead received~~
- ~~9/23: Nathan confirms yes to Greg "11838 S Lowe Ave - 3 units - $2,780 gross monthly rent - closing tomorrow - new client who lives in Australia. Do we want to take this?"~~
- ~~9/23: Management agreement signed for start date of 9/28/2021.~~

**Additional Project Notes**

1. 10/19/2021 Greg apparently was quite involved with a few new clients post-takeover. Also, in reviewing Greg's email, there are a lot of questions and post-takeover questions and feedback about the Building Liability Coverage program. **11/9-needs discussed 11/23-this topic needs to be a separate meeting.**

   - Example question: "The ████████████████████████████████████████ Tenant-caused damage should be covered by the building's insurance policy, no? If not, how is this different from a security deposit, if we do, indeed have renters coverage? The portal has our policy information linked, so that's demonstrably in effect. My primary question is: WHO is the beneficiary of this insurance policy, and why is the renter paying it for them?

   - Our typical response: The BLC provides coverage for to the owner for tenant-caused damage. In some instances, this duplicates the liability coverage provided by renters insurance policies. Unfortunately, ensuring (not insuring) that each tenant maintains renters insurance is particularly cumbersome (and sometimes impossible), so the BLC solves that issue. The BLC does not replac2501e the insurance coverage that the owner has (and pays for).

   There are two recent issues from newly onboarded clients that Greg was involved with. PM brought into the loop with both issues. Discuss.

   - 11838 South Lowe - no heat complaint. Problem tenant. Shared utilities. Section 8 paperwork. 3 units - 2 legal and garden apartments not permitted. Realtor feels like she made a mistake in referring to us. 3 unit building - top floor Section 8 tenant, main floor a bad tenant who is accusing everyone for something yet has not paid rent in three months. Garden level occupant lives in a unit that may not be permitted. He may be the person who reported no heat; if an inspector follows up on the no heat inquiry by visiting the property, this could lead to problems. This tenant also pays for the common area electric and gas because the equipment used in those areas also heats his apartment. He pays a discounted rent.

6

Blankenship vs. Outer Banks Capital, Inc.                                                                Page 161

Amended Complaint | 23-CV-0867 | February 23, 2023

- 7552 N Oakley - New takeover. Epic failures; many internal errors (PM words). We had association docs and rules. We approved a new renter and gave her keys before we had Board approval. We didn't know Board approval was required (but we had all the docs). The Board President is heavily involved. Somehow she learned the tenant required a Guarantor in order to get the apartment. She feels that is a disqualifier in itself when it really is none of her business. Owner says he was not notified about the new tenant or the need for a guarantor; this is mostly inaccurate as Tammy did communicate this fact to him. Board approval is required before the tenant can move in (she's had the keys since 10/15).

2. **10/11/2021- The Westward360° Guarantee**
Why should an investor hire Westward? Why should a renter select a building we manage? What is our message? I developed a DRAFT marketing concept to provide investor clients and tenants a reason to select Westward360. **10/19/21- BB to set-up a meeting to discuss in greater detail; include a proforma during that discussion. 11/23/2021 Defining the Guarantee is in process. The Guarantees have been refined to include Invest and CAM. A financial model has been created and I am researching items in PW, Buildium and Strongroom.**

**Leasing Guarantee**-We will find a quality tenant within 30 days or you do not pay a leasing fee!
**Tenant Placement Guarantee**-Due to our thorough multi-point AI tenant screening process, we find and place the tenants most likely to fully honor the terms of their lease. However, if a screened tenant does not fulfill at least nine (9) months of a lease term, we will find and place a replacement tenant in the rental unit with no leasing fees being charged to the property owner.
**Eviction Guarantee**-If a screened tenant placed by Westward360 has to be evicted for non-payment of rent, we will be responsible for the eviction process including the costs or fees associated with eviction, up to $1,000.
**Satisfaction Guarantee**-If you're not satisfied with our provided service, let us know and give us the opportunity to resolve to your satisfaction. If you are still not satisfied, you may cancel your property management agreement, without penalty, with 30-days notice. The notice period allows for a smooth and professional transition for the tenant(s), wrap-up of any outstanding maintenance items and invoices, and assignment of the lease and security deposit funds properly transfer.
**Pet Guarantee-**We guarantee your home will not be damaged by a pet we approve. We will pay for any pet damage that exceeds the security deposit, up to $2,000!
**On-Time Rent Guarantee**-Owners receiving timely rental proceeds should be a priority to any property management company. While some companies claim it, we believe it is so important that we put our money where our mouth is. We guarantee that when your tenant pays on time, our office will initiate your payment via ACH no later than the first business day after the fifth of each month. If we fail to live up to our On-Time Rent Guarantee, then you will not be charged that month's management fee.

3. ~~**10/19/21 Observation. I'm aware of three (3) recent management clients who brought us on for the sole purpose to deal with legacy tenant issues and/or severe delinquency. One client took it a step further and said she wanted the risk to transfer from her to Westward360. Are we concerned about getting used for a few months and getting terminated?**~~
4. Marketing-Patrick
   a. Branded Materials and Fulfillment (9/7/2021 Identified all marketing material used in all departments on August 7, 2021. Evaluated three potential firms to produce and fulfill orders electronically. Selected AlphaGraphics. 9/28/2021 Patrick is now handling this project.) 10/19/2021-business card orders for several staff are in process. **11/23 Patrick shared new branding. Need copy from Patrick for review and comment**

7

      i.    Email template BB to draft creative brief

      ii.   Company brochure BB to draft creative brief

     iii.   "Sell Sheets"  BB to draft creative brief

   b.  ~~Secured a graphic artist for design work~~

   c.  9/7/21 Need to define Westward PROs. 9/28/2021 PROs is requesting a brochure to promote new services.  **11/23 Pro Brochure near completion.**

5. Website Upgrade – Top 10 Fixes & Page Expansion  9/28/2021 Website improvements are on hold per Brent. 10/12/2021 A series of form updates are required (forms currently in use on the web) for the Pipedrive integration.  I have discussed with Brawley.  Note: we will be eliminating the use of welcome@westward360.com with these changes.DISCUSS. Referral Page offering referral fees for (a) leads that results in Rental Agreement with Investments, (b) leads that result in a HOA/COA Management Agreement with CAM, Existing Renter who refers a friend and the friend moves in. 10/19/2021-BB to meet with Brawley to update forms and incoming lead process.  **11/23/2021- APM integration created; crossover will happen by EOM.  The referral program is documented. I will schedule a meeting after the holiday to get others engaged in the process.  Web developer is creating a proposal to create this page on the website.  We will need to determine how the referral gets handled internally.  A referral agreement has been drafted.**

   a.  This will require a referrer to "register" the lead with us at www.westward360/referral in order to collect the correct tax forms and to get paid.  We will no longer pay the referral fee if the person wasn't registered.  (You can't claim a deal was yours after they signed a agreement and we're in the process of onboarding them.

   b.  9/7/21 Plan to expand About Us section to include (a) headshots of the seven BOD's with a short bio.  Also, planning to have News section under About Us for Press Releases. 9/28/2021 I have the source available to coordinate remote head shots when needed.

6. Lead Management on Investment side? How do we track leads before the application get submitted? 9/7/21: Met with Nathan.  Seeking third party support to fully utilize propertybase.com. Major Project. 9/28/2021 – CRM is the solution but a system of record needs defined first.  I continue to work with Nathan in developing an approach. 10/4 - see above. 10/19/2021-Focus reshifted to the CRM in Propertybase.  Sydney reviewing system features. Need other systems phased out; too much risk of duplication.  I am researching resources for system optimization and/or CRM deployment.  **11/23-no update**

7. New Business

   a.  Client Retention Plan – Prepared a recommendation to the Board on August 9, 2021.  Held a brainstorming meeting with the Board on August 31.  9/28/21 I am no longer participating with this project, per email from Brent on 9/14/2021. 10/19/21-provided new schedule that track contract attrition.

      i.    3Q21 CAM Attrition: 1.7% Units, 2.0% Fees. YTD CAM 2.9% Units, 3.1% Fees. 4Q21 is trending to be highest attrition level for 2021.  Thru 10/2021 the average unit lost average $29.07 with new business average $25.95.  A turnover loss of $3.11, or 10.7%.

      ii.   3Q21 Invest Attrition: 2.4% Units, 3.3% Fees

   b.  New CRM will improve lead management and give us actionable data going forward 10/19 See Pipedrive update above.

   c.  Other changes in New Business.  9/28/2021 Changes with Investments noted above. **11/23-Holiday cards have been designed and will be sent to a targeted list of 475 Board members.  Weekly meetings have been established that include Amia as we look for grow the on-site department.**

8. Happiness Survey, now called an 9/7/21 Employee Pulse Survey to be released this week. 9/28/2021 Survey is complete, results shared with Board and presented the results to Eric, Danny, Ann, Sydney and Claudia.  Response rate was consistent to the past at 97 surveys. Submitted. Discuss next steps. 10/4/21 Complete**.**  10/11/2021 Presented survey to key member of staff.

                                                         8

Amended Complaint | 23-CV-0867 | February 23, 2023

Recommend various actions to the group but, to my knowledge, next steps have not been determined. Suggestions included. **11/23/2021 I don't believe anything has been sent to our employees. Did something change?**

 a. Existing questions maintained but added logic to answer the next level question based on their response.
 b. Survey format has been changed to work on PC, tablet and mobile.
 c. Employees do not need to be signed in to complete the survey. They can even use an incognito browser.

9. Westarity. Planning to add a single page on the website discussing the non-profit. Is timing such that our non-profit status will be clear by 10/31/2021. Do we need the status finalized or can we still; build and release the page? 9/7/2021 Page is being developed even if foundation isn't established. Need Make A Wish, Habitat and other charity events. **9/28/2021 No action taken.**

10. 9/28/2021 Onboarding and Offboarding. Developing a task management approach that will eliminate the use of Sheets and Asana by using Zendesk. 10/4 Next steps: template design. 10/19 no action taken recently. **11/23 no action**

11. ~~9/7/21 Billboard @ Webster.~~ ~~Three periods of 30 days limited to W360 business only. Production cost and installation is either $1,250 or $2,200 9/28/2021 In communication with the sign company. Need to speak with Patrick and he's been unavailable. He returns from vacation on Thursday and hopefully we can update then. 10/4/21 Patrick wants to get the Board engaged and develop an overall theme or strategy and then use the billboard to help deliver that message. 10/11/2021 Billboard secured and artwork approved. Discuss 30 day period risk. 10/19/2021 Completed~~

12. ~~Press Release – 9/28/2021 press release created and edited. Patrick will distribute once approved by Brent. All future press releases will be initiated and distributed by Patrick. 10/4~~ ~~First press release~~ ~~distributed. Patrick is drafting for Denver expansion.~~ **~~10/11/2021~~** ~~**Denver press release prepared and distributed.**~~

13. 2022 Budgets. 9/28/2021 I've been looped in to create the Marketing/Advertising Budget and its 75% complete. The supporting schedules that feed the main budget file are detailed and capture all known expenses running through that GL. Last week, Brent asked me to prepare budgets for new business. Discuss the format used to date. 10/4/21 5500 Marketing schedule due to Spencer this week. Created model for new business but also estimates total revenue given various turnover variables. 10/11/2021 Marketing budget completed. Revenue is drafted and new business revenue is complete. 11/9/21 - **Will** present at budget retreat **11/23/21 - completed and presented during OBC Planning Meeting.**

14. Realty Marketing – 9/28/2021 – this project is to create a marketing plan that targets homeowners of Associations we manage for our Realty services. Currently looking into our current communication methods to the population and focusing in on monthly statements/invoices. Other solutions have been discussed to keep a constant contact with the HO so Westward Realty is top of mind when the HO wants to sell. 10/4 Plan to identify 10 Associations and begin an email campaign to start. I am also looking into adding a statement on outbound communication mediums, such as invoices or in our standardized email signature. 10/11/2021 No movement during the past week. 10/19-A couple approaches have been presented. Nathan does not want direct mail. The email list is outstanding so I don't know what % of HO's are available. This list would come from CAM and be used by Realty. **11/23 No update**

15. HR Items – 9/28/2021 a series of concerns developed in working with the attorney on severance documents. All of those items were documented in a summary sent to Brent and David. I met with David on 9/9/2021 to provide more context to the summarized items. Items I deemed critical were noted. I have not had any further involvement nor do I expect to be involved going forward. 10/4/2021 Prepared a detailed summary of HR & Payroll issues; handed off to David September 9. 10/11/2021 (1) Employee classification risk discussion. (2) Sunny Parks update

9

Amended Complaint | 23-CV-0867 | February 23, 2023

16. EXPO this week; sending email to Board and Investor Clients that we are participating in Expo. There is a raffle for 4 Cubs tickets - "Let Us Ask You Two Questions" for entry into the raffle. EXPO is ready to go. PROs are involved in set up and tear down. Raffle foam boards being produced. Schedule completed. We are good to go. 10/12/2021 EXPO successful. Obtained 17 unique leads; five (5) leads have real potential. On 10/11/2021 I followed up with all leads and attempting to secure a virtual meeting to talk about Westward360 further. 10/19/21 How do you want new leads handled from a Sales perspective. Nathan wants all questions to be answered by him and only him. Several leads have requested a more formal introduction.

11/9/2021 Summary -

Total expenses: ███████

(This includes ██████ in payroll based on hours working the booth; includes PROs cost to set up and take down the booth; does not include any committed travel expense for Ian)

Net Leads: ██

Cost per Lead: ██████

Close %: ████
New Contracts ██ estimated future new business)
Cost per Contract: ███████

17. Call Center – 9/28/2021 over the past two months major strides for improvement have been put forth at the call center led by Jude. They have adopted (1) a one-call resolution strategy, (2) call back protocol vs. leaving a caller on indefinite hold, (3) cross training between CSR and APM positions, and (4) listening to calls and scoring them. Calls are listened to daily and CSR have a 1:1 meeting weekly to review calls with their supervisor. Total hold times are down to less than three minutes on average which is a major decrease from where we started at nearly 15 minutes. 10/4 See above To Do with the call center.
    a. 10/12/2021 Jude/Call Center -keep track of customer service calls vs. sales calls.
    b. 10/12/2021 Develop some measurement on negative sediment on call center calls and non-call center entries in Zendesk. I feel we should use data already in house to determine if we are improving or otherwise.
    c. 10/12/2021 Develop a US based back up team for when PH is unavailable.
18. Holiday cards - who should sign the cards? 10/12/2021 Holiday card plan prepared and presented on October 10. There are ongoing discussions about the plan; awaiting direction from Brent. 10/19/21-holiday card participation is final. Card message and signers have been proposed; await for approvals. Sydney met with the Chicago card company referred by Nathan. e-Cards are limited vs. other resources. Target release: week of December 20. 11/9/2021 Target date is 12/10/2021 **11/23 Final cards have been approved. Distribution to CAM and Invest clients, vendors, and employees.**
19. Employee SWAG/Holiday Gift
    a. Suggest we make the gift more personal and provide a food item for the holiday. Budget is +/-$85 per employee. I've had success with Honeybaked Hams in the past but it does present a few problems. 10/12/2021 Presented a plan on October 6 but the suggestion was not accepted. We are pricing a "kit" of several items as a holiday gift to each employee. Budget is ██████/employee. 10/19/2021-Initial SWAG box created to show concept. Now fine tuning the products to get the average cost down. 175 boxes will be ordered for all staff. An additional 50 boxes will be ordered for client relationship management and new hires. Any thoughts on what you would like this box to include?

10

Target distribution: week of December 13 but no later than December 21. 11/9 update provided with revised plan and cost. Two other options have been presented as alternatives - holiday hams and holiday shopping spree.

b. I spoke with Jackie and PH is planning to offer Christmas Baskets like years past. Jackie is coordinating the creation of the baskets and its content. It looks like the Christmas Basket will contain about $50 in food/treats/snacks/wine ~~and either a $25 gift card or $25 cash as part of the Christmas Basket,~~ 10/12/2021 This plan has been included in the overall project. **11/23-21 Project is completed and in production. In home delivery will be Dec 17 to Dec 20.**

Master Project Sheet located here:
https://docs.google.com/spreadsheets/d/1hwVWgsQ7XttgUM8PCLY1K07pFdLlMm205DJ50Q79Rpw/edit?usp=sharing

**<u>Conclusion</u>**
Recap New Items on To-Do List

11

Blankenship vs. Outer Banks Capital, Inc.                                              Page 166

Amended Complaint | 23-CV-0867 | February 23, 2023



# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-1
# February 10, 2023

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 170 of 254 PageID #:665
Amended Complaint | 23-CV-0867 | February 23, 2023

I'm just a little confused and concerned about compensation. I accepted the compensation knowing my minimum salary for the first six months would be ██████████████████ guaranteed commission). But then commissions would increase to at least ██████ per month. Under the commission structure in place, I do not think we will get close to the ██████ month number. In July, commission would be ██████ August is ██████

Three days ago I was told new business tasks were not going to be transitioned to me until January 2022. The reason being (a) the company sees the important tasks I am focused on, (b) the completion of these tasks is critical for the company and (c) layering on new business tasks would be too much. Today, I am taking on new business lead management, admin, and reporting tasks for Investment/Rentals.

**Brian** D. Blankenship
*Vice President, Business Development*

Direct: 773.676.0840 | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com | Email: brianb@westward360.com

 Powered by
cloudHQ                                    x

On Thu, Sep 2, 2021 at 10:15 AM Brent Straitiff <brents@westward360.com> wrote:
I'm fine with the plan outlined today for Investments. Based on the meeting, my understanding was you're taking over the process and involving Nathan on opportunities of building with 5 or more units.

Regarding CAM, I'd like to continue utilizing Ian on these leads through the end of the year. Definitely want you involved in opportunities as you get fully up to speed. I believe this will give you some time to get the foundational items over the line before year-end.

Make sense? Do you have any questions?

thanks,

**Brent** Straitiff
*Chief Executive Officer*
—

Association Management | Rental Management
Buy & Sell | Rent | Property Maintenance

**1464 W Webster Ave
Chicago, IL 60614**

773.572.0880 | westward360.com

Blankenship vs. Outer Banks Capital, Inc.                                    Page 169

file:///C:/Users/bblan/AppData/Local/Temp/mboxview/PTT60050.htm                    12/12/2021

Amended Complaint | 23-CV-0867 | February 23, 2023

On Thu, Sep 2, 2021 at 10:06 AM Brian Blankenship <brianb@westward360.com> wrote:
We never finished our discussion regarding taking on new business until January 2022. Is that going to happen?  I should've mentioned it on our call, but I didn't think about it until now.

**Brian** D. Blankenship
*Vice President, Business Development*



Association Management  |  Rental Management
Buy & Sell  |  Rent  |  Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct: 773.676.0840  | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com  | Email: brianb@westward360.com

file:///C:/Users/bblan/AppData/Local/Temp/mboxview/PTT60050.htm

12/12/2021

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-2
# February 10, 2023

 Gmail

**Brian Blankenship <bdblankenship@gmail.com>**

---

## Your trip confirmation (ORD - DEN)

---

**American Airlines** <no-reply@notify.email.aa.com>          Fri, Jan 06, 2023 at 11:39 PM
To: BDBLANKENSHIP@gmail.com

          

---

Issued: January 6, 2023

## Your trip confirmation and receipt

### Record Locator: MALSLQ

We charged $770.20 to your card ending in 2006 for your ticket purchase.

You'll need your record locator to find your trip at the kiosk and when you call
Reservations.

| Manage your trip |
| --- |

---

## Sunday, January 15, 2023

| ORD | | DEN | Seat: | 1D |
| --- | --- | --- | --- | --- |
| **10:33** AM | → | **12:11** PM | Cla | Bu ine (R) |
| | | | Meals: | Lunch |
| Chicago O'Hare | | Denver | | |

**AA 2363**

---

## Tuesday, January 17, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

| DEN | | ORD | Seat: | 4E |
|-----|--|-----|-------|-----|
| 5:53 PM | → | 9:20 PM | Class: | Business (R) |
| | | | Meals: | Lunch |
| Denver | | Chicago O'Hare | | |

**AA 2368**

---

Earn up to $200 Back

Plus, 40,000 bonus miles. Terms Apply.

Learn more



## Your purchase

**BRIAN BLANKENSHIP**

AAdvantage® ███████

---

| | |
|---|---|
| New ticket | $770.20 |
| Ticket #: ██████████ | |
| [$689.30 + Taxes and fees $80.90] | |

---

| | |
|---|---|
| **Total** | **$770 20** |

| | |
|---|---|
| **Total cost** (all passengers) | **$770.20** |

---

## Your payment

| | |
|---|---|
| Credit Card (AmericanExpress ending 2006) | $770.20 |
| **Total paid** | **$770.20** |

---

## Bag information

### Checked bags

**Airport**

st bag                    2nd bag

o charge                  No charge

Maximum dimensions: 62 inches or 158 centimeters calculated as (length + width + height)
Maximum weight: 70 pounds or 32 kilograms

Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply.
Bag and optional fees
 f your flight is operated by a partner airline, see the other airline's website for carry-on and
checked bag policies.

*Online payment available beginning 24 hours (and up to 4 hours) before departure.

## Carry-on bags

**1st carry-on:** Includes purse, briefcase, laptop bag, or similar item that must fit under the seat in
front of you.

**2nd carry-on:** Maximum dimensions not to exceed: 22" long x 14" wide x 9" tall (56 x 35 x 23
cm).

   

Book a hotel »        Book a car » Buy trip insurance »        Things to do »



Contact us        |        Privacy policy

Get the American Airlines app

        

Additional Services are subject to credit card approval at time of ticketing. Additional Services may
appear on multiple accompanied documents as a matter of reference.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-3
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

# DISCHARGE INSTRUCTIONS



**Brian Blankenship** 📅 12/15/2022 - 12/17/2022  📍 EVANSTON HOSPITAL 4 SOUTH SEARLE

## Your Next Steps

 **Do**

☐ Pick up these medications from WALGREENS DRUG STORE #02528 - GLENVIEW, IL - 2871 PFINGSTEN RD AT WILLOW & PFINGSTEN
- Ondansetron ODT
- OxyCODONE

 **Reason for your hospital stay:**

Reason for Admission, Evaluation and Treatment
You were admitted to the hospital for: ███████████████

During your stay you had the following treatment: ███████████████████
███████████████

 **Signs or Symptoms; When to call your health care provider:**

Blankenship vs. Outer Banks Capital, Inc.     Page 176



Blankenship vs. Outer Banks Capital, Inc.                                    Page 197

Amended Complaint | 23-CV-0867 | February 23, 2023



Please call the phone number listed or visit www.northshoreconnect.org to schedule an appointment with the provider(s) listed below. In addition, most services are available at multiple locations and this information can be accessed by calling or visiting www.northshoreconnect.org.

## Where to pick up your medications



### Pick up these medications at WALGREENS DRUG STORE #02528 - GLENVIEW, IL - 2871 PFINGSTEN RD AT WILLOW & PFINGSTEN

Ondansetron ODT • OxyCODONE

| | |
|---|---|
| Address: | 2871 PFINGSTEN RD, GLENVIEW IL 60026-1153 |
| Hours: | Mon-Fri 8am-10pm, Sat 9am-6pm, Sun 9am-5pm |
| Phone: | 847-559-9227 |



### Medications Instructions to follow at home:

Discharge Medication

You may be given a prescription for pain medicine upon leaving the hospital.

Narcotics:

These are strong pain relievers. They can cause severe nausea if taken on an empty stomach. They may reduce your ability to think clearly, drive, or operate heavy machinery. DO NOT TAKE WITH ALCOHOL. Narcotics can also cause constipation. Use them sparingly and reduce/stop them as soon as your pain improves. Some Narcotics such as Norco or Lortab have Tylenol in them already. DO NOT take additional Tylenol with your Narcotic. If you feel your pain can be adequately controlled with Tylenol alone, reduce or stop taking your Narcotic. (See Tylenol info below).

• Follow directions carefully. It's easy to misuse opioids if you take a dose other than what's prescribed by your doctor. This can lead to overdose and even death. Even sharing them with someone they weren't meant for is misuse.

• Be cautious. Opioids may affect your judgment and decision making. Do not drive or operate machinery until you can think clearly. Talk with your doctor about when it is safe to drive.

• Reduce the risk of drug interactions. Opioids can be dangerous if you take them with alcohol or with certain drugs like sleeping pills and muscle relaxers. Make sure your doctor knows about all the other medicines you take, including over-the-counter medicines. Don't start any new medicines before you talk to your doctor or pharmacist.

• Keep others safe. Store opioids in a safe and secure place. Make sure that pets, children, friends, and family can't get to them. When you're done using opioids, make sure to properly dispose of them. You can either use a community drug take-back program or your drugstore's mail-back program. If one of these programs isn't available; put unused medication in a sealable bag or coffee can, mix the medication with cat litter or unused coffee grounds, and place the bag or can in the trash.

• Avoid side effects. They can cause severe nausea if taken on an empty stomach. Narcotics can also cause constipation. Talk with your physician about taking stool softeners to avoid constipation. Use narcotics sparingly and reduce/stop them as soon as your pain improves. Some narcotics such as Norco or Lortab have acetaminophen (Tylenol) in them already. DO NOT take more than 4000 mg of acetaminophen (Tylenol) in a 24-hour period. If you feel your pain can be adequately controlled with acetaminophen (Tylenol) alone, reduce or stop taking your narcotic. (See acetaminophen (Tylenol) info below).

• Tapering off narcotic. If you are using narcotics regularly for more than 10 days, you may need to gradually reduce your dose to avoid side effects. You can do this by decreasing your daily dose by 25% each day.

## Narcotics Disclaimer

You have been prescribed a narcotic pain medication. Please remember the following:

• Narcotic pain medications such as Norco, Vicodin or Tylenol with Codeine may cause drowsiness or dizziness, and keep you from thinking clearly, safely driving a car, truck, forklift or using other machinery.

## Narcotics Disclaimer (continued)

- Be careful when taking narcotic pain medications with other medications that may cause extra drowsiness (for example, sleep aids, muscle relaxers and psychiatric medicines).
- Do not drink alcohol while you are taking narcotic pain medications.
- Narcotics can be abused or stolen. Be sure to store your medicine in a safe and secure place. When you are done using narcotic medicine, get rid of it right away.
  - Dispose of narcotic pills by taking them to a DEA authorized medicine drop off box or take back program. If you can't find one or get to one right away, flush your unused medicine . Narcotic pills can go down a toilet or sink.

## Important Information about your Antibiotic

## Learning About the Safe Use of Antibiotics

## Introduction



Antibiotics are drugs used to kill bacteria. Bacteria can cause infections. These include strep throat, ear infections, and pneumonia.

These medicines can't cure everything. They don't kill viruses or help with allergies. They don't help illnesses such as the common cold, the flu, or a runny nose. And they can cause side effects.

There are many types of antibiotics. Your doctor will decide which one will work best for your infection. Examples include:



## What are the possible side effects?

Side effects can include:

- Nausea.
- Diarrhea.
- Skin rash.
- Yeast infection.
- A severe allergic reaction. It may cause itching, swelling, and breathing problems. This is rare.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-4
# February 10, 2023

Name: Brian Blankenship | DOB: 2/15/1973 | MRN: 202287173 | PCP: GREGORY WALLMAN, DO | Legal Name: Brian Blankenship

# Appointment Details

**VASCULAR LAB   SKOKIE CVI**
9650 Gro   Point Road
SKOKIE IL 60076

# Brian Blankenship

10/03/2022  8:00 AM   ARTERIAL DOPPLER UPPER

De cription **49 year old male**  Provider  **ROOM VASC LAB SKACC B**  Department  **VASCULAR LAB   SKOKIE CVI**

## Your Demographic Information

| Date Of Birth | Gender Identity | Race | Ethnic Group | Preferred Language |
|---|---|---|---|---|
| ▮ | Male | Caucasian | Non-Hispanic | English |

## Patient Instructions

None

## My To Do List

No order  found for di play

## ⇥ Future Appointments



### Referrals placed today



Referred to

▮

Expected: 10/24/2022 (approximately)

Expected: 1/10/2023 (approximately)

Remaining: 3/4                    Interval: monthly
Last Done: Never

## We Performed the Following Today

## Today's Immunizations Administered on Date of Encounter - 9/8/2022

## Allergies as of 9/8/2022

## ✍ Current Health Issues

as of 9/8/2022

## Your Problem List

Blankenship vs. Outer Banks Capital, Inc.                    Page 183

https://www.northshoreconnect.org/mychart/inside.asp?mode=visitsummary&csn=WP-24xabLQ3aBw4G2DUO6ZXRLpw-3D-3D-24d-2FGG3qupBcrte...    4/5

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-5
# February 10, 2023

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 186 of 254 PageID #:681
Amended Complaint | 23-CV-0867 | February 23, 2023

Name: Brian Blankenship | DOB: 2/15/1973 | MRN: 202287173 | PCP: GREGORY WALLMAN, DO | Legal Name: Brian Blankenship

# Appointment Details

After Visit Summary®

**SLEEP LAB BANNOCKBURN**
2151 WAUKEGAN ROAD
BANNOCKBURN IL 60015

# Brian Blankenship

10/04/2022  8:30 PM   SLEEP STUDY

Description: **49 year old male**  Provider: **Room Sleep BB**  Department: **SLEEP LAB BANNOCKBURN**

## Your Demographic Information

| Date Of Birth | Gender Identity | Race | Ethnic Group | Preferred Language |
|---|---|---|---|---|
| ▓▓▓▓▓ | Male | Caucasian | Non-Hispanic | English |

## Patient Instructions

None

## My To Do List

No orders found for display

## ➨ Future Appointments



Di playing the next 6 appointment   Thi  patient ha  additional appointment    cheduled

## Referrals placed today



Blankenship vs. Outer Banks Capital, Inc.

Page 185

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 187 of 254 PageID #:682
Amended Complaint | 23-CV-0867 | February 23, 2023

ordered by Not Northshore Physician on 5/23/2022

| Remaining: 3/4 | Interval: monthly |
|---|---|
| Last Done: Never | |

## Pharmacy

WALGREENS DRUG STORE #02528 - GLENVIEW, IL - 2871 PFINGSTEN RD AT WILLOW & PFINGSTEN

## Pharmacy Contact

| Telephone | Fax |
|---|---|
| 847-559-9227 | 847-559-1269 |

Please let your doctor or your doctor's care team know if any items on your problem list are missing or incorrect.  Some of the problems listed may not have been addressed by your doctor during this visit.

## To view your lab results or for additional health resources

View your test results anywhere, anytime - http://www.northshoreconnect.org/
For additional health resources visit our website at http://www.northshore.org/health-resources/

**Most test results will be available immediately in NorthShore*Connect*. Please be aware that you may receive this result before your physician has reviewed it. Once your test result has been reviewed, your provider or care team will reach out to you if they determine additional information, clarification or instruction is needed.**

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-6
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

# DISCHARGE INSTRUCTIONS



**Brian Blankenship** 📅 10/24/2022 - 10/27/2022  📍 EVANSTON HOSPITAL 4 SOUTH SEARLE

## Your Next Steps

 **Do**

☐ Pick up these medications from ALLIANCERX (MAIL SERVICE) WALGREENS PHARMACY - TEMPE, AZ - 8350 S RIVER PKWY AT RIVER & CENTENNIAL

▮▮▮▮▮

 **Reason for your hospital stay:**

Reason for Admission, Evaluation and Treatment
You were admitted to the hospital for: ▮▮▮▮

During your stay you had the following treatment: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

**Signs or Symptoms; When to call your health care provider:**

---

Brian Blankenship (MRN: 202287173) • Printed at 10/27/2022  6:19 PM          ©2022 Epic Systems Corporation          Page 1 of 12

Amended Complaint | 23-CV-0867 | February 23, 2023

## Signs or Symptoms; When to call your health care provider: (continued)

- • Fever over 100.5 for 2 readings taken 4 hours apart.
- • Marked increase in redness, swelling, or pain around incision or drains.
- • Any excessive bleeding or drainage from your incisions.
- • Pain is not relieved by prescription medication.
- • Persistent problems with nausea or vomiting.
- • CHEST PAIN or TROUBLE BREATHING: CALL 911 or go to an Emergency Room.



## Caring for your Wound/Incision to prevent infection:
Discharge Wound

Blankenship vs. Outer Banks Capital, Inc.                                                                                      Page 189

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit M-7
# February 10, 2023

# AFTER VISIT SUMMARY



**Brian Blankenship**  DoB: 2/15/1973

📅 12/22/2022  4:10 PM  📍 Immediate Care - Northfield - Northshore Medical Group 224-364-2273

Fax: 847-663-8290

## Instructions

**Proceed directly to the emergency room for further evaluation.**

**Do not eat or drink anything until given the okay by your ER provider of care.**

**For the ER triage nurse and Provider:**  After visit summary printed



### IC TO ED OUTPT REFERRAL

Expires: 6/20/2023 (requested)
Evanston Hospital – Emergency Department
2650 Ridge Ave
Evanston, IL 60201
847-570-2111

Glenbrook Hospital – Emergency Department
2100 Pfingsten Road
Glenview, IL 60026
847-657-5632

Highland Park Hospital – Emergency Department
777 Park Ave. West
Highland Park, IL 60035
847-480-3751

Skokie Hospital – Emergency Department
9600 Gross Point Road
Skokie, IL 60076
847-933-6950

## Today's Visit

Reason for Visit



## NorthShoreConnect

View your After Visit Summary and more online at https://northshoreconnect.org/mychart/.

©2022 Epic Systems Corporation

# DISCHARGE INSTRUCTIONS


**NorthShore**
University HealthSystem

**Brian Blankenship** MRN: 202287173

📍 GLENBROOK HOSPITAL EMERGENCY ROOM   📍 GLENBROOK HOSPITAL   📞 847-657-5632

## ED Disposition

| ED Disposition | Condition | Comment |
|---|---|---|
| **Discharge - good condition** | -- | -- |

You were seen by: Agboola, Isaac Kolawole, MD, Krull, Caitlin Rhys, MD

## Diagnosis

| Diagnosis | Comment |
|---|---|
| ██████████████ | |

## Your Discharge & Follow Up Instructions Are:

Please be sure to take ████ as needed for back pain please do not take while driving or operating heavy machinery because it can make your drowsy.

Please be sure to take ████████████

## Discharge References/Attachments

████████████████

## Contact information for other follow-up providers:

**Follow up with NIRAV SHAH, MD**
Specialty: Anesthesia

NorthShore Medical Group
9600 Gross Point Rd.
Suite 1200
Skokie IL 60076-1214
847-945-7246

**Follow up with Mark T. Nolden, MD**
Specialty: Orthopaedic Surgery

NorthShore Medical Group
9600 Gross Point Rd.
Suite 1200
Skokie IL 60076-1214
847-866-7846

## Your Next Steps

👍 Do

☐ Pick up these medications from any pharmacy with your printed prescription

████████████████████

☐ Follow up with NIRAV SHAH, MD
NorthShore Medical Group
9600 Gross Point Rd.
Suite 1200
Skokie IL 60076-1214
847-945-7246
Pain specialist

☐ Follow up with Mark T. Nolden, MD
NorthShore Medical Group
9600 Gross Point Rd.
Suite 1200
Skokie IL 60076-1214
847-866-7846
Spine specialist

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit MM
# February 10, 2023

 Gmail

**Brian Blankenship <bdblankenship@gmail.com>**

## Hibbler Help Desk Appointment Information

1 message

**Hibbler** <hibbler@legalaidchicago.org>    Tue, Jan 3, 2023 at 10:10 AM
To: "bdblankenship@gmail.com" <bdblankenship@gmail.com>

Hello Brian,

Thank you for taking the time to talk with me on the phone earlier. Attached is the Statement of Understanding that I read to you.

You are scheduled for **Friday, January 27ᵗʰ at 3:10 PM.**

You should receive a confirmation email with all of the information to join the call. I am copying that information below. I recommend that you log into the call 5-10 minutes before your scheduled appointment. *The volunteer attorney will not call you.*

**If you plan on attending your appointment using Zoom video call:**

a. Please click the link below: https://zoom.us/j/93479385219

Meeting ID: 934 7938 5219

Passcode: xC3hb8

**If you plan on calling into your appointment using your phone:**

a. Call the number below before your appointment time.

    312-626-6799

b. You will then be prompted to enter the Meeting ID: **934 7938 5219**

c. Please be patient as it may take a minute or two to connect to the attorney.

**Please note:** the Help desk requires at least 24 hour notice for any cancellation or rescheduling.

If you have any documents of questions that you would like the volunteer attorney to review, please send them to me. If you have any other questions, you can email hibbler@legalaidchicago.org.

Best,

**Ella** *(She, Her, Hers)*

Help Desk Coordinator, Legal Aid Chicago

William J. Hibbler Memorial Pro Se Assistance

---

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distr bution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**Hibbler Statement of Understanding.pdf**
57K

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit N
# February 10, 2023

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 198 of 254 PageID #:693
Amended Complaint | 23-CV-0867 | February 23, 2023

Good Afternoon Brian,

Below is an update to the attached documents. I'm including Eric so he is in the loop.

**Realignment**:

- Sunny - Eric will handle timing and termination
- Kathy and Greg - We'd like the onboarding / offboarding functioning under the new proposed structure with corresponding terminations **completed by October 15th**.
- Ayanna - Danny will make any decisions related to Ayanna.
- Brenda - We agree with the timeline for her promotion but the transition of duties needs to be expedited to **meet the October 15th deadline**.
- Jude - We agree with the timeline for offloading the on/offboarding tasks **by September 30th**.
- James/Front Desk - I'd like the promotion to be announced by Jenny once she is back in the office. I'm unsure of when she is returning. In the meantime, Eric, please work on offloading the duties we determined were PM responsibilities (Keys and Printing). The **soft date for transition is September 30th** depending on Jenny's return.

**BB Tasks**

- Part A
  - We need to either hire or shift responsibilities to take on the 24 hours outlined in Part A for on/offboarding. I do not want you personally doing those tasks.
- Part C
  - These are the tasks I want you focused on in terms of priority.
    - **#3 - Onboarding and Offboarding task management conversion to Zendesk**
    - **#4 - Development of Pipedrive and the various integrations**
    - **#7 - Reputation Management Strategy & Software Implementation**
    - **#10 - Reconfiguration of [propertybase.com](propertybase.com)**
    - **#11 - Referral Program**
    - **#14 - New market business development (Prospecting)**
  - Other Notes
    - #1 Critical HR adjustments - Dave and Jenny will take this on
    - #2 Client Retention - Eric will be working on this
    - #5 Branding Standards and Use Policy - Patrick will work on this
    - #6 Marketing Material creation and production - Patrick will work on this
    - #8 Website Update - backburner
    - #9 Conversion of management agreements into Pipedrive - backburner, unsure of the need.
  - Consulting Gigs
    - #13 Call Center Support and Assistance - This is Jude's project but your involvement from a consulting perspective is appreciated. I'd like your time limited to 1 hour recurring calls with Jude.
    - #14 Human Resources assistance - Jenny and Dave will lean on you with questions from time to time.

I hope this helps. Please let me know if you have any questions.

thanks,

**Brent** Straitiff

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit OO
# February 10, 2023

**Complainant Reply to Employer Response (the "Reply")**
**Exhibit OO**
**Blankenship vs. Outer Banks Capital, Inc.**
**June 2, 2022**

This is a reference table to correlate dates, complaints, employee, and reference exhibit for claims or complaints made. Straitiff was in receipt of all claims/complaints and Cruz should be in possession of all documents November 1, 2021 and beyond, if Straitiff forwarded the information to Cruz as you would expect.

Add dates for business practice concerns === insurance kick backs, 3 times I pushed back for telling fraud

| | | |
|---|---|---|
| 1. | July 31, 2021 regarding Brown. | Exhibit X-5 |
| 2. | August 2, 2021 regarding Brown | Rebuttal |
| 3. | August 13, 2021 regarding Reilly. | Exhibit QQ |
| 4. | August 19, 2021 reported Ann to Jenny | |
| 5. | August 24, 2021 regarding Reilly. | Exhibit QQ Paragraph 3 |
| 6. | August 30, 2021 regarding Reilly. | Exhibit QQ Paragraph 3 |
| 7. | September 9, 2021 regarding HR issues. | Exhibit Q |
| 8. | September 20, 2021 regarding Brown. | Rebuttal |
| 9. | September 20, 2021 regarding Brown. | Rebuttal |
| 10. | September 20, 2021 regarding Brown. | Rebuttal/harassment |
| 11. | September 23, 2021 – investment accounting | |
| 12. | October 3, 2021 regarding Brown. Sex orientation | |
| 13. | October 3, 2021 regarding Brown. | Exhibit T |
| 14. | October 4, 2021 Brent slams Brian re: Ann comments | |
| 15. | October 11, 2021 regarding Investments. | Exhibit X-3 |
| 16. | October 13, 2021 aug 13 incident came up in my rant with Brent | |
| 17. | October 14, 2021 regarding Brown and Reilly. | Exhibit X-1 |
| 18. | October 15, 2021 regarding Straitiff and Brown | Rebuttal |
| 19. | October 18, 2021 regarding concealed gun | Exhibit RR |
| 20. | October 21, 2021 regarding Brown. | Exhibit X-6 |
| 21. | October 23, 2021 regarding Brown. | Exhibit P |
| 22. | October 26, 2021 ("Exhibit U") | |
| 23. | October 28, 2021 regarding Brown. | Exhibit VV |
| 24. | October 29, 2021 regarding Brown. | Phone Call |
| 25. | November 3, 2021 Behavior report shared | |
| 26. | November 3, 2021 regarding Reilly | Chat Log |
| 27. | November 4, 2021 regarding Brown. | Exhibit KK |
| 28. | November 7, 2021 regarding Brown. | Exhibit KK-1 |
| 29. | November 8, 2021 regarding Brown. | Exhibit KK |
| 30. | November 9, 2021 Exhibit KK-6 | |
| 31. | November 10, 2021 regarding Brown. | Exhibit KK-3 |
| 32. | November 10, 2021 regarding Reilly. | Exhibit UU |
| 33. | November 11, 2021 regarding Reilly. | Exhibit UU/QQ |
| 34. | November 17, 2021 regarding Brown | |
| 35. | November 17, 2021 regarding Investment tasks. | Exhibit Z |
| 36. | November 19, 2021 regarding Brown. | Exhibit KK-6 |
| 37. | November 23, 2021 regarding Brown. | Exhibit II |
| 38. | November 24, 2021 regarding Brown. | Exhibit II |
| 39. | November 29, 2021 regarding Brown. | Exhibit X-2 |
| 40. | December 1, 2021 regarding Brown. | Exhibit II |
| 41. | December 1, 2021 regarding Brown. | Exhibit F-1 |
| 42. | December 2, 2021 regarding Brown. | Exhibit D |
| 43. | December 2, 2021 regarding Brown. | Exhibit E |
| 44. | December 2, 2021 regarding Brown. | Exhibit B-1 |
| 45. | December 2, 2021 regarding Straitiff | |
| 46. | December 3, 2021 regarding wrongful termination. | Exhibit TT |

Blankenship prepared a timeline of key events with supporting documentation with the Complaint filed with the DOL on December 7, 2021. The timeline document (**"Exhibit OO-2"**) will contain some of the same information as above. If there is an error in dates or document, please resort to **Exhibit OO** as the correct information.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit P-2
# February 10, 2023



EEOC Response from Employer
Date:  6-10-2022

1. Please provide examples, evidence, etc. of Mr. Blankenship's performance deficiencies that lead to his discharge;

Employees noted in the discharge notes:
Nathan Brown - Board member of company, Chief Investment Officer
Jude Tungul - Transitions Department Head
Brawley Reishman - Board member of company, Chief Technology Officer
Sydney Shymkus -Marketing Manager
Brenda Becerra - Transitions Manager
Gregory Halpern - New Business contact for Investments Division
Sunny Park - Property Manager that would assist with new business



Brian Blankenship was hired as the VP of Business development on July 14th, 2021 and terminated on December 2nd, 2021.

1. Email dated  Dec 2, 2021  from  Brian Blankenship
   a. **FROM BRIAN** - This is my formal request to be removed from working with Nathan Brown and to not be required to assist Investments in any way.  I am willing to take on other responsibilities and even Investment tasks but only if Nathan Brown is removed from the day-to-day operations.
      i. Nathan Brown is one of the owners of the company. Additionally, he is one the directors responsible for the division Brian was hired to work within. Leaders need to work together, they cannot pick and choose who they work and communicate with. In addition, this does not adhere to our core values. Specifically, TEAM - Critical, supportive, unified, resourceful, inspiring, NO JERKS
2. From  Brian Blankenship  Memorandum on 9/7/2021 (in file)
   a. With Brian unable to complete the tasks layed out in the job description and his 30/60/90 day plan, we realigned his task to these 6 items. We were very clear these were the items we needed him concentrating on and completed by the end of 2021.

Amended Complaint | 23-CV-0867 | February 23, 2023



      i.    **#3 - Onboarding and Offboarding task management conversion to Zendesk -** <span style="color:red">Brian had little involvement on this task, it was passed on to Jude Tungul and Brawley Reishman.</span>

      ii.    **#4 - Development of Pipedrive and the various integrations -** <span style="color:red">The Pipedrive integration was completely stalled. I have included an email sent by Margo to Brian on November 10th with outstanding items that were never addressed. We picked this up after Brian's termination on December 2nd and had it completed by the end of the year. Confirmed verbally and in writing that Brian was not keeping this project on track or moving forward.</span>

      iii.    **#7 - Reputation Management Strategy & Software Implementation -** <span style="color:red">This was 90% complete with the exception of the NPS qualifier. The company Brian identified for NPS doesn't focus on what was needed so we had to pivot to a new company. We were able to get this project back on track after Brian's departure.</span>

      iv.    **#10 - Reconfiguration of** [propertybase.com](propertybase.com) <span style="color:red">**-** Brian was unable to understand the scope of this project and continued to make it more complicated than it needed to be. The project was handed off to Sydney and it was able to get back on track.</span>

      v.    **#11 - Referral Program -** <span style="color:red">The goal of this project was to have a comprehensive referral program for CAM PMs, Investment PMs, attorneys, real estate agents, engineers, Board Members, Investment Owners and others. [This](This) is the only document produced. This was last updated on 10-12-21 and doesn't address the needs.</span>

      vi.    **#14 - New market business development (Prospecting) -** <span style="color:red">No plan or strategy was presented for 2022 to increase new business on the CAM or Investment division.</span>

b.  Issues

      i.    Goal from the start was to transition Jude out of onboarding/offboarding. Brian never fully transitioned Jude out and Brenda into her new promoted role. Jude remained at the top of onboarding/offboarding and Brian had little involvement in the day to day.



ii. New Business - little time was spent on new business, we took the CAM portion off Brian's plate so he could concentrate on building infrastructure and a new business sales strategy. Through his tenure, he only personally signed up 1-2 single unit condos (need to verify the amount signed up).

iii. Leads - we received over 70 leads via All Property Management from October 27th, 2021 through December 2nd, 2021 with little to no contact made by Brian on these leads. If contact was made, it was through a bcc email that wasn't personalized. In addition, little to no phone call attempts were made to the prospective clients.

1. During the interview process, Brian criticized our sales process from a follow up standpoint. He didn't believe (Greg) was relentless enough in attempting to contact the potential customer. This was something we bought into and liked the idea of aggressive follow up to leads. The opposite happened in practice with Brian, there was little to no follow up or through on leads even with only handling the investment leads. Goal from the start was for him to be over both the CAM and Investment new business, however, he was unable to handle only the Investment side.

3. Other Documents

a. **Brent10142021** - we discussed this with the Board. Please note, the items he talks about in this document have nothing to do with what he was hired to do (VP of Business Development). Please see the job description and the 6 focus items further given to him in an attempt to focus him on what he was hired to do. He was more concerned with other areas of the business.

b. **Conflict Resolution_W360_BRS** - the meeting was an attempt for Ann and Brian to work together in a productive manner. Brian called a meeting with me the following Monday and said he was disappointed I didn't make Nathan a subject in the meeting. I told him I recognized the need for the two of them to work together in an effective manner but believed it would derail that meeting and thought it best to address separately. **Please note, Brian agreed with the approach at the Monday meeting but later changed his stance/opinion.** I had meetings



with both Nathan and Brian separately and also asked for them to meet to address any conflict between the two of them directly.

c. **Westward360 Mail - Brian Blankenship - Behavioral Report -** In an attempt for Ann and Eric to better understand Brian, I asked for his permission to send his Behavioral Report to both Ann and Eric. Brian gave me permission over the phone to do so. After I received permission, I sent the report to Ann. After I sent it to Ann, Brian asked to be included in the email to Ann and Eric. Since the email was already sent to Ann, I forwarded him a copy of the email to Ann and included him on the one to Eric. **Please note, this is contradictory to what Brian presented in his statement. Our position is backed by these emails.**

d. **BrentUpdate_10042021 -** Brian was unwilling to work well with others, this extended across the organization. I asked him to meet with Nathan to go over items and to circle back with an update. This update and my further conversation with Brian prompted the need for me to continue to focus him on the 6 items that needed to be achieved by the end of the year. It also prompted him to make the statement of "stay in my lane" on the 10-14-21 correspondence. **Please note, he recognized the 6 goals that needed to be completed by the end of the year and that the meeting was good with Nathan.**

2. Identify the official(s), by name and position, who made the decision to discharge Mr. Blankenship;

Brent Straitiff - Chief Executive Officer - Brian reported directly to Brent during his employment.

3. Provide a list of all of the Respondent's employees discharged from January 1, 2021 to the present. This data should include the following:

Attached is an excel spreadsheet with a list of employee's discharged during the requested period.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit T-1
# February 10, 2023

12/12/22

# ILLINOIS DEPARTMENT OF
# Human Rights

JB Pritzker, Governor
James L. Bennett, Director

December 8, 2022

BRIAN D. BLANKENSHIP
2803 BRINDLE CT
NORTHBROOK, IL  60062

RE:      Charge No.: 2022CR2218
         Respondent:  WESTWARD 360 D.B.A. OUTERBANKS CAPITAL
Complaint or Civil Action Filing Dates:     **9/28/2023   through   12/26/2023**

Dear Complainant:

You have chosen to have the discrimination charge you previously filed with the U.S. Equal Employment Opportunity Commission ('EEOC') investigated by the Illinois Department of Human Rights ('IDHR') under the Illinois Human Rights Act.  IDHR has received a copy of EEOC's determination and your request for the Department to investigate.  A copy of the charge has been served on the Respondent.  Keep this letter for reference if you need to telephone or come to IDHR.

You are required to preserve and maintain all records, including paper, electronic, or other formats, pertaining to this charge.  If your charge involves the basis of disability, IDHR requires that two additional forms be completed to determine whether IDHR has jurisdiction over your identified medical condition.  If we do not have copies of these documents in your file, we have included copies with this notice.

NA
1)      Verification of Disability.
Please give the Verification of Disability form to your physician for completion.  Request your physician return the completed form by mail to IDHR's address below within 30 days of your receipt of this notice; and

NA
2)      Consent form.
The consent form allows IDHR to review your physician's documentation.  Please fill out the consent form and return it to IDHR, again, within 30 days of your receipt of this notice.

If your charge does not involve the basis of disability, then the Verification of Disability and Consent Forms are not needed and are not enclosed.

IDHR's role is to conduct a neutral investigation of the allegations in your charge.  It is your responsibility to cooperate with IDHR's investigation and provide all pertinent information you have concerning the case by the dates requested.

An investigator will contact you after the case is assigned. IDHR must complete the investigation of your case by issuing its report of findings within 365 days from the date the EEOC issued its decision on your charge.  IDHR's investigation time may be extended if you and Respondent agree in writing.

9/27/22

555 West Monroe Street, 7ᵗʰ Floor, Chicago, IL 60661, (312) 814-6200, TTY (866) 740-3953, Housing Line (800) 662-3942
524 S. 2ⁿᵈ Street, Suite 300, Springfield, IL 62701, (217) 785-5100
2309 West Main Street, Marion, IL 62959 (618) 993-7463
www.illinois.gov/dhr

If IDHR does not complete the investigation of your case by timely issuing its report of findings, you may either file a complaint with the Human Rights Commission or commence a civil action in the appropriate circuit court within 90 days after the expiration of the 365 days (or the extended time). We have calculated the time above (see Complaint or Civil Action Filing Dates). While we have made this calculation with the best of intentions, errors can occur. The Human Rights Commission has ruled that it is your responsibility to count the number of days properly. If you file a complaint or commence a civil action in circuit court outside this 90-day period, your complaint or civil action may be deemed untimely and dismissed.

Once 455 days (365 days [or the extended time] plus 90 days) have passed, IDHR must dismiss your charge with prejudice without any further right to proceed if you have not filed a complaint with the Human Rights Commission, or commenced a civil action in the appropriate court. Therefore, you may wish to contact an attorney to decide the best way for you to handle your case.

If you file a complaint with the Human Rights Commission, the form of the complaint must be in accordance with section 7A-102(F) of the Human Rights Act. You must serve a copy of the complaint filed with the Human Rights Commission on IDHR on the same day that you file a complaint with the Commission. The Human Rights Commission will then schedule a hearing for your case before an Administrative Law Judge.

If you commence a civil action in circuit court, the form of the complaint must be in accordance with the Illinois Code of Civil Procedure. Please also serve a copy of your complaint on the EEOC: 500 West Madison Street, Suite 2000, Chicago, IL 60661. If you file a complaint with the Commission, you may not later commence a civil action in circuit court.

You must advise IDHR of all changes of name, address, or telephone numbers. If you do not do so, IDHR may dismiss your case if it cannot locate you.


SB1122 IN-6 Non-Med
CR/SR
4/17

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit UU
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

These are my notes taken from the day it happened. I did not write these today. I also included the email I sent to Ann about employee comments. She turned around and accused me of not protecting her, implied because she is a woman.

Ann Marie Reilly

Ann and I have had a couple significant encounters and I've lost all respect for her. On August 13, 2021, she called me at 7:15am literally screaming at me because of a summary email I sent her the night before. She attacked integrity, commitment, and communication skills. I was accused of discriminating against her because she is a woman. She told me that I was handling situations differently then I would be if she was a man. Her attacks continued and she ranted that I didn't have her back when defending her to another employee. I don't believe I said one word during this unprofessional and unprovoked conversation. I recall telling her I was disconnecting the call. Our current communication is in chat or by email. She's a lot like Nathan in that she enjoys telling people what to do. It's difficult for me to support her in any way let alone have he give me any direction. As I've stated multiple times before, the Company has tremendous risk in allowing her to go unchecked. Nathan is not managing her and she is doing what she wants.

1.  Accused me of treating her differently vs. how I would treat a guy (man).
2.  Verbally took offense to a statement I made to Greg which was a suggestion for Greg and Ann go offsite for a coffee and chat. To this day I don't klnow
3.  Twice accused me of not having her back.
4.  The most recent event was the handling of two employee survey comments. Ann claims she was not protected from those comments. She was protected because a.) they were not distributed to anyone but the Board and Eric, b.) they were excluded from a meeting reviewing the survey with other department heads, and c.) presented the comments in a professional way.

**Brian** D. Blankenship
*Vice President, Business Development*



Association Management  |  Rental Management
Buy & Sell  |  Rent  |  Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct: 773.676.0840  |  Mobile: 224.804.7692  |  Main: 773.572.0880
Web: westward360.com  |  Email: brianb@westward360.com

 Powered by
cloudHQ

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit X-1
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

10/14/2021

Brent -

I've been told to "stay in my lane" by several Westward360 staff when I broach issues they don't like but then they want my involvement in projects that I have experience that's acceptable even though the project(s) are "not in my lane".  Certain employees have tried to prevent my involvement or have asked me to position them favorably. There are entire departments doing their own thing, have no interest in combining resources, and lack control within. These are just a few of my interaction experiences with Westward360 staff.  Several weeks ago, you criticized my handling of something and told me that I struggle at times because I am used to sitting at the top of the org chart. I sat at the top of the organizational chart for nearly 18 years at two companies – the industry's largest privately held owner/operator and a well-respected company that was a pioneer of the industry and a Top 10 owner/operator – because I am great at what I do.  Ask anyone that I have worked for (clients), reported to (CEO, President), or reported to me directly or indirectly, they will all say the same thing – I'm one of the smartest people they know. A subject matter expert.  I am loyal and dedicated.  I can be "high maintenance".  I have a diverse and broad skill set.  I've tired to balance my past with today's position but struggle when I see a problem and want to solve it.  It's a curse at Westward.

Given your recent statements that we are not overstaffed or understaffed, I feel I need to say something because those comments are in complete contrast to what is happening.  In my chat with Nathan last Friday, he mentioned how understaffed the department is. I shared that comment on the summary I sent to you about that meeting. We may be laying off 64 hours in Investments (Greg and Kathy) but there has been a hiring spree. Ann added two new positions that were incremental, because she wanted Kathy and Greg out of "Investments" space to make room, which is in addition to the part time employee they kept from a new management job. (I raised this concern in late August but raising this issue was not well received by Nathan).  Plus, based on my limited knowledge, there are 160 hours being recruited for in PH, excluding two (2) PH positions for Realty, with an additional 160 hours needed after the first four positions get filled. As I told you a few days ago, I had interaction with Ann and I questioned her hiring to replace Kathy's "non-onboarding" hours.  She does not understand that Greg and Kathy's hours were cut from payroll.  Then I hear about a new position we just hired in Investments – Investment Administrator.

A plan was developed to conduct layoffs in early August to cut hours, leverage the existing transitions team, and save payroll dollars.  Days before the changes were to happen, Nathan wanted more time to plan and the layoffs were pushed to September 10. No effort was given to understanding existing tasks or task reassignment (except for onboarding, off boarding and new business development).  But nothing occurred on September 10 because Department Heads were not prepared.  The delay in these layoffs is 0% my fault and 100% Nathan Brown. Yet I'm being held to task as if I've delayed the change as evidenced with the hard date I was given to implement this change.  You instructed me to make the change to save payroll dollars despite risks I disclosed several times.  Nathan did nothing to plan for this change or reassign tasks.  His solution is to add more staff (180 hours+) which defeats the purpose of terminating Kathy and Greg.  The payroll dollars saved have been exceeded with new hires in other areas of the Investment group.

But during a conversation we had on October 11, you authorized new hires to a 1:1 ratio in the Investment department.  I didn't know new staff was approved - neither Ann nor Nathan mentioned it in any discussion we've had (and there have been plenty of conversations during the past two weeks). If new staff and hours have been approved, then hours should be allocated for new business admin tasks.  I've taken on these tasks because we were reducing payroll but if we are adding more hours, then someone else needs to take on those tasks.  Furthermore, I cannot, in good conscience, be the

person to terminate Greg or Kathy's employment on Friday. I am not comfortable terminating their employment knowing there is no plan in Investments to preserve the payroll hours or salary reduced. Its unfair

I didn't share the attached with you because I was sure Ann would run to you and tell you I was being intrusive. (The fact that someone would complain about me for sharing employee survey comments on a Friday afternoon or get upset because she was not protected is still mind boggling to me.) Despite my best efforts to handle the employee comments carefully and to limit their audience, my handling was criticized by you. My question is this: when will my actions be defended against Ann? Or will she continue to have an audience when she complains about something I did or something she doesn't agree with? I tried my best in this situation and I would not change how I handled it in any WAY. Correct me if I'm wrong but the whole point of consolidating certain Investment and CAM functions is to become more efficient? The Company needs to be aware and protect itself. Ann has a chip on her shoulder and will continue to plow her way through the department and company. She will continue to exert strength from her position as a woman. Look at her hiring trends – she only hires women and only promotes women. There is no gender balance and that's by her design.

I am disappointed in how the Company has handled the Sunny Parks situation. We are approaching 90 days since his 'theft of time' was uncovered yet he remains employed today. In fact, it sounds like there is a conversation around not terminating his employment. He is a long-term employee who has stolen from the Company and the properties he manages and we may not fire him? Employees need to be held to a higher standard and there should be ZERO tolerance for theft at any level. The theft is fully documented and all parties agree it represents stealing time. The employee has stolen at least 17 days this year (through July 31, 2021) and taken advantage of the Company. If you annualize the stolen days in 2021 and apply that to the eight years he's been employed, then we are talking 235 hours, or nearly $10,000. Theft of any kind and at any level cannot be tolerated; the Company's inaction validates the theft as the employee thinks he's gotten away with it. I recommended an immediate termination on July 23, 2021, but that plan was put on hold because the department needed coverage. The fact that Sunny remains employed today devalues my effort, and, worse, allows a thief to remain employed.

It is going to be a real challenge for me to work with Nathan Brown. He's smart and knows his audience. You should listen to our conversation from the evening of October 11 and compare that to his statements during the conference call October 12. He played to the audience during the call. Even Ann, who can't stand me, chimed in and revealed facts in the spirit of transparency. After the call, Nathan contacted two call participants to champion for "his way"; the employees notified me of the phone call presumably because they know there is a better way than "his way". The same thing is happening with the software changes in Realty and Investments – he will continue to throw up barriers and not accept new ideas until the conversation gives him what he wants. In fact, on September 23, Nathan called me and he was angry because something must've been said to him. He took the opportunity to tell me he only asked for my involvement in finding a solution to market to Association-managed homeowners. I reminded him he asked me to get involved with figuring our Propertyware and how it could be utilized more. He told me to "stay in my lane". He was very short tempered so I chose to not challenge him at that time.

Nathan is uncooperative and withholds important information from others. For example: did you know that the company has an employment agreement with Greg? Did you know that Greg manages an apartment building his parents own and retained Westward360 to manage? Did you know Realty holds Greg's Illinois Broker's License? I didn't know any of that until September 29. Despite my frequent communication and discussions about Greg's separation agreement, Nathan NEVER mentioned any of those facts. All of that needed to be considered. I only found out because an employee approached

me after hearing through the grapevine that I was going to fire Greg and they wanted me to be aware. A few days later another employee overheard Nathan talking to two employees telling them that "Brian has it out for Greg and he has been advocating his firing for months; he (Nathan) has been trying to prevent that from happening." The emphasis was on me and my actions. Then he was heard telling these two employees I was going to also take out Kathy because of her loyalty to Greg. I normally don't give a fuck about what others think about me because I know my decisions are well thought out. But to hear an owner of the company flat out lie and portray me in a negative light is not something I've dealt with during my professional career. And let's not ignore the fact that the conversation about an employee and their employment status is inappropriate.

I approached Nathan about this new information about Greg and he got me a copy of his employment agreement with Realty. I reviewed the agreement with our HR attorney and changes were made to the Separation Agreement to account for Greg's "dual employment status" as an independent contractor and an at-will employee. (Side note: the independent contractor agreement set off alarm bells with the attorney. The agreement has conditions that control the independent contractor as if they were employed). My recommendation to Nathan, after consulting with the attorney, was to tell Greg he needs to move his broker's license to another firm within 45 days and send a termination notice for the managed property. I explained this would ensure all ties are severed and there would be nothing lingering. Nathan told me to not take any action on either item because he didn't want the disruption.

I can't tell you how many times I asked Nathan to give me the most recent management agreement. I made the request because I made a recommendation to centralize management agreement last month and you told me you wanted me to handle management agreements. He never provided so I took the most recent onboarded location management agreement from Propertyware. On Monday (10/11/2021) he told me I had the wrong agreement yet this agreement was just used for a October 2021 property. It was interesting to see the management agreement signed by Paul. At first I thought it was a fluke but after looking any many other signed agreements, Paul was the signer on all agreements. So I asked the question – 'why does Paul sign the management agreements?' I get this long story that basically said the attorneys said Paul, as the managing broker, was recommended to be the signer. That made no sense to me especially considering Nathan is a broker as well. After asking a few more questions I learn Nathan didn't want to be bothered with signing management agreements so he outsourced that process to Paul. Paul literally signs whatever is put in front of him. What's worse is Greg would change the terms of the agreement for a client and no one but him reviewed any changes before sending to Paul to sign. Then, on Wednesday (10/13/2021), Nathan sends me a laundry list of questions about how I intend to manage the process. I have not responded nor do I intend to respond.

I am a very expensive employee to become Nathan's admin clerk. He's asked me to prepare two management agreements and two proposals. Ian creates his own agreements. I plan to generate them myself as needed. Ian customizes his marketing material and proposals and I'll do the same. I'm sorry but I am not his admin clerk. Then yesterday morning (10/13/2021) he sent me two leads from the call center telling me to follow-up and report back to him with the status. There was no reason for the email and he did it for one reason and one reason only. My response to him - "if you look at the lead you will see I was copied. Greg is following up on leads at this time. If he's out today, I was not aware. What's the purpose of your email? I don't need to be forwarded leads telling me to follow up."

His strategy is to beat you down by popcorning question after question looking for an opportunity to say "gotcha ya". He took this approach yesterday and today with me. Question after question, positioning and looking for that "gotcha ya" moment. He never got it because my responses were factual and firm. To give you context, during the past two days there have been more than 35 email

SUBJECT: Re: Frustration
FROM: Brian Blankenship <brianb@westward360.com>
TO: Brent Straitiff <brents@westward360.com>
DATE: 10/14/2021 11:30
ATTACHMENTS (20211014-113059-0001168): "NathanOnboarding.pdf" , "AnnChat100521.pdf" , "Westward360 Mail - Re_ Realignment Update.pdf" , "Westward360 Mail - Investment Onboarding.pdf" , "Westward360 Mail - Re_ Greg.pdf" , "BrentUpdate10032021.pdf" , "Realignupdate09282021.pdf"

I just realized I failed to include the referenced attachments.  Sorry about that.

**NathanOnboarding.pdf**

**AnnChat100521.pdf**

I am also including these additional attachments which are needed to provide the proper context to a person reading the email from this morning.

**Westward360 Mail - Investment Onboarding.pdf**

**Westward360 Mail - Re_ Realignment Update.pdf**

**Westward360 Mail - Re_ Greg.pdf**

**Realignupdate09282021.pdf**

Finally, I included the summary of the meeting (**BrentUpdate10032021.pdf** ) I had with Nathan on October 1, 2021.  This summary was requested by you and I asked for it to remain confidential.  If you feel it's necessary to share with the Board then I am okay with that as long as it is noted the summary was requested vs. provided unsolicited.

If there are any questions, please let me know.

**Brian** D. Blankenship
*Vice President, Business Development*

Direct: 773.676.0840  | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com  | Email: brianb@westward360.com

On Thu, Oct 14, 2021 at 7:53 AM Brian Blankenship <brianb@westward360.com> wrote:
> I am better at expressing myself in writing, especially in this situation.  I hope you will review the attachment with an open mind, like you have in the past.  I am very frustrated and only see that getting worse given recent events summarized within.  I'm WFH today and hope we can have a discussion late this morning or early afternoon.
>
> Brian
>
> **Brian** D. Blankenship
> *Vice President, Business Development*
>
>
>
> Association Management  |  Rental Management
> Buy & Sell  |  Rent  |  Property Maintenance
>
> 1464 West Webster Avenue



Brian Blankenship <brianb@westward360.com>

## Re: Realignment Update

1 me age

**Brian Blankenship** <brianb@westward360.com>                    Wed, Sep 29, 2021 at 1:05 PM
To: Ann Marie Reilly <annr@westward360.com>
Cc  Brent Straitiff  brent @we tward360 com , Nathan Brown  nathanb@we tward360 com , Eric Sta zczak <erics@westward360.com>, Claudia Luna <claudial@westward360.com>

Sure - I just finished putting the attached together regarding Kathy tasks.  I do not have anything similar for Greg.

Review the open item  for Kathy and then give me a call  o we can work through rea  ignment

📗 **KathyTaskReassignment**

**Brian** D. Blanken hip

*Vice Pre ident, Bu ine   Development*

Direct: 773.676.0840  |  Mobile: 224.804.7692  |  Main: 773.572.0880
Web  we tward360 com  |  Email  brianb@we tward360 com

On Wed, Sep 29, 2021 at 12:59 PM Ann Marie Reilly <annr@westward360.com> wrote:
Thanks Brian, this is helpful.  Would it be possible to see the list of onboarding/offboarding tasks assigned currently to Kathy and Greg that your team i  working off of?  Thi  would help me in term  of clarifying what i  omething I need to reassign and what is being covered by Brenda's team.
Best,
Ann

On Wed, Sep 29, 2021 at 11:34 AM Brian Blankenship <brianb@westward360.com> wrote:
Please let me know if there are any questions or if something is incorrect.

Brian

**Brian** D. Blankenship
*Vice President, Business Development*



Association Management  |  Rental Management
Buy & Sell  |  Rent  |  Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct: 773.676.0840  |  Mobile: 224.804.7692  |  Main: 773.572.0880
Web  we tward360 com  |  Email  brianb@we tward360 com



Brian Blankenship <brianb@westward360.com>

## Re: Greg

1 me age

**Brian Blankenship** <brianb@westward360.com>                         Thu, Sep 30, 2021 at 2:58 PM
To: Nathan Brown <nathanb@westward360.com>
Cc  Brent Straitiff   brent  @we  tward360 com

Nathan - can we talk about your concerns today?  Sorry we didn't connect while I was @ Webster.  I'm out of a meeting and available by phone the rest of the day.

**Brian** D. Blankenship
*Vice President, Business Development*

Direct: 773.676.0840  |  Mobile: 224.804.7692  |  Main: 773.572.0880
Web: westward360.com  |  Email: brianb@westward360.com

On Thu, Sep 30, 2021 at 9:52 AM Brian Blankenship <brianb@westward360.com> wrote:
What are your concern  ?  Not enough  everance? Ta  k rea   ignment?  Inbound lead management?  Let me know the concerns so I can address them, if possible.

If easier to set up a quick call, lmk.  I am @Zendesk Aliases 19
Brian

**Brian** D. Blankenship
*Vice President, Business Development*

Direct  77   676 0840  |  Mobile  224 804 7692  |  Main  77   572 0880
Web: westward360.com  |  Email: brianb@westward360.com

On Thu, Sep 30, 2021 at 9:48 AM Nathan Brown <nathanb@westward360.com> wrote:
We hold his license AND manage his parents property.

The licen  e i  n't an i   ue  he i  n't really active   The parent ' property i  a little different   I'm  ure they will want to move that.

The more severance we can give here the better.  I remain concerned about this situation based on his tenure

**Nathan** Brown
*Chief Investment Officer*
—

Association Management  |  Rental Management
Buy & Sell  |  Rent  |  Property Maintenance

1464 W Webster Ave.
 Chicago, IL 60614

773.572.0903  |  westward360.com

On Wed, Sep 29, 2021 at 6:08 PM Brian Blankenship <brianb@westward360.com> wrote:
One more thing...I understand that Westward360 manages a property his parents own. Is that correct?  Do you want to terminate that relation  hip with hi   layoff?

**Brian** D. Blankenship
*Vice President, Business Development*

Direct  77   676 0840  | Mobile  224 804 7692 | Main  77   572 0880
Web: westward360.com | Email: brianb@westward360.com

On Wed, Sep 29, 2021 at 5:21 PM Brian Blankenship <brianb@westward360.com> wrote:
Does Westward360 hold Greg's broker's license?

**Brian** D. Blankenship
*Vice President, Business Development*



A   ociation Management  | Rental Management
Buy & Sell  | Rent  | Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct  77   676 0840  | Mobile  224 804 7692 | Main  77   572 0880
Web: westward360.com | Email: brianb@westward360.com



**Brian Blankenship <brianb@westward360.com>**

## Investment Onboarding

1 message

**Brian Blankenship** <brianb@westward360.com>                    Mon, Oct 11, 2021 at 3:51 PM
To: Nathan Brown <nathanb@westward360.com>, Ann Marie Reilly <annr@westward360.com>
Cc: Brenda Becerra <brendab@westward360.com>, Brent Straitiff <brents@westward360.com>, Eric Staszczak <erics@westward360.com>

October 11, 2021

Ann & Nathan –

As we approach October 15, 2021, I want to take a moment and propose a few parameters to ensure we provide the best service possible to new and exis. ng clients.  Keep in mind the same team will handle CAM and Investment onboarding and o.   oarding so it's important we adopt consistent processes and procedures.  Therefore, I propose:

1.)  A 30-day advance no  ce is required to onboard a new loca  on.
    a.    Clients should be told we require 30 days advance no  ce to assume management.
    b.    When selling our services, we set the tone about onboard   ming.
    c.    The master management agreement should include a statement related onboarding and detail the no  ce period.
2.)  Onboarding can happen more quickly, under certain circumstances, but will always require a **minimum** ten (10) business days' no  ce to prepare the loca  on for our management.
    a.    This is necessary to prevent "fire drills" that have the poten  al to nega  vely impact other projects.
    b.    A. er we get some experience in handling CAM and Investment onboarding, I expect the ten (10) days to reduce to five (5) or seven (7) days, as an excep  on.
    c.    I also propose a new fee be established for any property onboarding with less than 30 days advance no  ce.  A Rush Onboarding Fee of $250 would be charged to any loca  on onboarded with less than 30 days' no  ce.  <u>The minimum ten (10) business day period will apply even with a rush request.</u>   The fee can be waived by Nathan, Ann or Brian if the fee becomes a barrier.
3.)  A management agreement must be fully executed by both par  es at least 30 days before the scheduled date our management begins.
    a.    A Rush Onboarding Fee will be charged if onboarding has 30 days or less.  The fee can be waived by Nathan, Ann or Brian if the fee becomes a barrier.
    b.    The ten (10) business day no  ce period begins on the date a management agreement is fully executed.
4.)  Crea  on of management agreements will be provided within 24 *business* hours of the request.
Ul  mately, management agreements will be posted in the respec  ve Management Agreement folder in Google Drive.  Going forward any client requested change to the management agreement will require internal review but also may require a legal opinion in certain situa  ons.  Non-standard management agreements will require addi  onal   me to consider the requested change(s) and must be approved by Brian Blankenship or Nathan Brown.
    a.    Non-standard CAM management agreements require approval by Brian Blankenship or Ian Duni.

A few other items:

•    On September 29, 2021, I provided a summary of Kathy's tasks with several comments.  I want to make sure the needed task reassignments are handled.  Do you need any assistance from me at this   me?  If you would like to meet and review, please let me know.

Amended Complaint | 23-CV-0867 | February 23, 2023

- General new business requests will be deemed non-critical and best efforts will be used to address the request within 24 business hours unless it's a life safety tenant issue or our employee(s) are in harms way.

These parameters will set the property up for success while allowing the team to manage the workflow for both CAM and Investments.  Its important potential clients are aware of the time needed to prepare the property for management because it's in the interest of both parties to position the property for success.  I look forward to the discussion – I will set up a 30 minute meeting for Tuesday to discuss.

**Brian** D. Blankenship
*Vice President, Business Development*



Association Management  | Rental Management
Buy & Sell  | Rent  | Property Maintenance

1464 West Webster Avenue
Chicago, IL 60614

Direct: 773.676.0840  | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com | Email: brianb@westward360.com

**Westward360**
**Realignment Update**                                                     <span style="color:red">**CONFIDENTIAL**</span>
**September 28, 2021**

---

The Realignment Plan that included lay-offs and other changes will not take place by 9/30/2021. The original Realignment Plan of 8/7/2021 included a timeline of key events; full implementation of the original Plan was 9/30/2021. After discussions on August 7, 2021, Investments requested more time to prepare for the impact and that request was approved. Under the revised timeline, the layoffs would occur 9/10/2021 and the schedule was updated accordingly. I presented an update to the revised plan, which considered recommendations from counsel, to Brent on 9/7/2021; I also delayed the expected 9/10/2021 layoffs. The update was reviewed by the Board on 9/13/2021. There were a series of changes and revised timelines disclosed on 9/14/2021.

Based on the above and for planning purposes, **"soft circle" 10/15/2021 or 10/22/2021 for the layoffs.** An update of relative tasks; my comments are informational, not directional.

**Kathy**
- Brenda and team will absorb her onboarding/offboarding tasks.
- Utility transfers, and the like, will have support from James. (see below)
- Nathan and/or Ann will reassign Kathy's non-transition tasks.

**Greg**
- Based on my experience with Greg to date:
  - 40% of his time is spent onboarding/offboarding
  - 30% spent on new business
  - 30% on other tasks.
- Onboarding/offboarding tasks will be absorbed by Brenda & team.
  - Long-term task management will be converted to a Zendesk workflow.
- New business lead management will be split between Nathan and Brian. I will handle any lead less than five (5) units and Nathan will handle leads with more than five (5) units.
- New business admin tasks appear minimal. The largest task is maintaining incoming/outgoing spreadsheets, which will go to Brenda and team. If other new business admin tasks surface, I will assume them until we determine how and who handles going forward.
- Any of Greg's tasks outside of transitions and new business will be reassigned by Nathan and/or Ann.

**Zalea**
- We added a resource in Transitions with Zalea and I think the incremental 40+ hours should be sufficient.
- Investments requested Zalea remain on Team 2 Friday, with no involvement in onboarding, for the next two weeks.
  - Zalea is scheduled to return with 100% of her time focused on transitions on October 11, 2021.

Blankenship vs. Outer Banks Capital, Inc.

**Other**

- I don't want to "put the cart before the horse", so I am not adding additional resources until we determine it's necessary.
  - There are about 24 hours of tasks that are unknown and unassigned.
  - Brent, Nathan and others know additional hours may be needed at some point post-implementation.
  - If certain tasks can't be absorbed with the current plan, then we will add up to 24 hours in resources.
    - Nathan prefers resources supporting Investments to be 100% dedicated to Investments and not shared.
- I understand Investments links several of its internal spreadsheets to the new business incoming and outgoing spreadsheets. I committed to Nathan last month that these would not change immediately.
  - Big picture – we will need to develop a process that transitions Pipeline data into our various systems. Outgoing business tracking may need to remain on a Google Sheet.
- I continue to meet with Jude to understand his onboarding/offboarding tasks for CAM as those tasks will be reassigned. I'm still sorting out what we are required to do compared to what we do.
- James will continue the limited support he provides to transitions (I estimate this to be 5 to 8 hours per week.) I intend to structure his assistance to focus on utility changes and management. I believe Eric is addressing the front desk changes by 9/30/2021.
- New business lead management will be consolidated using a product called Pipedrive. This will create one place for our incoming leads to reside. I will likely use Zendesk Sell for several weeks until our Pipedrive is completed by the consultant. Pipedrive is estimated to be fully functional by 10/31/2021.
  - I expect new deals to be managed in Pipedrive, including new management agreements. Once the management agreement is executed, transitions will take over and the new business is tracked by Brenda & team.

**Suggestion**

The company should consider designating one person to manage Management Agreements. There needs to be more control of the document. Changes are made to Agreements to satisfy the client's demand, but a single change can have a major impact. Requested changes need reviewed and approved. This position would act as the centralized "control" of our Management Agreements. The process is too loose today. Various parties would request new documents and document changes through this position. The addition of this process will decrease our responsiveness and increase the time it takes to get Agreements executed. If we set a goal of turning documents within a 24-hour period that will be acceptable. This position should report to a key decision maker who can approve/deny/modify the Agreement.

I don't want to sugar coat anything and hope there will be patience as this Plan gets adopted. This change will be disruptive to the organization. There will be tasks popping up that will need reassigned on the fly. I know I am missing stuff but there is only so much one can do to get information from an employee without being obvious to our Plan. The disruption will eventually subside if we work as a team and not in individual or department "silos". The Company will be in a much better position once the change happens, and new systems are developed.

I hope this update provides reassurance with the Plan. Thank you for your assistance, in advance. If there are any specific questions, please let me know.

2

Blankenship vs. Outer Banks Capital, Inc.                                                        Page 221



Brian Blankenship <brianb@westward360.com>

## Documents

1 me age

**Brian Blankenship** <brianb@westward360.com>                                    Sat, Oct 2, 2021 at 6:23 PM
To: Nathan Brown <nathanb@westward360.com>

Nathan   below are link  to variou  doc  that are u ed for onboarding and offboarding

ONBOARDING
https://docs.google.com/document/d/1OAbzuBbXark0YnjKIlSFCGxIOllYtRNaAqTdw4rcacI/edit?usp=sharing

https://docs.google.com/document/d/1tdnIEr-FB7TqPd-4oOH0KZoH2ngBtygINEe4ZEMVInQ/edit?usp=sharing

https://docs.google.com/document/d/1b6Ie0CHpO-8fqAOUxTB3q5lLd4i0-X3KhVM_m55PZwk/edit?usp=sharing

https://docs.google.com/spreadsheets/d/1vWS4X0y7J9YvZLMWKckl8ty4NtpVZZTwC-woBiYkAtU/edit?usp=sharing

OFFBOARDING
http  //doc  google com/document/d/1lUJOfrK3HaYOIe4AP   RJDem5EZldyIUzn9oD8pk  nc/edit?u p   haring


**Brian** D. Blankenship
*Vice President, Business Development*



Association Management  | Rental Management
Buy & Sell  | Rent  | Property Maintenance

1464 We t Web ter Avenue
Chicago, IL 60614

Direct: 773.676.0840  | Mobile: 224.804.7692 | Main: 773.572.0880
Web: westward360.com | Email: brianb@westward360.com

Ann Marie Reilly

,

Tue 4:19 PM

I might have something else for kathy
Temporarily. Will let u know more tomorrow

Brian Blankenship

,

Tue 4:20 PM

not following...something else?

Ann Marie Reilly

,

Tue 4:22 PM

Yes another position in my division

Brian Blankenship

,

Tue 4:37 PM

but we are not replacing those hours.

Ann Marie Reilly

,

Tue 4:40 PM

For onboarding?

Brian Blankenship

,

Tue 4:42 PM

correct, or in general. we cut 24 hours plus Greg's 40 from our corporate salaries. So there should
be ▮ hours less payroll in investments, or over ▮▮▮ in payroll

Ann Marie Reilly

,

Tue 4:52 PM

i am not replacing any "onboarding" salary hours no

Brian Blankenship

,

Tue 4:53 PM

so you are separating Kathy's hours into two components? onboarding and other? And then
replacing the other hours?

Ann Marie Reilly

,

Tue 4:54 PM

I'm still working on my budget (and salaries) for 2022

Brian Blankenship

,

Tue 5:03 PM

The goal has been to consolidate processes and save payroll $. If we turn around and spend the ███ we saved then it makes all this effort pointless. It's been assumed Kathy's hours were███ hours for onboarding. Those hours would not be replaced. Technically, Investments already replaced Kathy's hours with the part time new hire, Shelia (?). If replacement hours have been approved, I'm not privy to those discussions If those hours aren't saved for the balance of 2021 and during 2022 then it makes this whole exercise pointless. Not trying to be a jerk here; just trying to make a point.

Ann Marie Reilly

,

Tue 5:13 PM

i have positions to fill.

Brian Blankenship

,

Tue 5:17 PM

I sent to you and Nathan a summary of Kathy's tasks that I was aware.  The non-onboarding tasks are to be absorbed by existing staff, not new hires.  Same with Greg.  I am absorbing some of the admin tasks and Nathan is taking on some of the new business leads.  Personally speaking its disheartening to hear we are adding more hours when I am absorbing tasks that I don't really want. We should just keep them both in place.

Ann Marie Reilly

,

Tue 5:21 PM

Thanks- I'm working closely with Eric and accounting on my budget. Appreciate you!

To:     Brent
From: Brian
Date:  October 3, 2021
**Re:     Conversation Update**

As mentioned earlier this week, I had a meeting with Nathan Friday at 3pm. <u>I share these notes with you in confidence.</u> This has a lot of detail, beyond my conversation with Nathan, so let's discuss more tomorrow in person.

**Marketing of realty services.** Explained I could spend weeks thinking about options but something is better than nothing. I suggested two approaches: (1) we take 10 Associations and begin an email marketing program for that group and (2) add a statement (Buying or selling, contact Westward360 at xxx-xxx-xxxx or online at realty.westward360.com) to any outbound communication to the HO. I would need someone with system knowledge (probably Shana) to figure out the details. My suggestion was not "approved"; he told me he didn't want his opinion to influence me one way or another. It's 100% up to me what to run with what I think is right. This is a new position compared to my earlier interactions with Nathan.

**Buildium Conversion.** Today was the first time he talked like it was going to happen. There was a call with Buildium last Friday; I heard about the call on Wednesday. I requested to join the call, but my request went unanswered. I mentioned to Nathan that from my research on Buildium, it could replace the RealtyMX and Top Producer software because Buildium supports rental listings and will syndicate leads. He said from his hour call with Buildium last week he didn't think my assessment was accurate. I explained to him there is no perfect system and we need to find the shortcomings. But then we need to find a way to live within the system's capabilities which means we may need to change the way we currently conduct business. Moving RealtyMX to Buildium is a major conversion and unrelated to the Propertyware conversion. Based on this discussion, there is limited interest in moving away from RealtyMX, and he's currently in the process of eliminating Top Producer.

He explained how three owned assets were going to convert to Buildium this month. The plan is to flush out the issues and figure out other systems it affects post-conversion. I asked if we were running a parallel test using Propertyware or is this a full conversion. I'll assume no parallel test. After everything gets figured out from the conversion, and Nathan approves, the remaining locations would be converted in one event. The expected conversion to Buildium is 1/31/2022 at the earliest.

There is a lot to unpack from above. First and foremost, as an operations guy to his core, the plan, or lack thereof, is ripe for errors and problems. I don't know much about the company systems or their integrations, but the conversion goal should have zero impact on the tenant, client, and financials. Nathan acknowledged there would be an impact with the tenant and owner portal; "it's okay to have a little disruption because what other choice do they have" is the wrong attitude. I began to ask "next level" questions, like I always do, but there was no interest in continuing this topic. I have a lot of experience with system conversions and there is no way you can set yourself up for success in less than 30 days. These are mission-critical systems that support the core business of the company. These are questions that popped into my head after our call; they have not been asked:

1. Are we going to run Buildium parallel with Propertybase? (I did ask this question)
2. Who is training the employees?
3. Are we using CAM employees with experience in Buildium?
4. How and who is managing the data transfer? Is any of it encrypted?
5. Post-conversion will we audit the system financials to ensure the ledgers and account balances match Propertyware?
6. Who is setting up Buildium pre-conversion?
7. Are tenants going to be required to input their credit card data in Buildium even though it's already established in Propertyware?
8. Will tenants lose the historical ledger data once they are converted?
9. Have forms and rental agreements been reviewed to work with Buildium (I'm sure the pre-populated fields will be different).

I'd suggest Nathan form a "conversion committee" with department representation (accounting, investments, IT, operations, PH, realty, etc.)  This will start to bring the issues to the table so they can be solved before converting.  Create a timeline to incorporate timing to solve identified concerns, technical issues, and staff, including PM & APM, training, converting three locations without an understanding of the conversion impact will be very disruptive for those locations and each department head.  Form the "conversion committee" in the next few weeks and then work towards running a parallel test.  The committee will need 45 days or more to get into Buildium, identify the issues and find a solution. This puts you in December and you don't want to start a mission-critical project around the holidays because staff is usually in and out during the month.  Start the parallel test beginning in January 2022 and run it for two months and then run only Buildium for one month.  During that month plan about the timing to convert the rest of the portfolio.   It would look something like this and this is a best-case scenario:

| | |
|---|---|
| October 15 - | Committee formed |
| December 17 - | Due diligence completed; make go or no go for parallel test |
| December 17 to Jan 3 - | Perform final set-up of Buildium |
| January 3 - | Begin Buildium and Propertyware parallel testing |
| February 28 - | End Parallel test |
| March 1 - | Run Buildium independently |
| March 1 to March 10 - | Final evaluation; results of parallel analysis. Go or no go for full conversion. |
| March 1 to March 31 - | Prepare for company-wide conversion.  Begin training programs for staff. |
| March 31 or April 1 - | Convert all properties to Buildium. |
| April 2 - | Conversion Complete. |

Converting RealtyMX to Buildium would require more considerations.  Timing will need to follow the conversion plan because a property must be on the Buildium platform before you can use the system.

The above schedule adds months to an initiative you want completed by 12/31/21 or 1/31/2022, at the latest.  Running Buildium only in November at three locations and then converting the remaining portfolio in December or January, is very aggressive.  The added two months in the above timeline will get you in a position of knowledge and save untold hours post-conversion.  I'd suggest the conversion and its plan be led by someone other than Nathan or Ann.  Shana would be an excellent choice; I would also be a good choice, but it would impact the current plan.

**Propertybase.** I have not spent much time in the application itself, but I understand its role and why it got added to the technology stack. Propertybase has the potential to be a fully functional CRM for Realty. This includes lead management and DocuSign for paperless contracts with clients. To take advantage of the Propertybase features, it will require some work on our side.

- Contact forms on realty.westward360.com need updated to Propertybase Webforms in order for web inquiries to post into Propertybase CRM.
- Portal syndication will need established in order to push and receive leads from various online portals.
- Front Desk integration is necessary with the Portal syndication. Once complete, Realty will be able to push listing and rentals to various portals, including Zillow and Realtor.com.
- DocuSign will need integrated in order to manage contracts and extension documents with clients.
- Workflows will need to be established for automated email notifications and email marketing.

It sounds as if Nathan is prepared to stay with Propertybase. I explained to him it will take time and money to get the system to function as he expects. But even then, there will be current processes that cannot be accommodated, and we will need to change our way of business to work within the boundaries of the system. He said he was willing to invest some money and would make a 2-to-3-year commitment to Propertybase. There is much more here to figure out before a plan can be developed.

**Greg.** I reminded Nathan that Greg has other responsibilities in the Investment department that are not related to new business or on/offboarding. I don't know what those tasks are, but they will need to be reassigned. After our meeting, I supplied Nathan access to the known Investment documents related to Greg's task, onboarding, and new business.

Westward360 holds Greg's brokers real estate license and Greg/Westward360 managed his parents apartment building. Personally, I'd tell Greg he needs to move his broker's license to another firm within 45 days and send a termination notice for the managed property and provide the required notice period from the agreement. This will ensure all ties are severed and there won't be anything lingering. Nathan does not want to address any of those topics at the time of layoff.

**Kathy's Current Responsibilities.** I also informed Nathan that I shared a list of Kathy's tasks/responsibilities earlier in the week, and I was surprised at the number of tasks she performs for the department unrelated to on/offboarding. Again, there are many tasks that need to be reassigned.

**KathyTaskReassignment**

**Brokerage.** He told me that Ashley was not going to step into Paul's role immediately. The last time he and I met he disclosed Ashley becoming the managing broker. He told me she was the third person he's championed for and stuck his neck out to get them - the other two times were the hiring of Ann and myself. (It was an uncomfortable discussion because I think he was expecting me to say something like thank you, but I didn't as I don't believe his comment was an accurate statement.) He expressed to me the importance of marketing realty services and improving Propertybase because the financial trends for realty are bad. He initially told me realty business/income has been flat for the past three years. Friday he told me the trend was bad and will only get worse looking out 60 to 90 days. This was discovered while he was reviewing financials with Ashley. Nathan was visibly concerned about the numbers.

(Note: GL 1402 of the 2021 Budget for Brokerage does not match the summary schedule. The summary does not include the 'Investment Commission' detailed on the 1402 schedule. I might be looking at it incorrectly.)

**Employee Pulse Survey.** I asked Nathan if he reviewed the summary sent to the Board from last week and he had not. I made him aware of two comments that he should review - Comment #15 and #22 in the last section. He began guessing who might have said those comments. I also explained to Nathan that I omitted the two comments from the summary I sent to Eric, Danny, Ann, Claudia and Sydney. I asked him if I should share with Ann directly and he said yes. I spoke to Ann Friday evening and sent her the comments. She also began to try and figure out who might have provided the comments. Nathan and Ann agree that #22 was authored by Greg. Nathan initially thought #15 was Jared but after he and Ann spoke they think it was authored by Jude. I have no way of confirming or denying their guess because the survey was anonymous, and I turned off all tracking functions. I'm a little concerned about future interactions with Jude if they assume he was the author.

**Facebook/Instagram**. Discussed how we could begin listing rentals and for sale property as posts on Facebook and Instagram. He wants to wait until Ashely gets settled in. (This could be a while because she does not meet the requirements to become a Managing Broker, he said. She needs more time in the broker role.)

**Additional Resources.** We talked about added resources and where they are needed. He did tell me he was willing to share an employee across department if that is what I recommend. I explained to him that I didn't want to commit to extra hours until post-change with on/offboarding and new business. He told me he was surprised I did not recommend a full-time PH resource to replace some of Greg's tasks. (This was the only conversation during our meeting where I felt he was setting me up to fail and to be able to say he had no involvement. He's never mentioned this comment before and there have been plenty of weeks for him to raise any concerns. This comment follows an email he sent me last week where he said he continues to be concerned about Greg's departure and the situation as a whole. When I pushed him for details, he backed off his original comment.)

Nathan expressed how short-staffed all his departments are today. It sounds like we are adding two PH resources for Realty, two for accounts payable, and several others. I didn't get any other details.

**Goals**. Overall, the meeting went well and was productive. I took the opportunity to let him know I had six major goals to focus on by the end of year. He didn't know the goals but recalls hearing about it during a Board meeting. I told him five of the six goals involved Investments at some level. Further, I said I hope he and Ann will help make these goals happen. He acknowledged the success of the goals will change the way we do business, and that was a good thing.

_____

I apologize for the length of this update. I would like to remind you the details about this discussion with Nathan are confidential and I ask that you not share. I want to have a relationship with Ann and him but any disclosure of these details will only set my progress with Nathan backwards. I'd appreciate knowing, in advance, if you are not able to maintain confidentiality. Let me know if you would like to discuss any topic further. Thanks for your support.

Amended Complaint | 23-CV-0867 | February 23, 2023

exchanges, over 130 chat messages in three different conversations, and three phone calls totaling 75 minutes. Not one time in any of that communication did he express a concern about onboarding or new business. In fact, he and I discussed being prepared with Greg gone on October 1 and I followed up our conversation the next day with copies of onboarding and offboarding processes (see attached). This evening you call me because Nathan expressed his nervousness and have a discussion with me assuming I was not keeping Nathan in the loop. This was an incorrect assumption. I find it very disturbing that the guy who oversees and is responsible for Investments is trying to beat me down when he should be supportive. This is not the first time he's taken this approach with me. Additional disturbing instances with Nathan include:

- Nathan stopped responding to Sydney when we requested an email list of Investment clients so we could send a marketing email about our attendance at the EXPO. He eventually stopped responding to Sydney and we sent out the message without including our Investment clients.
- I heard from an employee, other than Nathan, that a call was scheduled with Buildium on October 1 to such the Propertyware conversion. Given my involvement with Realty and Investment operating systems, I requested to be included in that meeting. I sent two requests only to be completely ignored.
- On October 4 I was invited by Nathan to a sales call he booked but it was not clear if it was an on-site meeting or virtual (no Google Meet credentials were included in the meeting). I literally spoke to Nathan in the office 30 minutes before the call and he wasn't confident the call was virtual. He said he would let me know. I emailed him 14 minutes after the expected start time and received a reply an hour later which said, "sorry. Was on the google meeting. i thought i included you there?" Words cannot describe how much that pissed me off.

I'm a very expensive person to prepare Nathan's management agreements and proposals, which he has already had me do. I cannot operate in the environment he creates. It's not healthy for anyone. The problem in Investments should be obvious – look at the people who did not succeed under him, the offshore staff refuse to work for Investments and look at the turnover! I understand the consequences of my position but I'd rather deal with this now because it will only get worse next week or next month.

Expressing my views like I have is problematic at multiple levels. My hope is this event will start to correct the problems that have existed long before I started. I've tried to remain respectful throughout but apologize for any statement that is not. People deserve better and if this event makes that happen just a little bit, then I'm glad to have taken this risk.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit X-5
# February 10, 2023

Case: 1:23-cv-00867 Document #: 6 Filed: 02/24/23 Page 232 of 254 PageID #:727

Amended Complaint | 23-CV-0867 | February 23, 2023

Good Morning Brian,

There's a lot here, I believe these are the issues you're bringing up. Please correct me if I missed anything.

1. HUD Hire
2. Fire/Dialpad
3. Communication
4. Kathy Termination
5. Ann and PROS
6. PH taking jobs/roles

Thank you for jumping in on the fire/Dialpad situation.

Brent

On Sat, Jul 31, 2021 at 8:09 AM Brian Blankenship <brianb@westward360.com> wrote:

Brent & Nathan -

I was a little surprised to learn late yesterday that we have hired a new employee with a partially undefined job responsibility (TBD).  It's a part time position working ▮▮▮▮▮▮▮ week with an annual salary of ▮▮▮▮▮▮  The job duty is to handle the HUD process for a recent portfolio of buildings we began to manage recently.  I have since learned no one in the company, except for Greg, has met her and his interaction was limited to exchanging documents.  Greg is one foot out the door yet we trust his judgement when making a hiring decision?

I'm a little more than surprised…I couldn't sleep much last night hence this morning email. Plus, I'm sure you heard already but there was a fire at a property in Chicago last night.  I noticed some funky things were happening at the call center around 930pm last night.  The call center was not accepting calls and callers were stuck in queue on hold (5 calls). At 955pm a bunch of calls came in at once and one of the calls was a Chicago Police Officer. He called four times and could not get connected to Glenn at the call center.  Thankfully he left a voicemail which I picked up immediately.  It was to inform us about the fire.  A third-floor apartment that was being renovated caught fire on the porch.  Nobody was injured.  I called Eric immediately and he took it from there.  I happened to be in the right place at the right time for sure.

I am trying to get people onboard with changes and the last thing I need is other people having their own agenda.  I do not know why I was not informed about this hire as I thought we were on the same page. This puts me in a very bad position when I am making recommendations to make us a better company. I am making decisions that others would not make for a long time.  Two employees who are aware that change is forthcoming have advised me that I may want to reconsider because the rest of the company will become afraid of me.  Some folks may see me like that but give me a little time to prove these are the right decisions when the result will pay off in spades.  I didn't join the company to win a popularity contest but if I am excluded from details like this, I could make the wrong decision.

I also learned that the decision was made to terminate Kathy M.  <u>I have not made that decision.</u>  Brent has said it multiple times and to multiple people, these are my decisions and I'll be held to task for this to be successful.  If you want Ann to make these decisions after she consults with Nathan, then maybe it's best

she makes all the decisions.  A different example: Ann has taken it upon herself to pursue maintenance work without even considering PROs.  She thinks some third-party vendors outperform PROs and since she's had bad experiences with PROs, she has held back business from going to PROs.  Then to take this even further she's been very vocal about her displeasure with PROs and has expressed this to her staff.  How can the company expect PROs to get the first bite of the apple when we tell managers to go around the PROs directive and obtain third-party bids.  Ann is a bit of a wild horse, controlling, and very aggressive and she wants everything her way and she wants it now.  I like Ann but she's gone a bit rogue on some things and whoever is her direct supervisor needs to tame her down.  She is losing a lot of credibility with others in the company because of her aggressiveness and doing things her own way without communicating or respecting others.

I am also perplexed why we are adding nearly ███████████████████████████████ ███████████████████████████████████ company cannot make this hire because there is a big risk, and if not handled properly, you will end up with a discrimination charge and fight it for the next two years.  We can't lay-off staff after we hire someone in advance of the lay-off and then turn around and give that new hire the job responsibility of the person we just laid off.  That causes employment risk and does not show well to the rest of the staff.  We also have risk if we terminate one of the longest tenured employees in the company and replace her with a new employee making ██████████ less performing the same job functions.  The company has even more risk in terminating Kathy and if I decide to make a change it will be handled delicately and properly.  She is over 40 which requires the employer to handle her termination differently.  Not only a risky move but our employees will see this happening and draw their own conclusion. So it needs to be handled carefully for visuals.  Others will think they are next. A lot of the staff already thinks the company's goal is to shift as many positions as possible, including their own, to the Philippines. I've met with a lot of people from the top down and it's a concern top down. We don't need to be feeding the fire with careless decisions.

Professionally speaking, it's a smack in the face when both Ann and Nathan knew staffing changes were planned but went a different way.  This is your company and I have tried to keep you both informed so I have your support or revise to take your feedback into consideration. I've been in many of the same meetings with both Ann and Nathan, plus 1:1 phone calls during the past three weeks. Yet a plan was devised and a conscious decision made to leave me out of the discussion.  I need to be on the same page with you both and I don't need an employee going behind my back because she has the support of Nathan. It's a fuck you with a cherry on top.

This response is probably not the best for my future career with Westward360 but I feel it's worth the risk because it's important for you to see I take this job seriously, command loyalty when the same is expected of me, and my constant quest to deliver an end product that makes you, the Board, and the Company proud to be an owner of Westward360.  I recognize the risks of our actions and I am protecting you.

This person who is scheduled to begin on Monday should not be hired.  If she was given a verbal offer at ███████████████████████████ it should be revoked in writing.  A change will not make our client (and her prior employer) very happy.  We're gonna say look at how much we collect in management fees and he keeps giving us business.  We gotta keep him happy at any costs.  I understand and have been in similar situations in the past.  This is more than management fees.  This is about your company and doing the right thing.

Please excuse any typos and bad grammar.  Thanks.

Brian

**Brian D. Blankenship**

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit X-6
# February 10, 2023

10/21/2021

To:     Brent
Cc:    Board of Directors, Eric Staszczak
Re:    Letter of Frustration 10/13/2021

---

The letter I provided you at 7:53am on October 14, 2021, was shared with all members of the Board of Directors and Eric Staszczak later that morning. You informed me of this during a phone call around 12:45pm, when you acknowledged receipt of the letter. The Board met sometime during the afternoon on October 14, 2021, to review and discuss. On October 14, 2021, you called me at 5:45pm to discuss further. The following is a recap and follow-up comments.

Three events were planned because of internal discussions:

1.) Brent is having a discussion with Brian (this was the call at 5:45pm)
2.) Nathan would reach out to Brian to arrange for a 1:1 discussion after the call with Brent
3.) Brent is coordinating a meeting between Brent, Nathan, Brian, and Ann to find common ground so we are in a position to work together

The instruction with my 1:1 meeting with Nathan was to find common ground because "productive grounds must be found or there will be a bigger issue." You felt common ground would be found since both Nathan and I want the organization to go from good to great. It was suggested that I approach the meeting with Nathan with an open mind and "owning" my letter. Further, admitting it was not the best way to handle the situation and I jumped to some conclusions. I will "own" my letter but do not agree it was mishandled nor did I apologize for making a conclusion using the information I had available.

Brent called around 4:30pm on October 15, 2021, to ask how my meeting with Nathan went. Nathan and I met at the office earlier Friday at 12:30pm. The meeting went fine but was mostly focused on facts that I was unaware for jumped to conclusion comments. This meeting did not address any of the underlying issues. I stand by my action of sending the 10/14 letter to my direct supervisor. This was the third time since July 14, 2021, that I've had a follow-up meeting with Nathan directly after expressing frustrations and/or concerns. If you review all three correspondences, you will notice the consistency of frustration and the questionable actions and comments. Obviously, the legitimate issues raised in the correspondence have not improved between July and October. Am I the only person to have concerns in working with Nathan? Am I the only person who has raised issues caused from questionable policies and actions? If so, then the problem must be with me, and I may be in the wrong place. But if I'm not the only person to have an issue, why haven't actions been taken place to address the concerns identified before now?

I was criticized for not handling my frustrations properly when in fact I did exactly as I was directed. I notified my direct supervisor and outlined my concerns and frustrations. When we first spoke by phone on October 13, you told me that you were not prepared to discuss at that time yet called me back within 15 minutes to say we should chat. That's when I decided to prepare the letter. I fully expected this to create a conversation between you and me. I did not send the letter to the Board of Directors or solicit for anyone else's comments. You didn't want to address the letter 1:1 until you involved the Board. Those were your choices; I did what I was asked to do when I became frustrated. Plus, my frustrations were current and occurring in real time so I don't know how I could have approached this any sooner than when

I did.  I also disagree with the position that I should've approached you instead of writing a letter.  I did approach the frustrations when we spoke by phone on October 13.  But I also know myself and I'm able to express my feelings in writing better vs. words.  Respectfully, there is nothing wrong with that approach.  I was told next time I get frustrated to come to you before I get too frustrated.  I did that this time and the previous two times as well.  I don't agree with your criticism about my handling, presenting, or approaching this event.  I did everything you previously asked me to do going forward this time.

During our October 15, 2021 call, the conversation was very critical of me, my actions, and my employment in general.  In fact, there were 13 points of criticism, some of it constructive, that you highlighted.  You mentioned two company failures and there were zero mentions addressing any concern about Nathan raised in my letter.  I'm not interested in rehashing all those points here, but I will respond to a few of the more bothersome critiques.

1.) You want to be told the truth.  I can only assume this comment was made because you feel I've provided a non-true statement.  I do not lie.  I've been accused of withholding facts at times, but never lying. I stand by EVERY comment made in all my communication about this subject.  If there is something you don't believe, tell me what it is and I will validate the concern.

2.) Your statement, "The Board is not going to look at me differently." I don't quite know what to say except to question why it was even said.  If raising issues supported with facts causes me to be looked at differently, then the Board needs some professional maturity.  As I've told you before, it's not easy presenting problems to the Board; disclose this information knowing its potential to negatively impact me should be appreciated.

3.) Politics.  It was suggested I become more aware of company politics and learn how to co-exist with them.  Sorry, but that's not for me.  As you and the Board know, I am not afraid to address a problem or situation head on and ignoring any politics or other noise.  I will get to the root cause and go from there.  I have never been a political guy and it served me just fine in my professional career to date.  I don't see that changing any time soon.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit X-11
# February 10, 2023

**Complainant Rebuttal to Employer's Response (the "Rebuttal")**
**Exhibit I**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**May 27, 2022**

**Timeline of Responsibilities**
All adjustments were made by Brent Straitiff.

| | |
|---|---|
| April 10, 2021 | Resume Submitted |
| June 24, 2021 | Offer accepted |
| July 14, 2021 | Start date |
| July 14, 2021 – July 30, 2021 | Onboarding Program (created by Straitiff) |

August 2, 2021 – September 10, 2021 "Period 1" – **No new business development tasks**
**Responsibilities**
- Propertybase
- Identified website issues from March 2021 deployment
- Implemented Google Analytics and Google My Business
- Multi-family property proposal and marketing development
- Client Retention & Employee Amnesty Program development
- Evaluate current CRM's; implement new CRM software
- Involve 3rd party consultant for Pipedrive adoption
- Marketing Department transition
- Staff for the Marketing Department
- Reputation Management Software adoption
- Call Center improvement and support for Jude
- Created and presented Workforce Realignment Plan
- Revised and completed Employee Happiness Survey
- Created and presented a Client Retention Program
- New Business Staff Recommendations
- Identify HR concerns; present to David Westveer
- Attend three (3) property tours
- Begin weekly Level 10 meetings (and prep work)
- Complete 3Q21 Rocks

September 2, 2021          Straitiff informs New Business Tasks will start Jan 2022

September 13, 2021 – October 14, 2021          "Period 2" – **No new business development tasks**
**Responsibilities**
- Focus on Straitiff's Six Priority Projects, due 12/31/2021
  - I was expected to take advantage of the time Straitiff freed up by delaying new business responsibilities.
- Progress or complete additional tasks unassigned by Straitiff
- EXPO coordination, setup and attendance
- Implement new staffing plan – Onboarding/Offboarding
- 2022 New Business Budget **("Exhibit RR")**
- 2022 Marketing Budget **("Exhibit RR-1")**
- Cross-marketing program for Realty discussion
- Quantified new business, operational, and administrative branded and non-branded printing needs.
- Investment New Business observations
- Developed a Press Release protocol and distribution list
- Began to consolidate how the Company and its affiliates order branded materials onto one platform.

Amended Complaint | 23-CV-0867 | February 23, 2023

**Complainant Rebuttal to Employer's Response (the "Rebuttal")**
**Exhibit I**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**May 27, 2022**

October 15, 2021 – December 2, 2021 "Period 3" – <u>**Assigned admin tasks for Investments**</u>
**Responsibilities**
- New staffing plan implemented for Investments
- Created a 12-month strategy for marketing to client list of Lieberman and Draper Kramer.
- Begin new business tasks for Investments (internal only)
- Inbound sales calls
- Qualify sales leads
- Provide marketing materials to qualified leads
- Give virtual presentations to qualified and interested parties
- Meet with prospective clients as needed
- Negotiate Management Agreements with new clients
- Coordinate takeover date with Owner and Onboarding
- Got involved with on-site staff, began to learn and understand that business with the goal of developing a marketing strategy for that product.
- OBC 2022 Budget Retreat & Presentation **("Exhibit A-3")**
- Employee Holiday Gift Program
- Holiday Card development for employees, investors, clients, and vendors
- Prepare website contact us forms for conversion to Pipedrive
- Define technical needs for IT to handle leads from website and allpropertymanagement.com
- Continue work on the six (6) priority projects
- Complete additional requests/projects upon request.
- 3Q2021 Rock Carryover Tasks

December 2, 2021           Employment Terminated

December 31, 2021                 Six (6) Priority Projects due

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit X-12
# February 10, 2023

Amended Complaint | 23-CV-0867 | February 23, 2023

**Fraud, Kickbacks, Self-Dealing, Undisclosed Profits**

Fraud, Kickbacks, Self-Dealing, and Undisclosed Profits are alleged activities that surfaced to my experienced eye in five months of employment. As these activities were discovered, investigated, and reported, the tactics and employees used to harass and retaliate increased causing for a worsening and hostile work environment. Additional questionable activities were either identified or I was informed by a current or previous employee. Many of these additional activities were related to activities in the Westward360 Realty division and Westward360 PROs with the balance in the Community Association Management ("CAM") division. This document contains no information related to these additional activities and they were not reported to Straitiff.

1. **Vendor Kickbacks – 360 Services**
   a. The company claims it is transparent and passes all savings to the property or owner. This is inaccurate based on the two claims noted above. However, the Company has an internal entity called 360 Services. This entity collects "kickbacks" from certain vendors detailed below. None of these "kickbacks" are disclosed to an investor or owner.

   b. The 360 Services entity collected kickback fees as summarized below. The 2021 Budget and YTD performance (as of November 30, 2021) is detailed in Exhibit NN-1. To show how this rolls up into Westward, review the schedule at Exhibit NN-2.

| 1604 - 360 Services | | | |
|---|---|---|---|
| | Vendor | Fee | YTD (11/30/2021) |
| 1 | Lakeshore Recycling | 7% of invoice | $48,123.45 |
| 2 | ITC | $4 per telephone line | $2,776.71 |
| 3 | Wintrust | Treasury less 75 basis points | $63,646.62 |
| 4 | Breea | $100 each invoice | $4,300.00 |
| 5 | McDonnell Energy | 25% of McDonnell commission | $20,475.35 |
| 6 | Servpro of Central Schaumburg | 10% of Invoice | $15,578.70 |
| 7 | NetVendor | $40 per vendor per year | $7,040.00 |
| 8 | Our Moving Concierge | Various per contract | $0.00 |
| 9 | Helios Visions | 10% of Invoice | $0.00 |
| 10 | A-Reliable Window Cleaning | 10% of Invoice | $3,799.26 |
| 11 | Personal Touch Carpet Cleaning | 10% of Invoice | $5,022.40 |
| 12 | Cortesi Law | 30% of tax appeal invoice | $0.00 |
| 13 | Franklin Energy | | $1,100.00 |
| 14 | One Call Install | | $600.00 |
| **Total Inflows** | | | $172,462.49 |

   c. One service is missing from the schedule is Rosenthal earnings split. Rosenthal kickbacks an unknown percentage, although believed to be 7.0%, of the total insurance business generated by the Company monthly. The Company requires all insurance to be funneled through Rosenthal including, but limited to commercial general liability, auto insurance, health insurance, errors & omission, worker's compensation, and professional liability. The 2021 Operating Budget indicates the budget for insurance and insurance related items

Blankenship vs. Outer Banks Capital, Inc.

exceeds $1,500,000. If these assumptions are accurate, the Company generates over $100,000 in "kickbacks" from Rosenthal but that also creates a major conflict of interest at many levels.

2. **Fraudulent Invoice Scheme**

a. On November 23, 2021, Blankenship identified a fraudulent invoice scheme in the Investment Division, which is led by Brown. The intent of the scheme is to capture unearned profit for Westward360. It appears there is a structured, routine, and fraudulent process that marks up certain third-party vendor and Westward360 re-invoices the vendor invoice by marking it up to 35% at the expense of the client. A comprehensive and documented process manipulates data so it will not be noticeable; the process disguises the profit taking mechanics so they are not visible on reports that are typically shared with clients and owners.

b. Refer to Supplement 1 – Fraudulent Invoice Scheme & Profit Centers

c. After discovering the fraudulent invoice scheme on November 23, 2021, and knowing it was a Brown initiative, I knew something had to change. The Company ignored my numerous and appropriate complaints about division issues, Brown and Straitiff failed to react professionally to resolve issues but they literally did nothing as CIO and CEO, respectively, of this Company to maintain a sense of professionalism. The hostile work environment created by Brown (and Straitiff later) was draining and nerve racking. To then find out Brown is stealing money from the Investment client without the client's knowledge or approval AND the CEO, as disclosed in the next section, is aware and tried to justify the fraud as a "service" makes the environment unworkable. The Company took no steps to provide the protections they disclose in the Handbook Pages 7, 13, and 14 ("ExhibitE-3") nor did they recognize the EEO protections that were in place from protected activities. With no protection, I had to protect myself and the only way to do that is to no longer work with Brown so I requested such again on December 2, 2021. My mental health and health in general had negatively impacted me because of my experience with the Company. I understand why employees in the past, who had issues with Brown, did not pursue because this process is challenging. Not only is Brown out front and center causing issues but you have Straitiff behind the scenes covering up Brown's behavior allowing Brown to continue. The reason Straitiff won't address any issue with Brown is because Brown is very emotional, requires constant positive praise, and needs recognition. Straitiff complies with Brown's needs to keep him focused on the multiple profit taking initiatives, including invoice fraud, to pad the Company coffers.

3. **Paycheck Protection Program ("PPP") Application Inaccuracies**

a. The various companies of Westward360 applied for Paycheck Protection Program ("PPP") and received two loans totaling $3,790,900 from a local bank under the PPP via the Small Business Administration ("SBA"). The Company appears to have provided inaccurate information when applying for the PPP. The loans were paid off in full by the PPP. Westward360 had a gain of $3,790,900 plus payroll savings. The payroll savings were generated by the Employer reducing every onshore employee, offshore employee, and independent contractor's performing tasks directed by the Company. All employees had their compensation reduced by 7.5% which generated approximately $51,000 in payroll savings per month. In addition to inaccurate payroll records, one of the terms of the PPP is the employer cannot reduce salaries if they accept a loan. See Exhibit NN-9 Paycheck Protection Program ("PPP") Fraud for a summary of events and Exhibit NN-5 SBA OIG Complaint contains the information provided to the SBA.

4. **Management of Client Funds in Westward360, Inc. Controlled Bank Accounts**
   a. Full control of the account
   b. Collect the interest earned on money that is not theirs
   c. Receive a kickback from the bank for keeping the account at Wintrust
   d. Other fees earned when directing new business loans, Association banking, mortgage/re-finance referrals, and debt on Everest investments

5. **Poor Cash Management**
   a. Late payments cause cash flow problems (over distribute since cash basis accounting)
   b. Late fees are paid by the client even when late payment is a result of Westward360's cash management deficiencies
   c. Utilities are disconnected
   d. Accounts go into collection for inaccurate balances
   e. Accounts payable process lacks clear details resulting in misapplied payments

6. **Force-placed Vendors.**
   a. The Company profits by forcing all properties to use a preferred vendor.  For example, Lakeshore Recycling is forced onto every new asset at the time of takeover canceling and ignoring any contract obligations or termination fees from a current contract. They require the owner or investor to absorb any fees, without disclosing this to them.  All financial business is coordinated with Wintrust, and it seems they have an interest in diverting all financial business to Wintrust given.  Every property is forced to obtain insurance, including worker's compensation, from Rosenthal.

7. **Undisclosed fees**
   a. The summary of Fees charged to clients in the Investment Division; there are more than 43 different fees and only five (5) of the Fees are disclosed in the management agreement ("Exhibit MM").  The remaining 38 Fees are individual "profit centers" for the Company.  None of those Fees are disclosed yet the Company charges the client account.  The profit from these fees is not represented in the above schedule.

   b. The Company expected Blankenship to provide misleading, deceptive, or fraudulent statements to current and prospective clients.  On October 17, 2021, Brown responded, "Overall, it's my strong opinion when explaining things you DO NOT give the client more information than they need." I refused to lie and mislead clients; Brown instructed me to not talk to any client, tenant, or prospective client.  On December 2, I informed Straitiff Brown, via email ("Exhibit E") was making the environment unworkable, and I could not lie to a client to which he responded by terminating my employment.

8. **Building Liability Coverage (Tenant Insurance) –**
   a. This is an insurance program that is force placed on every new tenant and gradually forced onto current tenants.  The Company created this program in early 2021.  As you can see in the exhibit, the Company got very creative to avoid compliance requirement ("Exhibit NN-8"). For new tenants, the insurance must be accepted at the time the lease is signed. The monthly premium is $12.00. To demonstrate the growth - after the first few months there were only 76 insurance policies but in June 2021 there were 275 insurance policies. At the end of September 2021 there were 835 insurance policies generating over $10,000 per month in premiums. Approximately 46% of the Investment rental portfolio had coverage as of

September 30, 2021. Brown's goal is to increase the penetration level to 90% by December 31, 2021. At 90% penetration, nearly 1,700 tenants will have this insurance force placed onto their accounts and generate over $20,000 per month. A tenant is forced to select this insurance even if they have their own renter's insurance policy.

b.  The program is administered by Rosenthal Bros., Inc. ("Rosenthal") with a reinsurer, Trisura Specialty Insurance Company ("Exhibit NN-4"). It appears the relationship with Rosenthal is with a single purpose entity ("SPE"), Everest Investments V LLC, and not with Westward360, Inc. or Outer Banks Capital, Inc. The Company retains all premiums and commission from this program and does not a have a revenue share with the owner or investor. At the end of the month, the Company informs Rosenthal with the number of active policies and then Rosenthal sends the Company an invoice. The $12.00 monthly premium is split: the Rosenthal invoice will charge $9.00 per tenant for one month's coverage. The remaining $3.00 is profit for the Company. I am unaware if or how Rosenthal underwrites this insurance plan. This program is not disclosed in the management agreement; the Company is generating profits from an asset they have no financial interest in and do this without a disclosure to the owner or investor. Based on my experience with tenant insurance programs, I was concerned about this program and how it was being sold. I attempted to bring my concerns to Brown as early as October 5, 2021, but they were discounted or ignored. On December 1, 2021, I sent Brown an email ("Exhibit NN-3") asking for documentation related to this program because I had a concern with how the company sold the service and how it was compensated.

9.  **Eviction Protection Plan –**
    a.  This is a self-insured program that charges the investor or owner an annual fee for the Company assuming the risk of a tenant placed by Westward360 into a rental apartment who becomes delinquent and gets evicted. If the owner or investor elected this program, then Westward360 will pay for the first $2,000 of expenses related to the eviction process. The annual premium varies widely and is not consistently applied but in general it ranges from $150 per unit annually to $75 per unit annually for larger multi-family buildings. Westward360, Inc. has collected nearly $60,000 from this program through November 30, 2021. The Company treats the premiums collected as 'cash' for accounting purposes and does not maintain a reserve for current or future claims. Another important distinction is the Company retains 100% of the premiums collected.

10. **Misclassified Employees.**
    a.  Reducing the Company's tax liability by (1) splitting employee compensation between W-2 and 1099 or (2) requiring certain z

11. **Ghost Invoicing.**
    a.  Refer to Supplement I – Fraudulent Invoice Scheme

12. **Automatic Recurring Maintenance Service Retainers.**
    a.  Refer to Supplement I – Fraudulent Invoice Scheme

13. **Shared Tenant Contact Information.**
    a.  Westward360 collects a significant amount of personal customer data in the operation of the business. The Company also retains historical data. This valuable data is shared between divisions using email marketing tools. However, the email is not compliant with

best practices.  For example, a Westward360 Realty independent contractor wants to promote brokerage (buy/sell) services to Westward360 rental tenants.  In this example, the Westward360 Realty independent contractor was provided access into the property management software used to manage rentals.  They access the system unattended and create a list of contacts using tenant data. Realty creates a email template in their system and sends the marketing email to the tenant.  Realty did not have the approval from the tenant to contact them but provided no information about how to unsubscribe from email.

14. **Real Estate Commissions.**
   a. Commissions are handled by Brown as he is the "managing broker" for the 25 to 30 independent contractors working at Westward360 Realty.  The following items HAVE NOT been deeply investigated by Blankenship but warrant attention.

# Blankenship vs. Outer Banks Capital, Inc.
# Exhibit X-13
# February 10, 2023

**Supplement 1 – Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

*The data within to validate the claim(s) was sourced from Company reports, data, and other methods. On December 16, 2021, the Employee notified the Employer that he was in possession of Company documents. This data has been and will continue to be shared with certain government agencies and interested individuals. The information provided to the DOL and OSHA was necessary to pursue the Complaint(s)I believe the Outer Bank Capital, Inc., Westward360, Inc, and Westward360 PC information retained supports the various Complaint(s) and that is the only reason it was retained. More specifically, no company data exists on a portable device and the data in my possession is securely stored in the "cloud". The information retained was properly accessed using the access rights granted to my logon by the Company. I used reasonable efforts to avoid confidential information, trade secrets, privileged documents, and HIPPA-protected information. A Whistleblower retaliation complaint was filed December 7, 2021, with the Department of Labor, OSHA ("Complaint").. Also, under Whistleblower protection, the information has been provided to other agencies for additional complaints. I believe the Outer Bank Capital, Inc., Westward360, Inc, and Westward360 PC information retained supports the various Complaint(s). Other than the information discussed above, I am not in possession of any additional Company property."*

**Initial Discovery – Invoice Fraud & Self-Dealing**

To respond to a client's question about an expense that was received in Investments on November 22, 2021, I reviewed general ledger, or **("GL")**, expense lines within Repairs & Maintenance and Contracted Services. I noticed the same payee, Westward360 PC, on several (I don't recall the sections category) for most of the GL entries, which is abnormal. I then looked at four or five other properties and generally noticed the same thing. Later the same day, I reached out to Spencer Baum, Director of Corporate Finance **("Baum"),** to obtain a copy of the chart of accounts for Cam and Investments in an effort to understand what I was looking at. And, the chart of accounts were needed for research as part of a program I developed, the Westward360 Guarantee **("Exhibit R-5")**. At 5:09 pm, Baum provided the chart of accounts for CAM (and corporate) but told me he did not have a copy of Investments. In a subsequent email, Baum told me he reached out to Tara Lindborg/Eason **("Eason"** or **"Lindborg")**, the independent contractor who serves as the Controller for Investments, for a copy.

Next, I performed a search using the term "Westward360 PC" on the Company's network, which is Google Drive, because this was the first time, I saw this company name. The results Google Drive provided were based on the access level I was authorized by the Chief Technology Officer **("CTO")**, Brawley Reishman **("Reishman")**. After reviewing a few of the results, I quickly realized something was happening given the documentation of a process defined as "Centralized Dispatch" (See **Exhibit MM-3, Exhibit MM-4, Exhibit MM-5, Exhibit MM-6" "Exhibit MM-7, and Exhibit MM-8)**. The documents made it clear that Brown was orchestrating a process that included creating false invoices payable to potential "shell" companies, inflating costs, and manipulating GL entries to generate profits. Further, there was evidence of Westward360 creating fraudulent invoices under multiple names, including Westward360 PC, Westward360 GC, and Westward360 PROs . According to the Office of the Illinois Secretary of State website's Corporation/LLC search, Westward360 GC and Westward360 PROs are not registered entities while Westward360 PC is an assumed name entity under Westward360, Inc.

At that time, I didn't investigate any further because I wanted to confirm my initial findings with a colleague. On November 24, 2021, I spoke with Staszczak and Tungul, who are two of the Company's longest-term employees and have a deep understanding through their involvement in the Company, about my discovery. They both told me they heard about a process that was being developed in Investments that I described. Neither had direct involvement, noting this was something Brown controlled. There was a collective agreement these findings were bothersome and, if accurate, meant Brown was stealing from clients for personal profit by creating fraudulent invoices, income statements and disguising the profit in one or more related companies. Again, if accurate, client income statements would be fraudulent, client funds misappropriated, inaccurate net operating income and cash flow reported to the IRS, and profits made by Westward360 from this scheme may not be reported as income.

Not fully understanding what or how the Westward360 PC company functioned, I investigated my findings further over the Thanksgiving holiday. The "Preferred Vendor" **("PV")** program was created by the Company in early 2021. The program has a list of vendors **("Exhibit II-3")** who receive business exclusively but discloses nothing about the Company profiting from that program. Nothing in Management Agreements Blankenship prepared and/or presented permits the Company to receive kickbacks by inflating the cost of service 15% to 35% from vendors the Company hired through the Preferred Vendor Program. Blankenship contacted two "preferred vendors", during the holiday, who confirmed they are not aware Westward360 was re-billing their services. One contact person, after a short moment to process our discussion, said that [Westward rebilling his services] made sense now that he thought about it. Disclosure and conflict of interest notices are not included in management agreement. The Company pays the vendor his invoiced charge while

Amended Complaint | 23-CV-0867 | February 23, 2023

**Supplement 1 – Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

the Company bill the client the inflated amount. In most situations, the Company marks up the invoice 25% and that 25% is profit for the Company. Specifically, I discovered that the Company was marking up vendor invoices, creating false invoices payable to an assumed named shell company, Westward360 PC, withdrawing money from client and investor accounts using the inflated and false invoice, and profiting from the delta between the vendor amount billed and the amount charged by Westward360 PC. Additionally, false invoices get created for:

- No charge ($0) invoices provided by Preferred Vendors
- Services not performed
- Maintenance retainers not implemented **(See Rebuttal Paragraph 17(b)(iii))**
- Other service contracts, such as janitorial services, that allow recurring billing but provide less service than contracted
- Securing annual, or long term, service contracts that get executed without competitive bidding because Westward360, inc. receives a "kickback" from the Preferred Vendor. See Fraud, Kickbacks, Self-Dealing, Undisclosed Profits.
- As the replacement for an actual vendor on invoices for certain services.

Each one of the above is another way for Westward360 to increase their profits. This is why Brown has developed a process around the false invoicing to ensure the scheme doesn't raise alarm bells with a client. This is an example of what was discovered.

To me, it seemed highly likely that the Company was effectuating a fraudulent laundering scheme by organizing Westward360 PC or Westward360 GC to pay vendors and then charging the clients at a higher rate through the Westward360 PC or Westward360 GC. These are high-level observations to give perspective of how big this fraudulent activity may be:

- The Company created an offshore "department" to perform the tasks associated with the fraud
  - Investment Operations Coordinator
  - The department had three (3) offshore employees and the fourth employee hired in December 2021.
- The Investment Division developed PowerPoint documents to train staff how to process third party invoice. See "**Exhibit MM-6" and "Exhibit MM-7"** detailing the steps necessary to perform the frauds well as step-by-step instructions to ensure the fraud is disguised from clients and investors. See "**Exhibit MM-3", "Exhibit MM-4", and "Exhibit MM-5"** (Note: additional documentation regarding this topic is available upon request.)
- Invoices get marked up approximately 15% to 35%.
- The fraud scheme could be expansive given the size of the portfolio and the number of invoices monthly.
  - The Investment Division processed 504 invoices in October 2021 payable to the three entities (Westward360 PC, Westward360 GC, and PROS) totaling $207,250. Specifically:
    - 398 invoices totaling $161,940 were billed by PROS for the Investment Portfolio. An unknown number of invoices were completed by preferred vendors but re-billed under PROS.
    - Two (2) invoices totaling $6,163 were billed by Westward GC for services provided by a preferred vendor. The amount of the mark-up is unknown but estimated to be 15% to 20% more than the amount billed by the preferred vendor.
    - 104 invoices totaling $39,145 were billed by Westward360 PC; all work was performed by preferred vendors but re-billed by Westward360 PC with a 25% mark-up.
- My research found 1,000's of invoices, beginning in February 2021, that were marked up and processed through this fraudulent scheme.
  - For example, the three Westward entities used in the scheme were responsible for 47% of total invoices and 49% of total expense for the entire division in October 2021.
- And according to my research, it appeared that the Company has transferred funds equal to the inflated invoice charge from the client's account into the Westward360 PC shell company account.

To circle back to Westward360 PROs, it appears there are a small percentage of the maintenance projects are performed by the Westward360 PROs staff. This is where the Company becomes super-greedy and show their arrogance in defrauding clients. Westward360 PROs submit the invoice for work they performed at a property using the billing rate

Amended Complaint | 23-CV-0867 | February 23, 2023

**Supplement 1 – Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

established.  The Westward360 PROs billing rate has a profit margin built into it already but the fraudulent invoice and markup scheme still marks up the invoice an additional 15% to 35%.

**The Company Re-Directs & Avoids**
In the Response, the Company tries to explain away the fraudulent invoice and markup scheme by redirecting the conversation two ways.  (1) To Westward360 PROs, the inhouse maintenance department.  I agree there is a benefit to most managed properties with the inhouse maintenance department, but that is not the discussion.  The invoice fraud relates to Preferred Vendors **("Exhibit II-3")** performing work at properties who then bill the property using a unique email address so the Investment Division can intercept the invoice to create a marked up fraudulent invoice for the property to pay.  During this process, the Company inflates the cost of Preferred Vendor invoice by 15% to 35% using a fraudulently created invoice that falsely states the service was performed by a Westward entity and directs the payment to that Westward entity.  (2) The Company acknowledges and discusses the construction management support fees, which are typically 3% to 5%, for negotiated or budget capital projects (typically over $3,000), as "marked up invoices".  They are talking about capital projects that require owner approval and are normally part of the annual budget process.  The fee is negotiated with the owner and is a percentage of the competitive bid and awarded capital project; in certain cases, Westward360, Inc. may serve as a general contractor.  See **General Contractor & Subcontractor section at Exhibit II**.  This process is unrelated to invoice the fraudulent invoice and markup scheme.  The fraudulent invoice and markup scheme relates to everyday expenses where Westward360 is entrusted by the Client to pay invoices on their behalf.  It is these types of invoices the Company is marking up and defrauding the Client.

The questions the Company has avoided to answer relate to the fraudulent invoice scheme where there are Preferred Vendors  **("Exhibit II-3")** who perform the work then Westward360 takes the invoice amount due from the Preferred Vendor and re-billed the Preferred Vendor billed amount and increases it by +/-25% by creating a fraudulent invoice. **("Exhibit II-1").**  Then they claim Westward360 PC or Westward360 GC or Westward360 PROs performed the work **("Exhibit II-2")**.  The vendor gets paid as he invoiced while behind the scenes Westward360 is disguising the fraud invoice they created so they can keep the 25% markup to themselves and be sure it is not visible to a client.  Below represents a sampling of invoices provided by a Preferred Vendor and the rebilling process as it involves multiple systems, including Propertyware and HCP, so the marked-up profit paid to Westward360 PC is hidden.  The Company goes out of their way to prevent owners from seeing the profit paid to the Company.

**Example of Processing a Fraudulent Invoice**
**Exhibit D** contains the letter sent to Straitiff on December 2, 2021.  This letter contains a "walk-through" of how the Company is committing the fraud.  Vendor X, who is a preferred vendor with Westward360, bid $2,500 for a repair project at Property Y and is awarded the work without competitive bidding the project.  Vendor X is allowed to perform the repair service at Property Y uninsured which puts the owner of Property Y at extreme risk.  When the project is complete, Vendor X submits their invoice for $2,500 to the Company for payment.  The invoice submittal process for Vendor X is different compared to any other vendor; they use a unique email address to submit for payment.  The invoice arrives and is sent to a Project Coordinator ("PC") for review and to process for payment.   The PC takes several administrative steps in Zendesk, Propertyware, and Strongroom AP and then produces a fraudulent invoice.  The fraudulent invoice is created in HCP and the invoice is payable to Westward 360 PC, Westward360 GC or Westward360 PROs for the original amount billed by Vendor X plus a 25% mark-up that is ultimately the profit Westward360 is generating for itself.  In the example, the PC processes the $2,500 invoice from Vendor X and generates an additional invoice, payable to Westward360 PC for $3,125.00 and the invoice states 'Work Completed by Westward360 PC'.   Vendor X is paid $2,500.00 but the funding of the $2,500.00 is different. The invoice normally gets processed with the Controller pulling money from Property Y directly to fund the check payment for Vendor X.  In this example, the Controller provides the fraudulent invoice to Property Y for payment.  The invoice is payable to Westward360 PC for $3,125.00 and not Vendor X.  In a process that splits this payment, $2,500 to the vendor and $625 to Westward360 as "profit" and involves structured descriptions and changing data on the invoice in Strongroom, the fraudulent invoices is paid to Westward360 PC.  Vendor X is paid $2,500 from Westward360 PC.  At the end of the month, the owner is given the Owner's Income Statement, which has been reformatted to disguise this process.  The Income Statement will have $3,150 charged to the appropriate general ledger ID but the general ledger has also been reformatted to show only the first row of the entry.  Therefore, the reason for a description to be a structured process.  The owner of Property Y will see Westward360 PC as the payee on the fraudulent

Amended Complaint | 23-CV-0867 | February 23, 2023

**Supplement 1 − Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

invoice for work performed by Westward360 PC for a total of $3,150.  $2,500 is paid to Vendor X and $625 remains in the Westward 360 PC account as profit for Westward360, Inc.  What you are looking at there in this example is fraud.

f the invoice scheme were a legitimate process there would be no need to create a false invoice and run it through the lengthy process designed to disguise the fraud.  The Company would pay the vendor invoice at the amount charged, following current and standard invoicing protocols, and then create and submit a separate invoice to the property for the Westward360 service charge (check payable to Westward360, inc.).  The Company currently prepares monthly invoices for each client for property management fees, allocation/chargebacks, and maintenance via PROs.  If this invoice fraud was a legitimate business practice there are existing processes to handle a Westward360 fee.  But they cannot use any approach that would reveal their profit to the client.  The scheme involves every system in the Company to support it.

**Paying Itself Without an Invoice - Invoice Fraud & Self-Dealing**
To further show the fraudulent intention of the Company to perform these activities, as an example, as of November 24, 2021, Westward360 did not have an invoice from a preferred vendor, Mike's Sewer and Drain, for a plumbing repair completed on March 22, 2021. But Westward360 PC created a false invoice for the vendor in HCP and created another false invoice, but this invoice was made payable to Westward360 PC and for an inflated amount. The property account had funds withdrawn on March 25, 2021, for the invoice payable to Westward360 PC at the inflated amount. It appears the vendor has yet to be paid the original amount because the original invoice has not been received. So not only did Westward360 collect the 25% markup, but they also withdrew the amount due to the vendor from the property account. The vendor has yet billed for the service but Westward360 pulled the funds and could be using those dollars in other ways.

The intention of the Company is obvious - Westward360 PC bills a client for a service that was never invoiced and then applies an increase to the false invoice, but they also retain the amount collected from the property and not paid the vendor.  Westward360's Agenda and desire to make more profits can be evidenced by 95 original invoices, dating back to February 2021 from preferred vendors, including ASAP Appliances, Cold vs Heat HVAC, Cortina HVAC, Mikes Sewer and Drain, Nilsson Industries, Splash Plumbing, and Ward Plumbing, which have not been received.  However, Westward360 PC has already billed clients an inflated amount using false invoices to the property; Westward360 PC has collected $19,673 on original vendor invoices totaling $15,960 with the original invoice missing. Westward360 PC inflated original invoice amounts 23.3% on this batch of 95 invoices and they have retained these funds since the vendor has not produced an invoice.

**General Contractor & Sub-Contractor Arrangement - Invoice Fraud & Self-Dealing**
Next issue to address is this general contractor and sub-contractor charade Straitiff proclaimed between Westward360 PC and the property managed yet there is no general contracting relationship with the normal course of business expenses Westward360 marks up.  This was one of the several reasons Straitiff tried to use as an explanation to what I saw.   There is not a single document that mentions that relationship and there are no agreements with the preferred vendors.  Where is the contract for each project?  Where is the agreement with the sub-contractor?  Why are sub-contractors allowed to work without adequate insurance?  Where are the lien releases for material purchases?  Then, why doesn't the same program exist for CAM; the same vendors are used across departments?  I'd encourage the DOL investigator contact a few of the vendors and request copies of subcontractor agreements and ask them if they provided their service as a subcontractor for Westward360 GC?  Westveer devotes an entire paragraph talking about this topic but his Response comments pertain to PROs.  Be aware that Brown will contact these vendors and give them "a story" to protect the invoice scheme.  He will provide them enough talking points to show there is a relationship.

**The Fraud Is Documented Part 1 - Invoice Fraud & Self-Dealing**
The Investment Division have created several training documents to detail the process of creating fraudulent invoices marked up to generate profits.  The documents detail how company systems are manipulated to hide the profit the Company is making.

> **Exhibit MM-3** -  Invoicing in HCP (Housecall Pro software)
> **Exhibit MM-4** − Dispatch Procedure ***USE THIS ONE***

Amended Complaint | 23-CV-0867 | February 23, 2023

## Supplement 1 – Fraudulent Invoice Scheme
## Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037
## November 1, 2022

**Exhibit MM-5** - Details on miscellaneous topics
**Exhibit MM-6 –** Invoicing.
**Exhibit MM-7 –** Operations Coordinator Work Flow

Below represents two months of the fraudulent invoice process. The full document **("Exhibit NN-7")** will provide an example of the invoice volume that is being manipulated. The document has six (6) data points that need to be explained:



1 – Zendesk # - this is the first step in the process to get a vendor invoice processed and paid.
2 – Vendor Charge – this is the amount the vendor charged for select work at the Building Address Serviced.
3 – Vendor PW – this is the vendor number assigned by PropertyWare.
4 – Owner Billed Amount – the inflated amount that Westward360 PC will charge the Building Address Serviced.
5 – Owner Invoice/HCP – this is the new invoice number associated with #4.
6 – Paid Under – this is the false entity that bills the property the Owner Bill Amount.

To detail the first line of information referenced - ASAP Appliances performed work at 2237 N Kedzie and billed Westward360 $99.00 for the service. The Preferred Vendor sends an invoice to an email address that bypasses the Westward360 accounting department and is received directly into "Centralized Dispatch" in Investments. The offshore staff Brown has working on this fraud then adds the vendor invoice into Propertyware for $99.00 payable to ASAP Appliances. The amount of the new invoice will be adjusted to follow a general guideline of a 25% increase over the vendor's invoice. The Westward360 falsely increased the amount due by $26.00 to $125.00. In HCP, the staff creates a fraud invoice $125.00, payable to **Westward360 PC** for work performed by Westward360 PC at 2237 N Kedzie; this disguises the actual vendor who performed the service and allows Westward360 to profit $26.00 from this single invoice. ASAP Appliances is paid $99.00 via Propertyware using the Westward360 account. Next, the fraudulent invoice payable to Westward360 PC gets processed and paid. The money is pulled from the 2237 N Kedzie with Westward360 PC getting paid $125.00. After the trickery Brown performs, or presumably the offshore staff, to hide certain details on the GL by allowing one line of text. This detail flows to the general ledger, owner's statements, and check registers. The false invoice collected $125 payable to Westward360 PC. With the invoice paid by the property, the Company then pays ASAP Appliances $99 via the Westward360 PC account. This leaves $26.00 in the Westward360 PC account which ultimately is paid out. I could not determine if those funds roll up into a different account or if the funds are distributed to the Board members/Owners.

Everything described so far is the handling of one invoice **("Exhibit II-10")**.

| Date | ZenDesk | VENDOR | Building Address Serviced | VENDOR CHARGED | VENDOR INVOICE | WW360 BILLED | WW360 FRAUD INVOICE | WW360 MARK-UP $ | WW360 % | Paid under |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/9/2021 | 410650 | ASAP Appliances | 2237 N Kedzie Blvd #1 | 99.00 | 94939 | 125.00 | 367943 | 26.00 | 25.0% | Westward360 PC |
| 2/10/2021 | 412819 | ASAP Appliances | 1339 W Early Ave #1R | 99.00 | 95028 | 125.00 | 368136 | 26.00 | 25.0% | Westward360 PC |
| 3/1/2021 | 424120 | ASAP Appliances | 1662.5 W Farwell Ave #2N | 276.78 | 94938 | 345.00 | 369116 | 68.22 | 25.0% | Westward360 PC |
| 3/5/2021 | 406042 | ASAP Appliances | 842 W Barry Ave #G | 133.10 | 94533 | 165.00 | 367635 | 31.90 | 25.0% | Westward360 PC |
| 3/5/2021 | 406293 | ASAP Appliances | 2134 W Arthur Ave #1S | 165.66 | 94531 | 205.00 | 367068 | 39.34 | 25.0% | Westward360 PC |
| 3/5/2021 | 406231 | ASAP Appliances | 451 W St James Pl Unit 2 | 174.00 | 94530 | 215.00 | 367679 | 41.00 | 25.0% | Westward360 PC |
| 3/8/2021 | 408720 | ASAP Appliances | 3127 N Racine Ave #3 | 99.00 | 94543 | 125.00 | 367813 | 26.00 | 25.0% | Westward360 PC |
| 3/8/2021 | 408999 | ASAP Appliances | 1330 N LaSalle Dr #303 | 99.00 | 94541 | 125.00 | 367809 | 26.00 | 25.0% | Westward360 PC |
| 3/9/2021 | 413368 | ASAP Appliances | 2235 N Kedzie Blvd #1 | 99.00 | 94563 | 125.00 | 368239 | 26.00 | 25.0% | Westward360 PC |
| 3/9/2021 | 410884 | ASAP Appliances | 1019 N Paulina St | 99.00 | 94562 | 125.00 | 368043 | 26.00 | 25.0% | Westward360 PC |
| 3/9/2021 | 421004 | ASAP Appliances | 4110 RIchmond St # | 111.68 | 94558 | 140.00 | 368898 | 28.32 | 25.0% | Westward360 PC |
| 2/10/2021 | 412049 | ASAP Appliances | 5419 S Drexel Ave #1S | 174.00 | 94998 | 220.00 | 368041 | 46.00 | 25.0% | Westward Pros |
| 3/4/2021 | 406342 | ASAP Appliances | 1457 N Washtenaw | 157.55 | 93976 | 200.00 | 367607 | 42.45 | 25.0% | Westward Pros |
| 3/4/2021 | 407555 | ASAP Appliances | 530 N Lakse Shore Dr #909 | 119.00 | 93956 | 150.00 | 367657 | 31.00 | 25.0% | Westward Pros |
| 3/4/2021 | 406503 | ASAP Appliances | 1662.5 W Farwell Ave #3N | 105.57 | 93954 | 130.00 | 367576 | 24.43 | 25.0% | Westward Pros |
| 3/5/2021 | 408823 | ASAP Appliances | 2649 W Altgeld St #1 | 176.61 | 94537 | 210.00 | 367810 | 33.39 | 25.0% | Westward Pros |
| 3/5/2021 | 408241 | ASAP Appliances | 1546 N Mohawk St #1 | 206.65 | 94536 | 260.00 | 367714 | 53.35 | 25.0% | Westward Pros |
| 3/5/2021 | 409216 | ASAP Appliances | 7339 S Coles Ave #G | 59.00 | 94535 | 70.00 | 367807 | 11.00 | 25.0% | Westward Pros |
| 3/5/2021 | 408258 | ASAP Appliances | 2535 W North Ave - CA LAundry | 115.66 | 94534 | 145.00 | 367692 | 29.34 | 25.0% | Westward Pros |
| 3/8/2021 | 410825 | ASAP Appliances | 4737 N Harding Ave #2 | 99.00 | 94557 | 125.00 | 367938 | 26.00 | 25.0% | Westward Pros |

**The Fraud Is Documented Part 2 - Invoice Fraud & Self-Dealing**

Amended Complaint | 23-CV-0867 | February 23, 2023

**Supplement 1 – Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

Now, let's review one (1) vendor. ASAP Appliances billed 497 invoices February 2, 2021 to October 21, 20211 to 393 units totaling $58,079. Of these invoices, 49, or 9.8%, were No Charge invoices for a variety of reasons. But, Westward360 issued invoices for 26, or 53%, of the No Charge invoices. This created an additional $5,677.00 in pure profit for Westward360 by using a No Charge invoice from a preferred vendor. Westward360 also created 24 invoices for projects completed by ASAP Appliances without an ASAP Invoice; There must be a reason the vendor had not submitted the invoice. It looks like Westward360 wanted to maximize profits so they billed it themselves. I am unable to determine the exact financial impact but I'd estimate Westward360 collected and retained over $3,500.00. Below are a few examples showing the steps Westward360 takes to profit from their deceptive efforts.

The following summarize invoices and the fraudulent financial gain generated from a single preferred partner, ASAP Appliances, between the period February 2, 2021 to October 21, 2021:

| | | |
|---|---|---|
| **Billing by Preferred Vendor** | | |
| ASAP billed invoices | 424 | $58,079.00 |
| ASAP No Charge invoiced | 49 | $0.00 |
| ASAP missing invoice | 24 | $0.00 |
| **ASAP Total Invoices** | **497** | **$58,079.00** |
| | | |
| **Re-billing same invoices by Westward360** | | |
| Westward360 rebilled invoices | 424 | $71,855. 75 |
| Westward360 No Charge rebilled* | 26 | $5,677.00 |
| Westward360 No Charge rebilled | 23 | $0.00 |
| Westward360 Missing Invoice rebilled* | 24 ` | $3,500.00 |
| **Westward360 re-billed invoices** | **497** | **$81,032.75[1]** |
| | | |
| Less: Amount paid to ASAP | | ($58,079.00) |
| | | |
| **NET PROFIT $ TO WESTWARD360** | | **$22,953.75** |
| **NET REBILLED % FOR PROFIT** | | **39.5%** |
| **NET REBILLED $ FOR PROFIT/INVOICE** | | **$46.18** |

[1] – rebilled to property/client by either Westward360 PC or WestwardPROs. False invoice claims service was performed by Westward360 PC or WestwardPROs

**The Fraud Is Documented Part 3 - Invoice Fraud & Self-Dealing**
Upon inquiry on November 24, 2021, Brown provided Blankenship a sample PDF of client reporting packages and another PDF of detailed financial reports that are not shared with clients because they provide too much detail. These were provided on December 1, 2021. Investment clients do not regularly receive a monthly report package, but when they receive one it's been modified before distribution. Investment Division cannot send a general ledger for the month or a check register because if they did it would disclose fees the Company collects that are not identified in the management agreement. The client will also see the Company transaction that transfers funds collected at the property level and see the line item where the Company records the profit from markup invoices. The client package consists of one document – the Summary or Standard Income Statement ("**Exhibit MM-12**"). The detailed income statement is not shared ("**Exhibit MM-11**"). He stated there were "obvious risks" in sharing too much information. Detailed and. See exhibits for additional notes. By comparison, Income statements are provided to owner/clients monthly in the CAM Division that include a check register and general ledger , among other reports. A sample CAM monthly package is provided at **Exhibit MM-13.**

**Profits Are Significant - Invoice Fraud & Self-Dealing**
The Company is taking advantage of situations that blur the lines of authority. While the targeted invoice markup ranges 15% to 35%, Westward360 expands their thievery beyond simple markups. One of the many reasons they divert Preferred Vendor invoices to "Centralized Dispatch" is so the offshore team can scrutinize each invoice further seeking additional profit opportunities. This is where they manipulate $0.00 Preferred Vendor invoices to an actual invoice and create

Amended Complaint | 23-CV-0867 | February 23, 2023

**Supplement 1 – Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

invoices out of mid-air for unbilled services.  This allows them to further enhance their profits on the Preferred Vendor.  In this example, one Preferred Vendor generated $22,953.75 in profit for the Company in eight (8) months via these fraudulent practices.  **\*Billing for no charge vendor invoices and vendor invoices directly, the Company created an additional profit of $9,177 which is 40% of the Net Profit!**  This is explanation enough for the reason why Brown is expanding the offshore department orchestrating this fraud.  In this example, Brown paid 50% of the annual salary for one employee in the Philippines by rebilling $0.00 invoices.

The single most important question the DOL should ask the owner  is "are they aware Westward360 offers a service that marks up third-party vendor invoices and the mark-up becomes profit for Westward360."  Then, "Has this service benefited you?"   The Company is providing this service for its own gain.  If the Company would be transparent, there is not a single client who would agree to using this "service" if they knew their property management company was marking up third-party invoices 15% to 35% and keeping that revenue for itself.  If finding a good vendor to perform service(s) at property managed by Westward, then, maybe, the Company should examine its own processes to find efficiency.

The Company can keep telling itself what it wants to rationalize the fraud and claim the whole scheme is untrue and without merit but a fraud is a fraud.  The Company is defrauding clients.  The Company is violating Professional Standards industry-related associations and organizations.  The Company lacks 'best practices' standards and has taken fraudulent markups to a whole new level with billing for $0.00 invoices.  Westveer claims Blankenship has the *"complete inability to understand the Company's structure or service offering."* I am experienced and have seen fraud/theft of all types during my professional career and identifying the invoice scheme happened because I do understand the company structure.  Blankenship identified the invoice fraud and reconstructed how the Investment Division marked up invoices and how they disguised the profit on the general ledger.  The complex process was defined in the Complaint filed.  To investigate, outline and provide the evidence is a result of Blankenship's understanding and experience. **Interestingly, the Company made NO comment and explained NOTHING about these fraud accusations detailed in the Complaint.**

*Suggestion to the DOL and other Investigators: A simple exercise of contacting random vendors and ask them about their Westward360 experience with this new service would flush more issues, as I did with the two phone calls I made as part of vetting the fraud before presenting to Straitiff.*

I've collected information from four (4) random Preferred Vendors and summarized the various critical data points below to highlight volume and profits.  **Vendors 2, 3, and 4 HAVE NOT been analyzed to the same level as Vendor 1 so the Profit $ and Profit % for Vendors 2, 3 and 4 are UNDERSTATED.**

| Vendor | Period | # Inv | Vendor Billed | Client Paid | Profit $ | Profit % |
|---|---|---|---|---|---|---|
| **1. ASAP Appliances** | 2/2/21 – 10/21/21 | 497 | **$58,079.00** | **$81,032.75** | **$22,953.75** | **39.5%** |
| 2. Mike's Sewer | 4/8/21 – 8/21/21 | 22 | $5,300.00 | $6,497.75 | $1,197.75 | 22.6% |
| 3. Splash Plumbing | 2/4/21 – 11/24/21 | 334 | $85,600.00 | $104,404.50 | $18,804.50 | 22.0% |
| 4. JH Carpeting | 9/27/21 | 1 | $6,790.00 | $9,600.00 | $2,810.00 | 29.2%\* |
| **TOTAL** | | **854** | **$155,769.00** | **$201,535.00** | **$45,766.00** | **29.4%** |

*\*-example of a single transaction*

**Westward360 generated $45,766 in profit $ from marking up 854 Preferred Vendor invoices, or nearly $54 per invoice.** (This amount is understated for the reasons noted above).

**In the summary above and continuing with ASAP Appliances, Westward360 generated $14,220.85 in profit $ from marking up the vendor price during the period.**

- **ASAP Appliances billed a property an average amount of $136.98  per invoice and Westward360 re-processed the invoice by creating a new, fraudulent invoice with an average markup of $32.49 per invoice.  But then Westward360 further enhances their profit by targeting the 73, or 17% of the total, $0.00  invoices provided by the Preferred Partner. Over 25 $0.00 invoices got re-created with an amount due and, incredibly, billed to the Client.  This generated an additional $9,177 in profit for Westward360 as none of the amount collected was paid to the Preferred Vendor.  For ASAP Appliances YTD, I estimate the Company generated $22,935.75 in profits during the period from their illegal, and undisclosed invoice   fraud scheme**

Amended Complaint | 23-CV-0867 | February 23, 2023

**Supplement 1 – Fraudulent Invoice Scheme**
**Blankenship vs. Outer Banks Capital, Inc. Case #5-2330-22-037**
**November 1, 2022**

This is fraud and anyone should see it for what it is – fraud.  It's a violation and illegal process at many levels.  Ignore all the numbers and assumptions and think of the fraud this way – Investments is marking up invoices to generate profits.  100% of the invoices are fraud from a growing group of Preferred Vendors.  Not only are they marked up, but they also misrepresent who performed the service on 100% of the invoices.  The Owners of this enterprise are literally generating millions of dollars.   Brown has orchestrated the conversion and adoption of fraudulent activities by controlling the flow of information through one point of entry, created an offshore department focused on re-creating invoices, eliminated the separation of duties between accounting/finance functions and other departments, and has a 1099 independent contractor serving as the Controller for the Investment Division who reports to Brown.

All of this allows Westward360 to expand their thievery beyond simple invoice markups, it touches everyone and everywhere with Brown driving the "gray train".  Brown has convinced many of his onshore and offshore employees this process is acceptable; he's forced them to participate in a fraud.  Brown has convinced the Controller of the Investment Division to commit this fraud by paying fraud invoices to Westward360 payees and then using system tricks and modified income statements to disguise the theft and fraud.

Regarding the Controller, this "employee" is not an employee.  The Company recognizes her as a 1099 independent contractor and she is in Michigan.  First, the Controller can in no way be a 1099 "employee".  A Controller plays a critical role in separating the duties between accounting and operations.  The professional Controller is in effect neutral and practices Generally Accepted Accounting Procedures **("GAPP")** or a modified version thereof that is created to meet the needs of the business.  These modifications require documentation and executive-level approvals and often require the review of the Company's outside accounting firm. Documentation and approvals are paramount given the Company's contractual obligations to clients or investors for annual audits or audits related to any client or investor lawsuit.

In most organizations a Controller reports  to a Chief Financial officer, or another senior level position.  The Company's CFO, Westveer, is not involved with any function within the Investment Division. Instead, the Company has the Controller reporting to Brown, who is the Chief Investment Officer.  The Controller is committing fraud and knowingly pulls money from client accounts for payment on these fraudulent invoices into the Westward360 PC account; the Controller should pull client funds based on the vendor invoice and pay the amount due from the vendor invoice. The Company, or Brown exclusively, directs her duties and I'd bet that she lacks the third-party insurance that covers her mistakes while functioning as a 1099 independent contractor. Classifying this position as a 1099 "employee" allows the Company to avoid registration as an employer in Michigan, shift payroll burden to the 1099 employee, extend the Company's group health insurance option to an ineligible "1099 employee" but prevents the Company from providing proper insurance, including EPL and D&O, for its protection as well its contractual obligations.   The investigation should look at her activities hard and, I suspect, the level of fraud she knowingly commits is criminal just like Nathan Brown's involvement and direction.

The irony of it all – on November 11, 2021, Duni emails Blankenship **("Exhibit YY-1")** about the Westward360 Guarantee concept that was presented to the Board **("Exhibit R-5")** which led to email exchanges, that included Straitiff, about a competitor, Phoenix Rising Management **("PRM")**. Straitiff requested Blankenship research to see what information he could find about a lawsuit involving them.  The following day Blankenship provided Duni and Straitiff copies of two major lawsuits and various documents.  See **Exhibits ZZ-5, ZZ-6, and ZZ-7.**  PRM had been sued by multiple community associations they manage for fraudulent practices and deceptive profit centers.  The accusations are similar to the findings Blankenship discovered during his term of employment with the Company.

**||||| The Remainder of this Page is Blank |||||**